**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Kraig J. Marton (003816)
kjm@jaburgwilk.com
Jeffrey A. Silence (029143)
jxs@jaburgwilk.com

Attorneys for Plaintiff Thacker

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Thacker,<br><br>    Plaintiff,<br><br>v.<br><br>GPS Insight, LLC; Robert Donat, individually,,<br><br>    Defendants. | Case No. 2:18-cv-00063-DJH<br><br>**PLAINTIFF'S BRIEIFNG RE UNREISOLVED DISCOVERY ISSUES ARISING FROM COURT-ORDERED MEET AND CONFER**<br><br>(Assigned to Honorable Diana J. Humetewa) |

In a minute entry (Doc. 69), the Court ordered the parties to meet and confer to discuss Plaintiff, Jeremy Thacker's ("Jeremy") requests for documents that he deemed relevant in his June 2018 letter to Defendants. The Court's minute entry stated that if the parties were unable to resolve reach an agreement as to any of those 45 requests, Plaintiff may submit briefing addressing those unresolved requests. The Court then entered a minute entry (Doc. 87) denying Plaintiff's *Motion to File One Consolidated Discovery Motion* and granting Plaintiff until August 20, 2018 to submit this Briefing. Plaintiff hereby submits that briefing.

**I.  Background**

Defendant Robert Donat ("Donat"), the CEO and owner of Jeremy's former employer, Defendant GPS Insight ("GPSI"), terminated Jeremy because he was jealous

of Jeremy's romantic relationship with a female employee (Kristin Lisson) with whom Donat previously had a romantic relationship. When Ms. Lisson made it clear to Donat that she was not interested in rekindling her romantic relationship, Donat retaliated against Jeremy and Ms. Lisson and ultimately directed that they be terminated (within about a week from each other). Defendants claim that Donat was not involved in the termination decision and that Jeremy's two managers terminated him because of alleged performance issues.

Jeremy has asserted claims for sex discrimination and unlawful retaliation under Title VII. Jeremy has also asserted a defamation and false light claim against Donat based on statements that Donat made about Jeremy in his angry fits of jealousy before and after terminating him including that he is a "felon" who "stole" money from GPSI and that he has "herpes."

Jeremy seeks lost wages and front pay in the amount of $2,838,720. He also seeks punitive damages, emotional distress damages, damages for harm to reputation, and attorney fees. One of the factors in determining the amount of his lost wages is Amerisure, which is a business relationship that Jeremy was responsible for nurturing for over 2.5 years, beginning early on his employment with GPSI in 2013. In January 2016, Jeremy was informed that Amerisure may refer up to 9,000 units over the next 3 years. This would have resulted in Jeremy receiving a commission of as much as $648,000.

During that same week, Jeremy was offered a promotion to the Government Sales Team. Jason Walker, VP of Sales (and one of Jeremy's managers), told Jeremy that he wanted him to concentrate on the Government Sales Team, but he would work out something "fair" on Amerisure, like he had for David Pope with Epicor and Josh Schwartz with Wheels. Epicor and Wheels are large non-governmental referral sources that Mr. Schwartz and Mr. Pope had worked on for years before moving to the Government Sales Team.

2

141296755.1

Back in January 2015, Mr. Walker sent a company-wide email stating that Mr. Pope and Mr. Schwartz would be allowed to service their large non-governmental clients (Epicor and Wheels) and receive full commission while working in the Government Team. Mr. Walker then confirmed in an email to Jeremy immediately afterward that he too would be afforded the same opportunity, by being allowed to continue to service Amerisure's referrals and receive full commissions on those referrals.

Based on Mr. Walker's oral and written promises and GPSI's pattern and practice of allowing Mr. Schwartz and Mr. Pope to continue to service their large non-governmental clients while working on the Government Team, Jeremy believed that if Amerisure actually referred a sizable number of units (i.e., approximately 500+ units), he would be allowed to continue to service Amerisure and receive full commission for those sales. Instead, Jeremy was paid <u>nothing</u> for Amerisure, despite the oral and written assurances he would be treated the same as Mr. Schwartz and Mr. Pope. Jeremy maintains that but for the unlawful retaliation and discrimination, he would have been allowed to service Amerisure's referrals and receive full commissions, just like Mr. Schwartz and Mr. Pope.

In deciding issues of relevance and proportionality with respect to Jeremy's remaining requests, the Court should consider that Jeremy has produced roughly 95% of the unique documents and has spent hundreds of hours searching and producing responsive information. He disclosed the entirety of his medical records and prescription history for the last ten years. He produced thousands of text messages with Ms. Lisson and GPSI employees. There is nothing Defendants have asked for that he has not produced, except (i) to subject himself to a harassing IME, which this Court rejected and (ii) Defendants' request that he ask his current employer to produce any and all "HR or interview notes" that it may have on him, if any. The case law is clear that this kind of request is harassing and improper because it could jeopardize the party's employment. Jeremy, however, produced all of his pre-employment

3

communications with his current employer and every document, in his possession, related to his current employment that Defendants requested.

Defense counsel, Stefan Palys, represented to this Court at the telephonic conference on July 26, 2018 that Defendants produced more than 30,000 items (Doc. 82-1 7:23). 29,597 of those items are comprised of Jeremy's **entire** GPSI email account, which are chock full of useless information that has no relevance to this case. The truth is that Defendants have disclosed only a total of around **250 unique** items (excluding the documents they received in response to their subpoenas and excluding the unusable Slack messages provided August 16, 2018), whereas Plaintiff produced almost 5,000 unique items. "Unique" means an individual document that neither Jeremy nor Ms. Lisson had already disclosed. Many of these documents were company policies that were not even in place during Jeremy's employment.

Jeremy will be seeking sanctions for these and other discovery violations in separate motions. The purpose of this briefing is to have the Court decide whether Jeremy's unresolved discovery requests are relevant and proportional now that Defendants have participated in the court-ordered meet and confer and refused to produce many of the requested documents. Jeremy, however, wanted to provide the Court with at least some high-level statistics about Defendants' production in deciding issues of proportionality.

Jeremy also requests that the Court decide whether Defendants should be sanctioned for refusing to produce these requested documents. Jeremy has incurred significant fees seeking these documents and has been ignored at every step. Also, depositions for GPSI's five key employees will be taking placed between August 22, 2018 and September 5, 2018. Defendants have refused to allow Jeremy to reschedule these depositions pending the Court's ruling on these requests, so Jeremy has no choice but to proceed as scheduled because the deadline for taking depositions is August 24, 2018.

4

Assuming the Court agrees with Jeremy that his requests are relevant and proportional and orders Defendants to produce these documents, Jeremy will have to retake these five depositions. Jeremy will have also been denied the opportunity to send written discovery requests to follow up on the documents he receives because the deadline for written discovery has already passed. The wasted attorney fees and denial of access to key information throughout the close of discovery has been highly prejudicial to Jeremy.

Footnote 1 of the Court's Scheduling Order states, "General Order 17-08 implements the MIDP and should be reviewed carefully. It requires parties to timely supplement their MIDP responses as new information is discovered. **Parties who fail to timely disclose relevant information will be precluded from using it in the case and may be subject to other sanctions. Parties who unreasonably postpone disclosure of relevant information to the end of the discovery period will also be subject to sanctions**." (Doc. 23) (emphasis ours).

Jeremy seeks sanctions for Defendants' refusal to produce these highly relevant documents at the outset of the case.

## II. Unresolved Issues From Meet and Confer

Attached is a spreadsheet in PDF form that shows Jeremy's position on each of the unresolved requests. Simply copying and pasting the unresolved requests into this Briefing would have taken up all 7 pages granted to Plaintiff for this Briefing, so there was no other viable means of providing the information to the Court within the page limit.

## III. LRCiv 7.2(j) Certification

Pursuant to paragraph 6 of the Scheduling Order, LRCiv 7.2(j), and this Court's minute entry (Doc. 87), Jeremy certifies that despite sincere efforts, the parties have reached an impasse as to these issues. Specifically, counsel met and conferred telephonically on July 27, 2018 and July 31, 2018. Counsel also exchanged numerous emails before, during, and after those meet and confers. Defense counsel sent an email

141296755.1

to undersigned counsel on August 16, 2018 confirming that "We conferred at length about the 45 requests contained within your June 19th letter."

## IV. Conclusion

Jeremy has been denied access to these documents for long enough. They are highly relevant and should have been produced at the outset of the case pursuant to the MIDP and Scheduling Order.

DATED this 20th day of August, 2018.

**Jaburg & Wilk, P.C.**

s/ Jeffrey A. Silence
Kraig J. Marton
Jeffrey A. Silence
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
Attorneys for Plaintiff Thacker

*Certificate of Service*

I hereby certify that on the 20th day of August, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Carrie M. Francis
Stefan M. Palys
Michael A. Vincent
Stinson Leonard Street, LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Carrie.francis@stinson.com
Stefan.palys@stinson.com
Michael.vincent@stinson.com
Attorneys for Defendants GPS Insight, LLC

Timothy B. O'Connor
Schneider & Onofry, PC
365 East Coronado Road
Phoenix, Arizona 85004
toconnor@soarizonalaw.com
Attorneys for Defendant Donat

s/ Kim Rogers

6

141296755.1

# EXHIBIT 1

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|----------------------|
| 1 | Most recent commission workbook provided to each GPSI salesperson reflecting all sales data including all tabs from January 1, 2015 to present in native format. We are sending you concurrently herewith an example of the Commission Worksheet. | Incomplete - < 50% | A "commission workbook" is an Excel spreadsheet showing what each sales agent generated in sales and what they were paid for those sales along with the supporting sales data details on separate tabs. The master commission workbook contains all of the individual commission workbooks. Defendants agreed to provide the commission workbooks for only 4 of the 25 sales agents and only for the year 2016. In addition, the commission workbooks produced by Defendants only contained the summary data with none of the supporting data. Without that supporting data, Plaintiff has no way of verifying any of the information provided. The two sales agents included were David Pope and Josh Schwartz, who worked with Jeremy in the Government Sales Team. Jeremy requested the commission workbooks for all sales agents for 3 reasons: (i) At the beginning of each year, Donat gives each sales agent a profit-sharing bonus based on the employee's sales performance from the previous year. Jeremy contends that the profit-sharing bonus Donat awarded him in 2017 (for his performance in 2016) was far less than other sales agents because Donat was jealous of his relationship with Kristin. Jeremy requested the profit-sharing bonus information in Request # 2 below. He needs the commission workbooks to measure against the profit-sharing bonus. If he is only given the profit-sharing bonus for each employee (and no information about each sales agent's sales performance), it renders the profit-sharing bonus information useless. (ii) Jeremy needs the commission workbook (for more than just the year 2016 for Mr. Schwartz and Mr. Pope) to confirm that they were being paid a full commission for their large non-governmental clients (like Amerisure) for a period of years. The workbook is needed to show during what years they were allowed to service these clients and whether they were paid full commissions for each of those years. Defendants claim that they were not paid a full commission for their large non-governmetal clients. This is directly relevant to Defendants' claim that Jeremy is not owed any compensation for Amerisure, which is a key issue with respect to proving retaliation and calculating his lost wages and future lost wages. (iii) Although the profit-sharing bonus award was subject to Donat's discretion, Jeremy believes there must have been some established metrics that Donat relied on in awarding the profit-sharing bonus. For example, Jeremy believes the profit-sharing bonus for all employees could have ranged from 4% to 20% of the agent's overall pay depending on each employee's gross sales and length of employment. Jeremy needs the workbook for all employees to see what kind of historical averages Donat awarded to his sales agents. Jeremy knows for certain that it will only take Defendants a total of ten minutes to produce the commission workbook for a period of years, which consists of one Excel spreadsheet. The burden to produce all salespeople is less than producing some as anything other than all requires the spreadsheet to be broken apart. |
| 2 | Profit-sharing/Compensation Summary letters for each salesperson at GPSI for the years 2016, 2017, and 2018 which represents the prior year's performance. i.e. 2017 Profit-Sharing/Compensation Summary represents 2016 performance. | Incomplete - 0% | The "profit-sharing compensation letters" contain the amount of the profit-sharing bonus given to a particular sales agent, which includes the percentage of their overall pay that the bonus is based on. In other words, it shows whether the employee received a bonus based on 5% or 15% of their overall pay. Jeremy needs this information to show that the percentage of his profit-sharing bonus for 2016 was a significantly lesser percentage of his overall pay than others because Donat was jealous of his relationship with Ms. Lisson. He also needs to know whether Donat paid a historical average of 5% or 15% of an employee's overall pay when awarding these bonuses. This historical average will be used to calculate Jeremy's lost wages from now through the date of trial, including any award of front pay. The difference between being awarded a 5% bonus versus a 15% bonus (for a period of years) affects his lost wage and future lost wage calculations by hundreds of thousands of dollars. As of now, we have no comparative data. |
| 3 | Spreadsheet used by Mr. Donat to calculate Profit-sharing/Compensation Summary for each salesperson for years 2016, 2017, and 2018 in native format. | Incomplete - 0% | This is relevant for the reasons stated above. The underlying spreadsheet that Donat used will provide insight into the metrics and information he used to determine the amount (and percentage of overall pay) for the profit-sharing bonuses. Defendants produced a document intended to represent the spreadsheet used by Mr. Donat but it was not. It contained data from only 4 other salespeople and did not contain the formulas used to calculate the data. Defendants had copied and pasted values only into another spreadsheet for the purposes of not showing the formulas. |
| 4 | GPSI Sales Policy for each year from 2014-2018. | Incomplete - < 50% | The sales policies reflect the terms and conditions in which sales agents are entitled to a commission. In August, Defendants produced the 2012 and 2018 Sales Policy of which neither apply to Jeremy. Defendants have failed to produce the Sales Policy(s) that were in place for 2015, 2016 and 2017. Jeremy needs the sales policies because they are relevant to his lost wage claim including his claim that he is owed a commission for Amerisure. Defendants need to produce all Sales Policies that were active during Mr. Thacker's termination along with the dates they were effective. Plaintiff first requested this information in February 2018 and is astounded that Defendants have refused to produce this and then 6 months later produced a Sales Policy that says it was updated in 2018 a year after Mr. Thacker's termination. |
| 5 | All documents and presentation materials included in company-wide meeting presentations from January 1, 2014 to present in native format | Withdrawn | |
| 6 | All documents and presentation materials included in All Sales Meetings from January 1, 2015 to present in native format. | Incomplete - 0% | All Sales Meetings took place on a monthly basis (with some exceptions) and included presentations showing stats and metrics for individual salespeople and the sales teams. These presenations contain important information on accolades, awards, and other important information regarding Mr. Thacker's performance individually and comparitively. |
| 7 | All documents related to Sagemount, equity investment in GPSI and/or change in stock and/or ownership, including but not limited to contracts, terms and conditions, evaluations, and financials. | Incomplete - 0% | Bregal Sagemount recently acquired a minority interest in GPSI that is estimated to have cost between $8 million and $150 million. Mr. Donat was the sole owner of GPS Insight and this would be a huge impact to his income and worth which are discussed in more detail in request # 12. In addition, Jeremy has a right to know whether employees were given any stock options or other form of compensation including any kind of bonus (or promise of a bonus) because it is relevant to his lost wage calculation. If employees were not given (or promised) any form of compensation, he has a right to |

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|----------------------|
| 8 | All documents related to stock options and/or bonuses related to Sagemount and/or equity investment for all GPSI employees, including but not limited to any spreadsheets used to calculate bonuses/commissions and documents verifying/substantiating the data used to calculate the bonuses/commissions in native format | Incomplete - 0% | Plaintiff needs this information from the date of Jeremy's termination through the present because Bregal Sagemount recently acquired a minority interest in GPSI that is estimated to have cost between $8 million and $150 million. According to the Phoenix Business Journal, Donat is on record having stated, "The investment will allow me to take some chips off the table for me personally, to take equity ownership into the hands of employees for stock options and to engage with Sagemount with their program to assist and energize our company from sales and HR to support." Based on Donat's own admission, Donat may have awarded a larger profit-sharing bonus than in previous years, especially to long term employees like Jeremy. Jeremy has a right to know whether GPSI employees received a larger than average profit-sharing bonus. Defense counsel has stated that GPSI did not award any stock options. Jeremy needs proof to support that claim. Also, Jeremy's requests all documents related to "stock options and/or bonuses." A bonus would include any form of additional compensation (or document promising additional compensation) to sales agents arising out of this purchase. Defense counsl only referenced stock options and did not comment on bonuses. |
| 9 | All Lexis Nexis reports for Mr. Thacker, Ms. Lisson, and/or Mr. Dennis in native format including any communications reflecting when or why those reports were generated and to whom they were sent. | Incomplete - < 50% | Donat pulled a background report on Mr. Thacker after his termination that pulled GLBA information until false pretense. During 30(b)(6), Mr. Walker said that Mr. Donat had emailed him a copy of the background report on Jeremy showing all of his personal information including among other things his criminal history, addresses, email accounts, and partial DOB, partial social security number and other information under the protection of GLBA . Defendants, however, have not disclosed any emails or other communications showing when or how Donat requested or obtained this credit report or to whom else it may have been sent. Jeremy has reason to believe Donat shared the report with others, which, if true, is an act of retaliation and demonstrative of Donat's hatred for Jeremy. Defense counsel has stated (without any proof) that Donat obtained a copy of the report from his other attorney and that this communication is privileged. Jeremy disputes that this email would be considered privileged, and even if it was, these so-called privileged communications should be identified on a privilege log. |
| 10 | All documents that support Defendants' contention that Mr. Thacker was "written up" and/or counseled regarding any alleged behavioral issues including being "caustic and abrasive" and a "disruptive" employee. | Complete - Limited | |
| 11 | All expense reports for all employees from 2014 through present in native format including any document that reflects which employees were given access to use GPSI's company credit card and on what terms they were allowed to use the card | Incomplete - 0% | Defendants claim that Jeremy used his GPSI company credit card for personal expenses in the amount of approximately $4,500 without their knowledge or express or implied consent. Jeremy denies that all of these were personal expenses. More importantly, Jeremy will testify that his managers (Mr. Mortensen and Mr. Walker) gave him express and implied permission to use his company card for personal expenses so long as he repaid GPSI. Indeed, they gave Jeremy express permission to use the credit card in 2015. The expenses reports for other employees will reflect that Jeremys' credit card expenses pale in comparison to many others who submitted credit card expenses for extravagant personal expenses, which Mr. Mortensen and Mr. Walker knowingly approved. Jeremy agreed to limit this request to the expense reports for certain employees whose expense reports will show a pattern and practice of allowing employees to charge personal expenses on their company credit cards: Josh Schwartz, Mike Maccomiskey, Joe Vidmar, Ryan Driscoll, Harry Leitner, Elliot Batcheller, and Ryan Hill. Jeremy knows that these expense reports are already organized and collected in a common location easily accessible by Accounting. |
| 12 | The last five years' worth of tax returns for GPSI and Mr. Donat. Tax returns are a standard and common practice in civil case like this. | Incomplete - 0% | In federal court, discovery of a defendant's tax returns may be sought and obtained without any preliminary proof of a prima facie claim for punitive damages or evidence which would support such an award. EEOC v. California Psychiatric Transitions, 258 F.R.D. 391, 394-395 (E.D. Cal., 2009). EEOC v. AN Luxury Imports of Tucson, 2013 WL 12040009 (D. Ariz., 2013). Lopez v. Mauisun Computer Systems, Inc., 2016 WL 524659 (D. Ariz., 2016). Oakes v. Halvorsen Marine Ltd., 179 F.R.D. 281, 286 (C.D. Cal. 1998). Carrasco v. Campagna, 2007 WL 81909 (N.D. Cal. 2007). Southern California Housing Rights Center v. Krug, 2006 WL 4122148 (C.D. Cal. 2006). Charles O. Bradley Trust v. Zenith Capital LLC, 2005 WL 1030218 (N.D. Cal,. 2005). Even if such proof was required, the Complaint contains exhaustive detail about Donat's shocking and outrageous behavior that would easily support an award of punitive damages. Jeremy will of course agree to maintain confidentiality pursuant to the protective order. He simply wants to know Donat's net wealth because that is a factor that is relevant in deciding the amount of punitive damages under Jeremy's claims including discrimination and retaliation, defamation, intentional interference with contract, and false light. |
| 13 | Any insurance or other agreements under which another person or entity may be liable to satisfy all or part of the judgment or to indemnify or reimburse a party for payments made by the party to satisfy the judgement. MDIP # 6. Defendant's provided no detail in their disclosures. Mr. Thacker seeks the details of the arrangement with all insurance companies involved. | Complete - 100% | |

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|----------------------|
| 14 | All communications between, on the one hand, Mr. Donat and, on the other hand, Mr. Thacker from January 1, 2017 to the present, including but not limited to texts, emails, iMessages, Slack messages, cards, letters, notes, and messages on any social media or messaging application | Incomplete - > 50% | Defendants state in the Joint Status Report that they have produced all relevant text messages. Jeremy, however, produced numerous text messages between he and Donat that are clearly relevant. Jeremy will be seeking sanctions based on Donat's failure to preserve and/or produce these messages. |
| 15 | All communications between, on the one hand, Mr. Donat and, on the other hand, Ms. Lisson from January 1, 2016 to the present, including but not limited to texts, emails, iMessages, Slack messages, cards, letters, notes, and messages on any social media or messaging application. | Incomplete - > 50% | Defendants state in the Joint Status Report that they have produced all relevant text messages. Ms. Lisson, however, produced hundreds of text messages between she and Donat that are clearly relevant. Jeremy will be seeking sanctions based on Donat's failure to preserve and/or produce these messages. As for Slack, Defendants initially testified at their 30(b)(6) depositions that they did not preserve any direct Slack messages. "Direct" message means any message between a limited number of people and that is not designated by the sender as "public." "Public" means anyone in the company can view it. On August 16, 2018, Defendants produced Slack messages in an unusbale format. It looks like the messages are between employees that have nothing to do with this lawsuit. We will be filing a separate motion regarding this issue but wanted to inform the Court of the status of this request. |
| 16 | All communications sent by or to Mr. Donat, Mr. Walker, Mr. Mortensen, Mr. Batcheller, Mr. Fitzgerald and Kristi Donat from February 22, 2017 to April 15, 2017, including but not limited to texts, emails, iMessages, Slack messages, or messages sent through any social media or messaging application. | Withdrawn | |
| 17 | All communications between, on the one hand, Mr. Donat and, on the other hand, Kate Wells regarding Mr. Thacker, Ms. Lisson, and/or any topic related to a workplace romance from January 1, 2017 to the present, including but not limited to texts, emails, iMessages, Slack messages, cards, letters, notes, and messages on any social media or messaging application | Withdrawn | |
| 18 | Any document that you contend reflects that GPSI provided a copy of any employee policy to any of its employees including the company-wide email referred to in 30(b)(6) deposition of Mr. Fitzgerald in which he claims that all GPSI employees were made aware of the new policies available on Knowledge Base sometime in 2017 | Complete - 100% | |
| 19 | Slack Weekly Summary email for every week in the months of February 2017, March 2017 and June 2018. | Incomplete - 0% | Defendants claim in the Joint Status Report that "there are no responsive documents." Jeremy will be seeking sanctions for Defendants' failure to preserve Slack messages. Slack is the primary form of communication that GPSI employees use. Defendants are refusing to provide statistics on their Slack usage in hopes of downplaying the importance and prevelance of the tool for internal communications. According to credible online sources, organizations that use Slack for internal messaging typically reduce email usage by over 40%. If the number of Slack messages are as high as Plaintiff suspects, Defendants have allowed for the deletion of hundreds of thousands of messages since Mr. Thacker's termination. Defendants have an obligation to provide any information available to them regarding the number of Slack messages sent since March 2017. In a worst case scenario, Defendants are absolutely able to prouduce reports for June and July 2018 showing a total number of messages sent along with the number of messages sent by each individual user. |

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|----------------------|
| 20 | Any email that was sent or received by any GPSI employee between March 6, 2017 and April 15, 2017 which contains any of the following words: Kristin; Lisson; KL; "K.L."; Jeremy; Thacker; JT; "J.T." | Incomplete - < 50% | Defendants have produced almost no emails regarding the internal communications about Jeremy or Ms. Lisson, even though Defense counsel stated that in the meet and confer that there are several thousand documents responsive to many of these search terms. On August 2, 2018, undersigned counsel informed defense counsel in an email that he could significantly reduce the number of hits by removing all emails to or from SalesOperations@GPSI.com, which is the operations team. All remaining emails are highly likely to be relevant because they would not encompass the day-to-day activities of emailing the operations team. Given that Defendants have produced almost no emails, it is not overly burdensome for them to review these emails. Jeremy produced tens of thousands of texts and emails (and the entirety of his medical history for the last ten years) at GPSI's insistence. Defendants should have to put in some effort to locate and produce responsive information that is directly related to conversations about Jeremy and Ms. Lisson. Again, Defendants claim that there are a large number of responsive documents for each search term, but defense counsel would not tell us, in writing, how many "hits" there were for each search term. Instead, he told us the figures over the phone and provided no supporting documentation. We did not agree to limit the search terms because each is likely to produce relevant information. Defendants apparently believe that just because there are, for example, 5,000 "hits" for a search term, they are not required to review any of those documets. Plaintiff has a very different view of a party's review and production obligations. |
| 21 | Any email that was sent or received by David Pope, Mr. Walker, Joe Vidmar, Josh Schwartz, Nathan Washington, Phil Eatman, or Mr. Mortensen at any time which contains any of the following words and/or phrases: "earn out"; "ear out"; "referral fee" | Withdrawn | |
| 22 | Any email that was sent or received by Mr. Batcheller, Mr. Fitzgerald, Mr. Walker, Mr. Donat, Mr. Mortensen, or Wayne Holder at any time which contains any of the following words and/or phrases: "discrimination charge"; devil; asshole; "witch"; "cult"; "piece of shit"; "reference" & "job offer"; "sexual harassment"; EEOC; "trail of bodies" | Incomplete - 0% | These disparaging term have either appeared in emails and text messages sent by Donat or were statements made by Donat in conversations about Jeremy or directly to Jeremy. The search terms related to the EEOC and discrimination are relevant to Jeremy's discrimination and retaliation claims. The "reference" & "job offer" search term is relevant to Jeremy's claim for intentional interference with prospective business relations and his retaliation and discrimination claims because Jeremy believes that Donat may have made disparaging statements to prospective employers when called for a reference about Jeremy. These search terms are necessary to determine whether Donat did indeed make any disparaging statements about Jeremy that sabotaged his ability to find other employment. If they refuse to conduct these searches, Jeremy will have no way of verifying what may have been said about him to prospective employers. Defendants also claim that there are a large number of responsive documents for each search term, but defense counsel would not tell us, in writing, how many "hits" there were for each search term. Instead, he told us the figures over the phone and provided no supporting documentation. We did not agree to limit the search terms because each is likely to produce relevant information. Defendants apparently believe that just because there are, for example, 5,000 "hits" for a search term, they are not required to review any of those documents. Plaintiff has a very different view of a party's review and production obligations. |
| 23 | Any email that was sent or received by Mr. Batcheller, Mr. Walker, Phil Eatman, Mr. Donat, or Mr. Mortensen at any time which contains any of the following words and/or phrases: Amerisure; "Fleet Connect"; "call records"; "activity tracking" | Incomplete - 0% | Jeremy believes that he would have been allowed to service Amerisure and been paid a full commission for all sales referred by Amersiure but for the unlawful retaliation and discrimination. Defendants claim that Jeremy is not entitled to any compensation for Amerisure. That is why we want all communications about Amerisure. The other two search terms ("call records" and activity tracking") are relevant to Donat's claim that Jeremy deserved to be terminated because he was always absent from work and his call records showed that he hardly made any calls during one of the final weeks of his employment. Information about "call records" relates to Donat's claim that he was rarely calling enough customers. Any information about "activity tracking" relates to Donat's claim that Jeremy was never working and was never in his office. Jeremy agreed to limit this request to all emails sent or received by these individuals between January 1, 2016 and the present. Jeremy also does not seek any emails to or from SalesOperation.@GPSI.com, which is the email associated with the operations team and should drastically the number of responsive documents for each of these search terms. He just wants emails between these key employees (his managers) discussing Amerisure and his alleged performance issues. Again, Defendants claim that there are a large number of responsive documents for each search term, but defense counsel would not tell us, in writing, how many "hits" there were for each search term. Instead, he told us the figures over the phone and provided no supporting documentation. We did not agree to limit the search terms because each is likely to produce relevant information. Defendants apparently believe that just because there are, for example, 5,000 "hits" for a search term, they are not required to review any of those documnets. Plaintiff has a very different view of a party's review and production obligations. |
| 24 | Any email that was sent or received by Mr. Walker, Josh Schwartz, Nathan Washington, or Mr. Mortensen at any time which contains any of the following words and/or phrases: 'State of Oklahoma"; "Oklahoma" & "commission" | Withdrawn | |

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|---------------------|
| 25 | Any email that was sent or received by Mr. Walker, Phil Eatman, Mr. Donat, or Mr. Mortensen at any time which contains any of the following words and/or phrases: "profit sharing"; "profit-sharing"; "profit" & "bonus"; "sales commission plans"; "rep commission plans"; "Sales Policy 2014"; "Sales Policy 2015"; "Sales Policy 2016"; "Sales Policy 2017"; "Sales Policy 2018"; "Sales Awards"; "sales team expenses"; "commission eligibility"; "territory exception"; reassigned; "taking away"; "keep list"; "back to GPS Insight"; Holdovers | Withdrawn | |
| 26 | Any email that was sent or received by Mr. Walker or Mr. Mortensen at any time which contains any of the following words and/or phrases: CalCartage; CMI; "Container Freight"; "California Multimodal"; "K&R Transportation"; "Epicor"; Glassdoor; "best places to work" | Withdrawn | |
| 27 | Every email thread which was sent or received by Barbara Somerside, Carrie Race-Simms, Ray Kosick, or Mr. Donat from October 1, 2016 to present which contains any of the following words and/or phrases: Jeremy; Thacker; JT; "J.T." | Withdrawn | |
| 28 | Any email that was sent or received by Mr. Batcheller, Mr. Fitzgerald, Mr. Walker, or Mr. Mortensen from December 15, 2016 to present which contains any of the following words and/or phrases: Jeremy; Thacker; JT; "J.T."; Kristin; Lisson; KL; "K.L"; "Rob"; "Donat"; Robert; "RD"; "R.D."; "Gob" | Withdrawn | These are the four key players in management, and any discussion about Kristin, Jeremy, or Donat during the relevant time period are highly likely to be relevant. Defendants sought (and were given) all of Jeremy's post-lawsuit communications with Ms. Lisson. Defendants should be required to do the same. At a minimum, their emails through Jeremy's termination on March 6, 2018 should be disclosed. |
| 29 | Any email that was sent or received by Mr. Donat from January 1, 2016 to present which contains any of the following words and/or phrases: Kristin; Lisson; KL; "K.L." | Incomplete - < 50% | Donat found out about Ms. Lisson's relationship with Jeremy in early January 2016 and immediately began retaliating against her and Jeremy. Any emails that Donat sent or received that refer to Ms. Lisson (or her initials) from January 2016 to the present are directly relevant to Jeremy's claims because they reflect his anger and jealousy toward Jeremy. Mr. Palys claimed in his portion of the Joint Motion Regarding Discovery Dispute that Plaintiff requested ALL emails regarding Ms. Lisson while leaving out the request was for limited dates and from limited Custodians. Mr. Palys can automatically filter out any privileged emails with his firm, so the burden in producing these is minimal. Defendants also claim that there are a large number of responsive documents for each search term, but defense counsel would not tell us, in writing, how many "hits" there were for each search term. Instead, he told us the figures over the phone and provided no supporting documentation. We did not agree to limit the search terms because each is likely to produce relevant information. Defendants apparently believe that just because there are, for example, 5,000 "hits" for a search term, they are not required to review any of those documets. Plaintiff has a very different view of a party's review and production obligations. |

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|----------------------|
| 30 | Every text message or instant message sent or received, including all messages sent or received 48 hours before and after any such message, from the following individuals: Mr. Donat, Mr. Walker, Mr. Mortensen, Mr. Batcheller, Mr. Fitzgerald, Kristi Donat, or Phil Eatman between the dates of January 1, 2017 to present, including but not limited to texts, iMessages, messages on any social media or messaging application containing any of the following terms: Jeremy; Thacker; JT; "J.T."; Kristin; Lisson; KL; "K.L."; "Rob"; Donat; "RD"; "R.D."; "Gob"; lawyer; legal; attorney; fired; firing; terminated; | Incomplete - < 50% | Defense counsel has stated that this request is overly burdensome but was unable to tell undersigned counsel how many responsive documents there were for each of the above search terms. He claims that his text message downloading program is unable to provide that information, which is very surprising because this kind of information is readily available on every text message program that we are familiar with. He should be required to use one of the many programs (that are very inexpensive) to provide this information or else be required to produce the responsive documents. He should not be allowed to claim that it is too burdensome to respond without providing specific information to support his objection. Defense counsel also claims that the terms lawyer, attorney, and legal are likely to produce privileged information. While these terms may produce some privileged communications, Jeremy and Ms. Lisson have produced text messages involving themselves and either Donat or members of GPSI management that contain these search terms. Examples are 2nd tab below. In addition, this request is for TEXTS not emails. Defendants claim these terms are harassing because they will produce privileged information but this argument holds no wait as all that is required is to filter out Defendants' Counsels' phone numbers. If they choose to do so, Defendants will need to produce a Privilege Log. Again, Defendants claim that there are a large number of responsive documents for each search term, but defense counsel would not tell us, in writing, how many "hits" there were for each search term. Instead, he told us the figures over the phone and provided no supporting documentation, despite requets. We did not agree to limit the search terms because each is likely to produce relevant information. Defendants apparently believe that just because there are, for example, 5,000 "hits" for a search term, they are not required to review any of those documets. Plaintiff has a very different view of a party's review and production obligations. |
| 31 | NetSuite report containing status of all Government leads, prospects, opportunities, and customers in Southwest Territory (AZ, CO, KS, MO, NM, OK, TX, UT) to present. | Withdrawn | |
| 32 | NetSuite report containing status of all leads, prospects, opportunities, and customers previously assigned to Mr. Thacker, from March 1, 2017 to present. | Withdrawn | |
| 33 | NetSuite report containing status of all leads, prospects, opportunities, and customers associated with Amerisure, including but not limited to companies referred by Amerisure, customers of Amerisure and/or any opportunities where Amerisure was a reference from June 1, 2013 to the present. | Withdrawn | |
| 34 | NetSuite report containing status of all leads, prospects, opportunities, and customers associated with Epicor, including but not limited to companies referred by Epicor, customers of Epicor and/or any opportunities where Epicor was a reference from January 1, 2010 to the present. | Withdrawn | |
| 35 | NetSuite report containing status of all leads, prospects, opportunities, and customers associated with "Wheels" (the company), including but not limited to companies referred by Wheels, customers of Wheels and/or any opportunities where Wheels was a reference from January 1, 2010 to the present. | Withdrawn | |
| 36 | Report and/or documentation of acknowledgement of policies on Knowledge Base by employees containing the status of acknowledgment for each policy on KB by each employee for the following dates of March 6, 2017, one day prior to date of companywide email notifying employees of policies on KB and 45 days after the same email as referenced by Mr. Fitzgerald in 30(b)(6) deposition. | Complete - 100% | |
| 37 | Daily attendance records for all salespeople from January 1, 2014 to present, including but not limited to time of arrival and departure each day. | Withdrawn | |

| # | Request | Status | Plaintiff's Position |
|---|---------|--------|----------------------|
| 38 | Summary report of phone calls and phone time for all salespeople from January 1, 2014 to present, including but not limited to calls made from each salesperson's extension, all work-related calls made from each salesperson's mobile phone, all time using Clearslide's Soft Phone for communication during presentations. | Withdrawn | |
| 39 | The Exchange calendars of Mr. Donat, Mr. Batcheller, Mr. Walker, and Mr. Mortensen for the time period of January 10, 2017 to March 6, 2017. Mr. Donat, Mr. Walker, and Mr. Mortensen have all made claims about the timing of certain events as it relates to this case. | Incomplete - 0% | Defendants have made several statements regarding the timing of events as it relates to Mr. Thacker's termination. Plaintiff has the right to evidence supporting their claims of when and where certain events took place. |
| 40 | All mobile phone records and/or logs for Mr. Donat, Mr. Batcheller, Mr. Mortensen, Mr. Walker and/or Kristi Donat between January 1, 2017 and March 30, 2017. | Incomplete - < 50% | Donat claims that he was not involved in the decision to terminate and that his management team (Mr. Batcheller, Mr. Mortensen, and Mr. Walker) made the decision on their own. Jeremy believes the phone records for these individuals will show that Donat was actively communicating with his management team. Given that Jeremy (the top sales agent) and Ms. Lisson (a key employee) were the only employees terminated during this this time, these phone calls are instrumental in disproving Donat's claim that he was not involved in their termination. Kristi Donat is Donat's ex-wife. Jeremy has a text message from Donat to him stating that Kristi told him that he should "fire his ass." Although Kristi is not a GPSI employee, Jeremy believes that Kristi uses a phone and that GPSI pays for the monthly service for that phone. In other words, GPSI has access to the information on the phone. Defense counsel stated that it not true. If it is not true, GPSI should have to produce supporting documentation showing that GPSI does not pay her monthly bill. In 7th Supplemental, Defendants have turned over mobile phone records of Mr. Donat which contain redacted phone numbers with no explanation for the redaction. If redactions were due to privilege, Defendants need to produce a privilege log for these and any other items per the MIDP. In addition, Defendants turned over some type of phone records for Mr. Mortensen and Mr. Walker but from what Plaintiff can determine it seems like they only produced records of Face-Time calls not all mobile phone calls. Mr. Thacker knows he spoke with Mr. Mortensen on his mobile phone during the time period submitted and yet that phone call is not reported in the documents produced by Defendants. Mr. Walker's phone record showed only 2 phone calls over a matter of months which is clearly not accurate. They submitted no phone records for Mr. Batcheller. |
| 41 | All phone system records and/or logs of calls (internal and/or external) for Mr. Donat, Mr. Batcheller, Mr. Mortensen, and/or Mr. Walker from March 2, 2017 to March 6, 2017. | Incomplete - 0% | Defendants have made several statements about when certain phone calls were made in relation to events surrounding Mr. Thacker's termination. For instance, Defendants claimed that they accessed recordings of Mr. Thacker's phone calls at certain dates and times as well as the times of certain internal phone calls surrounding Plaintiff's termination. Defendants did not think it was burdensome to pull phone records of Mr. Thacker's phone logs to try and prove he was not working. Defendants own their own phone system server and have easy admin access to the logs. They should be able to run the reports with little effort. If Defendants are unwilling to perform the action, Mr. Thacker worked for the company that supplies Defendants phone system and would happy to pull the logs. |
| 42 | Produce all images embedded in GPSI_00108130,136-17 in native format. | Complete - 100% | |
| 43 | All items not containing a Custodian need to be produced with correct Custodian assigned. | Incomplete - > 50% | Defendants have produced a plethora of items with no custodian attached. This is a violation of the MIDP, which requires that the parties "[i]nclude in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control." (Doc. 3 p. 5:20-23). Defense counsel stated that even though the MIDP expressly requires this, he is not going to address this issue. Defense counsel was also unable to explain how it was even possible that documents could be disclosed with no custodian assigned. [Update: Defendants provided an overlay in their 7th Supplemental, but much of that information was incorrect. Documents were assigned to Jeremy Thacker as custodian, but Jeremy's entire GPSI email account has already been produced. Thus, the emails that Defendants produced in this Disclosure where Jeremy is a party were clearly provided by the other GPSI employee that is a party to the email.] |
| 44 | All items with a Custodian of "General" should be assigned to the correct Custodian. Produce all group text messages identifiable as group text messages, and all parties included in the group identified as well. | Incomplete - > 50% | In many cases, the custodian was listed as "general." This is a violation of the MIDP, as discussed immediately above. Jeremy has a right to know from whom each document came from. This is particularly disturbing given Defendants' abysmal disclosures and the inability of their 30(b)(6) witnesses to testify about what devices and accounts were imaged and searched, when they were imaged and searched, and what search terms were used. Defense counsel that even though the MIDP requires this, he is not going to address the issue. |
| 45 | Produce GPSI_00103218-7847 in native format. Defendants produced a 4,000 page spreadsheet in TIFF format without the native despite the agreed upon format for spreadsheets. | Complete - 100% | |

Text Messages Referred to in #30

Jeremy; what are you even talking about? I know better what? Why don't you just coMe out and say what you're not saying? No one understands but you; Jeremy. And no one cares. There are 20 non negotiable iron-clad reasons we finally after 3 years pulled your plug before it got worse and worse and worse. And we are looking for/finding:docuMenting more. Just go out and work your magic for soMe other company and succeed like you clearly can. I like reasonably good; kind; (non-creepy-girlfriend-phone-hacking) positive people who aren't total Seawards so we needed to part ways. Jason and Tyler more than Me. They agreed before I brought them the recording you were so considerate to make. I didn't even know how on the bubble you were after the Meeting Thursday. I love the money you bring in. But not the constant bitching about you I hear and morale issues. Money isn't worth it. Sorry. It's done. Move on. <u>Good luck with the suit. I suggest you keep your money as I will defend it trivially; using LCRA residuals</u>. Nothing we have let you go over is a protected category. Stop being a baby and just go out and get a job. I'm sure this wasn't your first. I got fired once and it was transformative. I hope it is for you. Don't reply I'm done. <u>Sticking you on block since **lawyers** insist everything go through them</u>. Since you aren't iOS you won't know I'm not receiving your texts. Good night and thank you for checking on <u>KL</u>. She's a different person in 2017 and I'm worried; that's all. Worried about others this and last year as well. [From Mr. Donat to Jeremy - **NOT Produced by Defendants**]


If you are able physically and emotionally to talk please call me this morning before you get to work. If you're not please call in sick. I don't know if it was nerves or alcohol or drugs or you trying to record me which got you so completely incoherent/unable to speak last night but I am very worried for you. Jeremy got there within 2 minutes to tell me you were OK which I was both glad and skeptical to hear. Again if you want my help I want to give it. If you don't you're on your own because <u>you've painted yourself into a very small corner mostly because if Jeremy's **legal** and other threats and the mystery of how he found out about my texts</u> regarding the recording/if he stole it from you why haven't you reacted differently. Please call me Kristin. It's not just me who is worried but I'm the one trying to keep what is best for you in mind vs. what seems best for the company. [From Mr. Donat to Kristin - **NOT Produced by Defendants**]


<u>I was instructed not to reach out.</u> And was okay with that because I was on vacation. I bottled it up and chose not to let it ruin my vacation. I got back Friday morning and talked with Jason and got the okay to reach out. <u>I'm being delicate and respectful to my employer because I've been advised **legal** is involved.</u> I was so upset I went out to diner with Terry Friday night and ugly cried in public. I was going to reach out Saturday morning to you but Jeremy beat me to it with a guilt trip. I was hoping for a more organic connection. I'm still processing this. I don't want to be put in position to have to choose sides. [From James Adamthwaite to Kristin - **NOT Produced by Defendants**]