# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Jeremy Thacker, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 2:18-cv-00063-PHX-DJH |
| | ) | |
| GPS Insight, LLC; Robert J. | ) | |
| Donat, individually and as | ) | |
| Trustee of the Robert Donat | ) | |
| Living Trust Dated | ) | |
| April 19, 2017, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPTION OF DIGITAL RECORDING

AUDIO FILE NO. 1

TRANSCRIBED BY:
KELLY SUE OGLESBY, RPR
Arizona CR No. 50178
Registered Reporting Firm R1012

PREPARED FOR:
THE COURT
(ORIGINAL)

1     how --

2            JEREMY THACKER:  I'm not sure I understand.

3            JASON WALKER:  -- how is it different, David

4     owned it and he closed, personally closed all the

5     business, so he was earning commissions, just like you are

6     going to earn a commission on LC, right?

7            JEREMY THACKER:  Yeah, I understand that.

8            JASON WALKER:  But you closed -- what you are --

9     what you are asking for, and if I -- quite frankly, if I

10     turned this to Rob, if I sent this paragraph to Rob, based

11     on what you did, he would be, like, no way in hell.

12     Because what you are saying is I called -- you closed

13     nothing.  You got paid nothing because you closed nothing.

14     You --

15            JEREMY THACKER:  That's weird, when someone says

16     that we are moving forward with you in that email from the

17     VP and then they move forward and do it.

18            JASON WALKER:  But what did you -- so what did

19     you -- what David was closing were specific deals.

20            So what I am trying to show you is you are

21     citing here, you are combining things, but I

22     was willing --

23            JEREMY THACKER:  I was willing to close those

24     deals.  I mean --

25            JASON WALKER:  Okay.  So let's stay on point

1    because you were killing quota or anything else.  And it's

2    been a good thing for you.  We are happy for you.  That's

3    worth more than that whole program is ever going to be

4    worth.

5              So if you had stayed, that would have been

6    hugely detrimental to you.

7              JEREMY THACKER:  In addition, it's a portion of.

8    It's not all.  It's some of.  Like, it doesn't mean that I

9    wouldn't have done anything else.  I don't think I

10   understand how you are doing the comparison.

11             JASON WALKER:  Well, I am comparing what you

12   have actually closed --

13             JEREMY THACKER:  And this, some of this number,

14   is commercial deals.

15             JASON WALKER:  It's all -- that's all

16   commercial.

17             JEREMY THACKER:  No.  The 2587.

18             JASON WALKER:  That's fine, too.

19             JEREMY THACKER:  Okay.  Well, those would have

20   still been there, is what I'm saying.

21             JASON WALKER:  Well, if you want to break it out

22   here, I'm going to work with real numbers, and you can go

23   back and forth with whatever crap it is that you are going

24   to go through right now.

25             And you are missing -- you know, if you continue

```
 1    down the path of demanding the payment schedules and some

 2    other things, you are going to end up getting probably

 3    nothing.  The reason that I haven't gone to Rob with this

 4    yet --

 5            JEREMY THACKER:  Uh-huh.

 6            JASON WALKER:  -- is because last week when you

 7    weren't even here, I had five different people in my

 8    office complaining about you.

 9            JEREMY THACKER:  Okay.

10            JASON WALKER:  If I go down there now, it's

11    going to be no, and the reason is because you are a bad

12    citizen in the company and you have caused a lot of issues

13    over time.

14            David, Joe, Josh, these guys were all treated

15    differently.  They have been here for nine years.  And the

16    reason that they have done -- that they have been

17    successful is because they have contributed.

18            And here is the bottom line.  I have included

19    you several times, and I will go through -- if you want to

20    talk about being treated unfairly, I think you have been

21    treated more than fairly.  From your work schedule, Tyler

22    and I have allowed you to do things like work from home

23    whenever you want.  You are not here when we get

24    questioned by everybody else, including (inaudible),

25    whatever.
```

```
1   misconstrued, I don't -- and, you know, it may end up

2   being $10.  But the whole attitude of your email, you are

3   now going to pay this on this date.  I was like, look,

4   man, I have got to work this through Rob.  I'm not

5   delaying this.  You are causing me more pain and headache

6   by doing what you are doing around here, because it's

7   preventing me from even fucking helping you.

8           JEREMY THACKER:  What did I do?

9           JASON WALKER:  You pissed off Carrie.  You

10  pissed off Ray.  Rob happened to be in there.  I had

11  Elliot ask me what was going on.  James -- I don't -- do I

12  need to --

13          JEREMY THACKER:  Yeah.

14          JASON WALKER:  You are driving Tyler insane with

15  stuff.  So you need to help us.  This is a two-way street.

16  I feel like we have done -- we have, both of us, stuck our

17  necks out for you for years.

18          JEREMY THACKER:  Okay.

19          JASON WALKER:  And we have gladly done it,

20  because for some reason we have a big soft spot for you

21  that we wanted you to be successful.

22          You have got to return that by just -- we had a

23  discussion at the beginning of the year.  You remember

24  that?  We sat down and we said here is what we need from

25  you.  We need you to be here.  We talked about some things
```

1   something, there is a common denominator.

2           JEREMY THACKER:  Okay.

3           TYLER MORTENSEN:  Our conversations have been,

4   look, you need to go the extra mile to try and make sure

5   that you are not misunderstood or that you don't come

6   across the wrong way.

7           I have never had anybody else come up as

8   frequently in terms of being misunderstood or causing

9   problems or complaining or pushing back or saying this

10  isn't good enough.  It needs to change.  We should do

11  this.  We should do that.  That didn't work out.  I'm

12  treated unfairly.

13          Like, over time they have repetitively happen

14  with you.  And all I have tried to do is help guide you

15  and provide ways where you can try and change that.

16          Now, again, who is right and who is wrong is

17  going to change in every circumstance.  We don't always

18  have all the information.

19          JEREMY THACKER:  But when we do --

20          TYLER MORTENSEN:  Okay.

21          JASON WALKER:  It doesn't matter.

22          TYLER MORTENSEN:  But that -- the only thing, I

23  haven't heard you say "okay" once in this meeting.  It's

24  constantly nitpicking specific things.  Oh, that's not

25  what -- you challenge everything.  You question

```
 1    the thing.  These people aren't making this shit up, so --
 2              JEREMY THACKER:  She is making this shit up.
 3              TYLER MORTENSEN:  Let's just say that she is.
 4    Over two -- no.  I'm just saying.
 5              JEREMY THACKER:  Okay.
 6              TYLER MORTENSEN:  Let's say that she is.  What I
 7    was just saying is that there are instances where you
 8    probably were not wrong.  Nobody has ever said that you
 9    have been wrong every single time, but --
10              JEREMY THACKER:  When was the last instance
11    before that?
12              TYLER MORTENSEN:  Let me finish.
13              JEREMY THACKER:  Okay.
14              TYLER MORTENSEN:  Let me finish.
15              What are we expected to do when Rob, Elliot or
16    otherwise hear over four times in two weeks that those are
17    the things that they are seeing from you.  And on top of
18    that, every time Rob walks by your office for a month
19    straight, you are not there.
20              JEREMY THACKER:  I don't think Rob was -- okay.
21              TYLER MORTENSEN:  No.  I'm just saying.
22              JASON WALKER:  You don't what?  What don't you
23    think?
24              JEREMY THACKER:  Nothing.
25              TYLER MORTENSEN:  What do we say, what do we do
```

1  when multiple other people are saying that Jeremy is being

2  this?

3          JEREMY THACKER:  You look at the instance and

4  then you need to defend me when they are wrong, because

5  both of those instances are wrong.  I didn't -- I did not

6  say --

7          JASON WALKER:  We spend -- I spend, the two of

8  us have been spending almost all of our time defending

9  you.

10         JEREMY THACKER:  You didn't look at it and you

11 just didn't defend me to me.

12         JASON WALKER:  If Elliot comes in here and says

13 Barbara just had an incident with Jeremy, it's just -- I

14 don't even know what happened.  It was this was the kind

15 of thing I just had to sit down with Elliot for a half an

16 hour and talk about what's going on with you.

17         JEREMY THACKER:  That's unbelievable to me,

18 because what if it's not true?  Like, that doesn't matter?

19         JASON WALKER:  So did the thing with -- Jeremy,

20 it's a --

21         JEREMY THACKER:  I understand.

22         JASON WALKER:  It's a perception issue.

23         JEREMY THACKER:  This month --

24         JASON WALKER:  The perception issue is very

25 real.

1            JEREMY THACKER:  Two times this month, I don't

2     even know of any other incidents, besides James.

3            JASON WALKER:  James --

4            JEREMY THACKER:  So James, if we are going to

5     talk about perception issue and James is going to be the

6     benchmark, then that's not a good foundation.  James

7     bitches about everything and cries like a fucking baby all

8     the time.  Like, that's not --

9            TYLER MORTENSEN:  Nobody is putting you in jail

10    for this or punishing.  Nothing has happened to you as a

11    result of it, other than trying to work the timing out in

12    a way that this can actually work for you.

13            JEREMY THACKER:  Well --

14            TYLER MORTENSEN:  But this came across as very,

15    like, I'm fed up, I'm not going to deal with this anymore,

16    you are going to do this for me now.  And on the wings of

17    these things that are happening, it seems very intentional

18    and very methodical and you appear --

19            JEREMY THACKER:  I am very upset about it.  I am

20    very upset that I have been slandered when I didn't do

21    anything.

22            Like, did you -- you read the Barbara email.

23    Did you think that I was --

24            TYLER MORTENSEN:  All -- that -- there is two

25    parts to this.

1   this could possibly be retaliation for that?

2           TYLER MORTENSEN:  I never got the impression

3   that you didn't do that to them.

4           JEREMY THACKER:  That I didn't what?

5           TYLER MORTENSEN:  Ray was actually defending you

6   when Rob walked in.  I think -- and Elliot --

7           JEREMY THACKER:  Then why are we using it as

8   evidence in this matter?

9           TYLER MORTENSEN:  Because it's another example.

10          JEREMY THACKER:  Well, no.

11          TYLER MORTENSEN:  Elliot walked in and he said,

12  look, I do not want him to get in trouble.  I am trying to

13  prevent this.  I have heard this from multiple sources

14  over the last couple weeks.  I just want to make sure he

15  doesn't get himself in a bad position.  What's happening?

16          He never came in and said this guy is causing

17  all these problems, like what the hell is wrong with him.

18  He was very on your side.

19          JEREMY THACKER:  But that's what I am being told

20  now.

21          TYLER MORTENSEN:  No.  I'm saying that over a

22  period of time, these things are happening.

23          JASON WALKER:  You are causing problems for the

24  two of us constantly so that I can't get my work done or

25  even do something like this, is what I am trying to

```
1    explain to you.
2              TYLER MORTENSEN:  If --
3              JASON WALKER:  It's detrimental.  Regardless of
4    whether it's true or not, Jeremy, the truth is Tyler and I
5    are doing sword fighting with everyone about this.
6              TYLER MORTENSEN:  Ray has never come across as
7    trying to get back at you or being intentional.  In fact,
8    it was the opposite.  He was very defensive of you.
9              JASON WALKER:  It was Carrie who --
10             TYLER MORTENSEN:  Carrie was throwing a bit.
11             JASON WALKER:  Look, this has been an issue, and
12   he was defending you in some of it, but all I am trying to
13   get across to you is that the incident happened.  Rob
14   happened, in true form, perfect timing for you, Rob was in
15   there, so five minutes later he is down here and I am
16   having to, like --
17             JEREMY THACKER:  But I didn't do anything,
18   Jason.
19             JASON WALKER:  In Carrie's --
20             JEREMY THACKER:  I understand that.  I -- that
21   doesn't -- okay.  So if people --
22             JASON WALKER:  When you are in the middle of --
23   so I think all Tyler is asking you to do, when you are in
24   the middle of an interaction with someone, think about
25   what you are doing, because if it's someone like Carrie,
```

```
 1    and she is -- or if she thinks she is trying to help or if
 2    you are busy, there is a way to unhook yourself from that
 3    so she doesn't leave that feeling the way she felt.
 4              Something happened.  I don't know if you talked
 5    to her about it.  I talked to her about it.  She has an
 6    impression of what went on.  You need to try to change
 7    that.
 8              JEREMY THACKER:  And so what about when it's an
 9    inaccurate impression, because she is being told by Ray
10    that I was making a mistake that I wasn't making?
11              TYLER MORTENSEN:  Have you talked to her about
12    that?
13              JEREMY THACKER:  I did.
14              TYLER MORTENSEN:  And?
15              JASON WALKER:  And?
16              JEREMY THACKER:  She is fine.  We can call her
17    down.
18              TYLER MORTENSEN:  So part of -- there is another
19    side of this.  One of the things that's hard is we have to
20    fix your problems on a lot of these instances.
21              If I were in your position, I would have
22    immediately gone to Carrie and said:  Hey, I'm so sorry
23    you misunderstood this.  I was not trying to not be
24    helpful, blah, blah, blah, blah, blah, and between the two
25    of us I probably could have gotten her to, like, take
```

1    haven't been fired and Ryan Hill was.

2              JEREMY THACKER:  Okay.

3              TYLER MORTENSEN:  Because I haven't had anybody

4    complain about -- that I can even recall, these are the

5    only conversations with individuals that I have had.  Mike

6    Sutton, anything that he caused, like, those are the

7    double standards.  Those are people that caused problems,

8    did things and repeatedly came up that are no longer here.

9              JEREMY THACKER:  Okay.

10             TYLER MORTENSEN:  I mean, Josh, I -- I have

11   limited experience --

12             JASON WALKER:  Josh does stuff, when he used to,

13   but he would call me and kept it to that.

14             JEREMY THACKER:  I have never said a negative

15   word to anybody, other than Tyler.  That's true.

16             TYLER MORTENSEN:  And I have kept that to us and

17   I have limited that to us.

18             JEREMY THACKER:  That's my point.  I am not

19   criticizing, and I am not -- and the two instances that

20   you are bringing up right now, which are the only two that

21   I can even think of in the last -- since I have been on

22   the gov team, other than James, is these two.

23             TYLER MORTENSEN:  And nothing would have

24   happened if you didn't demand this right now.

25             JEREMY THACKER:  No.  I asked for this in

```
 1    December and wasn't even spoken to about it.  Just -- and

 2    when I asked you about it in December --

 3              TYLER MORTENSEN:  Do you know why?  Because it

 4    wasn't until this year that Amerisure told us how many

 5    vehicles they were going to do, because they had to

 6    establish a budget for this year and it's way less than

 7    they told us.

 8              JEREMY THACKER:  Okay.

 9              TYLER MORTENSEN:  It's only 800 more vehicles,

10    and they just started doing that.  So Amerisure only

11    actually came to fruition in terms of what they were going

12    to do this year based on whether or not they were going to

13    get budget approved.  All these things that they told us

14    have changed dramatically.  They told us several thousand

15    vehicles --

16              JEREMY THACKER:  1100 units.

17              TYLER MORTENSEN:  They used budget that was up

18    from last year.

19              JEREMY THACKER:  I understand that.

20              TYLER MORTENSEN:  But on this budget -- so we

21    needed to know, is there two or three more thousand

22    devices?  Is it 800?  All that.

23              And, again, you are getting distracted and not

24    focusing on the point.  What I'm saying is that we

25    wouldn't have kept repeating or drove this into the
```

They've already closed 1,100 units.

but they closed 1,100 units

```
 1   ground.  We had a conversation --

 2              JEREMY THACKER:  You couldn't have told me that

 3   one of the four times that I asked you guys?

 4              TYLER MORTENSEN:  Okay.  We could have gone to

 5   Rob and he would have said no.

 6              JEREMY THACKER:  No, no.  You couldn't have told

 7   me your plan?

 8              TYLER MORTENSEN:  Me and Jason have had multiple

 9   times that we have tried to connect over it and hadn't.

10   We didn't have a plan.

11              JASON WALKER:  Other -- believe it or not, there

12   are --

13              JEREMY THACKER:  I do understand that, but that

14   was two months.

15              TYLER MORTENSEN:  But that's the thing.  Like,

16   how long do you think it took Josh to get something on

17   will?  How long --
```
Wheels
```
18              JEREMY THACKER:  To get paid?

19              TYLER MORTENSEN:  No.  To get a program or

20   different exceptions.  Like, it's --

21              JEREMY THACKER:  It's been a year and four

22   months then, a year and two months.
```
JEREMY THACKER:
In July.
```
23              TYLER MORTENSEN:  Well, Amerisure didn't close a

24   single deal until the end of Q3/Q4.  The entire year was

25   spent -- that was the very first one for 12 trucks.
```

1    JEREMY THACKER:   In July.   and then

2          TYLER MORTENSEN:   12 trucks in September.

3          JEREMY THACKER:   Yeah.

4          TYLER MORTENSEN:   And the majority of the

5    several hundred devices came in Q4.   I can show you how

6    many came in Q4.

7          JEREMY THACKER:   I understand that.

8          TYLER MORTENSEN:   But the entire year was

9    working on doing everything that you would have had to do

10   and wasted all your time doing to only get 6-, 700, 800

11   units.

12         JASON WALKER:   And the value -- we are trying to

13   explain the value of the program is solidified now.   It

14   helps the conversation that I need to have.

15         The reason -- and literally I wanted to get this

16   done probably a week and a half ago, and then all this

17   other stuff started happening.   I told Tyler, I am not

18   going down there telling Rob about this right now.   You

19   have to trust me just a little bit to know enough of when

20   I want to go and talk about something like this, because I

21   do believe this does have value, but the timing is just

22   not right.

23         I ultimately want to get a yes.   I can go down

24   and have the conversation and come back and say, guess

25   what, he said no.   I can't do anything about that.   I

1    don't write the check.

2             JEREMY THACKER:  My only issue with that is that

3    you didn't even read the conversation with Barbara, and

4    I'm in here being told that I'm being a distraction.

5    And --

6             JASON WALKER:  Because I had to have a

7    conversation, because --

8             JEREMY THACKER:  No.  Why doesn't somebody

9    actually verify it, what happened?  Because there is

10   nobody in this entire building that could read that

11   conversation and feel like that.

12            TYLER MORTENSEN:  Here is the thing.  If you

13   hadn't sent this email, Jason would have continued to work

14   this out, tell you what he was going to try to get you

15   paid on, go to Rob and get it okayed.  I don't know how

16   soon or long that would have taken, but we wouldn't be

17   continually meeting about this.

18            We had discussions.  We talked about it and I

19   said, look, I don't know if you are wrong or right.  Let's

20   read the email.  Yeah, that was probably unjustified on

21   Barbara's part.  You are being thrown to the wolves a

22   little bit.  Let's make sure that does not happen.

23            The last thing either of us want is for you to

24   be inaccurately accused of stuff you are not doing.  And I

25   will go and sit down with Barbara or call her, or sit down

1 | with Rob and say, look, this is unfair, but at some point

2 | I start to look stupid if you are not trying.  When --

3 |         JEREMY THACKER:  Not trying?

4 |         TYLER MORTENSEN:  No.  I'm saying when it's

5 | accurate, I will do that every single time.

6 |         JEREMY THACKER:  This is accurate.

7 |         TYLER MORTENSEN:  Okay.

8 |         JASON WALKER:  But, again --

9 |         TYLER MORTENSEN:  But you failed to acknowledge

10 | just the overtime piece of it.

11 |         JEREMY THACKER:  Oh, okay.  And I'm asking for,

12 | in the past year, what are those times?  I know when I was

13 | called --

14 |         TYLER MORTENSEN:  It is not -- you are talking

15 | about omission in commission.  What other people do is

16 | build deposits and earn respect and trust by being here,

17 | not causing problems, leaving late.

18 |         Like David has worked here for ten years and he

19 | is in here at 8:00 o'clock every single morning.  There

20 | are things that people earn just by doing their jobs.

21 | There are many --

22 |         JEREMY THACKER:  Do you want to know why I

23 | wasn't here at the beginning of this year?

24 |         TYLER MORTENSEN:  I'm not talking about the

25 | beginning of this year.  I am talking about four years.

```
 1              JEREMY THACKER:  Okay.

 2              TYLER MORTENSEN:  You are here less than

 3  anybody.  There is nobody on the sales team that is in the

 4  office less than you are.

 5              JEREMY THACKER:  Okay.

 6              TYLER MORTENSEN:  Now, if you had said, hey,

 7  Tyler, I need to be out of the office.  Is it okay if I do

 8  that?

 9              JASON WALKER:  And by the way, we defend you

10  daily about that.  And I am not joking.

11              TYLER MORTENSEN:  Rob asked why you weren't in

12  your office and what you do when you are sitting at your

13  computer, because it looks like you are just logging on to

14  Home Depot and different things all day.

15              So I said, no, Rob, don't worry.  Like, you are

16  so focused on the negative, because you don't see all the

17  things that we do to defend you here.  Rob, don't worry

18  about it.  He has got LCRI.  He has got CMI.  Yeah, he

19  might not be here but he is always working on stuff.  We

20  are keeping him stuff.  If Jeremy doesn't produce this

21  year, then it affects me.  My job is to make sure that he

22  sells and that he does his job.  Let me take care of that.

23  You don't worry about him, and we'll take care of it.

24              Like, it's constantly defending you.  So these

25  things are hard, because at some point --
```

1          JASON WALKER:  It's not just Rob.  It's the

2    small business reps for a long time would say, they kind

3    of make jokes.  It's stuff that we have to manage.

4          I am not saying it's right or wrong, Jeremy, but

5    I don't care that you are not -- I don't give a shit that

6    you are not here.  If I did, I would tell you you have to

7    be here every day.  We don't mind, but we have to manage

8    that.

9          And so the way that -- what we are asking is

10   that we don't have to have all this other stuff, verbal

11   stuff, so if you -- whatever you could possibly do to

12   check yourself, regardless of right or wrong, it doesn't

13   matter.

14         Like Tyler has pointed out, we are not having

15   these conversations about anybody else but you.  So why is

16   that happening?  I don't know.  I'm not in your

17   conversations.  But when it gets to me, it's just one more

18   thing that I have to deal with, and that's what we are

19   trying to guard against.  This is -- again, this is

20   like --

21         JEREMY THACKER:  I don't know how to change it.

22   I don't know how to change the past two -- the things that

23   have gone on, so --

24         TYLER MORTENSEN:  Not the past two.  Like --

25         JEREMY THACKER:  I don't know how to deal with

1          JEREMY THACKER:  When I am falsely accused, I

2     expect to be defended.

3          TYLER MORTENSEN:  And I will do that.

4          JEREMY THACKER:  Okay.

5          JASON WALKER:  There is -- what we are talking

6     to you about here is feedback we are getting from

7     perceptions.  If it's false, okay, we will take that.

8          JEREMY THACKER:  What happens when the owner is

9     trashing you to people?  Do you think people might feel

10    that way?

11         JASON WALKER:  When what?

12         JEREMY THACKER:  When the owner trashes you to

13    people in your personal life that you never even talked to

14    him about, do you think that that might affect the way

15    people see you, or give people permission to try to blame

16    you and make you the scapegoat?

17         JASON WALKER:  I don't really know how to answer

18    that.  You are talking about a specific situation, or are

19    you talking about you think Rob is going around telling

20    other people that you do bad things?

21         JEREMY THACKER:  Yeah.  Rob -- I know Rob has

22    told people my personal information that Rob doesn't

23    even -- some of it Rob knows about.  Some of it, I have

24    never told him about, so, yeah.  Do I think that Elliot

25    doing the same thing has an effect?  Absolutely.  And do I

1  response to it was like I don't know what else I can do.

2  Go figure it out.  That's how it came across.

3          JEREMY THACKER:  That's not how it came across.

4  That's not what I said.

5          TYLER MORTENSEN:  You were wrong in that

6  instance, because what Carrie read is how it came across.

7          JEREMY THACKER:  Okay.

8          TYLER MORTENSEN:  So if that was not your

9  intent, our conversation was you need to go and fix that.

10          JEREMY THACKER:  And I did.

11          TYLER MORTENSEN:  Okay.  So what's your point

12  then?

13          JEREMY THACKER:  That I'm still in here.

14          TYLER MORTENSEN:  Only because of this email.

15  We had one conversation about it.  Did I keep reiterating

16  that until that came up?  We talked last week and I told

17  you what I needed.

18          JEREMY THACKER:  I told you I couldn't go

19  because of the stuff that's going on.  That you couldn't

20  go to Rob because of it, and --

21          TYLER MORTENSEN:  Because it came on the heels

22  of him wondering what you do and questioning whether or

23  not you were even invested in this company.

24          His direct quote is:  Jeremy's success might be

25  the worst thing, because he could sit back and rest on CMI

1   and rest on LCRA and not do anything, when somebody else

2   could be here every day.

3           You appear to be unhappy or frustrated or not

4   excited.  You are not here all the time.

5           JEREMY THACKER:  Why ~~don't you~~ [did he] ask about me

6   going to Chicago?

7           JASON WALKER:  Because --

8           TYLER MORTENSEN:  What --

9           JASON WALKER:  What does it even matter?

10          TYLER MORTENSEN:  This is a circular, like,

11  completely convoluted conversation.

12          JEREMY THACKER:  I am saying, do you think --

13          JASON WALKER:  Hold on.  The only reason you are

14  here is because Rob didn't really get that upset when you

15  used the credit.  Like, Elliot and Rob do not have --

16  you -- you think there is a huge B on your forehead that

17  they are coming after you?  They are not.

18          JEREMY THACKER:  I do not.  I do not think that.

19          TYLER MORTENSEN:  But then why --

20          JASON WALKER:  [And he can.] ~~Well, how about Jeremy?  Is~~

21  ~~Jeremy getting moved to Chicago?~~  Because Rob meddles in

22  everything.  He is the fucking owner of the company.

23  That's what he does.  He is not going to stop.  He comes

24  in here and he asks me about Tyler.  He asks me about

25  everybody's business.  [He's like, "Look I thought Jeremy...is Jeremy gonna move to Chicago?"]

```
1              JEREMY THACKER:  Okay.

2              JASON WALKER:  Why?  I don't know.

3              TYLER MORTENSEN:  All I was saying -- what was I

4    saying?  The -- I want to get back to that, though, the --

5    what was I even saying?  Rob, why did he ask you --

6              JEREMY THACKER:  And that's believable to me, by

7    the way.  Can we talk about that?

8              TYLER MORTENSEN:  But I want to finish my point,

9    if I can remember what I was saying.

10             JEREMY THACKER:  You were saying about the

11   value, that I rest on my laurels.  That my success is my

12   own problem.

13             TYLER MORTENSEN:  No.  Okay.  He -- there are

14   two options.  We can keep you in this position and you are

15   not here, you leave early, you are very rarely here.

16   Somebody else could be here 8:00 to 5:00, 9:00 to 5:00,

17   constantly working, closing the deals that you are doing,

18   and/or could probably close more.

19             And it appears on the surface, with all things

20   that you can judge by walking by, in his view that you are

21   kind of half (inaudible) it or just doing the minimum.

22   And over time, that's hard to defend over and over, when

23   every single day he walks by and you are not there.

24   10:00 o'clock in the morning, and you are not there.

25   It -- there are only so many times when we can defend you
```

```
1    and say, oh, Rob, just trust me.

2            Until this year, the numbers have been mediocre

3    at best.  To say, look, it's worth it, Rob.  He is killing

4    it.  He is nailing quota.  He is selling like crazy.  I

5    know he is not here, but he gets stuff done.  This is the

6    year that you could actually blow things out.  We are

7    trying to prevent that from happening.

8            And all I'm saying is he is looking at that and

9    saying, yeah, he has got two deals, but what would

10   somebody else in his position do if they're here every

11   day?

12           Rob has never said that you can stop working

13   because you close deals.

14           JEREMY THACKER:  I haven't stopped working.

15           TYLER MORTENSEN:  I'm not saying that.  You just

16   keep interjecting and arguing.

17           Josh is in the office nearly every day and he

18   has sold however thousand devices every year.  It's

19   because he wants to.  He gives the impression and the

20   appearance that he comes in and he is motivated for all

21   the right reasons and he is working every single day.

22   David is working every single day.  They are in the

23   office.  You are not.

24           All these things factor into it.  If we have to

25   go to Rob and say, hey, we want to give Jeremy some extra
```

```
1                 JEREMY THACKER:  Okay.

2                 JASON WALKER:  What I am talking about is the

3      relationship built on trust is a two-way street where you

4      have not made -- you are really good at taking

5      withdrawals.

6                 JEREMY THACKER:  I don't know what withdrawals

7      you are talking about.  That's my issue.  If we are

8      talking about the credit card, I don't know what else we

9      are talking about.  If there are other things, then I want

10     to know.

11                JASON WALKER:  What I am saying is we have given

12     you -- I will give you -- again, I am going to go over

13     them, three specific examples.

14                One, the fact that we let you basically do

15     whatever you want with your schedule.  That is a

16     concession we make for you that we don't make for anyone

17     else here, and it's special treatment and it's a nice

18     thing that we do and we are happy to do it.

19                JEREMY THACKER:  Okay.

20                JASON WALKER:  The concession we are asking for

21     from you is basically to be here enough so that it's not

22     an issue, and you are not here.

23                JEREMY THACKER:  Well, last year it was not an

24     issue, was it?

25                JASON WALKER:  It is now and so we are telling
```

1    schedule.  We have to talk to people and defend your

2    actions all the time, because we believe that you are

3    working and are working in around here, so that would be

4    just one example.

5            TYLER MORTENSEN:  But that becomes hard if you

6    don't think that this is worth it or that you are getting

7    screwed.  Like if you don't think you can be successful

8    here and you don't want to see the big picture and you

9    don't want to stay, then we should probably stop defending

10   you and trying.

11           JEREMY THACKER:  I think I can.  I just don't

12   understand, while I'm a 1700, or whatever it is, 1600

13   units for the year, why we are having a conversation about

14   whether or not I'm at the office.

15           TYLER MORTENSEN:  Because nobody else gets that

16   exception, and Rob cares.  It's his company.  Because you

17   could do 3,000 units.

18           JASON WALKER:  Josh sold 7,000 in the year, and

19   he is still in the office every fucking day.

20           JEREMY THACKER:  Okay.

21           JASON WALKER:  I'm not saying that you need to

22   do that.  What I am saying is people notice.  You are a

23   high-profile employee here from the standpoint of being on

24   the sales team.  All we are asking for is that you make it

25   so we don't have to constantly defend you on that issue.

```
1              JEREMY THACKER:  Okay.  And I would like a
2    nonhostile workplace from the owner, and to be paid by my
3    company so I feel comfortable.                  VP of
4              JASON WALKER:  You think I am hostile to you?
5              TYLER MORTENSEN:  Okay.  He is talking about the
6    owner, VP.  Elliot, VP
7              JEREMY THACKER:  Is that a fair request?
8              TYLER MORTENSEN:  Absolutely.  We -- that -- you
9    are getting into stuff that we probably need to discuss
10   separately, which is a totally different issue.
11             JEREMY THACKER:  Well, but that isn't.  It's not
12   a separate issue.
13             TYLER MORTENSEN:  I'm not saying it's not.  I'm
14   just saying right now is probably not the time to start
15   that conversation.  I have go to an on-site presentation.
16   I am leaving in ten minutes.  But, yes, everybody deserves
17   a workplace that is safe where they can work, but I want
18   to -- yes, of course, everybody should.
19             JEREMY THACKER:  So if -- I don't think we had
20   any of this issue last year.  This occurred at the end
21   of -- maybe starting at the end of last year, which also
22   coincides with other pieces of this.  So I don't think
23   it's a fair representation of --
24             TYLER MORTENSEN:  That's not true.  Jason and I
25   had very specific conversations towards before any of the
```

1          BE IT KNOWN that the foregoing is a true and

2   accurate transcription of an audio recording done to the

3   best of my skill and ability.

4          I was not present at the audio recording of

5   these proceedings, and I make no representation as to the

6   accuracy or completeness of the audio recording itself.

7          I FURTHER CERTIFY that I am in no way related to

8   any of the parties hereto nor am I in any way interested

9   in the outcome hereof.

10

11

12          DATED at Phoenix, Arizona, this 29th day of

13   August, 2018.

14

15

16

17

18

19

20

21   _____
                      *Kelly Sue Oglesby*
22                   Kelly Sue Oglesby, RPR
            Arizona Certified Reporter 50178

23

24

25

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
Jeremy Thacker,              )
                            )
            Plaintiff,      )   No. 2:18-cv-00063-PHX-DJH
v.                          )
                            )
GPS Insight, LLC; Robert J. )
Donat, individually and as  )
Trustee of the Robert Donat )
Living Trust Dated          )
April 19, 2017,             )
                            )
            Defendants.     )
_____)
```

REPORTER'S TRANSCRIPT OF AUDIO RECORDING

AUDIO FILE NO. 2

Transcribed from audio recording by:

Annette Satterlee, RPR, CRR, CRC
Arizona CR No. 50179

1           JASON WALKER:   (inaudible) -- he starts

2  adding things up.  Jeremy, you know what I mean?  And

3  he's like what, and he starts why is this, why is he not

4  there?  And it's like, fuck.  And, and so it, it starts

5  to become really hard work to just constantly defend

6  that.  So I get that maybe that was a bad week and you

7  got -- you had a bunch of bad luck.  But the reason

8  we're, we're talking about this is because I have to,

9  I --

10          JEREMY THACKER:   I had the best week

11 ever.  That's the thing about it.  It wasn't a bad week.

12 It was a phenomenal week.  And I haven't been called in

13 to talk about that at all.  I've been called in to talk

14 about the admin getting upset with me.

15          JASON WALKER:   Well, it -- believe me,

16 Jeremy, no one would rather have conversations with you

17 about your great week than me and Tyler.  **Nothing was said

18          ~~JEREMY THACKER:   Shit.~~

19          JASON WALKER:   So now I wanted to address

20 this with you --

21          JEREMY THACKER:   Yeah.

22          JASON WALKER:   -- because I don't want

23 this to bubble up.  I don't want you to be frustrated.

24 I'm --

25          JEREMY THACKER:   Has anyone talked to

```
 1  Carrie and said, "you were wrong"?
 2              JASON WALKER:   I haven't circled back.  I
 3  was in fucking Vistage yesterday.  I, I haven't had time.
 4  And I'm going -- I will talk to her, and I will talk to
 5  James, and I will talk to other people.
 6              And, you know, James mentioned to me that you
 7  came and did something very nice for him the other day,
 8  and I was like, well, good.  But, he was also, you know,
 9  fucking, super bummer.  And I, I get James is sensitive.
10  But you know that.
                       └── butt-hurt
11              JEREMY THACKER:   I --
12              JASON WALKER:   So, but he's mad at you --
13              JEREMY THACKER:   He's mad at you more
14  than he is me.
15              JASON WALKER:   He's always mad at me.
16              JEREMY THACKER:   Okay.  So does that make
17  it, so is that your, like -- of course not.  It didn't
18  make you in the wrong.  And it doesn't mean that you
19  should get called in by Rod because James is fucking mad.
20              JASON WALKER:   Well, no.  But --
21              JEREMY THACKER:   Does James rule?
22              JASON WALKER:   -- half the time I call
23  James in here and I told him to fucking take his pacifier
24  out of his mouth.
25              JEREMY THACKER:   Okay.  So she ran to
```

1 somebody else that she shouldn't have fucking talked to.

2 I, I don't -- like if somebody is going to get in

3 trouble --

4            JASON WALKER:   You didn't get in trouble.

5            JEREMY THACKER:   I certainly did.

6            JASON WALKER:   We're trying to prevent,

7 we're trying to get you --

8            JEREMY THACKER:   It, it's trouble,

9 it's -- accused of rape, you fuck one goat?  You know the

10 old saying?  And you're a goat fucker?  Like every time

11 somebody says it and it's allowed to stand is why we're

12 here.  Because Elliot's been able to say complete

13 bullshit to me.  One hundred percent bullshit.  And it --

14 in public.  And it's never publicly refuted.  And I don't

15 even know if it's refuted at all.

16            And, and then I'm called in and told to be the

17 higher standard.  And that's hard to accept when you're

18 not making any money and the people that are doing shitty

19 things to you are making a lot of money.

20            JASON WALKER:   So, the stuff you're

21 talking about with Elliot, I don't, I don't know about.

22            JEREMY THACKER:   You were involved in it

23 last year.  You know, it was right before we went to

24 Texas and the stuff where he, you know --

25            JASON WALKER:   Which specific stuff?

```
 1  it.
 2              JASON WALKER:   I know.  And that's why I
 3  didn't do it.
 4              JEREMY THACKER:   But that's the heart --
 5  like, so, here we are again like --
 6              JASON WALKER:   I can --
 7              JEREMY THACKER:   The company is --
 8              JASON WALKER:   So I can ask --
 9              JEREMY THACKER:   -- making tremendous
10  value because we do the right things.  And on the
11  opposite side of it --
12              JASON WALKER:   I didn't tell you I'm not
13  doing this for you.  I am telling you I have to get it
14  done at the right time.
15              JEREMY THACKER:   I understand that.  But
16  my -- when you take that into consideration with the fact
17  that I'm getting in trouble for this other shit, that --
18              JASON WALKER:   We're talking about so you
19  don't get -- I, I don't want this --
20              JEREMY THACKER:   If it's made to Elli and
21  Rob, I'm already in -- like, who else is going to get me
22  in trouble?  Like I'm being told I have to step things up
23  because of it.  I mean, I -- that -- we can call it --
24  I'm not in big trouble, but --
25              JASON WALKER:   What we're asking you to
```

1  do is be here a little bit more.  That's not stepping it

2  up.  That's just be noticeable --

3                JEREMY THACKER:   Okay.

4                JASON WALKER:   -- in the office.  It's --

5  it cures a lot of shit.  Okay?  It's, it's -- and the --

6  here's -- Rob's not going to be here next week.  So if

7  you're going to fucking not be here, next week would be a

8  good week.

9            The problem is the one fucking hour that he's

10 in here, you are not.  And that's, that's the only basis

11 that he has --

12               JEREMY THACKER:   (Inaudible)

13               JASON WALKER:   -- whether you're fucking

14 here or not.

15               JEREMY THACKER:   I know.

16               JASON WALKER:   But it's, it's an

17 incredible amount of bad luck, but that's just how the

18 world works.  In case you haven't figured that out yet.

19 Like the one time he's in fuck -- when do you think the

20 last time he was in fucking Ray's office?  Seriously.

21 Probably a year ago.  And he was down there just on a

22 whim.  I mean, you got to fucking -- when he was here

23 telling me this -- and I am just sitting here, you got to

24 be fucking kidding me.

25            Like when's the -- and I even said, I'm like,

```
 1  Rob, really?  Why were you even in Ray's office?  He
 2  goes, I don't know, I just stopped.  I'm like Jesus
 3  Christ.  Like of all days.  And I was half as mad at
 4  Carrie about just doing -- I'm like can you not -- if
 5  you've got a problem, can you come down to me so that it
 6  just fucking -- that doesn't happen?  I -- you know --
 7  and it's just like fuck.                    doesn't           but
 8          And -- so I get put into issues where we're
 9  trying to -- it starts sounding like we're making excuses
10  for you, even though we're not.  It just sounds fucking
11  stupid.  And that's when Tyler and I get frustrated.
12          what              JEREMY THACKER:   I get it.  But no           with.
13  excuses need to be made.  If he's got issues, tell him to
14  come talk with me.  Or tell him to let me go.
15          But I don't want to have favors done that, that
16  shouldn't be happening.  Like I don't, I don't feel like
17  that running interference with Carrie or Rob about shit
18  that I didn't do is a favor.  And then I'm owed -- then I
19  owe a debt for something that -- I don't -- tell him to
20  come talk to me.  I'll deal with it.  And if the end
21  result -- then fine.  If trying to keep Rob happy is part
22  of my job, then fuck it.  I'm out.  Like, I don't care.
23  I don't --
24          JASON WALKER:   Well --
25          JEREMY THACKER:   I don't like the man,
```

```
 1  and I don't want anything to do with him.
 2                    JASON WALKER:   I understand that.  The
 3  problem is, is he owns the company.
 4                    JEREMY THACKER:   That's fine.
 5                    JASON WALKER:   That's the reality, and I
 6  can't -- and no one is going to change that.
 7                    JEREMY THACKER:   I understand that.
 8                    JASON WALKER:   Uh-huh.
 9                    JEREMY THACKER:   But then if he's causing
10  a problem -- if I'm causing a problem to him and he's
11  causing one to you, then so be it.  But if it's based on
12  bullshit like --
13                    JASON WALKER:   So what we're saying is --
14  again, if you could be here more, that goes away.  We
15  can, we can do --
16                    JEREMY THACKER:   I'm not here because I
17  don't want to see him, Jason.  I don't want him coming
18  into my office and high-five'ing me.  Like I, I -- fuck
19  him.
20                    JASON WALKER:   Yeah.
21                    JEREMY THACKER:   I don't want that.  And
22  I don't --
23                    JASON WALKER:   So --
24                    JEREMY THACKER:   And if that means
25  something, then okay.
```

1                     JASON WALKER:   And that's, that's more of
2  just -- but to me, for you -- just put all this -- forget
3  everything else for a second.
4                  That's a personal health thing, in all honesty.
5  And I look at it for you because that's not good for you.
6                     JEREMY THACKER:   I'm not mad.  I just
7  don't want to lie.  That's my, that's my personal health.
8  I don't want to look somebody in the eye and say, cool,
9  man.  Which is what I -- and so I avoid the fuck out of
10 him.  Because if I have to talk to him, it's not going to
11 end well.
12                    JASON WALKER:   Okay.  It's just not a
13 good way to have to go to work.  And, and so --
14                    JEREMY THACKER:   I agree.
15                    JASON WALKER:   -- I -- if you can, if you
16 can figure out a way around it, fine.  I -- that's the --
17 the problem, the problem with that is that I can't tell
18 him that as a reason for you not being here.  So, I have
19 to have others.
20                  And you have to understand that I -- that's
21 just because other people are expected to be here.  So if
22 you're not going to be here, we have to have a legitimate
23 reason for that.  I can't use that as one of them, even
24 though it might be legitimate.  It's not something I can
25 say.  Because that will just be not good for (inaudible)

a million reasons.

1              JEREMY THACKER:   In December?

2              JASON WALKER:   Whenever you and I sat

3  here, you asked me --

4              JEREMY THACKER:   That was December.

5              JASON WALKER:   -- about it.

6         Well, yeah.  And it's just (inaudible) lot of

7  shit going on.

8              JEREMY THACKER:   I know.  But that --

9  like it's -- but -- so when it's important to the

10 company, it's urgent and time matters.  When it's my

11 finances --

12             JASON WALKER:   So you -- but I was saying

13 like when you -- you -- this became -- you asked about it

14 because you didn't get paid, I didn't, like --

15             JEREMY THACKER:   Do you know what my

16 profit-sharing bonus was?

17             JASON WALKER:   No.  I don't know any -- I

18 don't get any information on any of that.

19             JEREMY THACKER:   I know I can't share it

20 with you.  But it went up by two hundred dollars.  Two

21 hundred.

22             JASON WALKER:   I don't even know how to

23 compare that --

24             JEREMY THACKER:   Ask Evan.

25             JASON WALKER:   Well, he's --

```
 1  shit.  And I'll give -- and I gave without getting back
 2  last year, and trusting.  And I felt like I got fucked at
 3  the end of this year.  And that's, that -- and you can
 4  say what you want, but I, I don't feel like it was given
 5  back to me.  I feel like I did give last year.  Like you
 6  gave me the opportunity and I took it, and I appreciate
 7  it and I ran with it.
 8                  JASON WALKER:   And I thought you did
 9  great.
10                  JEREMY THACKER:   And I did, too.  And
11  then when I needed a couple of things, I didn't get them.
12  Like I get -- my appreciation was a $200 profit-sharing
13  bonus --
14                  JASON WALKER:   I don't --
15                  JEREMY THACKER:   -- and --
16                  JASON WALKER:   That's not something that
17  I can -- that's not something I control.  I don't do -- I
18  don't have anything to do with that.
19                  JEREMY THACKER:   I, I get that.
20                  JASON WALKER:   I mean that's not, that's
21  not -- I don't -- I don't know what Kristen gets paid; I
22  don't know -- it's very unusual.  I've always been in
23  control of my own budget.  I don't, I don't -- I, I --
24                  JEREMY THACKER:   I understand --
25                  JASON WALKER:   (Inaudible)
```

1  think, literally, it would have been -- to get a check

2  cut --

3              JEREMY THACKER:   It would have been

4  difficult.

5              JASON WALKER:   Was --

6              JEREMY THACKER:   But it was somebody

7  here's fault.  It was their fault.  Not mine.  I get --

8  and, and nobody stood up for it.  Like that's -- I

9  understand it would have been difficult.  It was fucking

10  really hard for me, instead.  I paid.

11             And that's -- like that's the part that nobody

12  seems to really dive into, is what we pay when, when the

13  company makes a mistake.  When I lose a hundred units

14  because Chris Plosky and Elliot fuck off Cal Cartage --

15  or Pasadena.

16             It -- there's another side to it.  And there's

17  life going on and -- like -- and it's always put off and

18  put off.  And it's acted like it's not a big deal.  Like

19  just wait and trust us.

20             And I get emails from Elliot saying it's going

21  to be a win-win, and we all win together.  And then I get

22  a $200 profit-sharing bonus.  U.S.  Two hundred U.S.

23  dollars.  Like -- does that not -- I just want to know

24  if -- like -- and I want to be here.  I've tried to be

25  here.  I'm -- and I know it's not you.  I know you don't

1   have control over it all.

2                    JASON WALKER:   It's -- you know, all, all
3   I can say is there, there are, are -- you've just listed
4   off more shit than I, I can even, I can -- look, almost
5   all the reps combined that have had, like, issues, like
6   all of it, and it's all happened to you.

7                    JEREMY THACKER:   Then --

8                    JASON WALKER:   And, and I, and I know
9   it --

10                   JEREMY THACKER:   Yeah.

11                   JASON WALKER:   -- all happened.

12                   JEREMY THACKER:   I agree.

13                   JASON WALKER:   I don't know how that's
14  fucking possible.

15                   JEREMY THACKER:   I agree.

16                   JASON WALKER:   And the world is not out
17  to get you.  Certainly, we're not.  But --

18                   JEREMY THACKER:   It, it's not that I
19  think it's out to get me.  It's that when it happens --

20                   JASON WALKER:   Well, I --

21                   JEREMY THACKER:   -- it just -- like
22  acknowledgment of it.  And --

23                   JASON WALKER:   But, but -- so -- I mean,
24  like, I couldn't -- I can't acknowledge what I don't
25  know, for one thing.  And, so, like for an example, with

1  that pay thing.  And Tyler -- I mean he -- I know for a

2  fact if he had come down here and talked to me about it,

3  we would have figured out something.  Worst case

4  scenario, saying, all right, Jeremy, actually if you want

5  to do something, we know you're getting paid, go charge

6  something on the credit card and pay us back.  I'm just

7  using that as an example as the fucking worst case

8  scenario if we couldn't get you a check (inaudible) fuck,

9  I would have written you a check.

10          I -- but I didn't know.  And so, you know -- I

11  feel terrible that that happened, but I, honest to God,

12  didn't know.  I knew, I knew that you didn't get paid,

13  and then you were then going to get paid on the 20th.

14  And based on the fact that we broke the order up -- and

15  then, technically, we shouldn't even have done that -- I

16  was like, okay, well, that's fucking better than nothing

17  and that's good; at least he's going to get paid on that.

18  And that was the way I kind of left it.

19                  JEREMY THACKER:   Yeah.  And that's --

20                  JASON WALKER:   But I didn't know the

21  background.

22                  JEREMY THACKER:   I, I get that.  And

23  that's because I'm trying -- like I don't want -- it --

24  that's the ironic part of it, is that I'm trying not to

25  be in here --

1              JASON WALKER:   But you could -- so here's

2  how you could -- let me just tell you how you could have

3  done something.  Okay?

4              JEREMY THACKER:   Okay.

5              JASON WALKER:   If you had come down and

6  said can I talk to you, I really need to talk to you

7  about something's that's going on, and provided the

8  scenario about -- you know, the background and what was

9  going on, et cetera, et cetera, et cetera -- I mean, I

10  don't think ~~(inaudible) important~~ to try and get

11  something done for you.   [ I would have reacted poorly ]

12              JEREMY THACKER:   I did tell Tyler all of

13  that.

14              JASON WALKER:   I, I know you did.  And

15  so --

16              JEREMY THACKER:   And so --

17                 (Indiscernible)

18              JEREMY THACKER:   -- when I went to you

19  with this --

20              JASON WALKER:  So, but -- (inaudible)

21              JEREMY THACKER:   -- he got mad at me

22  about going around him.

23              JASON WALKER:   But, but something that

24  you did -- somehow he didn't get it.  Because Tyler looks

25  out for you as much as anybody.

```
 1                    JEREMY THACKER:    I know that.

 2                    JASON WALKER:    Maybe more.  And, so,

 3  something didn't get communicated there effectively.  And

 4  I, I don't -- I'm not saying it's your fault.  Either he

 5  didn't hear it or you didn't say it right.  Or maybe

 6  clear.  And I'm not blaming; I'm just saying something

 7  happened.  And, and there's -- there's something that's

 8  routinely happening here that we need to clean up because

 9  there's -- I don't want any -- no one should have that

10  much stuff happen to them.

11                    JEREMY THACKER:    Yeah.

12                    JASON WALKER:    And, and that's why --

13                    JEREMY THACKER:    And I will tell you, I

14  agree about what you said earlier that I'm doing new

15  shit.  And I'm paving new paths.

16                    JASON WALKER:    It's just fucking painful.

17                    JEREMY THACKER:    Yeah.  It is.  And --

18  but -- when it works, I feel like there should be some

19  celebration of it instead of a penalty for it while

20  everybody else celebrates it.  Like it --

21                    JASON WALKER:    Well, we are --

22                    JEREMY THACKER:    There's been --

23                    JASON WALKER:    What I was planning --

24                    JEREMY THACKER:    -- actual celebrations.

25                    JASON WALKER:    What I was planning on
```

1 doing in the fucking sales meeting was just that for you,

2 next month.

3              JEREMY THACKER:   I don't --

4              JASON WALKER:   But --

5              JEREMY THACKER:   Yeah.

6              JASON WALKER:   But, you, you don't -- you

7 know, I know you won't like that.  But that's the only --

8 you know, there are things in, in -- you know -- the

9 way --

10             JEREMY THACKER:   No, the way -- all I

11 care about is just the fair comparisons.  That's really

12 all I give a fuck about, is if I'm going to be

13 criticized, do it across the board and do it fairly.  If

14 I'm asked to stand next to David, then do it fairly.  I

15 don't want to --

16             JASON WALKER:   I'm not comparing you to

17 Josh or David.

18             JEREMY THACKER:   I know you may not be.

19             JASON WALKER:   Well --

20             JEREMY THACKER:   The other people with

21 the perception issues --

22             JASON WALKER:   But --

23             JEREMY THACKER:   -- do.

24             JASON WALKER:   But this year, you might

25 beat both of them.  Or -- put it this way.  You're going

1  to have a great year.  And, and by the way, nobody

2  thought you had a bad year last year.  I certainly

3  didn't, and I don't think Rob did.  I really doubt --

4                  JEREMY THACKER:   Well, I don't think

5  that, either.  But they thought the government had a --

6  like --

7                  JASON WALKER:   Well, we did.  We -- but

8  that's not your fault.

9                  JEREMY THACKER:   I know that.

10                  JASON WALKER:   That was more my fault.

11  And it was, it was, it was -- and I don't really even

12  know it was my fault.  But -- the reason it was my fault

13  is because the expectations were set poorly.  But that

14  was based on shit that Mike told me.  And I believed him,

15  and that was my mistake.

16                  JEREMY THACKER:   Agreed.

17                  JASON WALKER:   I fucked up.  And that's

18  why I owned it up in the, in the sales meeting.  It's

19  not -- we were putting the numbers up, and I wasn't going

20  to sit there and make a bunch of excuses (inaudible) now

21  we're going to kill it.

22                  JEREMY THACKER:   And I don't care about

23  the numbers.  I care about the overall perception.  Like

24  all I give a shit about is I don't want to be bothered.

25  I'm going to do the fucking work.  If you're going to be

1  fair to me, I'll do the work.  I'll get it done.  I'll

2  get it done a weird way.  You probably don't -- like, I

3  get all that.

4          But at this -- like, I still feel like my

5  intentions are being questioned.  And I've been good to

6  people.  I've been nice to people.  I've gone out of my

7  way to be fucking nice to people and let shit go.  I've

8  got 37 emails in my drafts right now to send to you that

9  I never sent last year, ripping (indiscernible name) ass

10 open for (indiscernible) and Mike, and all fucking

11 hundred other things that happened.  And I'm Abraham

12 Lincoln and that shit.

13          But, like, it's -- so I do feel like I'm giving

14 a -- and I feel like I'm being nitpicked on the other

15 side in a lot of cases.  And that's hard, and that's all

16 I'm saying.  And I'm going to do it.  I'll go shut up and

17 I'll go do my work and I'll be here.  But --

18              JASON WALKER:  Well --

19              JEREMY THACKER:  I just want to be

20 listened to when I -- and --

21              JASON WALKER:  So, I would rather -- see,

22 here's the thing.  You -- would you write an email --

23              JEREMY THACKER:  I don't want it to come

24 to that.

25              JASON WALKER:  What?

1                    JEREMY THACKER:   I don't want it to come
2 to that.
3                    JASON WALKER:   No.  But it's like, again,
4 in, in -- when I'm in Vist -- it's just -- the -- this
5 conversation is much more productive than emails.
6                    JEREMY THACKER:   It -- you know, I -- but
7 I -- all right.  So --
8                    JASON WALKER:   I, I --
9                    JEREMY THACKER:    -- can you please say
10 that I had four conversations with you and Tyler --
11                    JASON WALKER:   I understand that.  I
12 understand that.
13                    JEREMY THACKER:    -- and no communication
14 back?
15                    JASON WALKER:   But I also don't -- but
16 here's -- so, part of it's because I'm like, look --
17 well, first of all, you weren't here when I started to
18 deal with this.  But the other thing, too, if you -- if I
19 tell you I'm going to do something, I'm going to do it.
20 It may take -- and I should -- maybe I should have told
21 you an update.
22            But the other thing, too, is like I don't, I
23 don't have the background that -- how urgent this was
24 because of your finances.  Because in my head, I'm like,
25 well, Jeremy sold a lot of shit --

1              JEREMY THACKER:    It shouldn't have to be

2  due to my finances, though.   Like when it's --

3              JASON WALKER:    But the timing makes it

4  more (inaudible)   I -- again, I do this in accordance to

5  how I think I can get the biggest win.

6              JEREMY THACKER:   Oh, no.   That, that, I'm

7  fine with.   But like if, if just the regular payroll

8  stuff, when it happened --

9              JASON WALKER:   Well, that's what I mean.

10 I didn't know that.   So I, I -- and I'm sorry that I

11 didn't know that.   But I, I -- and so if Tyler knew that

12 and Tyler didn't tell me, I need to talk to Tyler.

13          But it shouldn't --

14             JEREMY THACKER:   What I'm saying is it

15 shouldn't have to do with my finances, though.   Just the

16 fact that we weren't communicated with as a -- like not

17 me, individually.   The sales team has not been

18 communicated with that we're not going to get paid on

19 something for six months.   We're not making enough

20 Goddamn money to have leeway.   And yet the leeway -- like

21 if you asked James, James, are you okay waiting six

22 months for your fucking bonus?   He would shit on the

23 floor and you'd never see him again.

24             JASON WALKER:   So --

25             JEREMY THACKER:   Yet he does it --

```
1   things.  The things I asked for I think were very
2   reasonable.  They didn't happen, and I think some
3   unreasonable things that did happen to me.
4           And I'm saying if I'm coming to Tyler or you --
5   I think Tyler missed out on last year, to be honest with
6   you.  When I wasn't a pain in the ass.  He had me as a
7   pain in the ass and then when I wasn't.  Because you and
8   I haven't had issues.  But -- and I think he still has
9   that perception, maybe, too, that I'm --
10               JASON WALKER:   No.  I --
11               JEREMY THACKER:   He walked right back
12   into it.
13               JASON WALKER:   Well, no.  I, I think what
14   he -- he was like, fuck, you didn't have any issues.  And
15   I'm like, no, I didn't.  And, and he was like, well, now
16   he's slipping back.
17           And so we wanted to talk to you.  Again, I
18   don't want to rehash this (inaudible) conversation.  But
19   that was the impetus, and I -- when I, I'm, look, we need
20   to talk to him, we've got to get this in order.
21               JEREMY THACKER:   Just under -- I've been
22   found guilty for shit I didn't do.  I know I'm guilty of
23   some shit.  But I've been found guilty of things that I
24   didn't -- I don't mean here, I just mean life.  And I'm
25   fucking sensitive to it.  And when people --
```

```
 1                    JASON WALKER:    I get it.

 2                    JEREMY THACKER:    -- say shit that's not

 3  true about me --

 4                    JASON WALKER:    Look.  I -- and I'm going

 5  to say one more thing here.  And I don't want to go down

 6  this path.  I don't -- and I'm, I'm happy I don't know

 7  anything.  Because I don't.

 8                    JEREMY THACKER:    Yeah.

 9                    JASON WALKER:    Okay?  And I mean it.

10  Only from the standpoint is because --

11                    JEREMY THACKER:    You don't want to know.

12  I know.
```

it's a messy

```
13                    JASON WALKER:    It, it is -- that's the

14  issue.  But I don't condone anything like that.  I

15  don't -- I think that you should be able to come here and

16  do your job and go home and, and leave it at that.

17  Everybody should.  And -- you know.  I will do everything

18  that I can to continue to try and make sure that that is

19  possible, up to and including letting you not be here all

20  the time.  But to the extent that we can coordinate when

21  you are here, it's better.  Because that helps with other

22  things more than you know.  And it allows me to push for

23  things that are right.  And I'll leave it at that.

24                    JEREMY THACKER:  Okay.  All right.

25                    JASON WALKER:  And it's -- you know,
```

1  unfortunately, that is discussed (inaudible) Vistage

2  yesterday.  We were having a different discussion when

3  something came up about HR and, you know (inaudible) I

4  was like, yeah, yeah, that'd be nice.  They were like you

5  guys (inaudible) HR and everyone has been collecting

6  speculate as to what that (inaudible).  But I won't.

7  But, it's also a conversation that I am going to have

8  because it's necessary. ◄ **See page 58

9          JEREMY THACKER:  All right.  I'm not

10 being a dick (inaudible) anybody.  I've, I've vented to

11 Tyler.  That's all -- that's it.  I didn't -- shot back

12 on the fact that I went out of my way to be nice to

13 everybody else.  And I will not bring anything that's not

14 valid.  All I ask is that if it's valid that it's

15 listened to.  And that's it.  That's that's all I

16 request.

17         JASON WALKER:  So the open items from

18 this conversation, the two words, what are the, what

19 are --  orders

20         JEREMY THACKER:  I'm not even worried

21 about that.  I got money now.

22         JASON WALKER:  Well, I, I don't want you

23 to not have money.  So, so what I'd like to do is put

24 something in place.  So -- like I don't want to wait

25 until it becomes an emergency.

```
1   (inaudible.)

2               UNIDENTIFIED MALE:   I think I did.   Think

3   I did.

4           (Multiple voices - indiscernible)

5             (END OF RECORDING)

6                   *  *  *

7
```

**This should replace the text that was struck through at 52:25 through 53:8.**

JASON WALKER:  Unfortunately, as discussed in my Vistage group yesterday, we were having a different discussion, and something came up about HR and I was like, "Yeah that would be nice." They were like, "You guys don't have an HR department?" And everyone's collective jaw dropped on the floor. They were like, "You guys are way too big…"

JEREMY THACKER:  There are reasons for that.

JASON WALKER:  Probably. I can only speculate as to what they might be.  But I won't.  But, it's also a conversation that I am going to have because it's necessary.

1              BE IT KNOWN that the foregoing is a true and

2    accurate transcription of an audio recording done to the

3    best of my skill and ability.

4              I was not involved in, nor was I present for

5    these proceedings, and I make no representation as to the

6    accuracy or completeness of the audio recording itself.

7              I FURTHER CERTIFY that I am in no way related

8    to any of the parties hereto nor am I in any way

9    interested in the outcome thereof.

10

11

12   _____        _____

13   Annette Satterlee                             DATE
     Arizona Certified Reporter #50179

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
Jeremy Thacker,              )
                             )
              Plaintiff,     )   No. 2:18-cv-00063-PHX-DJH
         v.                  )
                             )
GPS Insight, LLC; Robert J.  )
Donat, individually and as   )
Trustee of the Robert Donat  )
Living Trust Dated           )
April 19, 2017,              )
                             )
              Defendants.    )
_____)
```

REPORTER'S TRANSCRIPTS OF AUDIO RECORDING

AUDIO FILE NO. 3

Transcribed from audio recording by:

Annette Satterlee, RPR, CRR, CRC
Arizona CR No. 50179

1  way was (inaudible) posting my (inaudible) how do we do

2  something in a way that allows you to get compensated for

3  that but also allows us to move forward, too.

4           And I don't know that all the factors being

5  involved in the conversation Jason and I had we feel that

6  there's a path forward that really allows us to go down a

7  future together.  So --

8           JASON WALKER:  Where you would be coming

9  in here happy.  I don't want -- and we talked about that,

10  and I was saying for mental health --

11           JEREMY THACKER:  Yeah.

12           JASON WALKER:  -- for you, for us, and

13  for the company.  So that was kind of --

14           UNIDENTIFIED SPEAKER:  That was kind of

15  where Jason and I were.  We talked probably half an hour

16  that night, and then we talked for quite a while on

17  Friday and kind of came to the conclusion that we

18  probably need to part ways, but to figure out a way that

19  we could get you paid for the stuff that you talked

20  about.  How do we get you taken care of with LCI; how do

21  (inaudible) CMI; what do we do about Amerisure.

22           On the heels of that, we had a conversation

23  with Rob where he brought some things to our attention

24  (indiscernible) looking into calls and the activities for

25  last week that he just said, look, I want you guys to be

1   aware of these things.

2          And over time, and as you remember our

3   conversation last week, one of the things that became

4   more and more difficult was defending you and trying to

5   say to Rob, look, he's working, trust us.  He's doing

6   this, trust us.

7          So, we took the opportunity, with those two

8   things being brought up, to have a conversation with him

9   and say, look, we feel like we might be better off moving

10  in a different direction and letting Jeremy go, but

11  here's how we'd like to do it.

12                JEREMY THACKER:   What two things?

13                JASON WALKER:   Well, we can talk about

14  that.

15                JEREMY THACKER:   Oh.

16                JASON WALKER:   But, we talked to him

17  about a way that we can do that that would take care of

18  you.  So that -- going back to the conversation you and I

19  had, you know, how do you move on with the least amount

20  of damage, I think that we figured out a way to do that.

21          We also don't have much of an option because of

22  the things that he discussed, that's really not something

23  that we can get into.  So, we --

24                UNIDENTIFIED SPEAKER:   Sorry.

25                JASON WALKER:   -- basically came up with

1 basically a severance agreement that will get you paid

2 out on stuff and take care of things.

3         We are terminating your employment today.  But,

4 we want to go over the things (inaudible) few things,

5 also go over the severance agreement.

6         And then the reason Gary's joined us is due to

7 the new data security requirements that we have, in his

8 role, he just has to walk you through a few things in

9 terms of systems and access that you have -- or systems

10 that you have access to in order to walk through that.

11         So, I'm sure you're going to have questions.

12 But we can talk about the things (indiscernible) brought

13 to our attention if you want to.

14               JEREMY THACKER:   Okay.

15               JASON WALKER:   We'll walk through the

16 severance agreement.  We want you to look at that.  And

17 we'll explain what it includes, how it will work --

18               JEREMY THACKER:   Okay.

19               JASON WALKER:   -- and what the

20 (indiscernible) are behind that.

21               JEREMY THACKER:   Okay.

22               JASON WALKER:   So, the first thing when

23 he came in was he walked by your office last week and

24 noticed you were on the phone.  And you were kind of

25 leaning back.  It was -- I think he thought you were

1   staring at the ceiling or something.  And he was like,

2   oh, I've never heard Jeremy on a call.  So he

3   (indiscernible) listen.

4            And you were on a customer call.  And then he

5   was in the phone system, and there was a large file that

6   was a recorded call, and he listened to that as well.

7   And the call was you speaking to the Hyatt --

8            JEREMY THACKER:   Uh-huh.

9            JASON WALKER:   A call center.  And the

10  call was being recorded.  And it was a call that -- it

11  was -- it didn't come across very well.  It was a -- you

12  were -- I would, I would just call it bullying the call

13  center, it was pretty good, about something.  It was --

14  it put you in a -- not a good light.

15           JEREMY THACKER:   Okay.

16           JASON WALKER:   And it was something that

17  Tyler and I kind of listened to, and we were like, okay.

18  He -- there was nothing that (inaudible) and I hope for

19  God's sakes we never talk to our customers that way.

20           But it was a -- based on kind of some of the

21  stuff we had been talking about before, something that

22  neither Tyler or I could defend in any way because of the

23  nature of the call.  For one, it put you -- just the way

24  that you were talking to people (inaudible) very

25  professional.

```
 1              The second thing was that he just said, you
 2  know, what else did he do that weekend?  There was really
 3  less than 56 minutes, I think, in total phone time over
 4  the four days.  So, again, it was just something -- when
 5  Tyler and I kind of had that put in our lap (inaudible)
 6  I, I don't have a way to defend that.  It was difficult.
 7              And that's when we started having the
 8  conversation of let's figure out a way to give Jeremy the
 9  recognition from a payout perspective of all the things
10  that he's done, put together a plan that will help him
11  transition smoothly.  And that's what we want to go over,
12  because we think we've been able to do that.  And I think
13  it will be better for you ultimately, just given the
14  stuff that's gone on here, in your mind; better for us
15  because we won't have to be kind of in the middle of
16  this; and then also just better for the company overall.
17              So, that's what Tyler's got a copy of.  We'll,
18  we'll give it to you so you can look it over.  And I want
19  to walk you through it and just kind of explain to you --
20  it's very clear, but I want to explain to you what it --
21  if you have questions, I'll take you through it
22  step-by-step.
23              JEREMY THACKER:   Okay.
24              JASON WALKER:   So, will you read it, and
25  then I'll answer any questions (inaudible) if you have
```

1  know that I've seen them.  So --

2                 UNIDENTIFIED SPEAKER:   Well, he came to

3  us with that information (inaudible) not to do anything

4  cause of action or direction when he came and talked to

5  us.

6            What Jason and I have told you is exactly how

7  things happened.  We had a discussion trying to figure

8  out what's going on.  So, whether he's done that, they

9  were recorded on his server.  They're his property.  They

10 were done on his phone system.  He can probably do what

11 he wants with them.  So --

12                 JEREMY THACKER:   I don't think he can

13 call me a complete piece of shit to the girl that I'm

14 dating that's not involved in it.

15                 JASON WALKER:   Well, we're not going to

16 get into a legal discussion of it.  But --

17                 JEREMY THACKER:   Well, we are.  I mean,

18 this is a legal discussion.  I don't know how to --

19                 UNIDENTIFIED SPEAKER:   (Inaudible)

20 actions in this discussion.

21                 JEREMY THACKER:   Yeah.  Well, I know.

22 But it's, it -- that's why we're here.

23                 UNIDENTIFIED SPEAKER:   I understand.

24                 JEREMY THACKER:   Yeah.  I mean, I

25 wouldn't have set up 1500 (inaudible) and we didn't have

1  any problems until I started dating Kristen.  So the

2  coincidence of being asked about going to Chicago, about

3  him going through my recordings, about all of it, is not

4  coincidence.

5           But, at the same time, I don't, I don't want to

6  be involved in a lawsuit.  I don't want any -- I don't

7  think -- I do appreciate what you two have done, and I

8  care about other people here and I don't want to go down

9  that road of trying everything in the mud and getting

10 (inaudible) and people having to take the stand.  It's

11 bullshit.  But I don't necessarily think that this is

12 fair compensation based on knowing that as well.

13           JASON WALKER:   So, you don't have to

14 decide right now.

15           JEREMY THACKER:   Okay.

16           JASON WALKER:   That is your option.

17 Obviously, we tried to put this together to give you, you

18 know -- we, we do think it's fair.  That's why we put it

19 together.  We're very pleased with it.  But --

20           JEREMY THACKER:   You think it's fair

21 based on discrimination, or no?  (Inaudible) just fair

22 based on purely if we take that out of consideration, but

23 that, that can't be -- like I saw the text message saying

24 that he had proved what he'd known all along, that I was

25 a complete piece of shit.  So.

1              BE IT KNOWN that the foregoing is a true and

2   accurate transcription of an audio recording done to the

3   best of my skill and ability.

4              I was not involved in, nor was I present for

5   these proceedings, and I make no representation as to the

6   accuracy or completeness of the audio recording itself.

7              I FURTHER CERTIFY that I am in no way related

8   to any of the parties hereto nor am I in any way

9   interested in the outcome thereof.

10

11

12   _____        _____

13   Annette Satterlee                        DATE
     Arizona Certified Reporter #50179

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

UNITED STATE DISTRICT COURT

FOR THE

DISTRICT OF ARIZONA


Jeremy Thacker                     ) Civil Action No.
                                   ) 2:18-cv-00063-DJH
                Plaintiff,         )
v.                                 )
                                   )
GPS Insight, LLC; Robert           )
Donat, individually                )
                                   )
                Defendants.        )
_____ )


DEPOSITION OF ROBERT DONAT

August 22, 2018
Phoenix, Arizona
10:00 a.m.


PREPARED FOR:

ATTORNEY AT LAW

(COPY)


REPORTED BY:
Mary Davis, RPR
Arizona CCR No. 50271

AZ Registered Reporting Firm No. R1008

1  foundation.

2      A.    Among other things, yes.

3  BY MR. SILENCE:

4      Q.    What other reasons?

5      A.    Reasons that I don't personally know because I

6  don't directly supervise Jeremy Thacker.

7      Q.    So as you sit here today, all you know is that

8  Jason terminated Jeremy because of a difficult and

9  antagonistic conversation that they had on March 2nd,

10  2017?

11          MS. FRANCIS:   Object to form.

12      A.    No.

13  BY MR. SILENCE:

14      Q.    Well, I'm not understanding what -- why you

15  believe Jeremy was terminated by Jason, other than

16  Jason coming to you and telling you that he had a

17  difficult and antagonistic conversation with Jeremy?

18      A.    I presume there were many things leading up to

19  that meeting which required the meeting.  And after the

20  meeting, it became clear to Jason that Jeremy needed to

21  be let go.

22      Q.    What involvement, if any, did you have in the

23  termination of Mr. Thacker?

24      A.    None.

25      Q.    Did you make statements to Jason that were

 1    disparaging about Jeremy that he -- you believe he may

 2    have relied on in terminating Jeremy?

 3         A.    No.

 4              MS. FRANCIS:  Object to form and

 5    foundation.

 6         A.    No.

 7    BY MR. SILENCE:

 8         Q.    So is it your testimony that Jason made the

 9    decision to terminate Jeremy on his own without any

10    input or involvement from you?

11         A.    That's two different questions.  Can you break

12    it up for me so I can answer them accurately?

13         Q.    Is it your testimony that Jason terminated

14    Jeremy without any input from you?

15         A.    No.  Hold on, let me -- let me hear that

16    question one more time, please.

17         Q.    Is it your testimony that Jason terminated

18    Jeremy without any input from you?

19              MS. FRANCIS:  Object to form.

20         A.    No.  It is my understanding that he made the

21    decision to terminate Jeremy with no input from me.

22    He then terminated Jeremy after we discussed something,

23    so I don't know if any input of mine became relevant.

24    BY MR. SILENCE:

25         Q.    What input did you provide to Jason about

```
 1   Mr. Thacker's performance?

 2              MS. FRANCIS:  Object to form.

 3      A.    None.

 4   BY MR. SILENCE:

 5      Q.    You didn't make any disparaging comments about

 6   Jeremy to Jason prior to Jeremy's termination?

 7      A.    No.

 8      Q.    Did you make any disparaging comments about

 9   Jeremy to Tyler Mortensen prior to Jeremy's

10   termination?

11      A.    No.

12              MS. FRANCIS:  Object to form.

13              He answered.

14   BY MR. SILENCE:

15      Q.    Oh, I'm sorry.  What did you say?

16              MS. FRANCIS:  Can you read the answer

17   back --

18              THE WITNESS:  To make sure -- I don't

19   recall -- yeah, can you --

20              THE COURT REPORTER:  I have -- "No" was

21   your answer.

22              THE WITNESS:  No was my answer.  No.

23   BY MR. SILENCE:

24      Q.    Who made the decision to fire Kristin Lisson?

25      A.    I did.
```

1    Jason Walker?

2         A.    I wanted -- if that was the case, which I

3    think I would have, he was aware of the fact that we

4    were dealing with Jeremy's malicious acts, and I wanted

5    him to have an understanding of what we were dealing

6    with.

7         Q.    Do you know how you sent this to Jason?

8         A.    If I sent it to him, it would have been via

9    email.

10        Q.    Well, I thought you said you did sent it to

11   him?

12        A.    I said likely.  I believe I said likely.

13        I don't recall exactly sending it via email to

14   Jason.  I just presume that he was the one person

15   working with me on Jeremy's difficult nature subsequent

16   to his termination.  And had I sent it to Mr. Walker,

17   it would have been via email.

18        Q.    Have you ever asked for or been provided a

19   copy of a LexisNexis report like this for any other

20   GPSI employee?

21             MS. FRANCIS:   Object to form.

22        A.    Yes.

23   BY MR. SILENCE:

24        Q.    Which employees?

25        A.    One employee.  And it was right at the same

1    time, I believe, by Mr. Galbut, or his firm, and it was

2    for Ms. (Indiscernible).

3                    (Clarification by the Court Reporter.)

4        A.    Ms. Lisson.

5    BY MR. SILENCE:

6        Q.    Did your attorney provide you a copy of the

7    LexisNexis report for Ms. Lisson prior to her

8    termination?

9        A.    Can you remind me what date her termination

10   was?  I believe it was March...

11       Q.    March 19, I believe.

12       A.    I don't recall.

13       Q.    Do you recall why you asked your attorney to

14   provide you a copy of the LexisNexis report for Kristin

15   Lisson?

16                    MS. FRANCIS:  Object to form and

17   foundation.

18       A.    I don't recall having asked him for one.

19                    MS. FRANCIS:  And, again, Counsel, you're

20   getting into privileged communications.

21   BY MR. SILENCE:

22       Q.    Did you say you didn't ask your lawyer to

23   provide it?

24       A.    I don't recall asking him to provide it, no.

25       Q.    So you believe --

```
 1   BY MR. SILENCE:

 2       Q.    What involvement, if any, did you have in the

 3   termination of Mr. Thacker?

 4       A.      Here I --

 5               MS. FRANCIS:  Objection; asked and

 6   answered.

 7       A.    After it was decided that Mr. Walker was going

 8   to terminate Mr. Thacker, I became involved as the

 9   owner of a company with a potentially difficult

10   employee, based on previous conversations with

11   Mr. Walker, as to how to communicate his being

12   terminated, as well as how to present a severance

13   package.  Because I was in Florida, I was unable to do

14   so myself, if I had chosen to.

15   BY MR. SILENCE:

16       Q.    If Mr. Walker made the decision to terminate

17   Jeremy before this text, why did you need to dictate

18   the reason for his termination?

19               MS. FRANCIS:  Object to form.

20       A.    I didn't dictate.  I just simply was

21   explaining why I thought -- how I thought Jason should

22   frame his termination.

23   BY MR. SILENCE:

24       Q.    But I thought you said you left these kinds of

25   decisions to the manager.
```

1          MS. FRANCIS:  Object to foundation.

2      A.    Without my authorization and without the

3   authorization to give to Mr. Thacker, Mr. Thacker's

4   friend and supervisor, perhaps at the time,

5   Mr. Mortensen, advised Mr. Thacker that he could use

6   the company credit card for necessities because he

7   could not pay his bills.  I don't know what those

8   necessities meant.  Nothing was in writing.

9          It became clear months later that Mr. Thacker

10  had -- I had been told at one point racked on up on the

11  order of $10,000 of nonbusiness related charges.  This

12  was brought to Jason's attention by Mr. Holder, my

13  controller, at which point Jason was prepared to

14  terminate Mr. Thacker for fraudulently using GPS

15  dollars for personal use.

16  BY MR. SILENCE:

17      Q.    To the best of your knowledge, did Jason ever

18  give permission to Jeremy to use the card for personal

19  expenses because he was struggling financially?

20          MS. FRANCIS:  Object to form and

21  foundation.

22      A.    I don't believe that he did, no.

23  BY MR. SILENCE:

24      Q.    So your testimony is that if Jeremy used the

25  card to purchase any personal expense during his time

1   wanted to have her as your queen, or words to that

2   effect?

3               MS. FRANCIS:  Object to form.

4       A.    I do not recall the details of my text to her.

5   BY MR. SILENCE:

6       Q.    Does it sound like -- does the comment that I

7   want to have you as my queen sound like something you

8   might say to her at that time?

9       A.    No.  Roughly, I recall her telling me that she

10  could never have a relationship with me because she

11  could never work for -- excuse me.  She could never

12  have a relationship with somebody whom she worked for.

13  And I may have said something like, Well, if I'm -- but

14  I don't know what I said.  Something to the effect of

15  if I'm king, you can be queen, perhaps.

16          She seems to have taken offense to that,

17  because she says, quote:  I am not okay with being your

18  "Queen."  That's all I recall.

19      Q.    Did you provide your response to this text

20  message where you told Kristin Lisson that Elliot

21  Batcheller told you that Kristin -- that he always

22  thought Kristin Lisson was a bitch?

23              MS. FRANCIS:  Object to form.

24      A.    Yeah.  If you can show me the text message, I

25  can --

```
 1   BY MR. SILENCE:

 2       Q.    I'm wondering, did you provide the responsive

 3   text message where those words were used?

 4       A.    I provided --

 5              MS. FRANCIS:  Object to form.

 6       A.    I provided a complete backup of my phone to

 7   counsel, and I don't know what they provided you.

 8   BY MR. SILENCE:

 9       Q.    But you don't know whether that response to

10   that specific text was provided in this lawsuit?

11              MS. FRANCIS:  Object to form.

12       A.    Yeah.  I don't -- I don't provide things to

13   you; my attorneys do.  I don't have any idea what they

14   do or don't give to you.

15              I know that I've given them everything I've

16   got.  And rather than document dump it to you, they put

17   what's relevant in whatever form you've got to share.

18   So I don't know if they provided it to you.

19   BY MR. SILENCE:

20       Q.    My question, though, is did you give the

21   response to that text to your attorneys?

22       A.    Yes.

23              MS. FRANCIS:  Object to form.

24   BY MR. SILENCE:

25       Q.    So the only reason we wouldn't have it is
```

```
 1                    MR. SILENCE:  Camper.

 2        A.    You didn't read it right.  Do you want to read

 3   it right?

 4        Q.    Yes.  Please do.

 5        A.    Do you want me to read it right?

 6        Q.    Can you just -- my real question is, can you

 7   confirm that the text message in row 217 is a text

 8   message you sent to Kristin on that day?

 9        A.    Sure.  That looks right.

10        Q.    What did you mean when you told Kristin that

11   you wanted equal opportunity distancing from all

12   parties?

13        A.    She stated about 10 minutes prior to my

14   response, quote:  I may purposely distance myself from

15   everyone temporarily until I can get my bearings and

16   figure out what I'm doing.  I have your number...and

17   know where you live and work, for that matter.  Smiley

18   face.

19              I was saying to her, I'm glad to hear that she

20   is distancing everyone and not just me.

21        Q.    Who else do you believe Kristin was distancing

22   herself from?

23              MS. FRANCIS:  Object to foundation.

24        A.    She doesn't reference anyone else, so I don't

25   know if that meant people at work, people outside of
```

1    work.  She does reference Jeremy, so we'll go with it

2    might have meant Jeremy.  It might have meant Robert,

3    her good friend Robert Dennis.

4           But I don't know who specifically

5    two-and-a-half years ago -- year and a half ago I wrote

6    that text regarding.

7    BY MR. SILENCE:

8      Q.    Sir, isn't it pretty clear that you're telling

9    Kristin that you wanted her to stay away from Jeremy if

10   she wasn't going to date you?

11     A.    No.

12          MS. FRANCIS:  Object to form and

13   foundation.

14     A.    I never say anything about her staying away

15   from Jeremy.

16   BY MR. SILENCE:

17     Q.    You don't use his name, but isn't that what

18   you're intending to say in the text message on row 217

19   of this document?

20          MS. FRANCIS:  Object to --

21     A.    No.

22          MS. FRANCIS:  -- form and foundation.

23     A.    No.  I am telling her that I will be a, quote,

24   unquote, happy camper -- or I am a happy camper because

25   she is distancing herself from everywhere (verbatim)

1    temporarily until she can get her bearings and figure

2    out what she's doing.  She has my number, and she knows

3    where I live and work, for that matter.  Smiley face.

4          She is the one telling me that she is

5    distancing herself from everyone, to include myself.

6    And I was saying, as long as it's not just me, I'm a

7    happy camper.

8    BY MR. SILENCE:

9      Q.    Sir, the text message 10 minutes before this

10   says, quote:  Then everything with Jeremy happened so

11   quickly and unexpectedly, in parenthesis, sharing of

12   feelings, end parentheses, and I am more overwhelmed

13   than ever about where I am, where I'm headed, and where

14   I even live.  I don't want to let you or anyone down,

15   so I may purposely distance myself from everyone

16   temporarily until I can get my bearings.

17         Isn't it pretty clear that your response to

18   that text message was about Jeremy?

19              MS. FRANCIS:  Object to form and

20   foundation.

21     A.    So, again, no.  It doesn't have anything to do

22   with Jeremy.

23         It has to do with the fact that she is, quote,

24   purposely distancing herself.  I say that equal

25   opportunity distancing, meaning distancing herself from

```
 1   everyone, makes me a happy camper.  Not just myself.

 2   Not just Jeremy.  Not just Robert Dennis.  Not just

 3   Elliot Batcheller, people she works with.

 4          She is, quote, purposely distancing herself

 5   from everyone.

 6   BY MR. SILENCE:

 7      Q.   So you --

 8      A.   What I'm trying to say is, as long as I'm not

 9   the only one you're distancing yourself from, I'm a

10   happy camper.

11          Does that not make sense?

12      Q.   It sounds like you're saying to me, the only

13   way you'd be a happy camper is if she distances herself

14   from all GPSI employees.

15      A.   Sounds --

16          MS. FRANCIS:  Object to form and

17   foundation.

18      A.   It sounds to me like you don't like my answer,

19   so I'm going to give it again.

20          She says that she is purposely distancing

21   herself from everyone temporarily.  I said:  I get it

22   and as long as it's equal opportunity distancing from

23   all parties, I am a happier camper.  Paraphrasing.

24          Because I did not want to hear that I'm the

25   only person being distanced from.
```

1    BY MR. SILENCE:

2        Q.    So if she wasn't distancing herself from

3    everyone equally, you wouldn't be happy?

4              MS. FRANCIS:  Object to form.

5        A.    If she told me that she was only distancing

6    herself from me, I would not have been happy.

7    BY MR. SILENCE:

8        Q.    Why?

9        A.    Because I had long-standing relationship with

10   Kristin Lisson, and I would not want her to distance

11   herself from me.

12       Q.    And you wouldn't be happy if she did?

13       A.    Correct.

14       Q.    So the owner of the company and the person

15   responsible for determining her bonus wouldn't be happy

16   unless she distances herself -- if she distances

17   herself from you?

18              MS. FRANCIS:  Object to form and

19   foundation.

20   BY MR. SILENCE:

21       Q.    That's your testimony?

22       A.    That's not my testimony.  I am, in fact, the

23   owner of the company.  To some extent I do, in fact,

24   determine her bonus.  But correct, I would not be happy

25   should she distance herself from me.

Case 2:18-cv-00063-DGC   Document 129-1   Filed 11/15/18   Page 84 of 247

1          MS. FRANCIS:  Object to form.

2      A.    I don't know.  I don't have a copy of my NDA

3  in front of me, so I don't know.

4  BY MR. SILENCE:

5      Q.    Tell me about the terms of the deal between

6  GPSI and Sagemount.

7              (Clarification by the Court Reporter.)

8              MR. SILENCE:  Sagemount.

9  S-A-G-E-M-O-U-N-T.

10             MS. FRANCIS:  Object to form.

11     A.    Sagemount is a private equity firm owned by

12 Bregal.  They are in New York City, and we agreed that

13 they would purchase a percentage -- and this is all

14 public record -- a minority percentage of GPS Insight

15 from me in exchange for monetary compensation, as well

16 as their advice, their expertise, their people to come

17 along.

18 BY MR. SILENCE:

19     Q.    Let me interrupt you.

20     A.    That's a part of it, but that is a part of the

21 deal.

22     Q.    How much money did Sagemount pay for their

23 equity stake in GPSI?

24     A.    That is under nondisclosure, and I cannot

25 divulge the dollar amount without being told it's

1   the week to let me process the news in peace.  Later

2   that evening, I received 104 messages and 5 missed

3   calls.

4       A.    Right.  Yes.  Mr. Walker was unaware of the

5   fact that I was trying to help Kristin, not only save

6   the confidentiality for her husband's sake, as well as

7   her career sake, of our relationship.  I shouldn't say

8   that.

9           The confidentiality for her husband's sake as

10  well as helping -- trying to help her keep her job,

11  because it was evident to Mr. Walker that Ms. Lisson

12  had to be fired because she shared confidential

13  communications that were detrimental to GPS Insight

14  with Mr. Thacker.

15      Q.    Let me stop you there.

16          My question is, Do you admit that Jason Walker

17  told you before or on March 9th not to have further

18  communications with Kristin?

19              MS. FRANCIS:  Object --

20  BY MR. SILENCE:

21      Q.    Do you deny that?

22              MS. FRANCIS:  -- to form.

23      A.    I don't know what day or time he asked me to

24  do that.

25  ///

1    BY MR. SILENCE:

2        Q.    And do you deny that whenever it is that he

3    told you, that you violated his instructions and sent

4    104 text messages to Kristin Lisson?

5        A.    So I'm going to be --

6              MS. FRANCIS:  Object to form and

7    foundation.

8        A.    I'm going to be real clear.  Mr. Walker does

9    not tell me what to do.

10             Okay.  He told me that Ms. Lisson requested,

11   and he requested as a result, that I not contact

12   Ms. Lisson.  However, Ms. Lisson and I had a 10-month

13   relationship that Mr. Walker was not privy to.  And as

14   such, it was not something that I took his advisement

15   for.

16             I wanted to help Ms. Lisson, and she

17   acknowledged that she might need my help because she

18   was telling me things like:  She had been hacked by

19   Mr. Thacker.  He has everything.  I'm so paranoid.  I

20   don't know who to trust.

21             She then turned around and took my helpful

22   messages and turned them into this message that she

23   sent regarding the bullying and harassing.

24             (Exhibit No. 81 was marked for

25   identification.)

 1  STATE OF ARIZONA      )
                          )  ss.
 2  COUNTY OF MARICOPA    )

 3       BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
 4  duly sworn by me to testify to the whole truth; that
    the foregoing pages are a full, true and accurate
 5  record of the proceedings, all done to the best of my
    skill and ability; that the proceedings were taken down
 6  by me in shorthand and thereafter reduced to print
    under my direction.

 7
         I CERTIFY that I am in no way related to any of
 8  the parties hereto nor am I in any way interested in
    the outcome hereof.

 9
         {X}  Review and signature was requested.
10       { }  Review and signature was waived.
         ( )  Review and signature was not required/requested.

11
         I CERTIFY that I have complied with the ethical
12  obligations set forth in ACJA 7-206(F)(3) and ACJA
    7-206 (J)(1)(g)(1) and (2), Dated at Phoenix, Arizona,
13  this 6th day of September, 2018.

14

15

16

17       _____
         MARY DAVIS, RPR - Digital Signature
18       AZ Certified Court Reporter No. 50271

19
         I CERTIFY that OTTMAR & ASSOCIATES, INC., has
20  Complied with the ethical obligations set forth in ACJA
    7-206 (J)(1)(g)(1) through (6).

21

22                    Julie T. Ottmar

23

24       _____
              OTTMAR & ASSOCIATES, INC.
25       AZ Registered Reporting Firm No. R1008

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF ARIZONA


Jeremy Thacker                    )
                                  )
            Plaintiff,            ) Civil Action No.
v.                                ) 2:18-cv-00063-DJH
                                  )
GPS Insight, LLC; Robert          )
Donat, individually               )
                                  )
            Defendants.           )
_____    )


DEPOSITION OF JASON WALKER

September 5, 2018
Phoenix, Arizona
10:00 a.m.


PREPARED FOR:

ATTORNEY AT LAW

(COPY)


REPORTED BY:
Mary Davis, RPR
Arizona CCR No. 50271

AZ Registered Reporting Firm No. R1008

1      A.    The last one, I did send that to Kristin, but

2   it's not related to the previous chain of texts.  It's

3   just almost a month later.

4          Yes, this appears to be.

5   BY MR. SILENCE:

6      Q.    Do you recall whether you had a meeting with

7   Kristin Lisson to discuss this issue?

8              MS. FRANCIS:  Object to form.

9      A.    I don't recall, no.

10             MS. FRANCIS:  Can we be clear of what

11  text you're talking about, since there are two

12  different issues?

13  BY MR. SILENCE:

14     Q.    I'm talking about Kristin's text to you on the

15  first page, the second one down from the top.  It says:

16  I'll explain tomorrow, but can you tell me if you know

17  anything I should be aware of in terms of my

18  professional relationship at work being in jeopardy?  I

19  got a very confusing and upsetting message just now.

20  I'm trying to reconcile what it could be without

21  overreacting.

22     A.    I don't recall having a meeting specifically

23  about that, but Kristin and I met (Indiscernible) a lot

24  of things.

25             (Clarification by the Court Reporter.)

1   A.      Met about a lot of things.

2          I'm sorry.

3   BY MR. SILENCE:

4   Q.      Kristin had a meeting with you where she told

5   you that Rob Donat caused her to have a panic attack,

6   correct?

7   A.      Yes.  At one point, but it was far after this

8   string because I clearly had no understanding of

9   anything that was going on.

10  Q.      It seems like from this text message exchange

11  that you would have met with Kristin on or around

12  February 13th or 14th.  Does that sound about right?

13          MS. FRANCIS:  Object to form and

14  foundation.

15  A.      I told you I don't know.  It's possible, but

16  we certainly didn't meet on the 13th.  I believe this

17  was a weekend.

18  BY MR. SILENCE:

19  Q.      But you admit that you had a meeting with

20  Kristin after this text message exchange ended on

21  February 13, 2017, and in that meeting she told you

22  that Rob Donat caused her to have a panic attack?

23          MS. FRANCIS:  Object to --

24  A.      No.

25          MS. FRANCIS:  -- form and foundation.

1    BY MR. SILENCE:

2        Q.    When did Kristin tell you that Rob Donat

3    caused her to have a panic attack?

4        A.    I don't recall, but it wasn't right after this

5    text string.

6        Q.    Was it a few days after this text string?

7        A.    I do not remember.

8        Q.    And in that meeting, Kristin told you that Rob

9    told her that her reputation was being damaged because

10   of her association with Jeremy Thacker, correct?

11              MS. FRANCIS:  Object to form and

12   foundation.

13       A.    At one point that conversation took place.  I

14   don't believe it was after this.

15       Q.    When do you believe it occurred?

16       A.    Much closer to the time when I happened to

17   terminate Jeremy.  Kristin and I had several meetings.

18   We met all the time because we worked together.

19   BY MR. SILENCE:

20       Q.    And in those meetings, Kristin also told you

21   that Rob Donat told her not to talk to you about him,

22   correct?

23              MS. FRANCIS:  Object to form and

24   foundation.

25       A.    No.

```
 1   BY MR. SILENCE:

 2       Q.     Did GPSI have an HR department in 2016 and

 3   '17?

 4              MS. FRANCIS:  Object to form.

 5       A.     No.

 6       Q.     Prior to Jeremy's termination, what was the

 7   protocol with respect to what you, as a manager, should

 8   do when one of your employees is complaining about

 9   harassment by Rob Donat?

10              MS. FRANCIS:  Object to form and

11   foundation.

12       A.     There wasn't a specific policy for what you

13   just asked me.

14   BY MR. SILENCE:

15       Q.     Well, how should that situation be handled?

16              MS. FRANCIS:  Object to form and

17   foundation.

18       A.     I believe it should be handled exactly the way

19   I handled it, which was as soon as I had anything

20   concrete, in an official complaint, I went right to him

21   and told him to stop.  And I documented it.

22   BY MR. SILENCE:

23       Q.     What should the employee who is the victim of

24   harassment do in that situation?

25              MS. FRANCIS:  Object to foundation and
```

1   BY MR. SILENCE:

2     Q.    I just want to be very clear.  I understand

3   your testimony is you didn't know they had an affair

4   March 9th, 2017, right?

5            MS. FRANCIS:  Objection; form, asked and

6   answered.

7     A.    I answered --

8   BY MR. SILENCE:

9     Q.    My question is --

10           (Clarification by the Court Reporter.)

11     A.    I answered it.  That's what I said.

12   BY MR. SILENCE:

13     Q.    My question is, you also were not aware that

14   Rob Donat had any kind of romantic interest in Kristin

15   Lisson until March 9th?

16            MS. FRANCIS:  Objection; form, asked and

17   answered.

18     A.    It is impossible for me to know what Rob's

19   interests were.  I did not know.

20   BY MR. SILENCE:

21     Q.    Did you ever tell Kristin Lisson that you

22   believed Rob had a crush on her?

23     A.    Yes.

24     Q.    When did you tell Kristin Lisson that?

25     A.    I don't remember.

1    Q.      It was prior to Jeremy's termination, right?

2    A.      Yes.

3    Q.      Isn't that a romantic interest?

4            MS. FRANCIS:   Objection; form.

5    A.      Not to me, no.  That's not what I was alluding

6    to.

7    BY MR. SILENCE:

8    Q.      So you admit that Kristin told you prior to

9    Jeremy's termination that Rob had a crush on her, but

10   you deny that that constitutes having a romantic

11   interest?

12           MS. FRANCIS:   Objection; form and

13   foundation.

14   A.      He was married.  People have crushes on

15   people.  He liked her as an employee.  That's all I can

16   say.

17   BY MR. SILENCE:

18   Q.      But, sir, you said he had a crush on her.

19   A.      Yes.

20   Q.      Can you look at Exhibit 112, please.

21   A.      Uh-huh.

22   Q.      Have you seen this document before?

23   A.      I believe it was brought up in a prior

24   deposition.

25   Q.      It was produced to us in this lawsuit as text

1   you refer to his moving to the Government sales team as

2   a promotion, did you not?

3        A.    If that's what the recording says.  I don't

4   remember.  That was a very long meeting.

5        Q.    But if you said it was a promotion, you now

6   say it wasn't a promotion?

7              MS. FRANCIS:  Objection; form.

8        A.    In terms of it being a salary increase, it was

9   not a promotion.  You can constitute it any way you

10  want.

11             Is there a point that you're trying to make?

12  We gave him an opportunity even though he had done some

13  things in the past that we didn't approve.  I mean --

14  BY MR. SILENCE:

15       Q.    The point I'm trying to make is that --

16             MS. FRANCIS:  Go ahead.  Finish.

17       A.    I'm trying to understand the rationale for

18  your questioning.

19             MS. FRANCIS:  He doesn't have to answer

20  it.

21  BY MR. SILENCE:

22       Q.    The point that I'm trying to make is that this

23  issue about his use of the credit card occurred in 2015

24  and yet, Jeremy was given the opportunity to work in

25  the Government sales team where he could sell more

1    units and make more money, correct?

2         A.    Yes.

3         Q.    Why was Jeremy given the opportunity to work

4    on the Government sales team, to sell more units and

5    make more money, if there were, quote, issues

6    surrounding him?

7                   MS. FRANCIS:   Object to form.

8         A.    Because Tyler and I both believed that if we

9    could keep Jeremy focused, he could be successful.  We

10   wanted him to turn the corner, and we thought if he

11   could make more money, it would help him get out of

12   some of his financial issues, which would help him

13   improve his life.  That's why we did it.

14   BY MR. SILENCE:

15        Q.    You felt bad for him?

16        A.    I wanted to help Jeremy.

17        Q.    Wasn't Jeremy an effective sales agent?

18        A.    He could be.

19        Q.    Well, when he was given the opportunity to

20   work on the Government sales team, did you feel he was

21   an effective sales agent?

22        A.    He could be.

23        Q.    Well, my question was, was he at that time?

24        A.    At times.

25        Q.    If he wasn't a consistently good -- an

 1     A.     Tyler and I had talked about this program.   He

 2    was continuing to work on it.   He thought he was

 3    developing it into something really good.

 4           Again, I wanted to wait until we had better

 5    information to propose a better business case.   I don't

 6    like having conversations about hypotheticals.   I like

 7    having conversations with data so that I could prove a

 8    case.   It's reckless for me to go do it otherwise.

 9    That's it.

10    BY MR. SILENCE:

11     Q.     Do you value Josh Schwartz's opinion?

12           MS. FRANCIS:   Object to form.

13     A.     Yes.

14    BY MR. SILENCE:

15     Q.     Are you aware that Josh Schwartz believes

16    Jeremy should have been paid for Amerisure?

17           MS. FRANCIS:   Object to form and

18    foundation.

19     A.     No.   I think I agreed too.

20    BY MR. SILENCE:

21     Q.     You what?

22     A.     I agreed too; I just didn't know the amount.

23     Q.     Why has GPSI not paid Jeremy any compensation

24    for Amerisure?

25     A.     Because Jeremy was terminated before we could.

1    to Kristin as well.

2    BY MR. SILENCE:

3        Q.    So you don't handle -- excuse me.  You don't

4    trust Rob to handle things fairly?

5                MS. FRANCIS:  Object to form and

6    foundation.

7        A.    That's not at all what I said.

8    BY MR. SILENCE:

9        Q.    Did you tell Jeremy in the termination meeting

10   that he was insubordinate?

11       A.    I don't remember.

12       Q.    How was Jeremy's sales performance -- strike

13   that.

14               How did Jeremy's sales performance in 2017

15   compare to others?

16                MS. FRANCIS:  Object to form and

17   foundation.

18       A.    Well, for the first few months it was

19   fantastic.

20   BY MR. SILENCE:

21       Q.    Of 2017?

22       A.    2017.  True.

23       Q.    Why do you say it was fantastic?

24       A.    Because he closed LCRA in February, which was

25   a large transaction.

```
 1     Q.    How was Jeremy's sales performance in

 2  comparison to others in 2016?

 3              MS. FRANCIS:  Object to form and

 4  foundation.

 5     A.    I believe it was middle of the pack on the

 6  Government team.

 7  BY MR. SILENCE:

 8     Q.    When was the last time you looked at any sales

 9  data to see exactly how Jeremy compared to others in

10  2016?

11              MS. FRANCIS:  Object to foundation.

12     A.    I prepared it for counsel because I was

13  requested.  I don't know how long ago that was.  Maybe

14  a month or two.  Maybe longer.

15  BY MR. SILENCE:

16     Q.    How did you learn about Kristin's termination?

17     A.    From Rob.

18     Q.    Did he -- was it an in-person conversation?

19     A.    No.

20     Q.    Was it an email, a text message?

21     A.    It was a text message.

22     Q.    Do you recall what the text said?

23     A.    No.  I was made aware of it because Kristin

24  texted me, asking if she had been terminated.  I was

25  unaware, and I texted Rob.  He said, yes, I terminated
```

1              MS. FRANCIS:  Then tell him you don't

2   know.

3        A.    I don't know.

4   BY MR. SILENCE:

5        Q.    Well, if at trial that's the testimony,

6   doesn't that sure seem coincidental to you?

7              MS. FRANCIS:  Object to form and

8   foundation.

9        A.    Like I said, Rob asked lots of questions.  It

10  doesn't seem coincidental to me because it's not

11  outside of his normal behavior.

12       Q.    Had Rob Donat ever talked to you about Jeremy

13  transferring to Chicago prior to 2017?

14             MS. FRANCIS:  Object to form.

15       A.    No.

16  BY MR. SILENCE:

17       Q.    Could you go to page 22 of the last exhibit?

18             Do you see the paragraph towards the bottom

19  where, according to the transcription, it says --

20  starts with, it's a messy issue?

21       A.    Uh-huh.

22       Q.    And you say, according to the transcript, "It

23  is a messy issue.  But I don't condone anything like

24  that.  I think that you should be able to come here and

25  do your job and go home and leave it at that.

STATE OF ARIZONA      )
                      )  ss.
COUNTY OF MARICOPA    )

     BE IT KNOWN that the foregoing proceedings were
taken before me; that the witness before testifying was
duly sworn by me to testify to the whole truth; that
the foregoing pages are a full, true and accurate
record of the proceedings, all done to the best of my
skill and ability; that the proceedings were taken down
by me in shorthand and thereafter reduced to print
under my direction.

     I CERTIFY that I am in no way related to any of
the parties hereto nor am I in any way interested in
the outcome hereof.

     { }  Review and signature was requested.
     { }  Review and signature was waived.
     (x)  Review and signature was not required/requested.

     I CERTIFY that I have complied with the ethical
obligations set forth in ACJA 7-206(F)(3) and ACJA
7-206 (J)(1)(g)(1) and (2), Dated at Phoenix, Arizona,
this 18th day of September, 2018.




                    _____
                    MARY DAVIS, RPR - Digital Signature
                    AZ Certified Court Reporter No. 50271


     I CERTIFY that OTTMAR & ASSOCIATES, INC., has
Complied with the ethical obligations set forth in ACJA
7-206 (J)(1)(g)(1) through (6).




                    _____
                    OTTMAR & ASSOCIATES, INC.
                    AZ Registered Reporting Firm No. R1008

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Jeremy Thacker,                          )
                                         )
            Plaintiff,                   )   Case No.
vs.                                      )   18-CIV-0063-PHX-DJH
                                         )
GPS Insight, LLC; et al.,                )
                                         )
            Defendants.                  )
_____  )




DEPOSITION OF JASON WALKER



Phoenix, Arizona
May 15, 2018
1:54 o'clock p.m.



Walker Court Reporting
Registered Firm No. R1046
1900 W. Carla Vista, Suite 6284
Chandler, Arizona  85246
(480) 620-4472



PREPARED BY:  Laura D. Walker, RPR
              Certified Reporter
              No. 50195

Page 8

1       Q.    And you were Tyler's direct supervisor?

2       A.    That is correct.

3       Q.    And you report to Rob Donat?

4       A.    That is correct.  Yes.

5       Q.    Who made the decision to terminate

6    Mr. Thacker's employment?

7       A.    I did.

8       Q.    And what was the reason for the termination of

9    his employment?

10      A.    The reason that I decided that I wanted to

11   terminate Jeremy was there had been an ongoing issue

12   with behavioral attitude that was not conducive within

13   the organization to building a teamwork.  It caused a

14   lot of conflict.

15            It had been going on for some period of time,

16   years.  I don't know when it was first documented.  And

17   involved him doing things like not being in the office

18   enough, which caused issues for me managing other

19   employees, because it was different than what we were

20   allowing other employees to do.

21            That behavior from time to time would improve,

22   would not.  There were other also issues with just,

23   again, attitude.  I think you can probably glean from

24   some of the recordings that were made what I'm talking

25   about that led to what I felt there being a very

1    poisonous environment not only for the organization, but

2    also for Jeremy.

3           And it was after a very long conversation that

4    was actually recorded -- I believe that conversation

5    took place on March 2nd -- that I determined on my way

6    home that I thought the best thing for the organization

7    and Jeremy was to terminate employment.

8    Q.   So if I understood the timing there, after the

9    March 2nd meeting is when you made the decision to

10   terminate?

11   A.   Yes.

12   Q.   Okay.  When was the first time that you

13   considered termination of his employment?

14   A.   Probably the first time that I considered it

15   was in 2013, when I first documented the performance

16   issue with not coming into the office and being

17   untruthful.

18   Q.   Okay.  And so in 2013 when you first considered

19   it, what steps did you take instead of terminating him?

20   A.   I documented it, the specific behavior I was

21   talking about.  I spoke to Jeremy about it.  We mutually

22   agreed that this was something that he would work on.

23          And we moved forward and left it as, you know,

24   this needs to improve; otherwise, it could lead up to

25   another write-up and/or termination.

1    thought process and why I had come to the conclusion I

2    had.

3            I wanted to discuss it some with him and get

4    his input as well.  And then we mutually agreed that

5    that was the right decision; but, again, it was a

6    decision that I had made.

7        Q.   And so what did you tell him was your thought

8    process?

9        A.   I told him that my thought process was I don't

10   see any possible way that Jeremy can continue to work

11   here in a constructive manner, based on the conversation

12   we had yesterday.  This has been going on and on and on

13   for years.  And I'm done.  Personally, I can't invest

14   any more time in this.  I think we have given him every

15   opportunity to be successful.

16           And there are two parts to that:  There are

17   what you do and how you do it.  And it's the how you do

18   it that I can't take anymore.  And that was the basis

19   for my decision.

20       Q.   Okay.  And in response, did Tyler provide any

21   input other than, "I agree"?

22       A.   Not that I can remember.

23       Q.   But he expressed that he agreed?

24       A.   Yes.

25       Q.   So what were the next steps that you took in

1   terms of the termination process?

2       A.   So what happened next was we were in the

3   office, in his office together.

4       Q.   His?

5       A.   Tyler Mortensen's office.

6       Q.   Okay.

7       A.   And Rob Donat entered his office.  He did not

8   ask us what we were speaking about.  He merely came in

9   and said, "I have something I'd like you guys to listen

10  to.  I want to get your input on it."

11          We said okay.  And what he had sent to Tyler

12  was a recording of Mr. Thacker.  And I can't remember

13  the date of the phone call, but it was a recording of

14  Mr. Thacker treating a Hyatt employee not well on a

15  phone call.  And he was upset by it because it was done

16  on a company phone.

17          He looked to us as far as what we thought about

18  it.  And we listened to it, and Tyler and I literally

19  looked at each other, and I said, "Well, I would like to

20  talk to you about what we were talking about before you

21  came in here.  And this is a perfect example of exactly

22  why we are making the decision that we think we need to

23  terminate Tyler and want -- or Jeremy."

24          And that started the discussion that would have

25  happened anyway, which I would have gone to Rob to let

1  him know what I had decided to do.  And it happened kind

2  of serendipitously only in that he entered the office

3  with that recording.

4      Q.   Okay.  I want to clarify something.

5           So you mentioned that he came in to Tyler's

6  office and said, "I want you guys to listen to this."

7  But in that you said he sent the recording to Tyler.

8           Had he previously sent that recording to Tyler,

9  or what did you mean by that?

10     A.   What I meant is I think he listened to a

11  recording and then I think it was on our phone server.

12  I think he forwarded that recording to Tyler and then

13  came down to Tyler's office.  I happened to be in there

14  having this discussion.

15          And when he came in he said, "Oh, you're both

16  here.  I'd like you to listen to this."

17     Q.   So when he says, "I'd like you to listen to

18  this," then it gets pulled up on Tyler's computer where

19  it's been forwarded?

20     A.   I believe so, yes.

21     Q.   Okay.

22     A.   And I don't remember.  He may have actually had

23  Tyler log into the phone system.  I don't recall exactly

24  how we listened to the communication, but it was a

25  recording off the computer nonetheless.

1      Q.   BY MR. KRESIN:  Sure.  You've said you produced

2  everything you had, but were there specific parameters

3  that you were asked to collect date-wise?

4           MS. FRANCIS:  Same instruction.

5           THE WITNESS:  No.

6      Q.   BY MR. KRESIN:  Okay.  During Mr. Thacker's

7  employment, was there any policy regarding dating

8  amongst employees or management?

9      A.   No.

10     Q.   I'll have you look at Exhibit 16.

11          Exhibit 16 is an employee handbook that's been

12  produced in this case, which on the front indicates an

13  effective date of February 2018.  It's kind of hard to

14  see because it's printed in black and white.

15          But I want to ask you about the substance of

16  some of what's in here and how that related to the

17  practice of the company at the time of Mr. Thacker's

18  employment.

19     A.   Okay.

20     Q.   On page 7, there's an Equal Employment heading.

21  And underneath the bullet points there's a paragraph

22  that states, "The company takes allegations of

23  discrimination, intimidation, harassment, and

24  retaliation very seriously and will promptly conduct an

25  investigation when warranted."

1          Was that the company's practice at the time of

2    Mr. Thacker's employment?

3          A.   So there was nothing -- this was written first

4    when this came out, to be clear.  And I think even in

5    the recording that was provided from our conversation I

6    made it clear that it was my policy that this was never

7    something that I would condone.

8          So as a general practice, I think we took these

9    things very seriously if they were ever brought up.

10         Q.   Okay.  Clarify a few things.  You started out

11   by saying -- I want to make sure I understood what you

12   said.

13         Did you say that there hadn't been a written

14   policy prior to this handbook?

15         A.   Correct.

16         Q.   Okay.  But you also said that your practice was

17   to take those types of allegations very seriously; is

18   that what I understand?

19         A.   I'll clarify.

20         Q.   Yes, please.

21         A.   So what -- the way that HR was handled before

22   we had a more formal process documented was that Wayne

23   handled benefits and administrative, payroll, things

24   such as that.  The managers were left to administer

25   human resources from a disciplinary action/performance

1   management standpoint.

2           And under that, I would have been the one to

3   handle such a thing as this if it had been brought to my

4   attention.  And that is how I would have handled it.  So

5   I would have been consistent with this policy.

6       Q.   Okay.  And so was it -- it says "will promptly

7   conduct an investigation when warranted."

8           Is it your understanding that at the time of

9   Mr. Thacker's employment, it was up to the manager to

10  determine if it was warranted?

11      A.   If it was brought to a manager's attention, I

12  would have to assume that that would be the case, yes.

13      Q.   And so did Mr. Thacker ever bring up that he

14  felt like Mr. Donat was harassing Ms. Lisson, to you?

15  Did he ever bring that up to you?

16      A.   No.

17      Q.   Did he ever bring up to you that he felt like

18  he was being retaliated by Mr. Donat?

19      A.   For what?

20      Q.   Did he ever bring up that he felt like he was

21  being retaliated in any manner?

22      A.   He brought up in the recording that he felt

23  like he was unfairly judged by Elliot and Rob.  And I

24  disagreed.

25      Q.   Did he say what motive he thought led to that

1   unfair judgment?

2       A.   His behaviors.

3       Q.   Anything more specific than that, to your

4   recollection?

5       A.   Not that I recall, no.

6       Q.   Okay.  Did Mr. Thacker ever communicate to you

7   that he thought he was being retaliated against by

8   anyone at GPSI because he was standing up for Ms. Lisson

9   with respect to Mr. Donat?

10      A.   No.

11      Q.   Did Mr. Thacker bring up to you or anyone else

12  at GPSI, to your knowledge, that he felt like he was

13  being retaliated against by anyone at GPSI because he

14  was involved with Ms. Lisson romantically?

15      A.   No.

16      Q.   And I don't mean just those specific words.

17           Anything of that nature that you recall him

18  bringing up?

19      A.   Not prior to his termination.

20      Q.   Okay.

21      A.   After his termination or during the

22  termination, he mentioned something of which I had no

23  knowledge.  And I believe I stated that.

24      Q.   When you say "during his termination," you mean

25  during the meeting?

1    A.   Uh-huh.  Yes.

2    Q.   What did he say during the termination meeting?

3    A.   I can't recall exactly.  It's on the recording.

4    Q.   If you could look at page 10.

5    A.   (Witness complies.)

6    Q.   Under the heading Employee References, if you

7    could review that paragraph and let me know.

8    A.   Okay.

9    Q.   Is that policy consistent with what the

10   practice of GPSI was at the time of Mr. Thacker's

11   termination?

12   A.   I believe so, yes.

13   Q.   Well, was there -- to your knowledge, was there

14   a specific Employee Reference Policy prior to this

15   handbook?

16   A.   No.

17   Q.   Okay.  In terms of how you handled inquiries

18   prior to this policy or this handbook being issued, was

19   your practice consistent with this paragraph?

20   A.   In general, yes.

21   Q.   Do you know whether others in management had

22   the same practice?

23   A.   I do not.

24   Q.   At any time since Mr. Thacker's termination,

25   have you received inquiries from other companies or

1    other people related to Mr. Thacker, as far as a

2    reference check?

3            MS. FRANCIS:  Object to form.

4            THE WITNESS:  No.

5        Q.  BY MR. KRESIN:  Have you heard of anyone at the

6    company receiving requests for reference checks on

7    Mr. Thacker since his termination?

8        A.  No.

9            MS. FRANCIS:  Can we take a break?

10           MR. KRESIN:  Sure.

11           (Short recess from 247 to 2:53 p.m.)

12       Q.  BY MR. KRESIN:  Okay.  We're back on the

13   record.

14           Mr. Walker, could you turn to page 19 of

15   Exhibit 16?

16       A.  (Witness complies.)

17       Q.  Under the heading Performance Evaluation it

18   says, "Employees will generally receive an appraisal of

19   their job performance annually."

20           Was that a practice that occurred during

21   Mr. Thacker's employment?

22       A.  Officially, no.

23       Q.  What does that mean?

24       A.  That means that it wasn't a published like in

25   this document.  There wasn't a formal company review

1   process.

2         In the sales department, we did start setting

3   goals and objectives and whatnot for the sales team

4   based on quotas, territory, plans, things of that

5   nature, and gave feedback based on that.  But it wasn't

6   official.  It wasn't tied to a bonus or a raise or

7   anything like that.  It was more of:  Here's what we

8   think you're doing well.

9         And we also did that on a weekly basis in

10  one-to-ones and things of that nature.  But it was

11  really more of an effort to help people improve, whether

12  it was on skill sets we thought they needed to work on,

13  things to build their territory better, help them make

14  more commission.

15        So it was more of a performance-based thing on

16  our part to help the company grow more and people

17  succeed.

18     Q.   So there aren't annual performance evaluations

19  for Mr. Thacker?

20     A.   No.  Not that I'm aware of.

21     Q.   And if they existed, you probably would be

22  aware of them; isn't that right?

23     A.   Yes.  With the caveat that if Tyler maybe gave

24  him one orally or written that I didn't see, but I don't

25  think so.

1    Q.   Okay.  If you could turn to page 51.

2    A.   (Witness complies.)

3    Q.   Under the heading Telecommuting, is this policy

4  consistent with the practice during Mr. Thacker's

5  employment?

6    A.   So we didn't have a formal policy on

7  telecommuting.  In general, this follows fairly closely

8  with what I would have had as a written policy for my

9  department.

10        And the way we practiced it, it was something

11  that was approved on a case-by-case basis and, in

12  general, again, wouldn't be allowed out of the gate for

13  an employee because we wanted them to be in the office.

14  So it generally lines up with what's written here, but

15  there was nothing official.

16    Q.   You said something along the lines of you would

17  have had that as a policy in your department.

18        Did you have a written policy for your

19  department related to this, or you're just saying that's

20  what the practice was?

21    A.   I'm saying that was what the practice was.  If

22  I had had a written policy, it would have probably read

23  very close to this.  But what we did practice was very

24  close to this description.  Not exact, but....

25    Q.   Okay.  How many people in sales telecommute?

1  thing for Jeremy, which was get him a fair amount for

2  what this would ultimately be worth.

3         And that was the basis of that whole

4  conversation that I was trying to have with Jeremy.

5  That sometimes I felt waiting a little bit was going to

6  actually benefit him because I would be able to have a

7  better business case to present.

8         Not having that information prohibited me from

9  doing that, which is why I was not in a rush to do it.

10     Q.   In January of 2017, did Mr. Thacker come to you

11  and express concerns about Rob Donat telling Kristin

12  Lisson certain things about Mr. Thacker's credit card

13  use?

14     A.   I don't remember.

15     Q.   Do you recall Mr. Donat in January 2017

16  bringing up to you the possibility of transferring

17  Mr. Thacker -- or Mr. Thacker transferring to Chicago?

18     A.   Yes.

19     Q.   Okay.  How did that come up?

20     A.   He came into my office and asked me that exact

21  question.  He actually -- not that exact question.  He

22  asked me, "Have you heard about Jeremy wanting to move

23  to Chicago?"

24         And I had, because I think it had been a

25  discussion that had happened a while back.  And I said,

1          And then he had sent me an email talking about

2    Amerisure and what he wanted done.  So that's why the

3    meeting happened.

4          Q.   The meeting was for the purpose of talking

5    about Amerisure?

6          A.   Among other things, yes.

7          Q.   What were the other things that were sort of

8    the purpose going into the meeting?

9               MS. FRANCIS:  Object to foundation.

10              THE WITNESS:  The purpose was to set

11   expectations about Amerisure, get us all on the same

12   page, and have a good understanding of how that was

13   going to go going forward and what we needed from him so

14   that I could be successful in what he was asking for.

15         Q.   BY MR. KRESIN:  In January 2017, do you recall

16   meeting with Mr. Thacker about his goals for 2017?

17         A.   Yes.

18         Q.   Did he show you a list of two goals?

19         A.   I remember him holding up a piece of paper, and

20   it had -- I remember one goal.  I don't remember two,

21   but....

22         Q.   Well, was one of the goals his relationship

23   with Kristin Lisson?  Was that on that piece of paper?

24         A.   Yes.

25         Q.   Is that the one you remember?

1      A.   Yes.

2      Q.   Would LCRA possibly be the other goal?  Does

3   that -- do you recall that?

4      A.   I don't remember.

5      Q.   Okay.  And in response to seeing the reference

6   to Kristin Lisson, do you recall what you said to him?

7      A.   No.

8      Q.   Did you say something about not showing Rob

9   that?

10      A.   I don't remember.

11      Q.   Is it possible you said that?

12      A.   Yes.

13      Q.   How is working remotely different from

14   telecommuting, in your mind?

15      A.   Well, first of all, we hire people locally for

16   the purpose of having them in the office.  And the

17   reason that we have them in the office is because they

18   can learn more faster and get up to speed, better

19   communication, et cetera.

20           Telecommuting, by definition, to me, are the

21   people that are local but they work from home every once

22   in a while.  Remote reps are hired with that

23   specifically in mind.

24           Some -- we do have an office in Chicago.  One

25   guy works out of that office, but we do have others that

Page 62

1   STATE OF ARIZONA          )
                              )      ss.
2   COUNTY OF MARICOPA        )

3
            BE IT KNOWN that the foregoing testimony
4
    was taken before me, LAURA D. WALKER, RPR, a Certified
5
    Court Reporter, No. 50195; that the witness before
6
    testifying was duly sworn to testify to the whole
7
    truth; that the questions propounded to the witness
8
    and the answers of the witness thereto were taken down
9
    by me in shorthand and thereafter reduced to
10
    typewriting by me or under my direction; that the
11
    foregoing pages are a true and accurate transcript of
12
    all proceedings had upon the taking of said testimony,
13
    all done to the best of my skill and ability.
14

15
            I FURTHER CERTIFY that I have complied with
16
    the ethical obligations set forth in the Arizona Code
17
    of Judicial Administration 7-206(F)(3) and Arizona
18
    Code of Judicial Administration 7-206 J(1)(g)(1) and
19
    (2).
20

21
            I FURTHER CERTIFY that I am in no way related
22
    to any of the parties hereto nor am I in any way
23
    interested in the outcome hereof.
24

25

1

2        DATED at Chandler, Arizona, this 28th day of

3  May, 2018.

4

5                          Laura D. Walker, RPR
                           Certified Reporter No. 50195

6

                *     *     *     *     *     *     *

7

8

9        I CERTIFY that WALKER COURT REPORTING, a

   Registered Reporting Firm in the State of Arizona, has

10

   complied with the ethical obligations set forth in the

11

   Arizona Code of Judicial Administration

12

   7-206(J)(1)(g)(1) and (2).

13

14

15

16  _____

   Walker Court Reporting

17

   Registered Reporting Firm

18

       No. R1046

19

20

21

22

23

24

25

# EXHIBIT G

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF ARIZONA
 3
    JEREMY THACKER,              )
 4                               )
           Plaintiff,            )
 5                               )
    VS.                          ) No. 2:18-cv-00063-PHX-DJH
 6                               )
    GPS INSIGHT, LLC; ROBERT     )
 7  J. DONAT, Individually and   )
    as Trustee of the Robert     )
 8  Donat Living Trust Dated     )
    April 19, 2017,              )
 9                               )
           Defendants.           )
10
11       ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
12                  FUJITSU AMERICA, INC.
13                    DOMINIC LANAWAY
14                   SEPTEMBER 10, 2018
15                     VOLUME 1 of 1
16        -----------------------------------
17      ORAL AND VIDEOTAPED DEPOSITION OF DOMINIC LANAWAY,
18  produced as a witness at the instance of the DEFENDANT,
19  and duly sworn, was taken in the above-styled and
20  numbered cause on September 10, 2018, from 10:13 a.m. to
21  4:37 p.m., before Wendy S. Schreiber, CSR No. 9383, in
22  and for the State of Texas, reported by machine
23  shorthand, at the law offices of STINSON LEONARD STREET,
24  LLP, 3102 Oak Lawn Avenue, Suite 777, Dallas, Texas,
25  pursuant to the Texas Rules of Civil Procedure and the
```

                                                    Page 1

```
 1   provisions stated on the record or attached hereto.

 2   Job No. 2976215

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  2

```
 1            But, again, of course, I'll go back to the
 2    belief that if you felt that it was an unachievable or
 3    unrealistic environment, then as a high-class
 4    salesperson you would go do something else for another
 5    organization.
 6            So it's not -- it's not a fair reflection
 7    to look at Air New Zealand and the context behind how we
 8    engage with them and why and then try to extrapolate
 9    that out into saying it's, therefore, a three-year sales
10    cycle.  How on earth can I sell it in this year.  That
11    would be an untrue reflection of Air New Zealand as a
12    stand-alone engagement.
13            MR. WILLIS:  Counsel, how much --
14        Q.  (BY MR. SILENCE)  Have you ever provided a
15    written warning to be terminated?
16        A.  I beg your pardon?
17        Q.  Do you know whether Jeremy was ever provided a
18    written warning notifying him that he'd be terminated if
19    he didn't correct his behavior or attitude?
20        A.  No, I don't believe so.  A written warning
21    specifically?  No, I don't believe that we did or that
22    we were required to.
23        Q.  When did Jeremy allegedly call you an idiot?
24        A.  In one of the QBRs in Dallas.  And, as I said,
25    it -- it didn't really bother me that much so -- I mean,
```

Page 196

```
1    perfect, that's a matter for personal opinion.  We did
2    the very best.  If I had my time again knowing today
3    what -- knowing then what I know today, of course we
4    would have done some things differently.  But was it
5    what we expected?  No.  It was what we had to react to
6    in a small startup and we just tried to be honest and we
7    tried to be open and we tried to have the best endeavors
8    and if individuals didn't agree or didn't feel that it
9    was the right thing to do, then they could always
10   decide, as some did, to leave and go do something else.
11        Q.  So to sum up then, GlobeRanger's top sales reps
12   made about $1,000 -- strike that.
13                 So to sum up, GlobeRanger's top sales reps
14   made about $1,000 per month in commissions in 2017,
15   correct?
16                 MR. PALYS:  Object to form.
17                 THE WITNESS:  That's my rough estimation
18   based on recollection.
19        Q.  (BY MR. SILENCE)  And as of June 2018,
20   GlobeRanger did not employ any salespeople in the United
21   States, correct?
22        A.  We -- we -- sorry, let me just be sure I'm
23   clear.  We didn't employ any salespeople in 2018?  No,
24   we didn't.
25        Q.  Well, as of June 2018, that's when GlobeRanger
```

Page 201

Fujitsu America, Inc.   Dominic Lanaway   September 10, 2018
Job No. 2976215

1    no longer employed any salespeople in the United States,

2    correct?

3                MR. PALYS:  Object to form.

4                THE WITNESS:  That's correct.  But, again,

5    my personal feeling there is you are over simplifying

6    that statement to reflect as positively as you can for

7    the benefit of this conversation and your client.  So if

8    I need to repeat that, I will, okay?  We had a decision

9    as a company, at Fujitsu Corporate level, as to whether

10   we would put $10 million into GlobeRanger to redevelop

11   or continue to develop the product and because we

12   decided -- or it's out of our hands in Japan -- they

13   decided it was more cost effective and would be more

14   strategically advantageous is that they are looking at

15   bringing in -- or as we speak moving GlobeRanger

16   customers to an alternative platform.

17                So with that in mind it would have been

18   insane to hire new salespeople.  So as long as we can

19   just be clear that there is a matter of context and

20   events that lead up to June rather than simply saying in

21   June 2018 we just stopped hiring any salespeople.  That

22   doesn't necessarily reflect the -- the situation in its

23   truth.

24        Q.  Right.  But as of -- it's a yes-or-no answer.

25   As of June 2018, GlobeRanger employed no salespeople in

Page 202

1    the United States, correct?

2                    MR. PALYS:  Object to form.

3                    THE WITNESS:  Not directly but that is

4    correct.

5        Q.  (BY MR. SILENCE)  And Fujitsu retained one of

6    the 12 salespeople that GlobeRanger hired in May 2017,

7    correct?

8        A.  Correct.

9        Q.  And in total -- strike that.  And the total

10   revenue for 2017 the company did less than the quota for

11   one salesperson, correct?

12                   MR. PALYS:  Object to form.

13                   THE WITNESS:  Yeah, that's correct.

14                   MR. SILENCE:  Okay.  I have no further

15   questions.

16                   MR. PALYS:  Before we're off, Ray, do you

17   have any questions?  I think Ray is not on the line

18   anymore.  I have one follow-up.

19                   FURTHER EXAMINATION

20       Q.  (BY MR. PALYS)  If you have Exhibit 128 in

21   front of you still, it's the November 1st, 2017, comp

22   plan.

23       A.  Yes, I do.

24       Q.  Does Exhibit 128 tell you what commission

25   Mr. Thacker would have earned on a closed sale?

                                            Page 203

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT H

UNITED STATES DISTRICT COURT

for the

District of Arizona

| | |
|---|---|
| Jeremy Thacker, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 2:18-cv-00063-DJH |
| GPS Insight, LLC; Robert Donat, | ) |
| individually, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |


DEPOSITION OF ELLIOT BATCHELLER


Phoenix, Arizona
August 23, 2018
10:00 a.m.


PREPARED FOR:
ATTORNEY AT LAW

(COPY)

Reported by:
Lauren Kuhnhenn, RPR
Arizona CCR 50916
AZ Registered Reporting Firm No. R1008


Lauren Kuhnhenn

 1     Q.   Has Mr. Donat ever expressed his sentiment to

 2   you about Mr. Thacker in this lawsuit?

 3     A.   He believes that Mr. Thacker, you know, is --

 4   once again, this is an unfounded claim.  That's the

 5   extent of it.  I -- and that is my -- my approach to

 6   the whole thing.  I honestly -- we have a business to

 7   run.  I have not -- you know, I've been -- you know,

 8   you're having me be deposed, but beyond that my

 9   involvement in this is nil.

10     Q.   Has Mr. Donat ever expressed to you that he

11   hates Mr. Thacker?

12     A.   No.

13     Q.   Has Mr. Donat ever told you that he wants to

14   outspend Mr. Thacker in this lawsuit in the hopes that

15   he'll drop his claims?

16     A.   No.

17     Q.   Has Mr. Donat ever said anything disparaging

18   about Mr. Thacker to you?

19     A.   Yes.

20     Q.   I'll break it up into pieces.  What

21   disparaging things has Mr. Donat said about Mr. Thacker

22   after this lawsuit was filed?

23     A.   I think they align with his sentiments that he

24   communicates to Kristin; they're along the same lines.

25   That's -- you know, he -- he -- we have the background

 1    information, and it mirrors that information.  That's

 2    his basis is my understanding, is what -- it seems to

 3    align.

 4        Q.    What seems to align?

 5        A.    That the findings from the -- what we have

 6    from organizationally, the antidote information we have

 7    from complaints internally, as well as the information

 8    that was uncovered as a result of, you know, him

 9    looking into Mr. Thacker's background.

10        Q.    Right.  But what were the specific words or

11    comments that Mr. Donat made about Mr. Thacker after

12    the lawsuit was filed?

13                  MS. FRANCIS:  Object to form.

14                  THE WITNESS:  I think we have --

15    Mr. Donat has alluded to the fact it took place of --

16    of company property or the purchase was made with

17    company funds.  About Mr. Thacker's financial

18    background.  He has made allusions to Mr. Thacker's

19    previous relationships.  And I think that pretty well

20    covers it.

21    BY MR. SILENCE:

22        Q.    To the best of your knowledge, who has

23    Mr. Donat talked to after this lawsuit was filed about

24    those three issues?

25                  MS. FRANCIS:  Object to foundation and

1    the litigation or the lawsuit.  That was a component of

2    the termination; one component that we -- you know, we

3    cross that bridge a few times.  So I know that was

4    discussed.  I know -- and then, you know, the

5    conversations I've been privy to, you know, would be

6    back to my prior answer, you know, where basically

7    following in line with what was discovered in the

8    background and what Mr. Donat had uncovered with the

9    recordings and Mr. Thacker's tone, that he takes with

10   individuals when it doesn't serve his own purposes.

11   BY MR. SILENCE:

12       Q.   I thought I heard you say that he talked to

13   you about three issues:  Theft of the company cards,

14   your words were his financial background, and his

15   previous relationships.  Help me understand what is --

16   what did he tell you about Jeremy's financial

17   background?

18       A.   He -- he just alluded to what was in the

19   credit record.  And I -- again, without -- I don't

20   recall specifics just that there was, you know,

21   financial history that was not -- you know, it was not

22   good.  I guess that's -- but, again, without going into

23   great specifics.  And I can state unequivocally,

24   I've -- outside of my role in this, it's not something

25   that I go out of my way -- I actually go out of my way

1   to avoid discussing this lawsuit, as it's simply a

2   distraction for me, quite frankly.

3        Q.   Why did Mr. Donat tell you that he didn't

4   believe --

5              MR. SILENCE:  Do you mind reading back

6   what he said about the -- his previous answer.

7              (Requested portion of record read.)

8   BY MR. SILENCE:

9        Q.   So what did Mr. Donat tell you what the reason

10  that he thought Jeremy's financial history was not

11  good?

12       A.   I believe it was based on reviewing the credit

13  report.  I believe there was a credit report obtained

14  by Mr. Donat's attorneys.

15       Q.   Do you know how Mr. Donat obtained -- did he

16  request a copy of the credit record from his attorneys,

17  do you know?

18       A.   I don't --

19              MS. FRANCIS:  Object to foundation.

20              THE WITNESS:  I do not know.

21  BY MR. SILENCE:

22       Q.   Has Mr. Donat ever talked to you about the

23  information in any other employees' credit report?

24       A.   No.

25       Q.   And the third thing you said he talked to you

1  believe I put a charge one time and -- and repaid it,

2  and -- and might have brought it to Rob's attention,

3  but not reprimanded.

4  BY MR. SILENCE:

5      Q.   Have you ever gone to a strip club with GPSI

6  employees and used the GPSI company card to pay for it?

7              MS. FRANCIS:  Objection asked and

8  answered.

9              MR. SILENCE:  I don't --

10             MS. FRANCIS:  He answered that exact

11  question already.

12             MR. SILENCE:  I don't think it was GPSI

13  employees.  I think I said friends and customers.

14             MS. FRANCIS:  No.  But go ahead.  He can

15  answer it again.

16             THE WITNESS:  Yes.

17  BY MR. SILENCE:

18     Q.   Which GPSI employees?

19     A.   I don't recall.  It would have been -- I don't

20  recall.  Rob was with -- at one time.  And members of

21  the sales team would be ...

22             So ...

23     Q.   Was it more than once that you went to the

24  strip club with the GPSI employee and used the company

25  card to pay for it?

1    the recent complaint.

2        Q.   Do you know what, if anything, GPSI did to

3    address those complaints?

4        A.   We reached out to that employee's CEO, and

5    named the employee.

6        Q.   And told them what?

7        A.   What happened and gave them the -- the content

8    and from there, we've done our reporting.  It's not our

9    employee.  It's -- I -- we notified our employees what

10   we had done to let them know that we take that

11   seriously, that we had followed up with his -- his --

12   well, CEO had been made aware of his actions and that

13   was where we left it.

14       Q.   Has GPSI ever provided formal sexual

15   harassment or discrimination training to its management

16   team?

17       A.   We have not done any sort of formal training

18   onsite.  We have -- throughout time, we have used PEOs,

19   which are professional employment organizations, all of

20   which have significant content in their respective

21   portals whether that be -- today it's called Insperity,

22   our company called Co-Advantage, a company called SOI

23   which is now trying -- so we have -- we have posters.

24   We have all the labor law posters posted, but no

25   formal -- we have not brought in a -- an expert from

1    the field to provide that training.  Although many of

2    us have had that training in previous positions.

3          Q.   Has any informal sexual harassment training

4    been provided to GPSI management?

5                    MS. FRANCIS:  Object to form.  Asked and

6    answered.

7                    THE WITNESS:  The same holds true.  The

8    same -- that -- I would define that almost as somewhat

9    informal in that it's documented.  It's there.  It's

10   available for us as a resource.  We have the posters.

11   We have the content online and have a handbook, of

12   course.

13   BY MR. SILENCE:

14         Q.   What specific documents were you provided that

15   discuss --

16         A.   I --

17         Q.   -- claims of harassment or discrimination?

18         A.   I don't know.  It would have been a component

19   of their respective handbooks because we were leased

20   employees for those firms.

21         Q.   Does GPSI have an employee handbook in place

22   now?

23         A.   We do.

24         Q.   Do you know when that went into affect?

25         A.   Sometime over the last 12 months as a part of

1    our compliance process with the federal government

2    guideline.

3        Q.    When Jeremy was employed at GPSI, did -- to

4    the best of your knowledge, did GPSI have any employee

5    handbook?

6              MS. FRANCIS:   Object to foundation.

7              THE WITNESS:   Not that it was required

8    for review for employment by GPSI employees.

9    BY MR. SILENCE:

10       Q.    Where was the handbook kept during that time?

11       A.    The content would have been online.

12       Q.    On what --

13       A.    I -- I -- I do not know.  Whether that's in

14   our knowledge base, which is primarily where most of

15   that documentation lives, or in, you know, a box file

16   or simply in the hands of our controller and who serves

17   at the time as the HR arm of the organization.

18       Q.    Do you know who drafted that handbook?

19       A.    It would have been a collaboration between all

20   our HR resource that we have, and all our -- I

21   mentioned Human Capital Management and our benefits

22   broker offers an HR liaison, if you will.  We -- we

23   have, you know, Wayne Holder [phonetic], the controller

24   who works with them in drafting the handbook.  Gary

25   Fitzgerald who worked very close with them in drafting

1    the handbook because the handbook includes a lot of IT.

2    As a software company, you would expect a lot of IT

3    security components.  So there were a number of

4    individuals involved.

5         Q.   Do you believe that the handbook that was --

6    existed at that time contained harassment or

7    discrimination policy?

8         A.   I don't know.  I don't.

9         Q.   As a core value, how important is loyalty to

10   Mr. Donat?

11                   MS. FRANCIS:  Object to foundation.

12                   THE WITNESS:  That's a subjective

13   measure.  I -- I think loyalty is important to all of

14   us.

15   BY MR. SILENCE:

16        Q.   Do you know whether Mr. Donat values loyalty

17   more than others?

18                   MS. FRANCIS:  Object to form and

19   foundation.

20                   THE WITNESS:  I don't.  I could not say.

21

22   BY MR. SILENCE:

23        Q.   Are you aware of anyone at GPSI selling drugs

24   at any time on GPSI company property?

25        A.   No.

1  our disclosures, knowing you what you know about

2  Mr. Donat, are you really going to look the jury in the

3  eye and say that you have no clue whether Mr. Donat's

4  decision to terminate Kristin was motivated by her

5  refusing to get back with him?

6                  MS. FRANCIS:  Objection.  Asked and

7  answered now three times.  He's not going to answer it

8  again.

9  BY MR. SILENCE:

10     Q.   If you don't want to -- do you want to change

11 your answer?

12     A.   No.

13     Q.   Other than telling Mr. Donat to stop

14 communicating with Kristin, did you make any efforts to

15 ensure that he followed your instructions?

16     A.   I did what I could do.  I took every

17 precaution I could.  I don't have access to Mr. Donat's

18 phone.  I can't block Mr. Donat's number for Kristin.

19 I can't block Ms. Lisson's number from Rob.  I did what

20 I can do.  I cannot physically restrain somebody.

21               So if something took place, I -- I did

22 what I could do and what I committed to doing, what I

23 told Kristin I would do.  I followed through with all

24 of that.  And that that's what I can do, and that's --

25 I think that's reasonable for anybody.

1     Q.    But my question was:   Did you -- I understand

2   you're in a difficult spot and you can't tackle him,

3   but is there anything else you did other than tell

4   Mr. Donat stop communicating with her?

5                 MS. FRANCIS:   Object to form and

6   foundation.

7                 THE WITNESS:   I used big bold letters.

8   BY MR. SILENCE:

9     Q.    In an e-mail or text?

10     A.    I don't -- whatever I sent.   It was all -- it

11   was in all caps, I know that.

12     Q.    Does Mr. Donat typically listen to you when

13   you give him instructions like that?

14     A.    He takes it under consideration.

15     Q.    Have you ever referred -- well ...

16         How did you first learn of Kristin's

17   termination?

18     A.    I don't recall.   I -- I don't recall.   I would

19   guess it was Jason.

20     Q.    Do you know how Jason communicated that to

21   you?

22               MS. FRANCIS:   Object to foundation.

23               THE WITNESS:   I don't recall.

24   BY MR. SILENCE:

25     Q.    What was your reaction when you learned that

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that
     the foregoing pages are a full, true and accurate
 5   record of the proceedings, all done to the best of my
     skill and ability; that the proceedings were taken down
 6   by me in shorthand and thereafter reduced to print
     under my direction.
 7
          I CERTIFY that I am in no way related to any of
 8   the parties hereto nor am I in any way interested in
     the outcome hereof.
 9
          [ ]  Review and signature was requested.
10        [X]  Review and signature was waived.
          [ ]  Review and signature not required.
11
          I CERTIFY that I have complied with the ethical
12   obligations set forth in ACJA 7-206(F)(3) and ACJA
     7-206( J)(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
13   this 7th day of September, 2018.

14

15

16

17   _____
               Lauren Kuhnhenn, RPR
18        Arizona Certified Reporter No. 50916

19        I CERTIFY that OTTMAR & ASSOCIATES, INC., has
     complied with the ethical obligations set forth in ACJA
20   7-206 (J)(1)(g)(1) through (6).

21

22

23

24   _____
               OTTMAR & ASSOCIATES, INC.
25        AZ Registered Reporting Firm No. R1008
```

# EXHIBIT I

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


JEREMY THACKER,                        )
                                       )
                    Plaintiff,         )
                                       ) Civil Action No.
        vs.                            ) 2:18-cv-000630-DJH
                                       )
GPS INSIGHT, LLC; ROBERT DONAT,        )
individually,                          )
                                       )
                    Defendants.        )
_____ )




DEPOSITION OF TYLER MORTENSEN

Phoenix, Arizona
August 24, 2018
10:00 a.m.




PREPARED FOR:


ATTORNEY AT LAW


(COPY)

Reported by:
Robin Jasper, RPR
CCR No. 50286
AZ Registered Reporting Firm No. R1008

```
 1    him to be involved with somebody when there was an affair

 2    going on, and that she was currently married.

 3               I said if they wanted to have a relationship

 4    or if they were going to do that, keep it outside of

 5    public, let her go through a divorce, and if you guys want

 6    to have a relationship after that's happened, that's what

 7    I would suggest that you do.

 8        Q.   Do you recall Jeremy discussing having a

 9    relationship with Kristin in his annual review with you

10    and Jason Walker on January 11, 2017?

11        A.   No, not that I recall.

12        Q.   Do you recall Jeremy showing you his goals for

13    the year, one of them was LCRA and another was Kristin,

14    and Kristin was crossed out?

15               MS. FRANCIS:  Object to form.

16               THE WITNESS:  I do remember him holding the

17    paper, vaguely, I do remember that.  I think it did have

18    those two things on it.

19    BY MR. SILENCE:

20        Q.   To the best of your recollection, it had LCRA and

21    Kristin and the word "Kristin" was crossed out?

22               MS. FRANCIS:  Object to form, asked and

23    answered.

24               THE WITNESS:  I do recall.

25    BY MR. SILENCE:
```

1      A.    Nothing that was not approved outside of

2    business, no.

3      Q.    Are you aware of the amount of the expense report

4    that Mike Mac submitted for 2016?

5      A.    I remember rough numbers.

6      Q.    What do you remember the numbers to be?

7      A.    Well, I may not remember it correctly. That was

8    either his budget -- I know it was a lot, more than

9    $50,000.

10      Q.    Do you recall whether it was more than $100,000?

11      A.    I don't recall specifically. He didn't report to

12    me that year. I think it might have been over $100-. I

13    do recall $110- or $120-, maybe. But I don't know for

14    sure that that's right.

15      Q.    Are you aware of a background check being pulled

16    on Jeremy Thacker?

17         MS. FRANCIS: I'm going to instruct you not

18    to disclose anything that you have learned through

19    privileged communications or through management talking

20    about the defense of this action.

21         THE WITNESS: Okay. I can't respond to

22    that, then.

23    BY MR. SILENCE:

24      Q.    Have you seen a copy of the background report?

25         MS. FRANCIS: Object to form.

```
 1   STATE OF ARIZONA        )
                             )   ss.
 2   COUNTY OF MARICOPA      )

 3        BE IT KNOWN that the foregoing transcript was taken
     before me; that the witness before testifying was duly
 4   sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7
          I CERTIFY that I am in no way related to any of the
 8   parties hereto nor am I in any way interested in the
     outcome hereof.
 9
          [X]  Review and signature was requested.
10        [ ]  Review and signature was waived.
          [ ]  Review and signature not requested/required.
11
          I CERTIFY that I have complied with the ethical
12   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     (J)(1)(g)(1) and (2).  Dated at Phoenix, Arizona, this 7th
13   day of September, 2018.

14

15                      Robin Jasper

16
                      _____
17                         Robin Jasper, RPR
                      Arizona Certified Reporter No. 50286
18

19        I CERTIFY that OTTMAR & ASSOCIATES, INC., has
     complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22                      Julie T. Ottmar

23

24                    _____
                          OTTMAR & ASSOCIATES, INC.
25                    AZ Registered Reporting Firm No. R1008
```

# EXHIBIT J

1       IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF ARIZONA

3

Jeremy Thacker,                    )
4                                   )
          Plaintiff,               )
5                                   )
     v.                             )   No. 2:18-cv-00063-PHX-DJH
6                                   )
GPS Insight, LLC; Robert            )
7    J. Donat, individually         )
and as Trustee of The               )
8    Robert Donat Living Trust      )
Dated April 19, 2017,               )
9                                   )
          Defendants.              )
10                                  )
                                    )
11   _____)

12

13

14      VIDEOTAPED DEPOSITION OF JEREMY NOEL THACKER

15

                Phoenix, Arizona
16               August 21, 2018
                   9:05 a.m.
17

18

19

20   **CERTIFIED COPY**

21

22   Reported by:                   CARRIE REPORTING, LLC
     CARRIE A. CARIATI              Certified Reporters
23   Registered Professional Reporter   2415 East Camelback Road
     Certified Realtime Reporter    Suite 700
24   Certified LiveNote Reporter    Phoenix, AZ 85016
     Arizona CR No. 50355           (480)429-7573
25   carrie@carriereporting.com

1  information off any work computers at GPSI?

2              MR. SILENCE:  Objection.  Form.

3              THE WITNESS:  Repeat the question.

4              MS. FRANCIS:  Carrie, can you read it back

5  to him?

6              (The following requested portion of the

7  record was read back by the reporter.)

8              "QUESTION:  Prior to your termination, did

9  you delete information off any work computers at GPSI?"

10             THE WITNESS:  Yes.

11  BY MS. FRANCIS:

12     Q.    Why?

13     A.    Because I deleted things in the regular workday

14  that were no longer needed, meeting invites that were

15  expired or didn't happen, things along those lines.  I

16  mean, it is just the normal course of business.  There is

17  no requirement for keeping everything.

18     Q.    Did you wipe your computer clean?

19             MR. SILENCE:  Objection.  Form.

20             THE WITNESS:  Yes.

21  BY MS. FRANCIS:

22     Q.    Why?

23     A.    To prevent my personal information from being

24  obtained by a jealous owner and used against me in -- more

25  importantly against others as a weapon like he had

 1  previously.

 2      Q.    What type of personal information did you have

 3  on your computer that you were concerned about Mr. Donat

 4  seeing?

 5      A.    Other employees talking about him or situations

 6  that -- my personal relationship, just personal

 7  conversations for the most part, and I didn't want him

 8  having access to that.

 9      Q.    And that information was maintained on your

10  laptop hard drive?

11      A.    No.

12      Q.    Where was that information maintained?

13      A.    Well, depends on which information you are

14  talking about.

15      Q.    I am talking about the information you just

16  testified to.

17              MR. SILENCE:  Objection.  Form.

18              THE WITNESS:  The information -- the

19  information that was wiped from the PC, some of it was

20  maintained in the cloud.  Some of it was -- I mean, the

21  operating system was on the hard drive.

22  BY MS. FRANCIS:

23      Q.    And you wiped the hard drive clean?

24      A.    I wiped the hard drive clean, correct.

25      Q.    And there is no -- to your knowledge, is there

 1   any copy of that information maintained anywhere?

 2                   MR. SILENCE:  Objection.  Form.

 3                   THE WITNESS:  There is.

 4   BY MS. FRANCIS:

 5       Q.   Of the personal information that was on your

 6   hard drive?

 7       A.   Yes.

 8       Q.   Where is that maintained, to your knowledge?

 9       A.   In the cloud.  It was all Google --

10                   MR. SILENCE:  Objection.  Form to that

11   previous question.

12   BY MS. FRANCIS:

13       Q.   Whose Google account is it maintained on?

14       A.   It was mine.

15       Q.   Have you provided that information in this

16   litigation?

17       A.   I have, and before.

18       Q.   You provided a complete copy of everything that

19   was on your hard drive before you wiped it clean?

20       A.   I provided a copy of all work-related

21   information.

22       Q.   Did you provide a copy of the information that

23   you testified about that was personal in nature but

24   related to coworkers and your relationship?

25       A.   I have, yes.

1      Q.   When did you provide that?

2      A.   At discovery whenever I had -- whenever we

3   turned over production.

4      Q.   You testified previously that you provided all

5   work-related information.  I want to be --

6      A.   I provided that earlier --

7      Q.   Let me finish my question.

8      A.   Okay.

9      Q.   I want to be specific as to the personal

10  information you said that you didn't want Mr. Donat to

11  have access to.

12     A.   Um-hum, okay.

13     Q.   When did you disclose that information?

14     A.   Exchange of ESI in -- March 27th, was it?

15     Q.   Did you delete any Slack messages off of any

16  work computers?

17     A.   Yes.

18     Q.   When did you do that?

19     A.   Prior February.

20     Q.   I am looking for a specific date.

21     A.   I don't have a specific date.  It would have

22  been February.

23     Q.   What could you look at that would remind you as

24  to when you deleted that information?

25     A.   I could look at security logs if you provide

 1  them.
 2      Q.   Security logs for what?
 3      A.   Slack.
 4      Q.   How did you delete Slack messages?
 5      A.   I don't remember how I deleted them.
 6      Q.   Did you log into a specific account that you are
 7  associated with in Slack?
 8      A.   Yeah, I have just my account.  I don't have
 9  anything else.
10      Q.   That was a work-based account?
11      A.   Yes.
12      Q.   Why did you delete Slack messages?
13      A.   Same reason I gave for the other, which is the
14  -- I -- just sometimes we would talk about personal
15  information on Slack, and I didn't think that was
16  anybody's business.
17      Q.   Did you delete only personal information, or did
18  you delete your entire Slack account?
19      A.   I did not delete my entire Slack account.
20      Q.   Did you delete all the messages in your Slack
21  account?
22      A.   No.
23      Q.   What did you do in Slack when you deleted
24  messages?  Describe it for me.
25      A.   I deleted certain threads, I believe.

1     Q.    Which threads?

2     A.    I don't know.

3     Q.    To your knowledge, are copies of those messages

4  maintained anywhere?

5     A.    I don't know.  I don't have that information.

6     Q.    Did you keep copies of any of the messages

7  before you deleted them?

8     A.    I did not.

9     Q.    Did you delete anything else off of your work

10 computer or network?

11    A.    Anything else in addition to -- I don't know

12 what you are -- in addition to what?

13    Q.    In addition to what we already talked about.  We

14 talked about you wiping --

15    A.    Wiping the computer clean, so, no, I think that

16 would pretty much cover it.

17    Q.    Well, then you went in and deleted Slack

18 messages, true?

19    A.    No, I had already gone in and deleted Slack

20 messages.  Not true.

21    Q.    Okay.  Sometime in February you deleted Slack

22 messages?

23    A.    Correct.

24    Q.    Did you delete anything else off of the GPSI

25 network prior to your termination --

1    A.    "Okay."

2    Q.    When did this happen?

3    A.    Between '14, '15.  I don't -- I don't recall the
4    exact day.

5    Q.    Did you enter into an agreement to repay those
6    amounts?

7    A.    I entered into an agreement after that when the
8    auditors came in and needed documentation.

9    Q.    What did you agree to repay?

10   A.    The amount I had used in personal expenses.

11   Q.    How much was it?

12   A.    I don't recall.  Something around $6,000.  I
13   don't -- I don't know the exact amount.

14   Q.    Did Rob tell you that you couldn't charge
15   personal expenses on the account?

16   A.    I don't recall.

17   Q.    You recall that he was upset with you, though?

18   A.    I recall that he was upset, yes.

19   Q.    You don't recall whether or not you should stop
20   charging personal expenses?

21   A.    No, I don't recall.

22   Q.    After your conversation with Rob, did you
23   believe that it -- you were authorized to continue to
24   charge personal expenses on the company credit card?

25   A.    To Rob or to my direct supervisors?  It is a

1      A.    I told Tyler there is certain things I didn't --
2   I didn't like the way that certainly people interacted
3   with customers of mine.

4      Q.    Who -- who were you speaking of?

5      A.    Brent Eynon or Mike Mac (sic) would be the two
6   that I can think of.

7      Q.    Do you know if either of those people ever
8   complained about you?

9      A.    Not that I have ever been told.

10     Q.    When did your relationship with Kristin Lisson
11  start?

12     A.    We started work in 2013.

13     Q.    What was her position in relation to yours?

14     A.    She was -- at the time, I don't know.  I don't
15  know what her position was when she started.

16     Q.    How often did you interact with her when she
17  started?

18     A.    Not much.

19     Q.    Did that change?

20     A.    Yes.

21     Q.    When?

22     A.    Mostly when I moved to -- probably starting in
23  2015, somewhere in the middle of 2015, but definitely in
24  2016 when I was given a promotion.

25     Q.    When were you given a promotion?

1               I also went from working for Tyler

2   Mortensen to working directly for Jason Walker, the VP of

3   sales.

4        Q.    Didn't Tyler assume your supervision in January

5   of 2016?

6        A.    Nope.  He did in January 2017 when he got

7   promoted.

8        Q.    So in January of 2016, you reported to Jason

9   Walker, correct?

10       A.    Correct.

11       Q.    And then in January of 2017, you began reporting

12   to Tyler Mortensen?

13       A.    Again, yes.

14       Q.    What was Tyler's change in title in January of

15   2017, if you know?

16       A.    I believe he went to the national director of

17   sales or something along those -- I -- I don't really

18   know.

19       Q.    Do you know what his title was prior to that?

20       A.    Maybe director of sales.

21       Q.    Are you guessing or do you know?

22       A.    I am guessing -- yeah, I am guessing.

23       Q.    When did your romantic relationship with

24   Ms. Lisson begin?

25       A.    The very end of -- after Christmas or something

1    *A.*    I don't believe so.

2    *Q.*    When did you move in together?

3    *A.*    Officially or unofficially?

4    *Q.*    Both.

5    *A.*    She moved into the condo complex where I lived

6    in January.

7    *Q.*    January of what year?

8    *A.*    2017.

9              She had her own place but it was probably

10   500 yards from mine, so for all intents and purposes, I

11   stayed with her most of the time, but I maintained my own

12   residence and my stuff was there.

13   *Q.*    And you had a roommate at the time?

14   *A.*    I did.

15   *Q.*    To your knowledge, when did Mr. Donat first know

16   of your romantic relationship with Ms. Lisson?

17   *A.*    First knew about it -- first time that he knew

18   for certain about it was January 10th, but I believe he

19   probably knew something about it prior to that.

20   *Q.*    January 10th is the date that Ms. Lisson told

21   him about your relationship?

22   *A.*    That was the date, but December 25th he told her

23   not to marry Robert or I, so it seems like there would be

24   some indication that he knew something was going on.

25   *Q.*    Well, he had observed her interacting with you

1      Q.    Tell me specifically what you told your managers
2  about the sexual harassment of Ms. Lisson by Mr. Donat.
3      A.    So it was an annual review meeting.  Jokingly,
4  because I had a good relationship with Tyler and Jason, I
5  took in my annual goals.  And on a piece of paper, I
6  had -- No. 1 was Kristin Lisson.  No. 2 was Lower Colorado
7  River Authority.
8            And No. 1, I had put a line through as my
9  goals for 2017.  And I handed it to Jason and Tyler and we
10  all laughed.  And Jason said to me, "Do not let Rob see
11  this," which I thought was little strange at the time.
12  And we had the meeting.
13            At the end of the meeting, I told Jason and
14  Tyler that the day before Kristin had met with Rob and
15  told him about our relationship for the first time, and
16  Rob's response to that, that I owed the company money.
17            When I said it, Jason immediately responded
18  and said:  Completely makes sense why he came by my office
19  earlier and asked about moving -- about you --
20  transferring you to Chicago.
21            And then Tyler and Jason looked at each
22  other, like, oh, shit, and they -- then we had a
23  conversation about, hey -- Tyler said:  Rob knows he
24  cannot fire you for dating Kristin because it is illegal,
25  but he is going to have his eye out on you.  So you have

1    Q.    March 2nd and what date?

2    A.    March 6th.

3    Q.    And you produced both of those recordings?

4    A.    I did.

5    Q.    Did you alter the recordings in any way?

6    A.    In no way.

7    Q.    Did they -- strike that.

8          Did the recording capture the entire

9    conversations you had with GPSI management on those dates?

10   A.    Not in the March 2nd meeting.

11   Q.    What happened?

12   A.    It stopped after an hour.

13   Q.    Why?

14   A.    It was the limitation of the recording software

15   I was using.

16   Q.    How much longer did the conversation last after

17   the recording stopped?

18   A.    I don't know the answer to that.  It stopped

19   after an hour, and then when I realized that it had

20   stopped, I turned it back on and recorded the rest of the

21   conversation.

22   Q.    How much time had lapsed that wasn't recorded?

23   A.    Couldn't tell you.  Maybe -- I think it was

24   probably close to 30 or 45 minutes.

25   Q.    How did you turn it back on in the presence of

```
 1                            CERTIFICATE

 2            I HEREBY CERTIFY that the foregoing deposition
       was taken by me pursuant to notice; that I was then and
 3     there a Certified Court Reporter for the State of Arizona,
       and by virtue thereof authorized to administer an oath;
 4     that the witness before testifying was duly sworn by me to
       testify to the whole truth and nothing but the truth;
 5     pursuant to request, notification was provided that the
       deposition is available for review and signature; that the
 6     questions propounded by counsel and the answers of the
       witness thereto were taken down by me in shorthand and
 7     thereafter transcribed through computer-aided
       transcription under my direction, and that the foregoing
 8     typewritten pages contain a full, true, and accurate
       transcript of all proceedings had upon the taking of said
 9     deposition, all done to the best of my skill and ability.
               I FURTHER CERTIFY that I am in no way related to
10     nor employed by any of the parties hereto, nor am I in any
       way interested in the outcome hereof.
11             I FURTHER CERTIFY that I have complied with the
       ethical obligations set forth in ACJA Sections
12     (J)(1)(g)(1) and (2).
               DATED at Phoenix, Arizona, this 1st day of
13     September, 2018.

14                              _____
                                CARRIE A. CARIATI
15                              Registered Professional Reporter
                                Certified Realtime Reporter
16                              Certified LiveNote Reporter
                                Certificate No. 50355
17

18             I CERTIFY that this Registered Reporting Firm
       has complied with the ethical obligations set forth in
19     ACJA Sections (J)(1)(g)(1) and (2).

20
               DATED at Phoenix, Arizona, this 1st day of
21     September, 2018.

22
                                _____
23                              Registered Reporting Firm R1064
                                CARRIE A. CARIATI, Owner
24

25
```

# EXHIBIT K

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4   Jeremy Thacker,              ) No. 2:18-cv-00063-PHX-DJH
                                  )
 5                Plaintiff,      )
                                  )
 6   v.                           )
                                  )
 7   GPS Insight, LLC; Robert J.  )
     Donat, Individually and as   )
 8   Trustee of The Robert Donat  )
     Living Trust Dated April 19, )
 9   2017;                        )
                                  )
10                Defendants.     )
     _____)
11

12

13             DEPOSITION OF KRISTIN LISSON

14                   Phoenix, Arizona
                     August 14, 2018
15                     9:06 a.m.

16

17

18

19

20   Reported by:              CARRIE REPORTING, LLC
     DOREEN SUTTON, RPR, CSR, FAPR  Certified Reporters
21   Arizona CR No. 50076       2415 East Camelback Road
                                Suite 700
22   Prepared for:             Phoenix, AZ 85016
                               (480)429-7573
23                             carrie@carriereporting.com

24   (COPY)

25
```

1   that a lawsuit could come about.  What kind of lawsuit?

2   You said a lawsuit relating to me.

3       A.   Right.  So one of the messages that I recall

4   deleting after I had told Rob about me dating Jeremy, and

5   Jeremy knew that I had met with Rob and what he'd said

6   about Jeremy, and that Rob -- I was on my phone constantly

7   and didn't want to lie to Jeremy.  It was difficult for me

8   to keep those conversations private from Jeremy without

9   lying.  So Jeremy knew I was discussing with Rob, he asked

10  me -- I got a really late text from him, he asked me who

11  was that and it was Rob, and it was his response to a

12  letter I had sent him where I asked him to let me go.  And

13  his response was something with regard to -- and that's --

14  he said he didn't deserve to be lionized for caring about

15  me and that he understood now why Elliot had always called

16  me a bitch.

17       Jeremy asked me who is that and what was it, I

18  read that message to Jeremy and Jeremy asked why he would

19  say that, and I told him it was because I was telling Rob

20  to kind of stay out of my personal life, because Jeremy

21  knew I was having conversations with Rob.  And at that

22  point I deleted it without thinking about litigation, only

23  much later when things kept escalating was when Jeremy had

24  asked me if I had saved all those types of messages,

25  and -- in case of litigation, and I wished I had, but in

DEPOSITION OF KRISTIN LISSON, 8/14/2018

1      A.    He attempted to -- he made his request known to

2   have a physical relationship with me.

3      Q.    After December 26th?

4      A.    Uh-huh.

5            MR. CARDEN:  Yes?

6      Q.    BY MS. FRANCIS:  That's yes?

7      A.    Yes.

8      Q.    What did he do?

9      A.    When I met with Rob, I believe on January 10th to

10  tell him that I was now dating Jeremy or just started

11  dating Jeremy, Rob was upset that Jeremy was somebody I

12  would consider and cautioned me about Jeremy's possible

13  STDs and about the fact that Rob said that Jeremy owed the

14  company money and that he was a serial dater of women at

15  the company, and that it wouldn't look good for me.

16          And during that conversation, we talked a lot

17  about our past relationship and how upsetting it had been

18  for me when he'd push and pull and push me away and pull

19  me in and it was confusing, and he was very remorseful for

20  that.  And when he left, he mouthed the words I love you

21  to me.  We texted a little bit afterward, and I said I

22  need to distance myself and he said something to the

23  effect of as long as it's distancing from all other

24  parties, I'll be a happy camper.  That was when he first

25  learned of my relationship with Jeremy.

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1          And so from that point on and even I'm now

2     remembering, because a lot of these messages were deleted

3     and recovered, so they're kind of sporadic.  He mentioned

4     he was jealous of my relationship with Robert Dennis, he

5     wished that it was him that I was spending my time with.

6     He asked me to go on events, to different events with him.

7          Q.    Work events?

8          A.    No, I think there are, like, a Sundance event, so

9     a social event.  And that he would be okay with us being

10    in public now and that he would -- he wanted me back.  He

11    texted me constantly, saying he was having a really hard

12    time with it, that he was sad and upset and not eating and

13    stressed.  He said he was apparently obsessed with me and

14    going bankrupt, because he was also stressed about a lot

15    of his financial happenings at that time.  He said he was

16    constantly Jonesing for me.

17          He called after I had met with him to tell him

18    about the relationship with Jeremy.  I told Jeremy I met

19    with Rob to tell him I was dating you.  When Jeremy

20    mentioned that I had met up with Rob to Jason and Tyler,

21    Jason said oh, that must have been why Rob inquired about

22    your transfer to Chicago.  Jeremy relayed that back to me,

23    and the next time Rob and I were on the phone January 12th

24    I asked Rob to make sure he wasn't going to now target

25    Jeremy in any way.  He wanted to know why I was saying

1    that and I didn't tell him what I had heard, but that I

2    just asked him to not target Jeremy.

3            And Rob's response was now that there's -- that

4    he's on his radar, he can't help that the spotlight's on

5    him, doesn't matter how it got on him, but he's going to

6    be checking on Jeremy.  He asked me in ten years would you

7    rather be with a Jeremy Thacker or Rob Donat, so it was a

8    lot of that back-and-forth for several weeks, until he

9    sent me a very long letter via text, but I believe he had

10   mentioned that he had typed it in a different program

11   first about how he wanted me to be his queen and something

12   about rose petals from his previous relationship and he

13   wanted to take my son fishing and all sorts of things

14   about wanting a future with me.

15           When I responded to him how nice those things

16   were, you deserve to be happy, I take responsibility for,

17   you know, where we're at but going forward, I made a list

18   of things that I asked of him, one of them to not unfairly

19   discredit Jeremy.  There were several things I asked of

20   him and the last one was, like, respecting my choices and

21   I asked him to let me go, and that's when he responded

22   with the bitch text.  So from that point on, I was careful

23   about how I expressed my wishes to him, because it was

24   clear that me just saying what I wanted, he was not going

25   to accept.

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1          So there were continued messages after that, he

2    apologized a lot.  He brought me into his office, told me

3    I was the one thing that -- he has all the money in the

4    world and I was the one thing he wanted and couldn't have.

5    So there were many times where he expressed wanting a

6    relationship with me again.

7          Q.   Are you done answering?

8          A.   Yes.

9          Q.   My question was focused on your physical

10   interactions with him after December 26th; do you

11   understand the distinction?

12         A.   Yes.

13         Q.   After December 26th, did you have any sexual

14   relationships -- strike that.

15         After December 26th, did you have any sexual

16   interaction with Mr. Donat?

17         A.   No.

18         Q.   Did he touch you, kiss you, anything of that

19   nature after December 26th?

20         A.   He tried to hold my hand at -- when we met for

21   coffee, but no.  I mean, he hugged me after the meeting.

22         Q.   Did that make you uncomfortable?

23         A.   I pulled my hand away and told him I did not want

24   that.

25         Q.   Did he pursue touching you after you said that

DEPOSITION OF KRISTIN LISSON, 8/14/2018

1   also reported directly to Jason, and we would often meet

2   occasionally and talk about how Jason told James one thing

3   and Jason would tell me another thing.

4        Q.   On matters of significance?

5        A.   They were significant to us.

6        Q.   Did you ever confront Mr. Walker?

7        A.   Occasionally; he would laugh it off and blame

8   James for being dramatic or blame me for, you know, making

9   a big deal out of it.

10       Q.   But generally, you had a good working

11  relationship?

12       A.   Yeah, we had a great working relationship.

13       Q.   Do you think if you complained to him he would

14  take your complaint seriously?

15       A.   I did complain to him and he didn't take them

16  seriously, but I hoped he would.

17       Q.   You complained to him when?

18       A.   With matter -- many, many times about matters of

19  just day-to-day, I think he would try to do his best to

20  mitigate, but on more serious matters such as harassment,

21  the first time was in July of 2015.

22       Q.   What did you say to Mr. Walker?

23       A.   It was the day after the sales conference event,

24  I told Jason that -- this was prior to Rob's and my

25  relationship, consensual relationship, I had told Jason

1    that Rob had kissed me that night.

2        Q.    What specifically did you say to him?

3        A.    I said Rob kissed me last night.

4        Q.    What did you want him to do?

5        A.    He -- I asked him -- I don't know that I asked

6    him anything.  He put his hands on his face and said oh,

7    my god, are you serious.  We discussed the rest of the

8    night, there were a lot of things that happened that

9    night, and ten minutes later Rob was in my office.

10       Q.    What did he say?

11       A.    He said remind me what happened last night, Jason

12   told me I kissed you.  I said yes.  He apologized.

13       Q.    So Jason took action on your complaint; correct?

14             MR. CARDEN:  Objection; form.

15             THE WITNESS:  Jason told Rob what I had told him.

16       Q.    BY MS. FRANCIS:  And Rob apologized to you?

17       A.    Correct.

18       Q.    And you accepted his apology?

19       A.    Yes.

20       Q.    Did you expect anything more to happen?

21       A.    No, my -- no.  This was very in line with the

22   culture at GPS Insight.

23       Q.    And Rob didn't kiss you again until you began

24   your consentual relationship; correct?

25       A.    The next time he kissed me was when we were

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1        Q.    Did he respond?

2        A.    So in July of 2016, sales conference again, he

3   and I were talking and he asked me what had happened that

4   night that I had referenced to you, because Jason -- Rob

5   and I had earlier attended an SVP event.  Jason dropped

6   Rob and I off at Mellow Mushroom and knew that we were

7   very drunk.

8             The next day after that event I had left my

9   sunglasses in Jason's car and he came to give them to me,

10  asked if everything was okay, and I had tears in my eyes

11  and I said yes and he walked away.

12            So when we were at the sales conference in 2016,

13  Jason said I want to know what happened that night, I've

14  always wondered what happened that night.  So I at that

15  time had engaged in a consentual relationship with Rob,

16  didn't really want Jason to know about it, but Jason had

17  asked me questions about what happened that night, he

18  asked if anything happened.  I told him what happened and

19  he said I knew it, I knew he would do that, and he got

20  very upset.  We kept getting interrupted a lot, so I

21  didn't get to finish or figure out how he felt about it or

22  what he was going to say about it.

23       Q.    What specifically did you tell him had happened?

24       A.    That in the back seat that Rob had -- was holding

25  my hand while Jason was driving; Jason was really annoyed

1    by that, that it was in his own car.  I told him that Rob

2    had kissed me and I was so drunk I fell off my barstool,

3    so we were escorted out of the restaurant, and then I told

4    him that Rob -- that something happened afterward.

5         Q.   Did you tell him specifically what happened

6    afterward?

7         A.   I may have mentioned Rob's apartment, but I don't

8    remember specifics.

9         Q.   But you know you told him Rob held your hand?

10        A.   Uh-huh.

11        Q.   Correct?

12        A.   Correct.

13        Q.   And you know that you told him that Rob kissed

14   you and you fell off the barstool because you were drunk?

15        A.   Correct.

16        Q.   But you don't remember what you told him besides

17   that?

18        A.   Correct.

19        Q.   What did Jason do in response?  If you know.

20        A.   He got really upset, but as I mentioned, we were

21   interrupted a lot, so we talked about it via e-mail a

22   little bit that weekend.

23        Q.   Have you produced those e-mails?

24        A.   I did.

25        Q.   What else did he do in response?

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1     A.    I didn't ask him to do anything in response,
2 there was nothing else.
3     Q.    He was asking you to confirm what happened that
4 night, you weren't actually filing a complaint or making a
5 complaint that you wanted him to act on; is that correct?
6     A.    That is correct at that time.
7     Q.    I was originally asking you for information about
8 what you complained to Jason about matters that you said
9 you considered to be serious, not day-to-day operations --
10     A.    Uh-huh.
11     Q.    -- to confirm whether or not Jason responded and
12 took action.
13     A.    So there's one more time.
14     Q.    But we're on the same page, we're talking about
15 complaints that you made to him where you wanted him to do
16 something in response?
17     A.    Okay.  I see what you're saying.
18           So I -- on February 14th, I had --
19     Q.    What year?
20     A.    Of 2017.  I had told him the day before in a text
21 message that I had received some really upsetting
22 information, and we talked and he said he was unsure what
23 it would be about and we could talk the next day.  So on
24 February 14th, he stopped in my office and said that he
25 and Loray, his wife, had discussed things and said he

1    wasn't sure what was happening, but that if I needed to

2    take legal action I should, but that I should leave him

3    out of it.  And he said he was upset because this probably

4    meant that he might lose me as an employee, so --

5        Q.   Did you --

6        A.   When I actually made my complaint on March 9th,

7    it was only after I was told by my direct supervisor that

8    he wanted to be left out of it and, essentially, I was on

9    my own.

10       Q.   Did you produce a text with Jason where you told

11   him you had something important?

12       A.   I did.

13       Q.   And your conversation where Jason told you he

14   wanted to be left out of it, if you needed to take legal

15   action do it, that was a verbal conversation that you had

16   in the office?

17       A.   Yes.

18       Q.   You didn't give him any specifics about what was

19   going on?

20       A.   I told him that the -- I told him about the

21   message the day before, I kind of told him the substance

22   of the message but didn't say who it was from, but on the

23   February 14th in-person meeting I told him that it was

24   from Rob.

25       Q.   I want to be clear.  So on February 13th you

1   e-mail Jason and say what?

2       A.   I texted Jason.

3       Q.   You texted him?

4       A.   And said are you aware of any -- anyone at the

5   company or any performance issues or anyone complaining

6   about me that I should be aware of.

7       Q.   What was his response?

8       A.   Said not that I'm aware of, but it appears to be

9   that I'm not aware of much these days, something to that

10  regard; not verbatim, I can't quote.

11      Q.   What did you say in response?

12      A.   I said if it's not you, Tyler, Phil, James, or

13  Jeremy, then it's not urgent, and we can talk about it

14  tomorrow.

15      Q.   What did he say?

16      A.   He said okay.

17      Q.   You said something about upsetting information?

18      A.   Uh-huh.

19      Q.   Correct?

20      A.   Correct.  Sorry, I'm going to get that down.

21      Q.   Did you text Mr. Walker that you had some

22  upsetting information?

23      A.   The text was that I had heard that -- I

24  characterized the message that I had received from Rob

25  which was prompting me to inquire with Jason, I

1  characterized that as upsetting.

2      Q.   That's not what the text actually said?

3      A.   I'd have to look at the text.  I can't recall.

4      Q.   You recall the text being that you were asking if

5  there were performance concerns about yourself?

6      A.   I think I said I received an upsetting message,

7  are there any performance concerns; however, I'd need to

8  see the message to confirm.

9      Q.   And he responded not that he was aware of, but

10 then we could talk about it later?

11     A.   He responded no, I'm -- there seems to be very

12 little, what was it about, and I said if it's not

13 regarding these people, who meant a lot to me, then it's

14 not urgent and we can talk about it the next day.

15     Q.   And your conversation, the text conversation

16 ended --

17     A.   The text conversation ended, yes.

18     Q.   The following day was February 14th of 2017;

19 correct?

20     A.   Correct.

21     Q.   He approached you?  You approached him?

22     A.   He came into his office in the morning, he had a

23 golfing event, he wasn't going to be there all day so he

24 wanted to make sure and stop and check in.

25     Q.   And tell me to the best of your -- did you record

1    this conversation?

2        A.    No.

3        Q.    Tell me to the best of your recollection what was

4    said.

5        A.    He said -- he asked what the message was about, I

6    told him.

7        Q.    What did you tell him specifically?

8        A.    I told him the substance of the message.  I'm not

9    sure that I read it to him.

10       Q.    Tell me what you recall saying.

11       A.    I said Rob sent me a message that -- he said my

12   professional reputation is at risk and that I need to fix

13   it, something to that effect.

14       Q.    That's the best you can recall of what you said

15   to Jason?

16       A.    Yeah, how the conversation started.

17       Q.    What did he say in response?

18       A.    He said look, Loray and I have actually been

19   talking about this, about everything that's been going on,

20   and Loray has some affiliation with some legal -- her

21   profession is something regarding legal.

22       Q.    Jason said this?

23       A.    I'm saying the reason why he was telling me that

24   he and Loray talked about it, he said if I need to take

25   legal action I should and we think you should if you need

1   to, but that I need to be left out of it completely.

2        Q.   Did he say why?

3        A.   No.

4        Q.   What did you say in response?

5        A.   I don't recall specifically how much longer

6   the -- it was a quick conversation.  I'm sure I was upset

7   and started crying or something.

8        Q.   Is that in his presence or after he left?

9        A.   In his presence.

10       Q.   What did he say when you started crying?

11       A.   I'm not sure if -- I probably had tears in my

12   eyes, and the conversation -- he gets uncomfortable when I

13   get emotional or when anyone gets emotional around him,

14   it's a running joke, so I'm assuming he left shortly

15   afterward.

16       Q.   If you had problems with Jason as your

17   supervisor, who would you complain to within the company?

18       A.   It would have to be Rob or Elliot.

19       Q.   What was Elliot's role?

20       A.   Vice president of operations.

21       Q.   Did you ever feel that -- strike that.

22            So did you ever have an occasion that you had a

23   complaint about Jason that you took to another manager?

24       A.   No.

25       Q.   But if you did, you would have contacted Elliot

DEPOSITION OF KRISTIN LISSON, 8/14/2018

```
 1    knowledge.
 2         Q.   Are you aware of Mr. Thacker charging purely
 3    personal expenses on his company credit card?
 4         A.   I am not privy to knowing what he charged.  I
 5    haven't seen charges.
 6         Q.   Did you discuss it with him?
 7         A.   I knew that there was a dispute over it after his
 8    termination.
 9         Q.   Did you know that there was a dispute about it
10    before he was terminated?
11         A.   I did know about that when Rob in the
12    January 10th meeting brought up the fact that Jeremy owed
13    the company money.  I mentioned that to Jeremy and he --
14    and he said that's not true, I paid back the loan in full,
15    and he confirmed that that was indeed true, that he had
16    paid back his loan, so that was my understanding of that.
17         Q.   Why are you characterizing it as a loan?
18         A.   That's how Jeremy characterized it.
19         Q.   But you understood that these were things that
20    were charged on the company credit card?
21              MR. CARDEN:  Objection; form and foundation.
22              THE WITNESS:  I didn't know what, all I knew is
23    that Rob told me Jeremy owed the company money; Jeremy
24    explained that it was more of a loan and that he had paid
25    it back.
```

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1    A.    That is correct.

2    Q.    Did you attend that meeting?

3    A.    No, I did not.

4    Q.    Do you know who attended the meeting?

5    A.    No, I do not.

6    Q.    Who was the lawyer?

7    A.    Mr. Kresin.

8    Q.    On what date did you retain the services of

9    Mr. Kresin for your legal issues?

10   A.    I met with him for advice on -- it was after I

11   filed my complaint or sent my e-mail complaint to Rob,

12   Elliot, Tyler, and Jason in which I said I would be

13   seeking -- I would be discussing it with an attorney.

14         MS. FRANCIS:  I believe we're on No. 36.  Is that

15   correct?

16         MR. SILENCE:  I believe that is correct.

17         MS. FRANCIS:  The court reporter will mark it for

18   you.

19         (Deposition Exhibit No. 36 was marked for

20   identification.)

21   Q.    BY MS. FRANCIS:  The court reporter's marked

22   Exhibit No. 36 to your deposition.  Do you recognize this

23   document?

24   A.    Yes, I do.

25   Q.    Did you write this document?

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1    A.    Yes, I did.

2    Q.    Is this the document or the e-mail that you --

3    strike that.

4          What is Exhibit No. 36?

5    A.    I don't know how to answer that.  What is it in

6    general?

7    Q.    Yes.

8    A.    It's an e-mail that I sent to Rob, Elliot, Jason,

9    Tyler, Jeremy, and Rob's lawyer to disclose my affair with

10   Rob.

11   Q.    Is this the e-mail that you were referencing in

12   your prior testimony where you said that you met with an

13   attorney after you sent the e-mail to Rob, Elliot, Tyler,

14   and Jason?

15   A.    Yes, this is it.

16   Q.    Where in this e-mail does it say that you will be

17   seeking guidance from an attorney?

18   A.    The fourth paragraph, first sentence.

19   Q.    "I will not speak of this to anyone except an

20   attorney and Jesse, with whom I ask that you do not share

21   this information until I am able to tell him myself."

22         Did I read that correctly?

23   A.    Yes.

24   Q.    So it was after you sent this e-mail that you

25   first met with legal counsel?

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1      A.    Yes.

2      Q.    Was it the same day?

3      A.    Possibly.

4      Q.    You don't recall?

5      A.    I don't recall.

6      Q.    Who did you meet with?

7      A.    I met with Dave Kresin.

8      Q.    Did you arrange that meeting directly or did

9   someone arrange that for you?

10     A.    I -- I'm not sure if I arranged that or not.

11  Jeremy -- let me think about that.

12          I don't think I arranged that.

13     Q.    Who arranged it?

14     A.    I believe Jeremy.

15     Q.    Prior to your sending Exhibit No. 36, did any of

16  the people that received the e-mail have knowledge of your

17  affair with Rob?

18          MR. CARDEN:  Objection; form.

19          THE WITNESS:  I can't speak to anyone else's

20  knowledge.

21     Q.    BY MS. FRANCIS:  Had you told any of these people

22  that you were having an affair with Rob?

23     A.    I had told Jeremy.

24     Q.    When did you tell Jeremy?

25     A.    I told him portions of it on the 13th, I told him

1   in an e-mail that he's seen, you're saying you want to

2   stay?

3       A.   That wasn't the primary reason.  I think he was

4   questioning everything, based on the typo.

5       Q.   Why was he upset that you were e-mailing Jason

6   alone?  If you know.

7       A.   No, the e-mail -- the alone is in reference to he

8   thought that I was just keeping -- I have to look at the

9   text or the message.  He thought that I was not holding

10  Rob accountable to some respect by an omission of the word

11  that he misread.  That's my understanding.

12           (Deposition Exhibit No. 40 was marked for

13  identification.)

14      Q.   BY MS. FRANCIS:  The court reporter's marked

15  Exhibit No. 40 to your deposition.  Tell me when you're

16  done reading it.

17      A.   I'm done.

18      Q.   If you look at the second page of Exhibit No. 40,

19  it's an e-mail chain, so you have to read it backwards.

20  The first e-mail is an e-mail sent from you on GPS

21  Insight's e-mail account to Jason.  Do you see that?

22      A.   I do.

23      Q.   That's sent on March 9th at 4:55 p.m.?

24      A.   Uh-huh.

25      Q.   Correct?

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1    A.    Correct.

2    Q.    And that e-mail you sent to Jason alone?

3    A.    Just Jason.

4    Q.    Right.  And this is the e-mail that Mr. Thacker

5    is referencing in his text message on March 9th at

6    9:39 p.m., which is in Exhibit No. 39; correct?

7    A.    Correct.  Yes.

8    Q.    And he's upset that you're e-mailing Jason alone;

9    correct?

10   A.    He's upset by that because he thought I said I

11   asked that you not share my feelings about that with Rob.

12   So in him thinking that that's what I said, he was even

13   further exacerbated that it was just to Jason, like, that

14   I was trying to keep it private and not tell Rob how I

15   really felt.

16   Q.    Who did you blind copy on this e-mail on

17   March 9th to Jason that you sent on GPS Insight?

18   A.    Is it listed here?

19   Q.    No.

20   A.    I don't -- I'm -- why are you assuming I blind

21   copied someone?

22   Q.    Because Mr. Thacker is saying in Exhibit No. 39

23   that he just read it.

24   A.    I don't know that I blind copied Jeremy.

25   Q.    How did you send it to him?

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

1    Q.    Did someone help you write that e-mail?

2    A.    Someone did not help me write that e-mail.

3    Q.    Why did you need to make clear that the

4  harassment was sexual in nature?

5    A.    Because in -- I wanted to make sure that it

6  wasn't -- that Jason didn't misinterpret it that it was

7  just regular bullying or harassment, I wanted to make sure

8  that he knew my complaint was sexual harassment, because I

9  did not include that in my first complaint.

10    Q.    What prompted you to write this e-mail on

11  March 13th?

12    A.    I omitted that from my first complaint and I

13  wanted to clarify in my second complaint.

14    Q.    Why?

15    A.    I didn't want further misunderstanding.

16    Q.    Did someone tell you that you needed to clarify?

17    A.    No, not that I needed to clarify.

18    Q.    That you should clarify?

19    A.    Not that I should clarify.

20    Q.    Did anyone prompt you to send this e-mail on

21  March 13th?

22    A.    I sent -- I chose to send this e-mail on

23  March 13th.

24    Q.    But did anybody tell you you should clarify,

25  rectify, make clear, anything that caused you to send this

*DEPOSITION OF KRISTIN LISSON, 8/14/2018*

```
1   STATE OF ARIZONA         )
                             )   ss.
2   COUNTY OF MARICOPA       )

3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true, and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.

7

8        I CERTIFY that I am in no way related to, nor
    employed by any of the parties hereto, and have no
9   interest in the outcome thereof.

10       [X] Review and signature was requested.
             Review and signature was waived.
11           Review and signature not requested.

12       I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
13  J(1)(g)(1) and (2).  Dated at Scottsdale, Arizona, this
    24th day of August, 2018.

14

15                          Doreen Sutton

16       _____
                    DOREEN SUTTON, FAPR, CSR
17               Certified Reporter #50076
               Registered Professional Reporter

18
                 *    *    *    *    *    *
19

20       I CERTIFY that CARRIE REPORTING, LLC, has complied
    with the ethical obligations set forth in ACJA
21  7-206(J)(1)(g)(1) through (6).

22

23                          Michele Durrer

24       _____
                    CARRIE REPORTING, LLC
                  Registered Reporting Firm
25                 Arizona RRF No. R1064
```

# EXHIBIT L

1              MS. FRANCIS:  Object to form and foundation.

2              THE WITNESS:  I don't recall that, no.

3    BY MR. SILENCE:

4        Q.    And is this conversation that we are having about

5    Container Freight, is this the customer that's the subject

6    of the e-mails that you sent to Jason Walker?

7              MS. FRANCIS:  Object to form and foundation.

8              THE WITNESS:  I don't recall.  I know it

9    was -- I recognize the name Container Freight.  I don't

10   remember who the customer was.

11   BY MR. SILENCE:

12       Q.    Do you remember when you had this discussion with

13   Jeremy that we have been talking about?

14       A.    I believe it was towards the end of his

15   employment, possibly.  I'm not sure.

16       Q.    Do you remember ever talking to Rob Donat about

17   this Container Freight issue?

18       A.    I do know that when I was speaking to Ray in his

19   office about trying to get information, Rob either was

20   already in Ray's office or came in at the same time as me.

21   I can't recall.  I don't recall how Rob got there, but Rob

22   was in the office when Ray and I were having this

23   discussion about this order.

24       Q.    But you are not sure whether -- Well, let me back

25   up.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


JEREMY THACKER,                        )
                                       )
                 Plaintiff,            )
                                       ) Civil Action No.
        vs.                            ) 2:18-cv-000630-DJH
                                       )
GPS INSIGHT, LLC; ROBERT DONAT,        )
individually,                          )
                                       )
                 Defendants.           )
_____        )




DEPOSITION OF CARRIE RACE

Phoenix, Arizona
August 29, 2018
10:00 a.m.




PREPARED FOR:


ATTORNEY AT LAW


(COPY)

Reported by:
Robin Jasper, RPR
CCR No. 50286
AZ Registered Reporting Firm No. R1008

1   STATE OF ARIZONA          )
                              )    ss.
2   COUNTY OF MARICOPA        )

3        BE IT KNOWN that the foregoing transcript was taken
    before me; that the witness before testifying was duly
4   sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.
7
         I CERTIFY that I am in no way related to any of the
8   parties hereto nor am I in any way interested in the
    outcome hereof.
9
         [X]  Review and signature was requested.
10       [ ]  Review and signature was waived.
         [ ]  Review and signature not requested/required.
11
         I CERTIFY that I have complied with the ethical
12  obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
    (J)(1)(g)(1) and (2).  Dated at Phoenix, Arizona, this
13  12th day of September, 2018.

14

15                    *Robin Jasper*

16

17  _____
                 Robin Jasper, RPR
18       Arizona Certified Reporter No. 50286

19       I CERTIFY that OTTMAR & ASSOCIATES, INC., has
    complied with the ethical obligations set forth in ACJA
20  7-206(J)(1)(g)(1) through (6).

21

22                    *Julie T. Ottmar*

23

24  _____
             OTTMAR & ASSOCIATES, INC.
25       AZ Registered Reporting Firm No. R1008

# EXHIBIT M

**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Kraig J. Marton (003816)
kjm@jaburgwilk.com
Jeffrey A. Silence (029143)
jxs@jaburgwilk.com
Laura Rogal (025159)
lar@jaburgwilk.com

Attorneys for Plaintiff Jeremy Thacker

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Thacker, | Case No. 2:18-cv-00063-DJH |
| Plaintiff, | **Declaration of Kristin Lisson in Support of Response to Defendants' Motion for Summary Judgment** |
| v. | |
| GPS Insight, LLC; Robert Donat, individually, | (Assigned to Honorable Diane J. Humetewa) |
| Defendants. | |

I, Kristin Lisson, declare as follows under penalty of perjury:

1.      I am an adult and am competent to testify. If called to testify at trial, I would testify consistently with this declaration.

2.      I make this declaration based upon my personal knowledge.

3.      **In the fall of 2016, Jeremy Thacker gave Rob Donat a ride from the Brunswick Zone Via Linda Lanes bowling alley to High Street (Mr. Donat's apartment).**

4.      Mr. Donat, Jeremy, and I participated in a bowling league with other GPS Insight ("GPSI") employees in 2016.

5.      I saw Mr. Donat get into Jeremy's vehicle.

1

JABURG WILK
Attorneys at Law

6.      I had given Mr. Donat a ride from High Street to the bowling alley that same day.

7.      Mr. Donat and Jeremy were friendly whenever I saw them interact with each other during 2016.

**8.      On January 12, 2017, I called Mr. Donat twice.**

9.      Our first call lasted 29:15 minutes, and our second call lasted 7:50 minutes.

10.     Two days prior to these calls, I had informed Mr. Donat of my relationship with Jeremy.

11.     One day prior to these calls, Jeremy had informed me that Mr. Donat inquired with Jason Walker about a transfer for Jeremy to the GPSI Chicago office.

12.     On these calls, Mr. Donat and I discussed Jeremy at length. Mr. Donat told me that he would be paying attention to Jeremy now that he was on his radar.

13.     On these calls, I asked Mr. Donat not to scrutinize Jeremy due to Jeremy's romantic relationship with me.

**14.     Between January 16, 2017 and January 23, 2017, Mr. Donat and I spoke on the phone with each other five times for a total of 48:15 minutes.**

15.     On one of those calls, Mr. Donat discussed Jeremy's personal life; namely, that Jeremy had once sent a former GPSI coworker (Jen Gillham) unsolicited and inappropriate text messages.

16.     I understood that Mr. Donat had been golfing earlier that day with Allison McIlroy, a friend of Mrs. Gillham, who relayed to Mr. Donat the gossip about Jeremy.

17.     On the same call, I told Mr. Donat the information he had was false.

2

18. I told Mr. Donat that Jeremy and Mrs. Gillham had a previous consensual sexual relationship.

19. Later that evening, I told Jeremy the gossip Mr. Donat had relayed to me.

20. **On February 13, 2017, Mr. Donat called me.**

21. Our call lasted for 20:38 minutes.

22. On the call, Mr. Donat informed me that he learned that I was being "bitchy" from unnamed sources at the office.

23. Mr. Donat would not tell me who made the comments and asked me not to ask anyone about them, including my supervisor, Mr. Walker.

24. On the call, Mr. Donat also told me that my relationship with Jeremy was painting me in a negative light among my coworkers.

25. On the call, Mr. Donat also informed me that if I continued to pursue a relationship with Jeremy, that it would be the "nail in the coffin" for any relationship that Mr. Donat and I could ever have again.

26. In the same statement, Mr. Donat also acknowledged that I had already told him that I did not want a relationship with him again.

27. I ended the call because I experienced a panic attack and could not breathe.

28. **On March 1, 2017, Mr. Donat called me.**

29. Our call lasted for 45:49 minutes.

30. On the call, Mr. Donat told me that whenever he walked by my office and noticed that I was gone, he made sure to also walk by Jeremy's office because he was paranoid that Jeremy and I were together.

31. On the call, we also discussed at length Mr. Donat's perception of Jeremy's work performance and character.

32. **On March 9, 2017, I sent an email to members of GPSI management at 4:59 am with the subject: "A clearer picture for all involved."**

33. I had not met with an attorney prior to sending that email.

JABURG WILK
Attorneys at Law

3

34.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. EXECUTED this 12th day of November, 2018.

Kristin Lisson

# EXHIBIT N

1  **Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
2  Phoenix, AZ 85012
602.248.1000
3
Kraig J. Marton (003816)
4  kjm@jaburgwilk.com
Jeffrey A. Silence (029143)
5  jxs@jaburgwilk.com
Laura Rogal (025159)
6  lar@jaburgwilk.com

7  Attorneys for Plaintiff Jeremy Thacker

8

9                    **UNITED STATES DISTRICT COURT**

10                   **FOR THE DISTRICT OF ARIZONA**

11

12  Jeremy Thacker,                          Case No. 2:18-cv-00063-DJH

13               Plaintiff,                   **Declaration of Jeremy Thacker in**
v.                                        **Support of Response to Defendants'**
14                                           **Motion for Summary Judgment**
GPS Insight, LLC; Robert Donat,
15  individually,                            (Assigned to Honorable Diane J.
Humetewa)
16               Defendants.

17

18

19        I, Jeremy, Thacker, declare as follows under penalty of perjury:

20        I am the Plaintiff in this lawsuit, and I am providing this sworn declaration based

21  upon my personal knowledge.

22        **I. Audio Recordings of Meetings (Ex. 8; Ex. 9; Ex. C)**

23        1.      Defendants' Exhibit 9 to their MSJ (Doc. 112) is a transcript of part 1 of 2

24             of an audio recording of a meeting on March 2, 2017 between myself,

25             Jason Walker, and Tyler Mortensen.

26        2.      Defendants' Exhibit 18 to their MSJ is a transcript of part 2 of 2 of an

27             audio recording of a meeting on March 2, 2017 between myself and Jason

28             Walker.

1

3.     I personally recorded the audio using an app on my phone and certify the authenticity of the audio.

4.     Unbeknownst to me at the time, the app used to make the cut off after about an hour of recording.

5.     I estimate that 30 to 45 minutes between part 1 and part 2 of the meetings went unrecorded.

6.     During this unrecorded time, Mortensen left the meeting leaving myself and Walker alone.

**II. Dispute of the Accuracy of Transcripts of Audio Recordings**

7.     Defendants did not disclose the transcripts (Ex. 9 and 18) before including them in their MSJ (Doc. 112).

8.     The transcripts (Ex. 9; Ex. 18) are marked as certified transcripts.

9.     After noticing multiple errors in Ex. 8 and Ex. 9, I ordered the transcripts used by Defendants from Jane Doyle at JD Reporting.

10.    I dispute the accuracy of the transcripts of the audio recordings (Def Ex. 9 and 18) as well as the transcript of a third audio recording of a meeting on March 6, 2017 between myself, Tyler Mortensen, Jason Walker, and Gary Fitzgerald that was not used in Defendants' MSJ.

11.    Exhibits A and B contain accurate transcriptions of those recordings, including changes that I heard from listening to the recordings.

**III. ¶ Numbers 12 through 27 were purposely omitted**

**IV. § Numbers III and IV were purposely omitted**

**V. Foundation and Authentication of Documents**

28.    All of the emails that are attached to the Response to Defendants' Summary Judgment to which I am a party were either sent or received by me on the dates indicated.

2

29. Exhibit R was a recording of a phone call between Lisson and Donat on March 8, 2017 which I removed based on Court's order. I certify that Donat refers to me as a "fucktard" in that recording.

30. Exhibit S is my W2 from GlobeRanger.

31. Exhibit T is a text between me and Mortensen.

32. Exhibit U is an email between me and Mortensen.

33. Exhibit V is an email between me and Walker.

34. Exhibit W is Defendant's Responses to our discovery requests.

35. Exhibit X is a text from Donat to Batcheller, Mortensen, and Walker on March 5, 2017. Donat confirmed in his deposition that he sent this text.

36. Donat testified in deposition that Exhibit Z is his call logs on the dates indicated.

37. Exhibit AA through AD are texts between Lisson and Donat that Donat produced in this lawsuit and verified in deposition that they appear to be his texts.

38. Exhibit AD is a text between Donat and Lisson that Donat produced.

39. Exhibit AE through AG are texts between me and Mortensen that I produced.

40. Exhibit AH is my email exchange with Donat.

41. Exhibit AI is the response that GPSI filed to my claim for unemployment.

42. Exhibit AJ is a text between Donat and Lisson that Donat produced and verified in deposition that he produced.

43. Exhibit AK through AL are email exchange between Walker and Lisson and Walker and Mortensen that GPSI produced.

44. Exhibit AM is an email between me and Mortensen.

45. Exhibit AN is a text between Lisson and Walker that Lisson produced.

46. Exhibit AO is a draft of a text message that Lisson then copied and pasted into a text that she sent to Donat on January 17, 2017. Lisson does not

3

JABURG WILK
Attorneys at Law

have the text, and Donat will not produce it. Lisson produced this draft message.

47. Exhibit AP is an email between me and a GPSI employee, Chelsea Rosenthal.

48. Exhibit AQ is an email between Mortensen and Walker that GPSI produced.

49. Exhibit AR through AT are texts between Donat and Lisson.

50. Exhibit AU is a text between me and Lisson.

51. Exhibit AV is my W2 for GPSI.

52. Exhibit AW are texts between Walker and Mortensen produced by GPSI.

53. Walker and Mortensen confirmed in deposition these appear to be their texts.

54. Exhibit AX is an email from Walker to GPSI that GPSI produced.

55. Exhibit AY is a screenshot of Netsuite that I took in February 2017 showing my sales results.

56. Exhibit AZ is a text between me and Walker.

57. Exhibit BB is an email from me and Donat.

58. Exhibit BC is an email between me and Walker.

59. Exhibit BD is an email between me and Donat.

60. Exhibit BE and BF are texts between Donat and Lisson that Lisson produced.

61. Exhibit BG is a text between Lisson and Walker that Lisson produced.

62. Exhibit BH and BL are emails between Donat and Robert Dennis.

63. Exhibit BI through BK are text between Lisson and Donat that Lisson produced.

64. Exhibit BM is a police report that Donat filed against me.

65. Exhibit BN is an email between me and Mortensen.

JABURG WILK
Attorneys at Law

4

66. Exhibit BO through BQ are chart I created using data supplied by GPSI to show the number of units I had sold, revenue I generated, and my revenue vs. expenses in 2016 through 2017.

67. Exhibit BR is a Slack message between Walker and Batcheller produced by Defendants.

68. Exhibit BS through BV are texts between Lisson and Donat.

69. Exhibit BW is an email between Walker and Mortensen.

70. Exhibit BX is a text between me and Robert Dennis.

71. Exhibit BY is the one and only sales policy that GPSI provided.

72. Exhibit BZ are the relevant portions of Plaintiff's Seventh Disclosure.

73. Exhibit CA is Defendants' Thirteenth Supplemental Disclosure.

## VI. The Airbnb Allegation was Never Disclosed

74. Despite Walker's knowledge of the allegation in June 2017 (Ex. 25 ¶ 15), I certify that prior to August 31, 2018 in Defendants' 12th Supplemental Disclosure Statement, Defendants' had never mentioned the Airbnb scheme.

75. By August 31, 2018, the deadline for taking depositions and propounding discovery had passed.

76. Even when providing me with some notice of the Airbnb issue on August 31, 2018, Defendants had still never disclosed Chelsea Cassis as a witness name in a single document or proceeding in this case until their MSJ where they included her declaration. (Def Ex. 28; CA – Defendants' 13th Supplemental Disclosure).

## VII. The Airbnb Allegation is Provably False

77. While surprised by the declaration of Ms. Cassis, I will not accuse her of lying. (Ex. 28).

78. Instead, I believe she has either incorrectly remembered the events or taken something I said in jest as literal.

5

79. I have never received a payment, reward, or kickback of any kind as a result of a transaction through or involving Airbnb.

80. According to my account history and recollection, I have stayed in a total of four Airbnb properties. (Ex. N-1).

81. In Cassis' Declaration, she states that I had set up this arrangement with a friend in Dallas. (Ex. 28 at ¶ 6).

82. While I lived in Dallas for many years and maintain many relationships there, I have never rented an Airbnb or anything similar in the DFW Metroplex. (N-1).

83. In Mr. Walker's declaration, he states that I rented an Airbnb for $192 in November 2016 as part of an Airbnb scheme. (Ex. 25, at 2:23-25).

84. This is not the first time that Mr. Walker has, with little to no investigation into the accuracy or truth of the matter, falsely accused me. (Ex. A at 27:16-21, 29:18-23, 31:7-11).

85. With a few minutes of research, Mr. Walker could have easily determined that the Airbnb I rented in November 2016 was located in Austin, TX. (Ex. N-2).

86. Austin is over 200 miles south of Dallas. (Map – Dallas to Austin).

87. Walker was aware that the trip to Austin was made with a co-worker (still at GPSI), Josh Danke, to visit a prospect, which became my biggest client, Lower Colorado River Authority (LCRA).  (Ex. N-3).

88. As seen on Google Maps, the Airbnb was located less than a mile away from LCRA's headquarters in Austin; LCRA's address is 3700 Lake Austin Blvd, Austin, TX 78703. (Ex. N-4).

89. I ask the Court to take judicial notice of the maps showing the distance between Austin and Dallas and the Airbnb rental and LCRA's headquarters.

JABURG WILK
Attorneys at Law

6

90. Danke and I decided to share a two-bedroom Airbnb due to convenience of location and as a cost-saving measure for the company, as hotel rooms were over $250 per night for each of us at that time.

91. According to the Airbnb receipt submitted to GPSI in 2016, the property belonged to Nat Nealeigh. (Ex. N-2).

92. I have never met nor spoken to Nat before or after our stay and do not know of any mutual connections that exist between the two of us.

**VIII. I had Permission to Use the Company Credit Card for Personal Expenses**

93. I had permission to use my company credit card for personal expenses, so long as I repaid the money when I earned commissions.

94. In 2014, I approached Mortensen, my supervisor, to see if the company could help me with personal financial difficulties.

95. I specifically asked if the company could extend a draw against commissions.

96. After speaking with Walker and Batcheller, Mortensen offered an alternative solution of using my company credit card as opposed to a draw, as that would require Donat's approval.

97. Walker and Mortensen were aware that I was using the card for legal expenses surrounding child support.

98. I was also told that I could use the card for personal expenses, so long as I repaid the money.

**IX. Promissory Note**

99. In February 2015, I was asked to sign a promissory note.

100. The reason for the promissory note had nothing to do with me being in "trouble" for charging personal expenses.

101. As stated in the email, the external auditors needed the promissory note for tax and accounting purposes. (Ex. BN).

7

JABURG WILK
Attorneys at Law

102. Despite being February 13, 2015, GPSI requested that I backdate the document to December 31, 2014 in an effort to deceive the IRS.

103.  A GPSI employee notarized the document and dated it 2014. (Ex. BN).

104. Walker acted as the witness for the notary.

**X. Meeting with Donat, Walker, Mortensen, Batcheller, and Eatman**

105. In October 2015, I was called into Elliot Batcheller's office with Donat, Walker, Mortensen, Elliot, and Phil Eatman.

106. Other than me, Donat was the only person to speak during the meeting.

107. Donat had just learned of the expenses and wanted to discuss this with me.

108. It became clear very quickly that Donat was unaware that I had been given permission by Walker and Mortensen.

109. After the meeting my supervisors were not upset, nor was I issued a written warning.

110. Two months later, I was promoted to the Government Sales Team.

111. I continued to use the card through my termination in March 2017 for occasional personal expenses, with the permission and the expectation that I would repay the money.

**XI. Post-Termination Deduction of Expenses**

112. In the recording of March 2, 2017 meeting, Walker told me that if I had come to him that he would have said "…if you want to do something, we know you're getting paid, go charge something on the credit card and pay us back." (Ex. B, at 35:4-6).

113. In May 2017, I did not object to personal expenses being deducted from my paycheck because our agreement was that I would pay pack any personal expenses when I received large commission checks.

114. Also, I was only provided with documentation for a small percentage of the expenses that were deducted from my paycheck. (Ex. 26).

8

115.    I did object in writing to specific charges that I believe were legitimate reimbursable business expenses. (Ex. 26)

116.    I never received any documentation or notification supporting the additional charges prior to the deduction from my paycheck until the Defendants Motion for Summary Judgement, which was after the deadline for discovery had passed.

117.    While I agreed to repay personal expenses, I never agreed to have the funds deducted from my paycheck without my authorization or reviewing the charges.

118.    At the time, my Counsel suggested that I not get involved in arguments with Donat since we were preparing for litigation.

119.    After now reviewing the charges deemed personal by GPSI for the first time in their MSJ, I dispute many of the charges deducted from my paycheck.

120.    Over $1,000 of the charges were legitimate business expenses that should not have been deducted from my paycheck without my authorization.

**XII. Expense Reports for other GPSI Employees**

121.    I requested the expense reports for all GPSI employees (and later limited my request to just a handful of employees) to show that other employees frequently used the card for personal expenses and that GPSI knowingly approved those expenses.

122.    I requested the reports because I know that Batcheller used the card to go to the strip club with other GPSI employees.

123.    I also know that other GPSI employees used their card for extravagant personal expenses.

124.    These employees were never terminated.

125.    Defendants refused to produce any of these expense reports. (W).

9

**XIII.  Top Sales Performance**

126.  I achieved exceptional sales results in 2016 to 2017, including having the greatest single month in the history of the company in February 2017.

120.  That month, I alone sold over 1,500 units.

127.  If I were also paid for Amerisure, I would have accounted for roughly 50% of the overall sales among the 17 sales representatives.

**XIV.  Job Search Efforts**

128.  After Donat began harassing Lisson and me, I had one conversation with one company about possibly working for them.

129.  The only reason I did so was because I was because I feared I would be terminated, and even if not, I knew that Donat would not stop harassing me and Lisson until he got what he wanted – Lisson.

130.  I told Walker and Mortensen in the March 2, 2017 Meeting and prior to that meeting that I was excited about the opportunity to work on the Government Sales Team because I knew I could (and did) make a lot of money.

131.  I also had lots of friends at GPSI, including Lisson, so I did not want to leave.

132.  In the transcripts of The Meeting, Walker used the word "fuck" 26 times. (Ex. A; Ex. B).

**XV.  GlobeRanger**

133.  GlobeRanger was not a substantially equivalent job compared to my job at GPSI in terms of job satisfaction, seniority/status, income, or opportunity for growth and advancement.

134.  I worked at GlobeRanger from May 2017 through December 2017.

135.  It shut down all US operations in June 2018; all twelve salespeople were terminated.

136.  At GlobeRanger, I had a base salary of $90,000 annually.

10

JABURG WILK
Attorneys at Law

137. I received a draw of $3,750 per month for the first 3 months equaling $11,250.

## XVI. GlobeRanger's Commission Plan

138. Prior to October 27, 2017, I did not have the ability to earn additional income because we never received a commission plan.

139. When I received my offer letter in May of 2017, I was told that I should expect a commission plan by the end of June 2017.

140. Immediately upon receiving the commission plan on October 27, 2017, I shared my skepticism regarding whether the numbers were realistic based on the status of the company and products.

141. I was skeptical because GlobeRanger had just decided to pursue new markets that GlobeRanger had no experience in.

142. In addition to the lack of experience in the market to which I was assigned (aviation), this market had notoriously long sales cycles that are typically measured in years.

143. The commission plan only offered additional income for "closed" sales, which would be at least a year out.

144. On October 31, 2017 had a call with my managers where acknowledged the long sales cycles and how it was unlikely that I would close any sales in the near future.

145. On that call, I was promised an additional compensation plan that awarded payouts for sales activities (in addition to results).

146. I never received any activity-based compensation plan or activity-based pay, despite my asking on several occasions.

147. During the entire time I worked at GR, I only knew of one sale closed by any salesperson.

11

## XVII. GlobeRanger Income VS. GPSI Income

148. During the deposition of GR, they testified that the top performing salesperson had, in addition to her base salary, earned on average $1,000 per month.

149. The salesperson, Emerald Webster, started with the company about a year prior to me.

150. If I had performed at the same level as the more experienced, top performer at GR, I would have earned an additional $6,000 in total income, or $1,000 monthly, before the company terminated all salespeople in June 2018.

151. If I was the top performer from December 2017 to June 2018, my monthly income would have been $8,000 monthly.

152. My 2017 W-2 at GR was $63,894 for 6 months or $10,649 per month.

153. My 2017 W-2 at GPSI was $72,285 for 2 months or $36,142 per month.

154. In Walker's declaration, he states that my 2017 income is skewed because of an atypical sales month.

155. Assuming Walker was correct, my average monthly earnings for my final *12 month*s at GPSI was still over $13,000 per month on average, compared to $8,000 per month at GlobeRanger.

## XVIII. GlobeRanger Requirements to Change Industries

156. After four months at GlobeRanger, I was required to switch markets and begin selling to aviation.

157. I had no experience or interest in aviation but was also given no choice.

158. I was also required to pitch a product that I describe as "half-baked."

159. I was not comfortable with this type of "sales" or "prospecting," and I expressed my concerns to my supervisors.

JABURG|WILK
Attorneys at Law

12

**XIX. GlobeRanger Did Not Have Good Cause to Terminate Me**

160.   I never received a warning regarding my actions or behavior while at GlobeRanger, and I was not terminated for cause.

161.   I was terminated after raising concerns about not receiving a commission plan until five months after I started, the commission plan being unrealistic, and a lack of a product to sell or market in which to sell.

162.   I did not make a recording of the dinner Defendants refer to in their MSJ.

163.   I never told my co-workers that I recorded the meeting.

164.   I was never asked not to record phone calls by the CEO or anyone else at GR.

165.   I was never told that I would be terminated if I did not start prospecting.

166.   I never refused to visit a prospect.

167.   I never refused to do anything asked of me by GR.

168.   In September 2017, I did travel to meet Zodiac, the prospect mentioned during GR's deposition.

169.   I also travelled to see prospects in Michigan (Magna) and California (Unical, Northrop Grumman, Meggitt Polymers) and to visit GlobeRanger headquarters in Dallas on multiple occasions.

**XX. GlobeRanger Executive Sponsorship Calls**

170.   The Executive Sponsorship calls with Dennis Badman, CEO, were never positioned to me as disciplinary in nature nor treated as such.

171.   Dennis was looking to me for insights into what was actually taking place in the field.

172.   Those calls ended in October 2017 after GR's realignment.

**XXI. Usage of the Report for Employment Purposes**

173.   The attorney who requested the Report was engaged to handle the negotiation of my severance; the parties were actively engaged in

13

1   negotiating a severance package at the time the Report was obtained.

2   (AH 47).

3   174.   VP of Operations, Elliot Batcheller, testified that Donat justified my

4   termination by using information in the Report. (H 15-16, 18-19).

5   175.   Donat admitted to me in a text dated March 9, 2018, that he was

6   "lookingfor/ finding: documenting more" reasons for "pulling the plug"

7   on me a few days before the Report was generated. (BF).

8   176.   Donat also used the Report in an attempt to retain Robert Dennis as an

9   employee by showing that he should choose GPSI over me because I had

10   filed bankruptcy and lived in multiple homes.

11   177.   Donat's lawyer also requested and obtained a copy of Lisson's consumer

12   report from LexisNexis when requesting the Report. Ironically, Donat

13   refuses to produce this report, citing privacy concerns. (*Id.*).

14   **XXII.  Usage of the Report for Credit Purposes**

15   178.   Donat has made the claim that, as of March 13, 2017, when the Report

16   was generated, I owed GPSI money based on a promissory note dated

17   December 31, 2014, in the amount of $5,741.55. (Doc. 112 at 9; 24).

18   179.   In other words, when requesting and reviewing the Report, Donat believed

19   I owed money to GPSI based on that promissory note. (K 49, 130).

20   **XXIII.  Usage of the Report for Insurance Purposes**

21   180.   On March 27, 2017, two weeks after the Report was obtained, Defendants

22   protested my unemployment insurance claim. (AI 98).

23   **XXIV.  Dismissal of Claim for Intentional Interference with Business Relations**

24   181.   I believe that Defendants interfered with my ability to find other

25   employment and that such evidence would be contained in the documents

26   withheld by Defendants.

27   182.   I, however, do not wish to delay these proceedings any further and will

28   reluctantly agree to dismiss this claim.

14

JABURG WILK
Attorneys at Law

183.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. EXECUTED this 15th day of November 2018.

_____
Jeremy Thacker

15

# EXHIBIT N1



Airbnb, Inc. [US] | https://www.airbnb.com/trips

Apps Bookmarks Start LAN Media Tech Social Shop Biz Travel Personal Local Projects Home Automation Google News Drive Email forwarding Other bookmarks

## Past Trips

### Austin

Nov 8 - 9, 2016 · 2 guests
Stylish, Central 2BD/2BA in Tarrytown

★★★★★
Read Your Review

Get Receipt

Send or request money

### Seattle

May 22 - 23, 2015 · 1 guest
Immaculate Downtown Bellevue Condo

Get Receipt

Send or request money

### Seattle

May 19 - 22, 2015 · 2 guests
Sky Cabin Apartment with Views

★★★★★
Read Your Review

Get Receipt

Send or request money

### Boise

Dec 9 - 10, 2014 · 1 guest
It's all about the city.

★★★★★
Read Your Review

Get Receipt

Send or request money

https://www.airbnb.com/rooms/12324779

# EXHIBIT N2

 **airbnb**

**Airbnb, Inc.**
888 Brannan Street
San Francisco, CA 94103

# Confirmed: 1 night in Austin, TX

Booked by **Jeremy Thacker**
Monday, Oct 31, 2016

**Accepted**
QJ5QAF

| Check In | | Check Out |
|---|---|---|
| **Nov 8, 2016** | ❯ | **Nov 9, 2016** |

## Entire home/apt

Stylish, Central 2BD/2BA in Tarrytown
1306 Norwalk Lane 305
Austin, TX 78703
United States

Hosted by Nat Nealeigh
Phone: +1 (512) 332-9780

## 2 Travelers on this trip

Jeremy Thacker

Josh Danke

## Business trip notes

[None added]

**Cost per traveler**
This trip was **$96.00** per person, per night, including taxes and other fees.

**Security Deposit**
A Host requires a Security Deposit of $450 to book this listing. The Guest is responsible for the amount of the Security Deposit, but it will not be charged unless the host makes a claim.

## Charges

| | |
|---|---|
| $86.00 × 1 night | $86.00 |
| Cleaning fees ❓ | $85.00 |
| Service fee ❓ | $21.00 |
| **Total** | **$192.00** |

## Payment

| | |
|---|---|
| Paid with AMEX •••• 1083 | $192.00 |
| Mon, October 31, 2016 @ 2:04 PM MST | |
| **Total Paid** | **$192.00** |

Add billing details

## Average nightly charges

| | |
|---|---|
| Average nightly price | $86.00 |
| Average cleaning fee | $85.00 |
| Average guest fee | $21.00 |
| **Total per night** | **$192.00** |

## Need help?

Visit the Help Center for any questions.

QJ5QAF
Booked by **Jeremy Thacker**
Monday, Oct 31, 2016

**Cancellation policy**: Strict. Certain fees and taxes may be non-refundable. See here for more details.

Airbnb Payments, Inc. ("Airbnb Payments") is a limited payment collection agent of your Host. This means that upon your payment of the Total Fees to Airbnb Payments, your payment obligation to your Host is satisfied. Refund requests will be processed in accordance with: (i) the Host's cancellation policy (available on the Listing); or (ii) Airbnb Payment's Guest Refund Policy Terms, available at https://www.airbnb.com/terms. Questions or complaints: contact Airbnb Payments at 855-4-AIRBNB (855-424-7262)

**Explanation of Security Deposit**
Hosts can make a claim on their deposit within 14 days of your checkout date or before the next guest checks in, whichever is earlier. If a claim is initiated, Airbnb Customer Service will be in contact with both you and your Host to make sure both parties are represented fairly. Additional details regarding the Security Deposit are available at https://www.airbnb.com/help/article/352.
Payment processed by:
**Airbnb Payments, Inc.**
888 Brannan Street
San Francisco, CA 94103

**Airbnb, Inc.**
888 Brannan Street
San Francisco, CA 94103

Need help? Visit the Help Center, email us or call (800) 024 7626.

# EXHIBIT N3

| | |
|---|---|
| **From**: | Jeremy Thacker [/o=MEX09/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=542e77fa7eea4951adbe7e2c97e2fd54-jeremy.thacker] |
| on behalf of | Jeremy Thacker [/o=mex09/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=542e77fa7eea4951adbe7e2c97e2fd54-jeremy.thacker] |
| **Sent**: | 11/7/2016 4:00:13 PM |
| **To**: | Harold Leitner [harold.leitner@gpsinsight.com]; Elliot Batcheller [elliotb@gpsinsight.com]; Josh Danke [josh.danke@gpsinsight.com]; Jason Walker [jason.walker@gpsinsight.com] |
| **Subject**: | FW: LCRA Visit Agenda |
| **Attachments**: | GPS Insight Agenda.docx |

We just received the Agenda from LCRA for the next 2 days on-site.  Josh and I are meeting to discuss shortly.  Just keeping you in the loop.

**Jeremy Thacker** | **Government Sales Manager - Southwest**

**GPS Insight**
7201 E. Henkel Way, Suite 400 | Scottsdale, AZ 85255
480.663.9472
**gpsinsight.com**



---

**From:** Ashley Erickson [mailto:Ashley.Erickson@LCRA.ORG]
**Sent:** Monday, November 7, 2016 8:48 AM
**To:** Josh Danke <josh.danke@gpsinsight.com>; Jeremy Thacker <jeremy.thacker@gpsinsight.com>
**Cc:** Jeannine Vater <Jeannine.Vater@LCRA.ORG>; Daniel McKinnis <Daniel.McKinnis@LCRA.ORG>; Miguel Nunez <Miguel.Nunez@LCRA.ORG>
**Subject:** LCRA Visit Agenda

Josh and Jeremy,
Here is a high-level agenda for tomorrow and Wednesday.  Let me know if anything is missing or needs to be adjusted.


Thanks,
Ashley

THACKER53315

# EXHIBIT N4



1036 Norwalk Ln, Austin, TX 78703
LCRA Headquarters, 3700 Lake Austin B
Add destination
Leave now
OPTIONS
Send directions to your phone
via Exposition Blvd and Lake Austin Blvd
3 min
1.4 miles
Fastest route, the usual traffic
DETAILS
via Enfield Rd
4 min
1.3 miles
11:32 PM—11:54 PM
22 min
18
LCRA Headquarters
1036 Norwalk Lane
4 min
1.3 miles
22 min
3 min
1.4 miles
Lions Municipal Golf Course
O Henry Middle School
Brackenridge Field Laboratory
Randalls
Goodwill Central Texas Lake Austin Store
Mozart's Coffee Roasters
Walsh Boat Landing
Red Bud Isle
Bee Creek Preserve
Colorado River
Champions
Tarrytown Texaco
United States Postal Service
The Beer Plant
Wells Fargo Bank
Howson Branch, Austin Public Library
Tarry House
Stone Windmill
Johnson Creek Greenbelt
The Boulevard at Town Lake Apartments
Magnolia Cafe
Satellite
Map data ©2018 Google United States Terms Send feedback 500 ft

# EXHIBIT O

| | |
|---|---|
| **To:** | Jeffrey A. Silence; Palys, Stefan M.; Francis, Carrie M. |
| **Cc:** | "Timothy B. O'Connor" (toconnor@soarizonalaw.com); Kraig J. Marton |
| **Date:** | Tuesday, November 6, 2018 4:09:28 PM |

Jeff,

We've already discussed this both on the phone and now in the e-mails below. We believe what we submitted to the court is accurate. If you disagree, you can proceed as I outlined below. We're not responding to further e-mails on this topic.

**Michael Vincent** | Attorney | Stinson Leonard Street LLP

1850 N. Central Avenue, Suite 2100 | Phoenix, AZ 85004-4584

T: 602.212.8544 | F: 602.586.5295

michael.vincent@stinson.com | www.stinson.com

Legal Administrative Assistant: Christina Roundtree | 602.212.8553 |

christina.roundtree@stinson.com

**From:** Jeffrey A. Silence <jxs@jaburgwilk.com>
**Sent:** Tuesday, November 06, 2018 16:03
**To:** Vincent, Michael <michael.vincent@stinson.com>; Palys, Stefan M. <stefan.palys@stinson.com>; Francis, Carrie M. <carrie.francis@stinson.com>
**Cc:** 'Timothy B. O'Connor' (toconnor@soarizonalaw.com) <toconnor@soarizonalaw.com>; Kraig J. Marton <kjm@jaburgwilk.com>
**Subject:** RE: Transcripts of 4 audio recordings

Michael,

Are you refusing to answer whether you or your clients made changes?

**JEFFREY A. SILENCE** | Partner | D 602.248.1079



This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. Dissemination, distribution, or copying of this communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone at (602)248-1000, or via e-mail, and delete this message and all attachments thereto.

**From:** Vincent, Michael [mailto:michael.vincent@stinson.com]
**Sent:** Tuesday, November 6, 2018 3:55 PM
**To:** Jeffrey A. Silence; Palys, Stefan M.; Francis, Carrie M.
**Cc:** 'Timothy B. O'Connor' (toconnor@soarizonalaw.com); Kraig J. Marton
**Subject:** RE: Transcripts of 4 audio recordings

Jeff,

We've already discussed this. Your comparison to edited emails or text messages doesn't make sense. The original is the recording, not the transcript. You have the original recording. You can check yourself if something is inaccurate in the transcript.

If you believe there's something materially incorrect in the portions of the transcripts that we cited to the court in our summary judgment briefing, you should submit the recording itself to the court and point out the errors.

**Michael Vincent** | Attorney | Stinson Leonard Street LLP
1850 N. Central Avenue, Suite 2100 | Phoenix, AZ 85004-4584
T: 602.212.8544 | F: 602.586.5295
[michael.vincent@stinson.com](mailto:michael.vincent@stinson.com) | [www.stinson.com](http://www.stinson.com)
Legal Administrative Assistant: Christina Roundtree | 602.212.8553 |
[christina.roundtree@stinson.com](mailto:christina.roundtree@stinson.com)

**From:** Jeffrey A. Silence <[jxs@jaburgwilk.com](mailto:jxs@jaburgwilk.com)>
**Sent:** Tuesday, November 06, 2018 15:43
**To:** Vincent, Michael <[michael.vincent@stinson.com](mailto:michael.vincent@stinson.com)>; Palys, Stefan M.
<[stefan.palys@stinson.com](mailto:stefan.palys@stinson.com)>; Francis, Carrie M. <[carrie.francis@stinson.com](mailto:carrie.francis@stinson.com)>
**Cc:** 'Timothy B. O'Connor' ([toconnor@soarizonalaw.com](mailto:toconnor@soarizonalaw.com)) <[toconnor@soarizonalaw.com](mailto:toconnor@soarizonalaw.com)>; Kraig J.
Marton <[kjm@jaburgwilk.com](mailto:kjm@jaburgwilk.com)>
**Subject:** RE: Transcripts of 4 audio recordings

Michael,

The court reporter certified the transcript in preparation for the Court and you cited the transcripts numerous times as evidence supporting material facts in your MSJ. We care for the same reason that we would care if you edited emails or text messages and submitted them as originals.

JEFFREY A. SILENCE | Partner | D 602.248.1079



This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. Dissemination, distribution, or copying of this communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone at (602)248-1000, or via e-mail, and delete this message and all attachments thereto.

**From:** Vincent, Michael [[mailto:michael.vincent@stinson.com](mailto:michael.vincent@stinson.com)]
**Sent:** Tuesday, November 6, 2018 3:18 PM
**To:** Jeffrey A. Silence; Palys, Stefan M.; Francis, Carrie M.
**Cc:** 'Timothy B. O'Connor' ([toconnor@soarizonalaw.com](mailto:toconnor@soarizonalaw.com)); Kraig J. Marton
**Subject:** RE: Transcripts of 4 audio recordings

Jeff, why is this important? We've already discussed that at trial, the recording is what will come into evidence.

**Michael Vincent** | Attorney | Stinson Leonard Street LLP

1850 N. Central Avenue, Suite 2100 | Phoenix, AZ 85004-4584

T: 602.212.8544 | F: 602.586.5295

michael.vincent@stinson.com | www.stinson.com

Legal Administrative Assistant: Christina Roundtree | 602.212.8553 |
christina.roundtree@stinson.com

This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** Jeffrey A. Silence <jxs@jaburgwilk.com>
**Sent:** Tuesday, November 06, 2018 15:07
**To:** Vincent, Michael <michael.vincent@stinson.com>; Palys, Stefan M.
<stefan.palys@stinson.com>; Francis, Carrie M. <carrie.francis@stinson.com>
**Cc:** 'Timothy B. O'Connor' (toconnor@soarizonalaw.com) <toconnor@soarizonalaw.com>; Kraig J.
Marton <kjm@jaburgwilk.com>
**Subject:** Transcripts of 4 audio recordings

Michael,

Can you tell us whether you or your clients made any changes to the transcripts for the 4 audio recordings? If so, what changes were made?

**JEFFREY A. SILENCE** | *Partner* | D 602.248.1079



This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. Dissemination, distribution, or copying of this communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone at (602)248-1000, or via e-mail, and delete this message and all attachments thereto.

# EXHIBIT P



















# EXHIBIT Q

 Gmail

**Kristin Lisson <kristin.lisson@gmail.com>**

---

## Tyler
1 message

---

**Kristin Lisson <kristin.lisson@gmail.com>**
To: jeremy@thackerfamily.com

Tue, Mar 7, 2017 at 10:33 AM

Tyler just came into my office and asked how I was doing. I told him I could do my job and work with him fine but that I wasn't going to lie to him and tell him it didn't hurt my feelings how he approached me on Thursday night at the game under the guise of friendship and care only to use what I said later in discussions with Jason. He said he was really sorry and that he didn't even consider that I would've thought that because...

"Jason and I didn't know what were going to do until Friday morning after we talked to Rob."

He openly admitted that they had not made their mind up about how to proceed with you until Friday and that part of the reason for their decision with you was that they didn't want me to leave the company, which I had mentioned to Tyler as one of my options on Thursday.

There's more, but I wanted to get that quote down before I forgot it. Wish I had recorded it.

LISSON000624

GPSI_00109117

# EXHIBIT R

# EXHIBIT S

## Federal Filing Copy — W-2 Wage and Tax Statement 2017

Copy B to be filed with employee's Federal Income Tax Return

| Box | Description | Amount |
|---|---|---|
| 1 Wages, tips, other comp. | | 58423.28 |
| 2 Federal income tax withheld | | 10376.44 |
| 3 Social security wages | | 63099.09 |
| 4 Social security tax withheld | | 3912.14 |
| 5 Medicare wages and tips | | 63099.09 |
| 6 Medicare tax withheld | | 914.94 |
| d Control number | | 9FB/ |

Employer use only

c Employer's name, address, and ZIP code
FUJITSU AMERICA, INC
1250 E ARQUES AVE
M/S 164
SUNNYVALE CA 94088

| Box | Description | Amount |
|---|---|---|
| 11 Nonqualified plans | | |
| 12a See instructions for box 12 | C | 72.60 |
| 14 Other | 12b D | 4675.81 |
| | 12c DD | 3333.12 |
| | 12d | |

13 Stat emp / Ret. plan X / 3rd party sick pay

e Employee's name, address, and ZIP code
JEREMY N THACKER

| 15 State AZ | Employer's state ID no. 0770554941 | 16 State wages, tips, etc. 58423.28 |
|---|---|---|
| 17 State income tax 2103.22 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

Form W-2 Wage & Tax Statement Dept. of the Treasury-IRS OMB No. 1545-0008

## State, City, Local Filing Copy — W-2 Wage and Tax Statement 2017

Copy 2 to be filed with employee's State/City/Local Income Tax Return

| Box | Description | Amount |
|---|---|---|
| 1 Wages, tips, other comp. | | 58423.28 |
| 2 Federal income tax withheld | | 10376.44 |
| 3 Social security wages | | 63099.09 |
| 4 Social security tax withheld | | 3912.14 |
| 5 Medicare wages and tips | | 63099.09 |
| 6 Medicare tax withheld | | 914.94 |
| d Control number | | 9FB/ |

Employer use only

c Employer's name, address, and ZIP code
FUJITSU AMERICA, INC
1250 E ARQUES AVE
M/S 164
SUNNYVALE CA 94088

| Box | Description | Amount |
|---|---|---|
| 11 Nonqualified plans | | |
| 12a See instructions for box 12 | C | 72.60 |
| 14 Other | 12b D | 4675.81 |
| | 12c DD | 3333.12 |
| | 12d | |

13 Stat emp / Ret. plan X / 3rd party sick pay

e Employee's name, address, and ZIP code
JEREMY N THACKER

| 15 State AZ | Employer's state ID no. 0770554941 | 16 State wages, tips, etc. 58423.28 |
|---|---|---|
| 17 State income tax 2103.22 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

Form W-2 Wage & Tax Statement Dept. of the Treasury-IRS OMB No. 1545-0008

## State, City, Local Filing Copy — W-2 Wage and Tax Statement 2017

Copy 2 to be filed with employee's State/City/Local Income Tax Return

| Box | Description | Amount |
|---|---|---|
| 1 Wages, tips, other comp. | | 58423.28 |
| 2 Federal income tax withheld | | 10376.44 |
| 3 Social security wages | | 63099.09 |
| 4 Social security tax withheld | | 3912.14 |
| 5 Medicare wages and tips | | 63099.09 |
| 6 Medicare tax withheld | | 914.94 |
| d Control number | | 9FB/ |

Employer use only

c Employer's name, address, and ZIP code
FUJITSU AMERICA, INC
1250 E ARQUES AVE
M/S 164
SUNNYVALE CA 94088

| Box | Description | Amount |
|---|---|---|
| 11 Nonqualified plans | | |
| 12a See instructions for box 12 | | |
| 14 Other | 12b | |
| | 12c | |
| | 12d | |

13 Stat emp / Ret. plan X / 3rd party sick pay

e Employee's name, address, and ZIP code
JEREMY N THACKER

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| 17 State income tax | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

Form W-2 Wage & Tax Statement Dept. of the Treasury-IRS OMB No. 1545-00

## Employee Reference Copy — W-2 Wage and Tax Statement 2017

Copy C for Employee Records

| Box | Description | Amount |
|---|---|---|
| 1 Wages, tips, other comp. | | 58423.28 |
| 2 Federal income tax withheld | | 10376.44 |
| 3 Social security wages | | 63099.09 |
| 4 Social security tax withheld | | 3912.14 |
| 5 Medicare wages and tips | | 63099.09 |
| 6 Medicare tax withheld | | 914.94 |
| d Control number | | 9FB/ |

Employer use only

c Employer's name, address, and ZIP code
FUJITSU AMERICA, INC
1250 E ARQUES AVE
M/S 164
SUNNYVALE CA 94088

| Box | Description | Amount |
|---|---|---|
| 11 Nonqualified plans | | |
| 12a See instructions for box 12 | C | 72.60 |
| 14 Other | 12b D | 4675.81 |
| | 12c DD | 3333.12 |
| | 12d | |

13 Stat emp / Ret. plan X / 3rd party sick pay

e Employee's name, address, and ZIP code
JEREMY N THACKER
45

| 15 State AZ | ID no. | 16 State wages, tips, etc. 58423.28 |
|---|---|---|
| 17 State income tax 2103.22 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

Form W-2 Wage & Tax Statement Dept. of the Treasury-IRS OMB No. 1545-0008

## 2017 W-2 and EARNINGS SUMMARY

Ultimate SOFTWARE — People first




You can file your U.S. federal and state taxes with TurboTax directly from your company's employee self-service system. To take advantage of this convenient feature you can log in to your UltiPro portal, view your Form W-2, and click on the Export to TurboTax link. You can also get started with TurboTax directly by scanning the QR code or by typing this into your web browser: https://turbotax.intuit.com/affiliate/ultipaper

This Earning Summary section is included with your W-2 to help describe portions in more detail.

1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 63894.09 | 63894.09 | 63894.09 |
| Less Exempt Wages | | | |
| Less Deferred Comp | 4675.81 | | |
| Less Housing/Transportation | | | |
| Less Dependent Care | | | |
| Less Sec 125 | 795.00 | 795.00 | 795.00 |
| Less Excess Wages | | | |
| Taxable Wages | 58423.28 | 63099.09 | 63099.09 |
| (Reported on Form W-2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

2. Employee W-4 Profile To change your employee W-4 profile information, file a new W-4 with the payroll department.

FIT: S 3       SIT Res: AZSIT C 0       SIT Work: AZSIT C 0

Page 1 of 1

# EXHIBIT T

Mar 30, 2016, 8:22:17 PM Eastern Time: <u>Me</u>: "How's life? We are both so busy, we never get to chat. I miss getting to talk with you."

Mar 30, 2016, 8:48:21 PM Eastern Time: <u>Tyler Mortensen</u>: "I know it's crazy, you're turning into a road warrior."

Mar 30, 2016, 8:49:14 PM Eastern Time: <u>Me</u>: "Life is good just busy. Trying to keep up with everything at work and keep everyone happy. Clint just put in his two weeks Notice"

Mar 30, 2016, 8:49:16 PM Eastern Time: <u>Me</u>: "I've never been part of any opportunity like this before. I can barely sleep because I feel like I'm in the gold rush."

Mar 30, 2016, 8:50:09 PM Eastern Time: <u>Me</u>: "BTW, working directly with Jason has changed our relationship COMPLETELY around. You were right that I would see him differently."

Mar 30, 2016, 8:50:54 PM Eastern Time: <u>Tyler Mortensen</u>: "Yea you are in a great position, I'm looking forward to seeing it all come in"

Mar 30, 2016, 8:51:16 PM Eastern Time: <u>Tyler Mortensen</u>: "And I'm glad it's working out, I think it's changing his perspective too, which is good"

Mar 30, 2016, 8:51:41 PM Eastern Time: <u>Tyler Mortensen</u>: "Jason's a direct path to Rob"

Mar 30, 2016, 8:51:59 PM Eastern Time: <u>Me</u>: "So is my 23 year old gf �"

Mar 30, 2016, 8:52:48 PM Eastern Time: <u>Me</u>: "It looks like Evan and Ross are picking up steam. I haven't even looked at SMB numbers this month"

Mar 30, 2016, 8:56:55 PM Eastern Time: <u>Tyler Mortensen</u>: "That's funny and sounds about right"

Mar 30, 2016, 8:57:17 PM Eastern Time: <u>Tyler Mortensen</u>: "Yea they are doing well. I have s feeling Miles looking for another job"

Mar 30, 2016, 8:57:37 PM Eastern Time: <u>Tyler Mortensen</u>: "SB will do 200 again this month which is good. Alex has done about 65"

Mar 30, 2016, 8:57:44 PM Eastern Time: <u>Me</u>: "Mike?"

Mar 30, 2016, 8:58:06 PM Eastern Time: <u>Tyler Mortensen</u>: "Oops, yes Mike S"

Mar 30, 2016, 8:58:14 PM Eastern Time: <u>Tyler Mortensen</u>: "He wants more money"

Mar 30, 2016, 8:59:14 PM Eastern Time: <u>Me</u>: "I haven't talked to him since that falling out a couple of weeks ago. It wouldn't surprise me. He's really entitled and impatient. He's talented and hustles but those other traits make it tough."

Mar 30, 2016, 9:00:21 PM Eastern Time: <u>Me</u>: "Don't repeat this but he lives with his mom. He is desperate to move out. So I wouldn't be surprised at all."

Mar 30, 2016, 9:01:09 PM Eastern Time: <u>Me</u>: "Ryan Hill quit his new job. I bet he'd have a change of attitude if we'd hire him back. Hard to get people up to speed"

Mar 30, 2016, 9:03:13 PM Eastern Time: <u>Tyler Mortensen</u>: "I didn't realize that. I know he's not making what he wants to and seeing Clint leave for s better base and upside will probably make him think even more about it"

Mar 30, 2016, 9:03:37 PM Eastern Time: <u>Me</u>: "I didn't know Clint was leaving."

Mar 30, 2016, 9:03:49 PM Eastern Time: <u>Tyler Mortensen</u>: "Ryan was good, it's frustrating that didn't work out because he knew what he was doing"

Mar 30, 2016, 9:03:59 PM Eastern Time: <u>Tyler Mortensen</u>: "Yes Clint put his notice in today"

Mar 30, 2016, 9:04:20 PM Eastern Time: <u>Me</u>: "Maybe the time apart would change things. Sometimes dramatic events make people see things differently."

Mar 30, 2016, 9:06:20 PM Eastern Time: <u>Tyler Mortensen</u>: "I think it's possible for sure. Not sure other people would be willing to try it again though. Just a guess, I haven't talked to anyone about it"

Mar 30, 2016, 9:07:54 PM Eastern Time: <u>Me</u>: "I don't know either. It's tough to do though. I do think he realizes what a special place and opportunity GPSI is. I don't know if he knows how to not be so disruptive though."

Mar 30, 2016, 9:09:52 PM Eastern Time: <u>Tyler Mortensen</u>: "Yea it's hard to change someone and would be risky to take that chance again. And he would have to go to the gov team which would mean Jason would definitely have to be ok with it"

Mar 30, 2016, 9:10:10 PM Eastern Time: <u>Tyler Mortensen</u>: "There aren't any positions open on the commercial side"

Mar 30, 2016, 9:14:12 PM Eastern Time: <u>Me</u>: "That's a tough sell. Where is Clint going?"

Mar 30, 2016, 9:19:47 PM Eastern Time: <u>Tyler Mortensen</u>: "Heat software"

Mar 30, 2016, 9:20:10 PM Eastern Time: <u>Tyler Mortensen</u>: "I think in just going to apply for the gov Midwest position and let"

Mar 30, 2016, 9:20:10 PM Eastern Time: <u>Tyler Mortensen</u>: " someone else manage �"

Mar 30, 2016, 9:20:57 PM Eastern Time: <u>Me</u>: "Dude, not to be discouraging but I don't know why you don't do that. Get rid of SMB and let Phil manage everyone else."

Mar 30, 2016, 9:21:21 PM Eastern Time: <u>Me</u>: "I think $250 to $500K per year is realistic for the next 3 years"

Mar 30, 2016, 9:21:45 PM Eastern Time: <u>Tyler Mortensen</u>: "It would be fun but probably not likely"

Mar 30, 2016, 9:22:22 PM Eastern Time: <u>Tyler Mortensen</u>: "It would be crazy though"

Mar 30, 2016, 9:24:39 PM Eastern Time: <u>Me</u>: "VZW owns(ed) government and they shit the bed. All the early adopters are ready to leave them and all the late adopters are ready to do it now. It's a good spot"

Mar 30, 2016, 9:25:41 PM Eastern Time: <u>Tyler Mortensen</u>: "Yea it is. It's pretty crazy"

Mar 30, 2016, 10:09:05 PM Eastern Time: <u>Tyler Mortensen</u>: "When you make $500k in a year I'll expect a steak dinner

THACKER65913

�"

Mar 30, 2016, 10:11:11 PM Eastern Time: Me: "You'll get more than that. I owe you a lot. I know you were joking but I'm not."

Mar 30, 2016, 10:11:38 PM Eastern Time: Tyler Mortensen: "I think you can make it happen"

Mar 30, 2016, 10:11:56 PM Eastern Time: Tyler Mortensen: "This year alone could be awesome"

Mar 30, 2016, 10:12:07 PM Eastern Time: Tyler Mortensen: "For you specifically"

Mar 30, 2016, 10:12:26 PM Eastern Time: Me: "Yeah, that part is really surprising. I thought this year was going to really suck"

Mar 30, 2016, 10:15:27 PM Eastern Time: Me: "Dude, I just saw that JP Pest ordered 27 Units and Easter Seals ordered 12. That's like Christmas"

Mar 30, 2016, 10:18:18 PM Eastern Time: Tyler Mortensen: "Lol good stuff"

Mar 30, 2016, 10:18:21 PM Eastern Time: Tyler Mortensen: "That's sweet"

Labels: Text, Inbox

# EXHIBIT U