M149305

# PRESS HARD... YOU ARE MAKING 3 COPIES
### FOR BEST COPIES - REMOVE FROM BOOK AND WRITE ON A HARD SURFACE

## VICTIM REQUEST FOR, OR WAIVER OF, PRE-CONVICTION AND / OR PRE-ADJUDICATION RIGHTS

| This form opts you in as a victim because there is probable cause that a crime has been committed against you. Opting in does not mean you are "pressing charges." Please keep this form for future reference regarding your case. | **1** | **<<FORM USE>>** |
|---|---|---|
| | ☒ Initial Contact ☐ Victim-Initiated Change(s) | ☒ By Phone/Mail DATE 5/25/17 ☐ In Person |

**2** **<<CASE IDENTIFYING INFORMATION>>**

REPORTING AGENCY: SCOTTSDALE PD   Phone #: 480.312.5000
Reporting Officer(s): M. MILLER   85C   Complaint/Report/Citation #: 17-11782
Location: 7201 E. HENKEL WY   Report/Citation Date/Time: 5/25/17 1500
Offense/Type of Crime: THEFT
☒ Felony   ☐ Misdemeanor   ☐ Petty Offense   ☐ Domestic Violence Issue

**3** **<<ARREST / DETENTION STATUS>>**

| SUSPECT NOT IN CUSTODY | SUSPECT CITED OR RELEASED / REFERRED | SUSPECT IN CUSTODY - ADULT | SUSPECT IN CUSTODY - JUVENILE |
|---|---|---|---|
| ☐ UNKNOWN ☒ KNOWN | ADULT ___ JUVENILE ___ | INITIAL APPEARANCE: | DETENTION HEARING: |
| ☒ ADULT | SUSPECT #1 | SUSPECT #1 | SUSPECT #1 |
| ___ JUVENILE | | | |
| SUSPECT #1 JEREMY THACKER   DOB | DOB   SUSPECT #2 | DOB   SUSPECT #2 | DOB   SUSPECT #2 |
| SUSPECT #2 ___ DOB | DOB   COURT | DOB   COURT | DOB |
| If an arrest/detention in this case is made, you will be notified at the earliest opportunity. If you are not notified of an arrest/detention within 30 days, you may obtain case status information by calling the law enforcement agency indicated in Box 2 above. | DATE:   TIME: If a citation is issued, the accused may appear at any time prior to the date and time shown. | DATE:   TIME: CUSTODIAL AGENCY: The adult suspect in custody will appear in court for an Initial Appearance within 24 hours of arrest. | DETENTION CENTER: The juvenile suspect in custody will appear for a Detention Hearing at the county Juvenile Court or Detention Center within 24 hours of detention, but may be released at any time prior to this hearing. |

**4** **<<VICTIM OR VICTIM'S LAWFUL REPRESENTATIVE>>**

**A.** Who was the crime or offense committed against?
Victim: GPS INSIGHT   Sex: ☐ M ☐ F Birth Date: ___

**B.** Lawful Representative: ROBERT DONAT   Sex: ☒ M ☐ F Birth Date: ___   Relationship to Victim: ___

If lawful representative, check (one) of the following which applies:
☐ The victim has designated me as his/her lawful representative.   ☐ The victim is incapacitated or deceased and I am an immediate family member.
☒ The victim is a legal entity (corporation, partnership or business).   ☐ The victim is minor child and I am a parent, an immediate family member or legal guardian.
☐ The victim is a vulnerable adult & I am the legal guardian.

**C.** How can you be contacted?   What is your language preference? ☒ English ☐ Spanish ☐ ___
Name: ROBERT DONAT
Mailing Address: ___   Apt: ___
Home Address (if different): ___   Apt: ___
City: SCOTTSDALE   State: AZ   Zip Code: ___
Telephone: (Primary) ___   (Alternate/Message) ___
Email: ___

| **D.** ☐ I REQUEST my rights in this case. OR ☐ I WAIVE (DECLINE) my rights in this case. | (FOR REPORTING AGENCY USE ONLY) | NOTES / COMMENTS: |
|---|---|---|
| I understand that I must keep my mailing address and phone number current with the agency or court responsible for providing my rights. Failure to do so can mean that my rights are waived. I also understand in order to make any changes to the information supplied on this form, I must contact the appropriate agency or court. | ☒ REQUEST / WAIVER exception per A.R.S. § 13-4405(B) and § 8-386(B) | |
| Victim or Lawful Representative Signature / Date: | | |
| ☒ | | |

POST-VICTIM-CONTACT
ARREST NOTIFICATION: ☐ PHONE ___   ☐ MAIL ___
DATES / TIMES ___   DATE / TIME ___   INITIALS ___

**LAW ENFORCEMENT COPY – GREEN**   REV. 9/2016

EXHIBIT BN

| **From:** | Tyler Mortensen [/O=MEX05/OU=EXCHANGE ADMINISTRATIVE GROUP |
|---|---|
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TYLER.MORTENSENF37] |
| **Sent:** | 2/13/2015 8:23:46 PM |
| **To:** | Jeremy Thacker [jeremy.thacker@gpsinsight.com] |
| **Subject:** | FW: Jeremy Promissory Note |
| **Attachments:** | Employee_Loan_Jeremy_Thacker_20141231.docx |

Please see the thread below, our auditors need a copy of the loan agreement for the money allowed on the personal card and what you repaid. Wayne and Elliot put together a promissory note we need you to sign and return on Monday. Jason will need to be a witness. I'm out Monday but please make sure this gets taken care of. The auditors need this from Wayne asap.

Thanks,

**Tyler Mortensen**
(O) 480.663.9465 | (M) 480.285.4326

---

**From:** Wayne Holder
**Sent:** Friday, February 13, 2015 1:21 PM
**To:** Tyler Mortensen
**Cc:** Elliot Batcheller; Jason Walker
**Subject:** FW: Jeremy Promissory Note

Tyler,

Please have Jeremy sign as soon as possible and Jason witness the signature. I just need a scanned copy back to send to the auditors. Thanks!

Sincerely,

**Wayne Holder** | Controller



7201 E. Henkel Way – Suite #400
Scottsdale, AZ 85255
Direct: 480-663-9464
Toll Free: 1-866-477-4321 ext. 8045
Wayne.Holder@gpsinsight.com
www.gpsinsight.com

---

**From:** Elliot Batcheller
**Sent:** Friday, February 13, 2015 1:08 PM
**To:** Wayne Holder; Tyler Mortensen
**Subject:** Jeremy Promissory Note

Here you go, Jeremy will need to sign and someone (preferably Wayne) will need to countersign and scan to PDF.

Wayne, I have the template saved here and it probably makes sense to put the executed doc here as well.

This PC ▸ accounting (\\172.16.0.21) (Z:) ▸ Employees ▸ Jeremy Thacker

GPSI_00045276

# EXHIBIT BO



*Based on "new business" sales data provided by GPS Insight from January 1, 2016 through March 2, 2017.

THACKER 066329

# EXHIBIT BP



*GPS Insight limited the dates of income to 2016.
**Revenue is the total contract value of "new business" generated from January 1, 2016 through March 2, 2017.

THACKER 066328

# EXHIBIT BQ



*Rolling revenue generated for GPSI by Jeremy vs Jeremy's personal income and alleged personal expenses.
**Based on customer retention rate of 85% after 24 month contract expiration.

THACKER 066327

# EXHIBIT BR

Direct Messages between Jason Walker and Elliot Batcheller on **2017-03-06**

**JW**   **jason.walker (Jason Walker)** 2017-03-06 08:07 PM
I am now... thanks.

**JW**   **jason.walker (Jason Walker)** 2017-03-06 08:07 PM
Just read James' blog

**EB**   **elliot.batcheller (Elliot Batcheller)** 2017-03-06 08:08 PM
I'm hoping it's effective (obviously). I assume you talked to Rob?

**JW**   **jason.walker (Jason Walker)** 2017-03-06 08:10 PM
yeah... he is so funny. He totally is on the talk track that he would never had said anything if he knew we were firing Jeremy. I tried to explain that we did not know until friday morning.

**JW**   **jason.walker (Jason Walker)** 2017-03-06 08:14 PM
Gary wanted to know if you got the phone shut down?

**EB**   **elliot.batcheller (Elliot Batcheller)** 2017-03-06 08:15 PM
I did

**EB**   **elliot.batcheller (Elliot Batcheller)** 2017-03-06 08:16 PM
That's now the story so we'll just have to get used to it.

# EXHIBIT BS



3/7/17, 7:54 AM from Rob Donat

He would need your pin to do that though so probably not likely. I'm done for the day... have a good one.. ☐☐

3/7/17, 9:25 AM from Rob Donat

Talked with Jason and all is good. Told him I didn't tell him about us talking starting a month ago because it was meddling with his team but I wanted to try to help you out.

EXHIBIT BT

3/6/17, 11:49 PM from Rob Donat

Feel like you can trust someone ever? Don't hide your 4 digit code? Easy to remember

3/6/17, 11:49 PM from Rob Donat

He knew about that call. And that he was getting shit canned Monday.

3/6/17, 11:50 PM from Rob Donat

What's ironic is he knew it before any of us did

3/6/17, 11:51 PM from Rob Donat

He put together my rage about his Phone call which only you and I knew about with his 3 hour argument/conversation with Jason and Tyler which I didn't know about.

3/6/17, 11:51 PM to Rob Donat

I have a 6 digit code. I did not know he was getting fired today, I don't know how he did, and I am frankly still processing it all. I need to let my brain wind down and try to get sleep before the kids get up.

3/6/17, 11:52 PM from Rob Donat

Or maybe he just noticed me wanting to punch him in the throat all night at the game. That could have given it away.

3/6/17, 11:53 PM from Rob Donat

If he didn't tell you then you need to think about that obviously. I've been reeling for days over this too and you're not alone and I'm sorry.

# EXHIBIT BU

1/12/2017 07:17

I'll let you go now and have fun with the morning routine (if you even get around to reading this beforehand). Thanks for the morning text and good news. Hope to watch it with you someday. ☐

1/12/2017 11:58

Ok I'll let you go again. Thanks for not shutting me out it would kill me right now. ☐

1/12/2017 16:35

I've thought about this though seriously. I'm apparently obsessed with both you and going bankrupt

1/12/2017 16:37

I get that

1/12/2017 16:39

Yeah I heard about Jack...

LISSON0408

# EXHIBIT BV

Rob  Donat;+16026778000;;Biggest dick driving move I've pulled in years.;1/24/2017 12:15:56 PM;Received

Rob  Donat;+16026778000;;Ok?  Stomach still in knots WTF!?... maybe it was the green onions. ;1/24/2017 3:39:44 PM;Received

Rob  Donat;+16026778000;;Literally can't text about it ;1/24/2017 4:14:57 PM;Received

Rob  Donat;+16026778000;;Seriously Where would it be ;1/24/2017 4:24:19 PM;Received

Rob  Donat;+16026778000;;Driving ;1/24/2017 4:25:00 PM;Received

Rob  Donat;+16026778000;;Back to one;1/24/2017 4:16:06 PM;Sent

Rob  Donat;+16026778000;;Screw it I'm going 20;1/25/2017 2:48:55 PM;Received

Rob  Donat;+16026778000;;Just remembering details of last all American dinner.  Didn't do that on purpose.  You still coming?;1/25/2017 3:00:05 PM;Received

Rob  Donat;+16026778000;;??;1/25/2017 3:35:01 PM;Received

Rob  Donat;+16026778000;;I'll be early if you want to hang out ;1/25/2017 5:08:28 PM;Received

Rob  Donat;+16026778000;;Test ;1/25/2017 7:30:46 PM;Received

Rob  Donat;+16026778000;;"(Did you catch the ""fun"" word" though?) ;)"";1/26/2017 7:14:22 AM;Sent"

Rob  Donat;+16026778000;;Please be careful!;1/26/2017 8:42:56 AM;Sent

Rob  Donat;+16026778000;;Let me know when you're back in the ground. ;1/26/2017 8:43:12 AM;Sent

Rob  Donat;+16026778000;;Hilarious ;1/26/2017 8:44:26 AM;Received

Rob  Donat;+16026778000;;Now I will definitely let you know ;1/26/2017 8:44:42 AM;Received

Rob  Donat;+16026778000;;Just got to airport looking forward to getting up in the air again in this plane. (nostalgia sets in);??? 6:38:11 AM;Received

Rob  Donat;+16026778000;;Maybe your new BF will follow suit and we can rebound to each other ????;1/26/2017 9:10:07 PM;Received

Rob  Donat;+16026778000;;??;9/3/2062 1:40:50 AM;Sent

Rob  Donat;+16026778000;;Enjoy then and stop texting me thanks though and have a nice weekend.  I may see you on my way to this golf tourney at Wigwam ugh!;1/27/2017 7:42:42 AM;Received

Rob  Donat;+16026778000;;Hilarious and I have a video of that which is my favorite ;1/27/2017 7:03:52 PM;Received

Rob  Donat;+16026778000;;So cute.  She's a little you.  Have fun.;1/27/2017 7:22:39 PM;Received

Rob  Donat;+16026778000;;Drive safe ;1/28/2017 3:15:40 PM;Received

Rob  Donat;+16026778000;;Love how that guy is relucant;1/29/2017 4:20:44 PM;Received

Rob  Donat;+16026778000;;How fast were you going?;1/29/2017 6:47:41 PM;Received

Rob  Donat;+16026778000;;Told you I should have gotten you my spare radar detector!;1/29/2017 6:48:43 PM;Received

Rob  Donat;+16026778000;;?You and jack both ;1/29/2017 6:47:55 PM;Received

Rob  Donat;+16026778000;;Need autopilot ;1/29/2017 6:59:00 PM;Received

Rob  Donat;+16026778000;;Glad you're ok ;1/29/2017 6:58:51 PM;Received

EXHIBIT BW

| **From**: | Jason Walker [/O=MEX09/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4B4AAE4ACAEA485EBBC67737301C3F13-JASON.WALKER] |
| **Sent**: | 2/23/2017 4:14:45 PM |
| **To**: | Tyler Mortensen [tyler.mortensen@gpsinsight.com] |
| **Subject**: | per my other email |

Jeremy needs to understand that every time he does something like this it kills my ability to politic for him on Amerisure. That is not something that **we owe** him on as it would just be a nicety at this point to thank him for his efforts. He has to be a good corporate citizen regardless of any other issues surrounding him at this time for me to do anything for him on this issue and he is simply not doing that right now. I am going to get the details on this from Carrie.

**Jason Walker | VP of Sales**

**GPS Insight**
7201 E. Henkel Way, Suite 400 | Scottsdale, AZ 85255
866.477.4321 x8014
480.663.9480 (Direct)
**gpsinsight.com**



EXHIBIT BX

Feb 28, 2017, 11:41:29 AM Eastern Time: Robert Dennis: I have some notes for your timeline but haven't had a chance to write them down yet

Feb 28, 2017, 11:44:10 AM Eastern Time: Me: Aww, dude. Don't burden yourself with it. I hate having you vested in this shit too.

Feb 28, 2017, 11:44:58 AM Eastern Time: Robert Dennis: lol it's not a burden in the slightest

Feb 28, 2017, 11:45:58 AM Eastern Time: Me: FYI, link and Sig do fine together

Feb 28, 2017, 11:46:12 AM Eastern Time: Me: Hurtie and link are hilarious.

Feb 28, 2017, 11:59:58 AM Eastern Time: Robert Dennis: Hehe I figured they would. It's just when link is on the leash that he's an asshole. Unless he's already walking with another dog

Feb 28, 2017, 6:26:48 PM Eastern Time: Robert Dennis: MMS Received

Feb 28, 2017, 6:58:59 PM Eastern Time: Robert Dennis: They opened an alamo drafthouse theater in Chandler!

Feb 28, 2017, 7:08:21 PM Eastern Time: Me: I've heard those are sweet

Feb 28, 2017, 7:08:35 PM Eastern Time: Me: I'm down for Modest Mouse too. I need to make sure that I'm in town.

Mar 1, 2017, 10:04:21 AM Eastern Time: Me: I got a room at Hyatt on Sat so we can leave the festival and chill and store our stuff. It's got 2 beds too. We aren't going Sunday. So if you want to go, you're no longer trapped at festival.

Mar 1, 2017, 5:10:34 PM Eastern Time: Me: http://hackaday.com/2017/03/01/create-cheap-philips-hue-compatible-devices/

Mar 3, 2017, 4:40:29 PM Eastern Time: Me: I may need you to do me a big favor. You're free to say no for sure.

Mar 3, 2017, 4:40:49 PM Eastern Time: Robert Dennis: Whatever you need man

Mar 3, 2017, 4:42:07 PM Eastern Time: Me: I'm remotely wiping my desktop at work using TeamViewer. I think it should delete everything. It's like 90percent done. I just want to make sure no buttons have to be pressed after it reboots or something. Just walk in my office and click OK or whatever. I'll tell you when

Mar 3, 2017, 4:42:35 PM Eastern Time: Robert Dennis: lol no problem

Mar 3, 2017, 4:43:08 PM Eastern Time: Robert Dennis: I was kind of hoping for something a little more glorified than button pusher. But I'll take it!

Mar 3, 2017, 4:43:17 PM Eastern Time: Me: Based on Kristin's Convo with Rob, I think I should be prepared

Mar 3, 2017, 4:43:28 PM Eastern Time: Robert Dennis: Yes

Mar 3, 2017, 4:43:47 PM Eastern Time: Robert Dennis: Did you guys talk today?

Mar 3, 2017, 4:44:16 PM Eastern Time: Me: Yes. I'm at her place. She's sleeping.

Mar 3, 2017, 4:44:37 PM Eastern Time: Me: I don't know why she thought I'd be upset about what he said. I've known that about him for years.

Mar 3, 2017, 4:45:42 PM Eastern Time: Robert Dennis: Good. I think she was more worried about telling you because of what you said about "the next time you cry about it, I'm going to be forced to take action."

Mar 3, 2017, 4:46:29 PM Eastern Time: Me: I am. I don't know what she expects me to do.

Mar 3, 2017, 4:47:00 PM Eastern Time: Me: I'm going to hire a lawyer whether she's involved or not. I dont even need her as evidence any more.

Mar 3, 2017, 4:47:47 PM Eastern Time: Me: Anytime you're comfortable. You can run by my desk

Mar 3, 2017, 4:47:54 PM Eastern Time: Me: No hurry.

Mar 3, 2017, 4:49:45 PM Eastern Time: Robert Dennis: What do I need to do?

Mar 3, 2017, 4:51:10 PM Eastern Time: Me: Potentially nothing. It might just say OK or something like that. Idk

Mar 3, 2017, 4:55:24 PM Eastern Time: Me: I'll do it this weekend d

Mar 3, 2017, 4:55:29 PM Eastern Time: Me: Don't worry about it

Mar 3, 2017, 4:55:37 PM Eastern Time: Me: Please don't. I'll take care of it.

Mar 3, 2017, 4:56:10 PM Eastern Time: Robert Dennis: MMS Received

Mar 3, 2017, 4:56:10 PM Eastern Time: Robert Dennis: Didn't do anything. Sent you a pic of what it was doing when I walked in

Mar 3, 2017, 4:56:36 PM Eastern Time: Me: Perfect ;)

Mar 3, 2017, 4:56:40 PM Eastern Time: Me: Thanks homie

Mar 3, 2017, 4:57:39 PM Eastern Time: Robert Dennis: No problem

Mar 4, 2017, 1:11:25 PM Eastern Time: Me: Yo

Mar 4, 2017, 1:11:45 PM Eastern Time: Me: We've got a ticket today and can find one more. Y'all should come down.

Mar 4, 2017, 1:45:07 PM Eastern Time: Robert Dennis: Today's edm day right?

Mar 4, 2017, 1:45:50 PM Eastern Time: Me: Kinda. Chromeo and flume. Not electro

Mar 4, 2017, 1:52:29 PM Eastern Time: Robert Dennis: Ok let me get a few errands done and then I'll hit you up to see where everything's at

Mar 4, 2017, 1:52:44 PM Eastern Time: Me: Cool. Whip.

Mar 4, 2017, 6:23:06 PM Eastern Time: Me: MMS Sent

Mar 4, 2017, 6:23:14 PM Eastern Time: Me: MMS Sent

THACKER00929

Mar 4, 2017, 6:53:59 PM Eastern Time: Robert Dennis:  You two... You guys look great

Labels: Text,  Inbox

THACKER00930

# EXHIBIT BY

# Sales Policy for Sales Reps

Sales Policy
Link:https://kb.gpsinsight.com/sales-policy-for-sales-reps/ Last Updated:June 6, 2018



This is the GPS Insight 2018 Sales Policy. This document is designed to outline general sales policies for our 2017 plan year. Any specific questions, please contact your direct manager.

## Sales Plans and Quota

Your manager delivered your sales plan for 2018 and had you sign it. This sales plan defines your AMRR quota for the year. Should you miss any monthly quota two months in a row, you will be placed on a Performance Plan. Terms of your performance evaluation plan will be on a case-by-case basis with your immediate manager. You may be terminated from GPS Insight for failing to meet quota three consecutive months in a row.

## Teams and Territories

Our sales teams are organized into the following teams and territories.

| Team | Manager | Fleet Attributes | Quota |
|------|---------|------------------|-------|
| Small Business Level 1 | Phil Eatman | 1 to 25 Commercial Vehicles | $132,000 AMRR |
| Small Business Level 2 | Phil Eatman | 1 to 75 Commercial Vehicles | $200,000 AMRR |
| Commercial Level 3 | Phil Eatman | 76 to 500 Commercial Vehicles | $350,000 AMRR |
| Commercial Level 4 | Phil Eatman | 76 to 1000 Commercial Vehicles | $479,000 AMRR |
| Strategic Level 5 | Tyler Mortensen | 1001+ Commercial Vehicles | $900,000 AMRR |
| Government Level 6 | Tyler Mortensen | Any Size Government Fleet | $900,000 AMRR |

Canada and Mexico, or any location outside of the United States, is round-robined and subject to assignment by management on a case-by-case basis. Reps cannot self-generate leads in non-US locations that are outside of the Fleet Attributes/Sizes as defined by their team.

## Customer Account Assignments and Changes

From time to time GPS Insight sales management may change a sales territory due to changing circumstances that might include customer concentration, vertical alignment or sales staff restructuring. With the objective of treating all of the sales staff fairly, the Vice President of Sales may determine and/or allocate commissions on sales in previously assigned territories or account groupings from time to time and on a case-by-case basis.

Unless otherwise agreed in writing by the sales staff involved and their supervisor, the sales representative who relinquished an account (whether from territory realignment or otherwise) will be entitled to 100% of the eligible and earned commission on any sales opportunity recorded on the relinquished account provided that the sale transaction is recorded as revenue from the identified opportunity within 90 days of transfer of that customer account. If the sale occurs and revenue is recognized during that initial 90 day period, then the sales representative who was assigned the account will not be eligible for any commission on the sale opportunity that closes.

Any sales transaction that is generated by a sales representative from a customer who had not been assigned to them or is out of their assigned territory (whether in terms of region, size, or other) will receive 0% of the eligible and earned commission. The sales representative who had been assigned the customer account, or should have been based on territory, will receive 75% of the eligible and earned commission and quota credit.

If there are any questions whether a lead/opportunity is considered to be within a sales representative's territory, the sales representative will halt the sales process to get clarification from the Vice President of Sales.

Exceptions

GPSI_00109408

# Sales Policy for Sales Reps

Sales Policy
Link:https://kb.gpsinsight.com/sales-policy-for-sales-reps/ Last Updated:June 6, 2018



Any exceptions to this sales policy or your individual commission plan will not be binding upon GPS Insight unless done in writing and approved by Vice President of Sales.

## Commissions

Commissions are earned and paid on the 2nd pay cycle each month for the prior month's payable transactions, following payment in full of the customer's associated invoice from the device transaction. Commissions are paid on AMRR, not on units. Each month you will receive a commission statement outlining each transaction and the associated AMRR value on the order. Your commission statement will show you both the AMRR you transacted that month, as well as what AMRR is payable in commission, which might not be the same as the AMRR you sold in that period. Commissions are only paid out when the customer's associated invoice from the device transaction is paid in full. You get paid when GPS Insight gets paid. You will be paid the listed percentage of AMRR sold based on your quota-attainment, as set in your Compensation Plan. Any unpaid AMRR will be held in a bank and paid out to you in the period in which the customer pays the associated invoice. Purchase Orders do not count as payment; only paid-in-full invoices. Commissions earned within 120 days of an employee's termination date will be paid and all other commissions are forfeited by employee.

If you reach a new tier of AMRR payout, as listed in your Sales Plan, we will perform a "true-up" to retroactively pay you the difference between the payouts you have already received from your old rate to the new one. True-ups are based on paid orders, not booked orders.

Commission Eligibility is determined by the number of days between the customer's first purchase and the sales transaction.

| Team | Days Since Order |
| --- | --- |
| Small Business Sales | 365 |
| Commercial Sales | 365 |
| Strategic Sales | 730 |
| Government Sales | 730 |
|  |  |

## Order Processing and Discounting

Signed agreements/transactions must be delivered to Sales Operations by 5PM on the final business day of the month.
Reps can discount AMRR independently and cannot exceed 5% discount. Any discount above 5% must be approved by your immediate manager. Any discount on device rental fees must be approved by your immediate manager. Refer to the published Price List here in the Knowledge Base for approved pricing. Any request for 5/10 second intervals must be approved by Rob Donat via your immediate manager.

## Leads

Leads are managed and operated by our Lead Operations Manager. In order to continue receiving sales-qualified leads from the marketing team, you must adhere to the Sales Contact Strategy as defined in the KB article. Any evidence that the Sales Contact Policy was not followed may result in a reduced assignment of leads until compliance is met. Management reserves the right to assign any lead to any rep for any reason at any time. Only vehicle counts count towards assigning leads to the proper team.

## Rep Awards

In order to encourage healthy competition and to facilitate a rewarding work experience, GPS Insight recognizes the following recurring sales performance awards:

| Team | Month | Quarter | Year |
| --- | --- | --- | --- |
| Commercial Sales and Small Business Sales | $500 | $1500 | $5000 |

GPSI_00109409

# Sales Policy for Sales Reps

Sales Policy
Link:https://kb.gpsinsight.com/sales-policy-for-sales-reps/ Last Updated:June 6, 2018



| Team | Month | Quarter | Year |
|------|-------|---------|------|
| Strategic and Government Sales | $500 | $1500 | $5000 |
|  |  |  |  |

In order to be eligible for a sales award, reps must meet your AMRR quota for that period. In the event more than 1 sales rep meets quota in a period, the rep highest percentage attainment of monthly quota will win. New business is defined by AMRR on transactions where the customer age is less than 365 days.

## Signature and Acknowledgement

The GPS Insight sales policy, and your individual commission plan, shall not be considered by you as an employment agreement and does not in any way modify your employment relationship with GPS Insight, establish a term of employment with GPS Insight, or modify your employment status. Notwithstanding the foregoing, this sale policy and your individual commission plan is not intended to be a written modification of any written employment agreement that you may have with GPS Insight. The GPS Insight sales policy and your individual commission plan are subject to modification or termination at any time by GPS Insight. Upon modification, GPS Insight will endeavor to provide to you advance notice of any modification. Verbal modifications to your individual sales commission plan and the GPS Insight sales policy shall have no force or effect.

Any exceptions to this sales policy or your individual commission plan will not be binding upon GPS Insight unless done in writing and approved by the Vice President of Sales.

By your signature below, you acknowledge that you have received and read a copy of this sales policy and your individual commission plan, and that you agree to abide by the terms and conditions of this sales plan.

GPSI_00109410

EXHIBIT BZ

sole purpose of entertaining married women, seems awfully concerned with—perhaps even threatened by—Mr. Thacker's personal sex life.

## C. DONAT'S PATTERN OF RETALIATION BY DISCLOSING EMPLOYEE'S CONFIDENTIAL INFORMATION

Mr. Donat has a pattern of being careless with the personal information of his employees, often times disclosing it is a means of retaliation and control.

In October 2016, Mr. Donat divulged to Ms. Lisson that George Daminov (employee) had health issues due to Hepatitis A.

In December 2016, Mr. Donat divulged to Ms. Lisson that Evelyn Lawson/St. Louis (employee) required hospitalization and alcohol-induced rehab.

In March 2017, Mr. Donat divulged to Ms. Lisson that James Pattie (employee) requires shots due to his post-coital headaches.

Mr. Donat held even less restraint when it came to influencing Ms. Lisson's perception of her new love interest:

"One quick thing and I'm not trying to be a dick but please be very careful with that. Pretty sure that's herpes he's constantly got going on lip-wise and he's no stranger to strippers" (1/10/2017 - GPSI_00108146). Mr. Donat was referring to Mr. Thacker.

It is no wonder why Mr. Thacker took special precautions prior to his termination and later provided Mr. Donat with explanation: "When I became aware of your actions regarding my personal phone call, I took the final step in my preparation of wiping my machine. The reason for that was not to protect my commissions or to destroy property but to try and keep any personal information from being used as a weapon against me, Kristin, or our relationship since there were plenty of examples of that happening prior" (3/10/2017 - THACKER00665-THACKER00669).

Even Mr. Donat himself acknowledges this point in his response that same day: "I also understand you may not have wanted personal data in our possession, which seems to be why you wiped your PC but provided us with a Google Drive backup" (3/10/2017 - THACKER00665-THACKER00669).

Yet now Mr. Donat claims Mr. Thacker's actions regarding his computer to be malicious, despite the company retaining all pertinent emails relating to GPS Insight clients within their CRM system as well as Exchange Server.

Furthermore, shortly after Mr. Thacker's unlawful termination, Mr. Donat pulled a background report on Mr. Thacker with the sole intent of finding information he could use as a pretext to justify Mr. Thacker's termination. With blatant disregard for Mr. Thacker's privacy (and the law), Mr. Donat shared the report itself with Mr. Walker (and possibly others) in an attempt to negatively influence his perception of Mr. Thacker.

Mr. Donat also invited Mr. Dennis, Mr. Thacker's best friend, to an offsite meeting in May 2017 to discuss information on the report with him. During that meeting, Mr. Donat even speculated about Mr. Thacker being a danger to Ms. Lisson's children. Unsolicited, Mr. Donat again referenced information on the report to Ms. Lisson in an email in June 2017 (GPSI_00108383 - GPSI_00108389).

**D. DONAT'S OBSESSION WITH MS. LISSON**

Mr. Donat refused to produce any of his text messages with Ms. Lisson that are relevant to Mr. Thacker's claims. It was not until May 25, 2018 that Mr. Thacker was able to obtain a copy of those text messages—but only because they were produced by Ms. Lisson. It is not surprising that Mr. Donat did not want to produce these text messages—as well as hundreds of others still unproduced by Mr. Donat that had already been deleted by Ms. Lisson prior to Mr. Thacker's termination—because they show how truly jealous he was of Mr. Thacker's relationship with Ms. Lisson.

From the moment Ms. Lisson told Mr. Donat about her new relationship with Mr. Thacker (1/10/2017) until her termination (3/19/2017), Mr. Donat worked obsessively at winning her back through whatever means necessary. Of the messages between Mr. Donat and Ms. Lisson that have been produced to-date, Ms. Lisson sent 198 messages in comparison with Mr. Donat's 726. A snapshot of these messages that

Mr. Donat sent to Ms. Lisson during this period is provided in the following pages. (Only 6 of 60+ messages in this section were produced by Mr. Donat himself.)

"[…] I love you. And miss you. […] And I hope the 2 lost months don't damn any long term possibility together. Worst case I will have to go through what you did; which is my of own doing. And I'll be ok. Best case we can restart starting with friends and I promise not to […] Anything you need please ask" (1/10/2017 - GPSI_00108141).

"I get it and as long as it's equal opportunity distancing from all parties I will be a much much happier and more optimistic camper" (1/10/2017 - GPSI_00108141).

"Also; not to pile on JT but I just realized you live over there with him too now!!! What could go wrong? Please be deliberate and know I'm willing and able to get to the next level with you (either up OR down..." (1/10/2017 - GPSI_00108143).

"I know I'm just trying to reconcile the long wait for you to actually be 'on the market' with 'I've lost my long term chance possibly to JT'. 'I've made a huge mistake'" (1/10/2017 - GPSI_00108143).

"[…] This week has made me understand how much you mean to me and I just want to do what I can to preserve that and maybe move forward slowly some day even though I would move today […]. And you told me you are considering JT because it didn't mean anything and wouldn't go anywhere (my interpretation) […]" (1/11/2017 – GPSI_00108676).

"[…] Sorry, just venting and jonesing for you so I'm blowing you up with IM" (1/11/2017 - GPSI_00108675)

"It was me thinking you spent your first night alone not alone and I'm sorry to speculate and have paranoia but I can see how having Jeremy romantically would […]" (1/11/2017 - GPSI_00108683).

"I'll let you go now and have fun with the morning routine (if you even get around to reading this beforehand). Thanks for the morning text and good news. Hope to watch it with you someday" (1/12/2017 - GPSI_00108679).

1     "Ok I'll let you go again.  Thanks for not shutting me out it would kill me right

2 now" (1/12/2017 - GPSI_00108679).

3     "I've thought about this though seriously.  I'm apparently obsessed with both you

4 and going bankrupt" (1/12/2017 - GPSI_00108679).

5     "[…] I'm excited / scared / hopeful for your future starting tomorrow whether I'm

6 a part or watching from somewhere I'll be able to see it and be happy for you; I hope.

7 […] The best housewarming gift I can think to give you is to promise not to text you

8 tomorrow unless you ask. I might not make it past Saturday though" (1/13/2017 -

9 GPSI_00108680).

10     "[…] I only have 10 months coming at me and 3 1/2 years of knowing how

11 amazing you are to have to come to grips with losing it. You have more than that and

12 I'm sorry for losing it at the worst time possible for you. Know no matter what I am

13 thinking constantly of you; not hurting nearly as much (long motorcycle ride helped

14 along with seeing my doggie); and will do anything for you at any time; even if you

15 insist it's let go; which I will now; hoping maybe we can reconnect. Know that everyone

16 needs you because you are a precious resource. You are such an amazing […]"

17 (1/13/2017 - GPSI_00108685).

18     "And I forgot amazing employee too" (1/13/2017 - GPSI_00108686).

19     "I wasn't going to grovel for a hug again so I'm happy you sent me one. Needed

20 that and thank you and [] too" (1/13/2017 - GPSI_00108682).

21     "Also I will say when you're in love and hurting every flipping song on the radio

22 punctuates it.  I need books on tape (been listening mostly to classical guitar which by

23 the way I want (in my hypothetical future perfect world) to learn with you assuming that

24 might be interesting)" (1/16/2017 - GPSI_00108704).

25     "Love how you run from this subject… makes me so much less obsessed about

26 it. […]" (1/17/2017 - GPSI_00108704)

27     "Love you.  I hope you get better soon.  ??(ANYTHING you need me to do for

28 you please let me know.)" (1/19/2017 - GPSI_00108705).

JABURG | WILK
Attorneys at Law

"Hope you're asleep. Thinking of you tonight" (1/20/2017 - GPSI_00108705).

"[…] I'm trying really hard to choose my words and their unintended effects, and not create and more bullet list items for a future 'I'm not ok' text. […]" (1/21/2017 - GPSI_00108693)

"Kristi just told me she couldn't have hand picked anyone better […]" (1/21/2017 - GPSI_00108699).

"Btw not trying to pry and it's fine if you were out with employees... I'm much better about that trust me" (1/21/2017 - GPSI_00108705).

"Re reading our texts as I'm prone to do. […] Working from home today and will see you later I hope and I'll keep it professional. […]" (1/25/2017 - GPSI_00108698).

"Just got to airport looking forward to getting up in the air again in this plane. (nostalgia sets in)" (1/26/2017).

"Maybe your new BF will follow suit and we can rebound to each other" (1/26/2017 - GPSI_00108707).

"[…] is it wrong you're who I want to say good night to every night…" (2/8/2017 – GPSI_00108148).

"(Don't answer that question unless it's in the negative)" (2/8/2017 – GPSI_00108148).

Given that Ms. Lisson had already pleaded with Mr. Donat to let her go (1/17/2017 - GPSI_00108692), Mr. Donat eventually switched tactics. This time, he attempted to manipulate her into ending her relationship with Mr. Thacker by telling her that it was damaging her career, despite producing no evidence to support such concern. Ms. Lisson had a stellar performance record (Employee of the Year 2014) and was extremely well-liked within the company. Mr. Donat knew that she would be particularly vulnerable to this ploy, as Ms. Lisson was finalizing her divorce, and her ability to support herself and her children was highly dependent upon her job stability.

JABURG|WILK
Attorneys at Law

1  Additionally, several of Ms. Lisson's work-related friendships went back 10+ years, and

2  she had built her entire social life and support system around her office-mates.

3      "Business hat on.  Been debating. Trying to keep the Chinese wall in place and

4  also trying not to control/guide you.  Worried you may (or already have) damage/d your

5  credibility and frankly your acceptance by others within the company.  Further than is

6  already the case.  Not just Jeremy, but that getting out isn't painting you in a good light.

7  And I think you need to avoid confusing personal empowerment with business

8  empowerment.  You're not making friends lately" (2/13/2017 - GPSI_00108534).

9      "Very sorry to drop that ambiguously on you.  Trust me it is me caring for

10  BOTH you and the company that caused me to do it that way and there was no other

11  choice other than to say nothing.  I think it is better for you long term if I told you as

12  well as for the company.  I'm sorry if it hurts.  I promise you it's the last thing I wanted

13  to do" (2/13/2017 - GPSI_00108536).

14      "I hope you can understand I'm trying to help you avoid it worsening and it's a

15  real concern for me both personally and professionally (for both our sakes)" (2/13/2017

16  - GPSI_00108536).

17      "[…]  You have been very focused on a SHIT TON of personal bullshit lately

18  and have come through it as well as you could but I felt I needed (with much

19  deliberation) to be the bearer of bad news and bad impressions which to be fair are not

20  company-wide but could become so.  And I hope you can adjust in order to fix that (if

21  you want -- your call).  You know that. I've told you many times.  I care deeply for you

22  and wouldn't have said anything otherwise.  You deserve to have someone shout from

23  the rooftops about you and vice versa.  I didn't want you to forget you have a

24  professional and personal reputation though and colleagues who may not feel the same

25  as you do about it.  Again, sorry" (2/16/2017 - GPSI_00108544).

26      "[…] Miss you.  Last night weirdly I woke around 2 and couldn't get back to

27  sleep and it reminded me of the night I was going insane thinking about you 2.  Was

28

thinking about it again last night but it was the byproduct not the cause. […]" 3/1/2017 - GPSI_00108620).

"I really truly think the world of you (love you most of the time) and promise you this is hard for me to do -- I just think it's necessary for you to know the damage which I think you're doing / have done / will do. I'm sorry. I really am" (3/1/2017 - GPSI_00108621).

"I hate being in this position more than you can imagine. That song from earlier makes me wish I could go back 5 months and see where we are at. I wanted to weather a storm no one knew was hitting us and emerge after the debris was hauled away. Life not so easy I guess" (3/1/2017 - GPSI_00108621).

"(Oh, and also change everything when I could have)" (3/1/2017 - GPSI_00108621).

"I hate to break it to you but I took 10 minutes went back 1 day and have confirmed my opinion of Jeremy as a person. He hides how much of a complete arrogant condescending and unkind piece of shit (in my humble opinion) he is very well but he was nice enough to record it for me to listen to. […]" (3/2/2017 - GPSI_00108624).

"You suggested I look at call records" (3/2/17 - GPSI_00108624).

"Maybe I should have waited until after the game to share that. Sorry. Just want you to know what I think about him personally and I'm glad to let you listen. Doesn't affect anything just my opinion and I want you to know both of those things. He treats people like shit if he doesn't have to be nice to them for his own purposes. That's how I would sum it up. […] He is the infant I always felt he was. And I'm glad he can sell. Sorry if I come off mad at you. In a way I am for you not seeing through it. Sorry but true" (3/2/2017 - GPSI_00108625).

"Something good will come from all of this I hope. For all of us. And I'm sorry to pile on unmercifully JT but I'm not kidding first thing I uncovered was…" (3/3/2017 - GPSI_00108626).

"I'm sorry yesterday was horrible for me and I'm sure much worse for you. I hope you're ok. I promise I've made the last point I ever will on that topic. It's your life and my opinion is what it is and we are both entitled to our own on him. I am more than willing to share the backup for this with you if you want to hear it, and I hope you never experience this side of him first-hand" (3/3/2017 - GPSI_00108626).

Seizing his opportunity to further fan the flame among his executive leadership team, Mr. Donat expressed to Mr. Batcheller his reasons for wanting to terminate Mr. Thacker. Within this very justification, he knowingly lied to Mr. Batcheller by indicating that he serendipitously "stumbled" on Mr. Thacker's phone recording, despite later admitting that he purposely reviewed Mr. Thacker's phone activity due to a private conversation he had with Ms. Lisson.

"I want the fundamental reason for Termination to be categorized as his culture killing nature […] combined with the fact that I stumbled on his self-I recorded abusive dialogue […]" (3/6/2017 -  GPSI_00108196).

With Mr. Thacker finally out of the way, Mr. Donat assumed he would get his chance with Ms. Lisson again. What Mr. Donat did not expect, however, was that Ms. Lisson had already told Mr. Thacker about Mr. Donat's secret messages to her, many of which highlighted Mr. Donat's repeated attempts to undermine Mr. Thacker's good standing at work.

When Mr. Thacker referenced such unlawful actions in his termination meeting on March 6, 2017, Mr. Donat sent himself into a tailspin. He was desperate to learn what information Ms. Lisson shared and to further conceal his self-serving actions from his executive staff.

"He's a sociopath. I upgraded him today" (3/7/2017 - GPSI_00108635).

"I'm sorry but I care for you and want you to know you can trust me on this." (3/7/2017 - GPSI_00108635)

"Sorry I'm not texting you for this tonight. I wanted to know you're being misrepresented by him. And I suggest you ask Jason to play the recording for you. It's

not like he's telling people he's going to murder them. It's just a truthful unchecked cross section of who he is when no one is looking. And I am afraid for you" (3/7/2017 - GPSI_00108636).

"He put together my rage about his Phone call which only you and I knew about with his 3 hour argument/conversation with Jason and Tyler which I didn't know about" (3/7/2017 - GPSI_00108637).

"Or maybe he just noticed me wanting to punch him in the throat all night at the game. That could have given it away" (3/7/2017 - GPSI_00108637).

"I like having history saved with you" (3/7/2017 - GPSI_00108641).

"Wrong time to get sentimental but I am" (3/7/2017 - GPSI_00108641).

"I'm glad you replied. You can trust me Kristin I promise" (3/7/2017 - GPSI_00108641).

"[…] Jeremy told jason I called him a piece of garbage in the text I sent you which you supposedly showed him. A) he saw it somehow. B) he can't stand the truth so he glossed over what I actually called him." (3/7/2017 - GPSI_00108646)

"Please don't tell Jason I told you the part about trust. That was between us but please believe me it was said." (3/7/2017 - GPSI_00108651)

"Can you call me assp? Figuring some of this out and need to talk not text - 90% sure he just opened your phone at some point Thursday or Friday but I want to get timelines figured out and do some damage control with jason and Tyler and Elliot as they think you deliberately and maliciously what I sent you (which I had not told them I sent you and I had expected/trusted to remain between us)" (3/7/2017 - GPSI_00108646).

"I know you are incommunicado" (3/8/2017 - GPSI_00108652).

"It would be a great idea to call me tonight though" (3/8/2017 - GPSI_00108653).

"Guess not. MDMAybe later" (3/8/2017 - GPSI_00108653).

JABURG|WILK
Attorneys at Law

"[…] I need you to pull it together because I can't hear you when you're sobbing. I'm sorry, but I'm going to be tough here. I'm trying to help you and want to help you. What do you mean he has everything? What did he get and how did he get it? I need you to get tough here. Obviously you can't talk. We'll see if tomorrow goes well for you. I'm sorry you're in the position you are. I'm not there. I'm not pulling the strings. Do you know that you've thrown your life and your family's and your career over a guy who's fed you ecstasy over the last couple months and just mind-fucked you? And he's threatening our company, which you love, and he's throwing you to the wolves because he has a vendetta for me because he's a fuck-tard, and I don't put up with that. Do you realize you're going to lose your job over this because nobody trusts you and you haven't had the strength to just distance yourself—at least on paper? And I'm sorry that you're in love with him but […]" (3/8/2017- GPSI_00108723).

Even after Ms. Lisson voluntarily disclosed her past affair with Mr. Donat to all parties involved in Mr. Thacker's termination, Mr. Donat continued to operate under the delusion that his romantic relationship with Ms. Lisson would one day be viable.

"[…] I understand your request and will honor it but need you to know I want to help you here Kristin. I don't know what you were doing last night but it is very frightening and I hope you are ok. I will not let you down and don't want to lose you as a part of our company" (3/9/2017 - GPSI_00108656).

"I want to let you know I'm glad you sent that email. I hope it has lifted the same incredible weight off your shoulders as it did mine. I hope you are better and regardless of how you want to move forward I will do what I can and really whatever you need. We all hope it's still as part of GPSI. I'm sorry" (3/9/2017 - GPSI_00108656).

When Ms. Lisson still did not return Mr. Donat's messages, he attempted to reach her through an email to Mr. Thacker, which he hoped Mr. Thacker would share with her (as admitted in a later message):

"[…] I don't want people in the company who damage others. I never damaged Kristin other than emotionally by distancing myself […] In fact the 2 times I upset her

the most, she ran pretty much […] into Robert's and your arms.  I am glad she had someone to help her through that time.  I couldn't be the reason she definitively left a good guy and shouldn't have gotten involved to begin with, but as you know, she is a wonderful person. […] She is talented and valued and deserves to grow and succeed with GPS Insight and I am committed (quite obviously I think you should see) to doing everything possible to ensure her continued success and security. […] anything further will go through my lawyers should you or she choose to go that route.  It will be costly and fruitless, and we are certain of that.  I expect you to and that's your prerogative, but I hope she doesn't go that route as this situation can easily be forgotten […] Please don't jack her life up any further Jeremy" (3/10/2017 - THACKER00665-THACKER00669).

How quickly Mr. Donat's praise of Ms. Lisson turned into condemnation when she finally reported to Mr. Walker and Mr. Batcheller that Mr. Donat had been secretly communicating with her and sexually harassing her, despite Mr. Donat having earlier promised them that he would not contact her anymore (3/9/2017 – GPSI_00108305, 3/13/2017 - GSPI_00108312). Several days later while drinking heavily in a Nashville bar, and without advanced discussion with her supervisor, Mr. Donat terminated Ms. Lisson's employment via text message:

"Drama stops now. Period. Stop" (3/19/2017 - GPSI_00108657).

Even after Ms. Lisson had settled her legal issues after her termination, Mr. Donat continued to call her (4/5/2017 - GPSI_00108943), send her texts and brood over their history by feverishly liking/unliking past text messages—even pleading for her to block him when he couldn't stop himself (4/17/2017 - GPSI_00108660, 4/20/2017 - GPSI_00108661), and follow her on social media where he frequently favorited her posts, such as: "Quick reminder after a long week: you're going to die" (5/6/2017 - GPSI_00108453).

Perhaps the most disturbing message he sent to Ms. Lisson since his daily obsession with her started, came a full three months after he had terminated her. To

1  avoid an electronic record appearing on the company's mail server, Mr. Donat even

2  created a covert email account (alias "YYZ Man") from which to send the message:

3      "3 months today. Jeremy talking to Jen telling him about what I had told you

4  trying to help you was the final straw, FYI.  Too much drama.  Figured I would give

5  you that nagging little piece of the puzzle if it wasn't clear.  Last words I heard from

6  you after hearing you ad [sic] nauseam pretending he had hacked your stuff (Oh my god

7  he put my network together!) when you were beyond wasted were 'He knows

8  evveerrryytthing…' (then long scary silence) [I frantically called Lance and Jeremy to

9  go help you that night but I'm sure that and other correspondences and details went

10  missing] Ironically 2 Manhattans and Country Music in Nashville were probably the

11  catalyst that Sunday night #yaymanhattans. And also Kristi suggested I fire your ass and

12  she has vastly better judgment than I. #yaykristi It wasn't your feeble cowardly

13  assertion (although I'm guessing Jeremy suggested both ridiculous emails). I was the

14  only one battling (not bullying) to keep you employed and stupid to be doing so – and

15  then you lied, baited, and extorted me.  And I still let it go and you would have been

16  fine except for that call and your inability to take solid caring advice and not feed

17  Jeremy with it.  We are all vastly better off this way I'm sure you will agree.  We do.

18  #GPSIvsGypsyBothRuleClearly.   I'm mostly over it – I just ran into this thread

19  randomly and noticed the date being 3 months.  We have both spent a lot of time in both

20  CA and Chicago! I would be remiss on my last ever text to you (hopefully) if I didn't

21  tell you to ask Jeremy about the SD card full of naked pictures of his former conquests

22  he shared with employees and also about his jail time for a domestic altercation.  And

23  how he bragged about banging Jen in Justin's office. And the $15k in unauthorized

24  credit card charges… Buying presents for loved ones… He will have plausible

25  explanations thankfully so you can sleep well knowing you are in good hands.  Again,

26  good luck! Also, you're welcome for the free money.  Keith still hasn't billed me –

27  obviously he enjoyed so much spending time speaking with you.  Jeremy will burn

28  through it in no time and move on to his 24th residence, another bankruptcy, another

failed furniture/mortgage business and likely leave you with the summary judgment for a change. #disgusted #sosad #yourinstagrampostsareridiculousthankyouformakingthemgoawayit'slikeabadaccidenth ardnottowatchbutappreciatethepseudointellectualpandering #doingbackgroundchecksfromnowon #bye" (6/19/2017 - GPSI_00108383 - GPSI_00108389).

Mr. Donat's efforts to mislead his executive team about his obsessive behavior toward Ms. Lisson extend all the way to the court. Less than 48 hours after sending that message to Ms. Lisson, specifically with regard to his reason for terminating her (i.e., his intoxication coupled with her "inability to take solid caring advice" about Mr. Thacker), Mr. Donat testified to a judge in Ms. Lisson's unemployment hearing that "the manner in which she was terminated was quick and abrupt because of hacking issues we had with associates of Kristin's" (6/21/2017 - GPSI_00108944). Mr. Donat well knew by the time of her termination (3/19/2017) that there were no such hacking issues as evidenced by his own admission in his email to Mr. Thacker nine days earlier:

"[…] I understand the rock and a hard place she was in and the reason for the leaks to you and the lies about them. We are all willing to forget everything happened and start work Monday moving forward. […] You telling (lying to) us you had seen her texts from me and 'she didn't know that' painted you as a stalker/hacker and led to the ugly part of this week. And anguished me that she was duped and hacked vs. complicit. […] I understand the weight of the world she's been bearing and I'm sorry she has been as understandably stressed as she has been" (3/10/2017 - THACKER00665-THACKER00669).

Lastly, four months after Mr. Thacker's termination and two months after attempting and failing to prosecute Mr. Thacker for trumped up theft charges, Mr. Donat sent Mr. Thacker a birthday card as yet another bizarre instance of his obsessive nature (7/7/2017 - THACKER00813). He bragged to one of his executive staff (Gary

Fitzgerald) that it was "[…] weird that I remember his birthday. There are only four birthdays I remember and one of them is my own." Mr. Donat has three children.

### E. DONAT'S PATTERN OF RETALIATION

Unfortunately, Mr. Thacker and Ms. Lisson were not the first, nor the last, employees to experience Mr. Donat's retaliatory behavior whenever his reckless leadership style comes into question. Mr. Donat is widely known at the company for obsessing over his Glassdoor reviews. He frequently solicits raved reviews from employees and responds with vengeance when he receives a negative anonymous rating, not resting until he finds out who submitted it.

"[…] This is unquestionably written in anger by a disgruntled former employee who no longer works for the company, let go 7 days ago." (Glassdoor, 5/27/2016)

"[…] the employee who recently resigned from the company who this seems to be from specifically and vehemently denies having written it, and is upset that it looks like it is theirs." (Glassdoor, 1/3/2018)

In a particular instance, what was internally referred to as, "Glassdoorgate," Mr. Donat sent an all-company email referencing a negative employee review (100 words) and his public response to it (1,000+ words), which has since been deleted. In the email, Mr. Donat offered a reward for the anonymous reviewer to come forward:

"[…] We owe this company's success to great employees who have been able to remain nimble, productive, and loyal. GPS Insight has been and will continue to be loyal to them. […] We try to recruit and retain only these types of employees. […] I will now offer a 1 month severance payment to any employee who at this time does not feel that GPS Insight is the right place for them. […] If you choose to reveal and somehow prove yourself as the reviewer as well, I will add 1 additional month severance and wish you well. […] I don't want unhappy, disgruntled, and frankly, toxic and backstabbing employees here […]" (6/12/2016 - THACKER00112-THACKER00116).

In his follow-up all-company meeting to address the review, Mr. Donat shared a slide entitled, "Anecdotes: Few 'bad' ex-employees." (THACKER00846). The slide

contained names and pictures of past employees (Josh Pacheco, Patrick Gray, others) with highlighted pictures of their subsequent employment and "bad luck" since leaving GPS Insight, which Mr. Donat offered as proof that every person should consider their employment with him to be special and irreplaceable.

When Mr. Dennis, Mr. Thacker's friend, resigned from GPS Insight, Mr. Donat's retaliatory behavior became even more malicious, as he attempted to not only tarnish Mr. Dennis' reputation internally among his peers but also among Mr. Dennis' new coworkers and managers at his next place of employment.

For context, Mr. Dennis sent the following resignation letter to Mr. Donat, Ryan Driscoll (Mr. Dennis' manager), Mr. Walker, and Mr. Batcheller on August 4, 2017:

"[…] I do not want my career to be measured by my perceived loyalties or my continued friendships with past employees. […] especially when I do not agree with, and have voiced my opinion on, how things were ultimately handled with regard to Kristin and Jeremy. […] Since Jeremy and Kristin were terminated, there has been tremendous effort among the leadership of the company to justify their illegal termination, despite their previous contributions continuing to pay dividends to the current bottom line. […] It's even more difficult to hear the justification that it was a business decision when there are much easier business decisions to make about more obvious sub-standard employees. But since those employees are perceived to be loyal, they'll get a pass. […] I simply cannot be a part of that culture any longer. As I was imparted with some advice about appearances, allow me to provide my own: The emperor has no clothes" (8/4/2017 - THACKER00821-THACKER00829).

In response, Mr. Donat sent the following message directly to Mr. Dennis:

"[…] I am fairly certain you may have literally no idea what actually caused their downfall and it's not really my place to let you know. If it's not 100% clear and unambiguous to you, then you don't know what has been going on. […] If I want to buy a boat and a third plane and a fifth residence, guess what, it's my prerogative. I grew up in vastly worse economic conditions than probably every employee did. The last time I

saw my abusive and unsupportive Dad was when I was 6.  I'm not sorry for myself.  It was a blessing.  I built everything I've got and I try to ensure employees do better and make more money than they would elsewhere. […] Was there anything illegal about firing Jeremy?  No.  Immoral?  No.  He stopped working. Period.  And was toxic.  And a Dick (Jason's words but mine as well).  And it's an at-will work state.  And he turned down a generous severance package because he's an idiot. […] The emperor wears no clothes is not advice as you stated.  It's an adage.  Many don't understand where that saying comes from or what it means.  I do.  I am very aware of myself and what people think of me.  I welcome dialogue.  I live my life openly and am happy to hear others' concerns, criticism, and comments (typically upper managers, but also Al Dababneh and others willing to dare).  If I'm not wearing any clothes in your eyes, it's just because you weren't willing or brave enough to tell me as such.  Or because you've let others make up your mind for you. […] This email is between us.  I hope you have the individuality to keep it that way. […] I hoped for a tie in this one.  Mostly for your sake. First and only time they will win. […]" (8/4/2017 - THACKER00816).

When Mr. Dennis did not respond to him, Mr. Donat invited Mr. Dennis via text message to meet with him (GPSI_00108110).  Mr. Dennis again did not respond. Not having gotten the reaction he wanted, Mr. Donat resorted to sending another punishing email to Mr. Dennis, this time also copying Mr. Dennis' new employers on the message:

"[…] In [your resignation letter], you twisted my words and cited an inaccurate and biased understanding of your friends' justifiable (and perfectly legal) termination (leading to the ongoing prosecution of one of them for felony theft), and attempted to disparage me personally. You criticized our culture as well, which, as you know, has won us the number 2, 3, and 2 spot in the Phoenix Business Journal's Best Places to Work for the past 3 years. […] When employees abandon their job, purport to give notice via a disingenuous and combative email after being afforded a last minute week and a half vacation, and then resign on the day their bonus is paid out, I draw a line.

Instead I am disappointed but not surprised that you would do something so blatantly wrong for what might amount to a couple thousand dollars in your pocket and to make some final statement. This tarnishes your professional reputation and is petty. It truly amazes me that you are indignant about this and that you believe that we are in the wrong here. […]" (8/18/2017 - THACKER00821-THACKER00829).

In line with his already-established pattern of obsessive and self-indulgent behavior, Mr. Donat still could not stop himself from contacting Mr. Dennis, despite no efforts from Mr. Dennis to return any of his messages since resigning three weeks earlier.

On August 21, 2017 Mr. Donat texted Mr. Dennis with a group selfie with his former coworkers and included the taunting message, "Miss you" (GPSI_00108110).

A day after that, Mr. Donat sent Mr. Dennis another email with three separate pictures: Ms. Lisson in Mr. Donat's bed, Ms. Lisson's favorite drink (a Manhattan), and Mr. Donat laying in the same position on his bed to recreate the first photo. The subject line: "So clueless…" (8/22/2017 - GPSI_00108104).

Finally, a week later, Mr. Donat sent his last message to Mr. Dennis, which sums up his flippant attitude toward people who no longer serve his personal or financial interests:

"[…] You are the recent antagonist and dredger, not me. […] I don't like being blindsided or disparaged. You are a new member of #cultjeremy. Literally. […] Someday you'll wake up, hopefully. […] If you hadn't quit after you started a new job. #mybossismorallycorruptbutitriedtodefraudhimoutoutofptoandvacationifiwasluckyandhewasdumbenoughtopayit.imthesuperiormoralentitylolnot. I defend myself vigorously. Always. […] I'm sure you've got your version of that which helps you get to sleep nightly. I respect that but also frankly don't give a shit" (8/29/2017 - GPSI_00108105).

And that's the crux of the issues at hand: Mr. Donat uses the ego defense of displacement in which "uncomfortable feelings such as anger, frustration, envy, and guilt are displaced and projected onto another, often more vulnerable, person or group.

The scapegoated target is then persecuted, providing the person doing the scapegoating not only with a conduit for his uncomfortable feelings, but also with pleasurable feelings of piety and self-righteous indignation." (Neel Burton M.D., 2013).

In summary, all of Mr. Donat's attacks on Mr. Thacker's character (his alleged child abandonment, his alleged conflict with his former roommate, his alleged drug use, his alleged STDs and past sexual conquests, his alleged "trail of bodies in his wake," his alleged theft, and his alleged poor sales performance) is just another example of Mr. Donat throwing smokescreens to hide his own underlying motive for impeding Mr. Thacker's success. He continues to search for reasons to justify Mr. Thacker's termination (after the fact) and openly admitted Mr. Thacker's sales performance was never the issue:

"[…] There are 20 non negotiable iron-clad reasons we finally after 3 years pulled your plug before it got worse and worse and worse. And we are looking for/finding:docuMenting more. Just go out and work your magic for soMe other company and succeed like you clearly can. […] I love the money you bring in. But not the constant bitching about you I hear and morale issues. Money isn't worth it. Sorry. It's done. Move on. Good luck with the suit. I suggest you keep your money as I will defend it trivially; using LCRA residuals. Nothing we have let you go over is a protected category. Stop being a baby and just go out and get a job. […]" (3/9/2017 - THACKER00924).

And when all else fails, Mr. Donat relies on his endless supply of financial resources and complicit inner circle to ensure that his transgressions are continually overlooked and kept hidden from his next unsuspecting target:

"I think we are done finally and KL will go away quietly. Sorry for the problems gents. I will make it up to you and all those affected (minus JT). Keep this utterly confidential" (3/24/2017 - GPSI_00108133).

### F. GPSI'S SALES POLICY

GPSI, like any company, seeks new business. For that reason, GPSI includes language in its sales polices defining "new business as AMRR (revenue) on transactions where the customer age is less than 365 days." GPSI's sales awards are all predicated on "new business." To "encourage healthy competition and to facilitate a rewarding work experience," GPSI pays bonuses for Salesperson of the Month, Quarter, and Year for each division. In each salesperson's annual Commission Plan, GPSI offers incentives of $17,000 per year. GPSI's Sales Policy states that its objective is "treating all of the sales staff fairly."

Unfortunately, an analysis of sales data recently disclosed by Defendants has revealed inconsistencies between the written Sales Policy and how success was actually measured. While the Sales Policy clearly states that only "new business" is counted toward quota and sales awards, GPSI has been giving a select few salespeople quota credit and commissions for customers who are over 5 years old, while the remainder of the non-select salespeople are held to a different standard, based on new business only for the prior year.

A review of sales records shows the company's top salesperson's business from 2016 to March 2017 is almost entirely made up of "old" business, while Plaintiff closed all new business. When the Sales Policy is applied to the sales data provided by Defendants, it is evident that Jeremy is not a "substandard" performer. Instead, he doubled the production of his next closest comparator in 2016 and 2017.

The damage to Jeremy is real. If only new business were considered, as the policy requires, Jeremy would have received $5,000 for Salesperson of the Year in 2016, plus additional bonuses during 2016. In 2017, Jeremy would have won Salesperson of the Quarter in Q1 based on the revenue he generated prior to his termination. In addition to the $1,500 for that award, Jeremy's production shows he would have won several additional awards, including Salesperson of the Year. In total for 2016 and 2017, Jeremy likely lost over $15,000 in these types of bonuses alone.

JABURG|WILK
Attorneys at Law

1    In terms of soft costs with real costs impact, he would have received the respect

2  and recognition that goes with being the top sales agent. He would have been paid

3  consistent with the $300,000+ salary and commissions that he knows the "top" sales

4  agents were paid.

5    Due to the delayed production of the sales data by Defendants, Plaintiff has not

6  been able to fully analyze the data to determine all damages. Plaintiff, however, has put

7  together some preliminary graphs and charts to demonstrate his success and damages.

8  These charts represent the most accurate observations that Plaintiff could make based on

9  the limited amount of time between the Defendants' delayed production and the

10  deadline for final supplementation of disclosures.

11        2.    **Legal Theory**

12    As Mr. Thacker's employer, GPSI is liable for illegal discrimination and/or

13  retaliation under Title VII of the Civil Rights Act of 1964 because GPSI's adverse

14  employment actions were motivated by Mr. Thacker's association with Ms. Lisson—the

15  subject of Mr. Donat's sexual obsession and harassment including quid pro quo

16  behavior—and/or by Ms. Lisson's and Mr. Thacker's objections and Ms. Lisson's

17  refusal to be subjected to the ongoing sexual harassment by Mr. Donat. See 42 U.S.C. §

18  2000e-3(a) (prohibiting retaliation for opposing illegal discrimination under Title VII);

19  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011) (approving retaliation

20  claim based on harming person closely connected to employee engaging in protected

21  activity); *Holcomb v. Iona College*, 521 F.3d 130, 139 (2nd Cir. 2008) (approving of

22  associational discrimination claim under Title VII).

23    Here, it is apparent that even if Mr. Mortenson and/or Mr. Walker made the

24  adverse employment decisions free from any illegal motive, the illegal discriminatory or

25  retaliatory interference of Mr. Donat caused them and GPSI to engage in the material,

26  adverse employment actions including: refusing to compensate Mr. Thacker for the

27  Amerisure deal in the same manner that others have been compensated under similar

28  circumstances; giving Mr. Thacker a significantly smaller profit-sharing bonus than

39

Under common law, GPSI and Mr. Donat will likewise be liable for the same conduct under a claim of invasion of privacy. *See Hart v. Seven Resorts Inc.,* 190 Ariz. 272, 279, 947 P.2d 846, 853 (App. 1997) ("One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person", quoting Restatement (2d) of Torts § 652B). Such claim may be based on any form of improper investigation or examination into another's private concerns "as by opening his private and personal mail, searching his safe or his wallet, [or] examining his private bank account." *Id.* (quoting Restatement § 652B, cmt. b). Under this common law invasion of privacy claim, GPSI and/or Mr. Donat will be liable for all damages caused by the invasion and subsequent disclosure and misuse of the personal information obtained, as well as punitive damages.

## V. COMPUTATION OF EACH CATEGORY OF DAMAGES CLAIMED BY PLAINTIFF WITH A DESCRIPTION OF THE DOCUMENTS OR OTHER EVIDENCE ON WHICH THE COMPUTATIONS ARE BASED

Mr. Thacker discloses the following computation of damages claimed. The computations are based on the limited information currently available to Mr. Thacker and may be supplemented or amended upon receipt of further information:

### A. Counts One/Two (Title VII Violations/Intentional Interference)

1. Economic Loss:

Mr. Thacker has disclosed an Excel spreadsheet containing a formula and methodology for calculating his lost wages and future lost wages. He has also disclosed four printouts of that spreadsheet (Scenario # 1, 2, 3, and 4) showing what he contends are four reasonable estimates of his lost wages and future lost wages.[1] These four Scenarios are conservative because they do not take into account Mr. Thacker's opportunities for winning monthly, quarterly, and annual sales bonuses. The Scenarios

---

[1] These lost wage calculations are estimates based on the information that is currently available to Mr. Thacker.

also do not take into account any award of stocks or other form of compensation paid to any GPSI employees as a result of the recent acquisition by Sagemount.

2. Compensatory Damages including but not limited to emotional distress, pain and suffering, and harm to reputation: an amount to be determined by the jury;

3. Punitive Damages: amount to be determined by a jury.

**Counts Three (Defamation/Defamation *Per Se*)**

1. Economic loss: Mr. Thacker seeks lost wages and future lost wages, as outlined above.

2. Compensatory Damages including but not limited to harm to reputation: amount to be determined by the jury;

3. Punitive Damages: amount to be determined by the jury;

**Count Four (False Light Invasion of Privacy)**

4. Economic loss: Mr. Thacker seeks lost wages and future lost wages, as outlined above.

5. Compensatory Damages including but not limited to emotional distress, and pain and suffering: amount to be determined by the jury;

6. Punitive Damages: amount to be determined by the jury;

**Count Five (Violation of Fair Credit Reporting Act)**

7. Compensatory Damages including but not limited to emotional distress, and pain and suffering: amount to be determined by the jury;

8. Punitive Damages: amount to be determined by the jury;

**B. Count Six (Intrusion Upon Seclusion Invasion of Privacy)**

1. Compensatory Damages including but not limited to emotional distress, pain and suffering: amount to be determined by the jury;

2. Punitive Damages: amount to be determined by the jury;

**C. Other Remedies**

1. Prejudgment and Post-judgment Interest: amount to be determined by the Court after trial;

2. Attorneys' Fees: amount to be determined by the Court after trial;

3. Costs: amount to be determined by the Court after trial**.**

Although Mr. Thacker has not determined all evidence he intends to rely on at this early stage of the case, he will rely on his own testimony, the testimony of others identified above as having information related to compensation or bonuses, documentation related to the Amerisure deal and compensation paid to others under similar circumstances, documentation related to the profit-sharing bonus received by Mr. Thacker and others as well as documentation of Mr. Thacker and others relative seniority and productivity, and documentation related to Mr. Thacker's base salary, profit-sharing bonus, commissions, and benefits.

Any Insurance or Other Agreement Under Which an Insurance Business or Other Person or Entity May be Liable to Satisfy a Possible Judgment or Indemnify or Reimburse a Party for Payments Made to Satisfy a Judgment

Mr. Thacker is unaware of any such agreements.

DATED this 15th day of October, 2018.

**Jaburg & Wilk, P.C.**

/s/ Jeffrey A. Silence
Kraig J. Marton
Jeffrey A. Silence
Laura Rogal
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
Attorneys for Plaintiff Thacker

*Certificate of Service*

ORIGINAL of the foregoing emailed
this 15th day of October, 2018 to:

Carrie M. Francis
Stefan M. Palys
Michael A. Vincent
Stinson Leonard Street, LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Carrie.francis@stinson.com
Stefan.palys@stinson.com
Michael.vincent@stinson.com
Attorneys for Defendants GPS Insight, LLC

1

Timothy B. O'Connor
Schneider & Onofry, PC
365 East Coronado Road
Phoenix, Arizona 85004
toconnor@soarizonalaw.com
Attorneys for Defendant Donat

/s/ Kim Rogers

JABURG|WILK
Attorneys at Law

## A.     VERIFICATION

I, Jeremy Thacker, declare:

1. I am the Plaintiff in the matter of *Jeremy Thacker v. GPS Insight, LLC and Robert Donat,* United States District Court Case No. 2:18-cv-00063-DJH.

2. I have read the foregoing Plaintiff's Seventh Supplemental Disclosure Statement and know the contents thereof, and the same is true to the best of my knowledge, except as to those matters therein stated upon information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 15 day of October____, 2018.

_____
Jeremy Thacker

EXHIBIT CA

1  Carrie M. Francis  (020453)
   Stefan M. Palys  (024752)
2  Michael Vincent  (029864)
   **STINSON LEONARD STREET LLP**
3  1850 North Central Avenue, Suite 2100
   Phoenix, Arizona 85004-4584
4  Tel: (602) 279-1600
   Fax: (602) 240-6925
5  Email:  carrie.francis@stinson.com
           stefan.palys@stinson.com
6          michael.vincent@stinson.com

7  Attorneys for Defendants

8

9                    **UNITED STATES DISTRICT COURT**

10                       **DISTRICT OF ARIZONA**

11  Jeremy Thacker,                    No. 2:18-cv-00063-PHX-DJH

12                    Plaintiff,        **DEFENDANTS' TWELFTH
                                        SUPPLEMENTAL DISCLOSURE**
13  v.                                  **STATEMENT**

14  GPS Insight, LLC; Robert J. Donat,
    Individually and as Trustee of The
15  Robert Donat Living Trust Dated April
    19, 2017;
16
                     Defendants.
17

18          Defendants hereby make their *twelfth* supplemental disclosures under Federal

19  Rule of Civil Procedure 26(e) and the Court's General Order 17-08. Additions are in

20  *bold and italicized*.

21  **I.      State the names and, if known, the addresses and telephone number of all
             persons who you believe are likely to have discoverable information relevant
22           to any party's claims or defenses, and provide a fair description of the
             nature of the information each such person is believed to possess. The
23           following witnesses may also be called at trial:**

24          1.      **Jeremy Thacker**
                    **c/o Plaintiff's counsel**
25

26          Mr. Thacker has knowledge of his job responsibilities, duties, and performance at

27  GPS Insight, LLC ("GPSI"), including his sales performance and work on the

28  Amerisure deal. He also has knowledge of his relationships, both personal and

professional, with other GPSI employees including Kristin Lisson, Robert Donat, Tyler Mortensen, and Jason Walker, among others. Mr. Thacker has knowledge of his post-GPSI employment history and also of other facts that allegedly support his claims against Defendants. Mr. Thacker also has recordings of various meetings with GPSI employees, and that he has knowledge of his intentional destruction of evidence relevant to this case.

Mr. Thacker has knowledge of various issues bearing on his character. For example, that he had dated or tried to date numerous women at GPSI; and that he had a disk containing nude images of his prior girlfriends that he would share with others. Mr. Thacker has knowledge of his prior theft of funds from GPSI through misuse of a company credit card as well as his running up of another $4,500-$5,000 in improper company credit card expenses just prior to his termination. Mr. Thacker has knowledge of an instance in which he sought to have GPSI adjust the timing of his compensation so that he could report a lower salary amount to a court handling a request to modify his child support payment, upon the request of his parents who had adopted his children and were taking care of them. In other words, Mr. Thacker has knowledge of an incident in which he wanted GPSI to help him mislead a court so that he would not have to provide more support to his parents and children. Mr. Thacker also has knowledge of how he got Ms. Lisson to start using ecstasy, when she is a single mother of two small children, who had not previously used drugs. ***Mr. Thacker also has knowledge of charges to GPSI for fraudulent business expenses for times when he stayed at a fake AirBnB he created with a friend, from which he received income personally. Mr. Thacker also has knowledge of using the GPSI company credit card to pay for a plane ticket for a work friend to take him on a personal trip for his birthday. Mr. Thacker also has knowledge of falsification of his application and resume when hired by GPSI as to his college attendance. Mr. Thacker also has knowledge of issues discussed in his deposition taken on August 21, 2018, the deposition of Ms. Lisson taken on***

2

*August 14, 2018, and the depositions of GPSI management/employees taken on August 22-24, 29, and to be taken on September 5, 2018.*

        **2.**      **Robert Donat**
                  **c/o Defense counsel**

Mr. Donat is the founder of GPSI. He has knowledge of the general operations of GPSI and its structure and clients. He has knowledge of his relationships both personal and professional with Ms. Lisson, his limited role in overseeing Mr. Thacker, GPSI's sales and compensation for its sales employees (including Mr. Thacker), and of facts relating to the specific statements and actions that he is alleged in the Complaint to have made, and the bases for them. He also has some knowledge regarding the employment and termination and resignation of some GPSI employees, including but not limited to Mr. Dennis, Mr. Thacker, and Ms. Lisson. *Mr. Donat also has knowledge of issues discussed in Mr. Thacker's deposition taken on August 21, 2018, the deposition of Ms. Lisson taken on August 14, 2018, and the depositions of GPSI management/employees taken on August 22-24, 29, and to be taken on September 5, 2018.*

        **3.**      **Kristin Lisson**
                4520 North 2nd Avenue
                Phoenix, AZ 85013
                (602) 315-3843

Ms. Lisson has information regarding her personal and professional relationships with both Mr. Donat and Mr. Thacker, her employment with GPSI, communications between herself, her supervisor Jason Walker, Mr. Donat, and Mr. Thacker on topics relating to her and Mr. Thacker's job performance, and personal communications between herself and Mr. Donat or Mr. Thacker concerning their relationships, roles in GPSI, and the alleged defamatory statements. Ms. Lisson has knowledge of the fact that she did not disclose her consensual relationship with Mr. Donat to anyone at GPSI until after Mr. Thacker was terminated. She also has information regarding communications

amongst herself, Mr. Thacker, and Mr. Dennis concerning Mr. Donat. Defendants believe that Ms. Lisson has knowledge of Mr. Thacker's surreptitious recording of meetings with GPSI employees, and his intentional destruction of evidence relating to this case. Ms. Lisson also has knowledge of her production of texts and emails to Mr. Thacker to help him prepare this lawsuit, in violation of her severance agreement with GPSI. *Ms. Lisson also has knowledge surrounding the conspiracy between her, Mr. Thacker and Mr. Dennis to fabricate legal claims surrounding their separations from employment with GPSI, including but not limited to her "perpetuating of the lie," to upset Mr. Donat into thinking she had been hacked or injured so that he would react in a way she could claim was harassing, and that Mr. Thacker was dangerous. Ms. Lisson also has knowledge of issues discussed in Mr. Thacker's deposition taken on August 21, 2018, the deposition of herself taken on August 14, 2018, and the depositions of GPSI management/employees taken on August 22-24, 29, and to be taken on September 5, 2018.*

    **4.    Elliot Batcheller**
           **c/o Defense counsel**

Mr. Batcheller is GPSI's vice president of operations, and has information regarding GPSI's operations, the circumstances surrounding Mr. Thacker's theft from the company and the resolution of that issue, Mr. Thacker's character and performance, the circumstances surrounding the hiring of Ms. Lisson, *and the termination of Mr. Thacker. Mr. Batcheller also has knowledge of issues discussed in Mr. Thacker's deposition taken on August 21, 2018, the deposition of Ms. Lisson taken on August 14, 2018, and the depositions of GPSI management/employees taken on August 22-24, 29, and to be taken on September 5, 2018.*

    **5.    Jason Walker**
           **c/o Defense counsel**

Mr. Walker was Ms. Lisson's direct supervisor and was, at times, Mr. Thacker's

supervisor. He has knowledge regarding Ms. Lisson's work history, various comments made by Ms. Lisson and others concerning Ms. Lisson's personal relationships with Mr. Thacker and Mr. Donat, the circumstances of the meeting between Mr. Thacker, Mr. Mortenson, and Mr. Walker discussing various employment issues and the calculation of compensation on the Amerisure deal, including how that compensation compared to others' compensation; and Mr. Thacker's attendance problems. Mr. Walker has knowledge of a meeting around the time of Mr. Thacker's transfer to the government sales team in which Mr. Thacker was told that it was his last chance before being terminated. Mr. Walker also has knowledge of the meeting in which Mr. Walker and Mr. Mortenson terminated Mr. Thacker's employment, and the reasons for his termination. Mr. Walker was also the original supervisor who hired Mr. Thacker, and has knowledge of Mr. Thacker's work ethic and absenteeism, and a prior instance in which Mr. Walker had wanted to terminate Mr. Thacker over Mr. Thacker's theft from the company through misuse of a company credit card. Mr. Walker also has knowledge of Mr. Thacker's attempt to get the company's help to adjust his income to mislead a court so that it would award less child support to Mr. Thacker's parents, who had adopted Mr. Thacker's children. Mr. Walker also has information about the timing of his learning of a prior relationship between Mr. Donat and Ms. Lisson – specifically that he learned this after Mr. Thacker's termination. Mr. Walker has knowledge of a phone call Mr. Thacker recorded to a Hyatt support line made during business hours. ***Mr. Walker has knowledge and will testify that had GPSI known of the after acquired evidence described below that it would have terminated Mr. Thacker's employment. Mr. Walker also has knowledge of issues discussed in Mr. Thacker's deposition taken on August 21, 2018, the deposition of Ms. Lisson taken on August 14, 2018, and the depositions of GPSI management/employees taken on August 22-24, 29, and to be taken on September 5, 2018.***

CORE/3505308.0002/142243378.1

**6.**    **Tyler Mortenson**
                    **c/o Defense counsel**

Mr. Mortenson was, at times, Mr. Thacker's direct supervisor. He has knowledge regarding Mr. Thacker's work and performance history, the details of and the challenges with calculation of compensation for the Amerisure deal, and how that compensation related to that given to others. Mr. Mortenson has knowledge of the reason he did not more quickly approach Mr. Donat concerning Mr. Thacker's compensation request regarding Amerisure – namely, Mr. Thacker was asking for special treatment/a favor in terms of his compensation request, and it did not seem appropriate to broach that issue at the same time there were concerns about his performance at work. Mr. Mortenson also has knowledge about the meetings between himself, Mr. Walker, and Mr. Thacker regarding performance issues and issues relating to Mr. Donat and Ms. Lisson, the reasons for and events leading up to Mr. Thacker's termination, and the termination meeting with Mr. Thacker. He also has knowledge of Mr. Thacker's financial problems and misuse of the GPSI corporate credit card for personal expenses. Mr. Mortenson also has knowledge of Mr. Thacker's attempt to get the company's help to adjust his income to mislead a court so that it would award less child support to Mr. Thacker's parents, who had adopted Mr. Thacker's children. Mr. Mortenson has knowledge of a meeting around the time of Mr. Thacker's transfer to the government sales team in which he was told it was his last chance at the company. Mr. Mortenson also has information about the timing of his learning of a prior relationship between Mr. Donat and Ms. Lisson – specifically that he learned this after Mr. Thacker's termination. Mr. Mortenson also has knowledge of the Hyatt call referenced above. *Mr. Mortenson also has knowledge of issues discussed in Mr. Thacker's deposition taken on August 21, 2018, the deposition of Ms. Lisson taken on August 14, 2018, and the depositions of GPSI management/employees taken on August 22-24, 29, and to be taken on September 5, 2018.*

CORE/3505308.0002/142243378.1

7. **James Adamthwaite**
   **c/o Defense Counsel**

Mr. Adamthwaite was a coworker of Mr. Walker and may have copies of e-mails between Ms. Lisson and Mr. Thacker that are relevant to this case. He may also have knowledge regarding the character of Mr. Thacker. He has knowledge of a round-trip airline ticket purchased for him by Mr. Thacker as a gift, which Mr. Thacker paid for using the GPS Insight company credit card.

8. **Robert Dennis**
   Robert Dennis
   18220 North 68th Street, Apt. 169
   Phoenix, AZ 85054

Mr. Dennis worked at GPSI in digital marketing and was a friend of Ms. Lisson and Mr. Thacker. Ms. Lisson confided in Mr. Dennis about her work at GPSI and eventually limited details about her personal relationships with Mr. Donat and Mr. Thacker. Mr. Dennis quit GPSI shortly after Ms. Lisson and Mr. Thacker were terminated. Mr. Dennis may have information, including e-mails and text messages, concerning the personal relationships between Ms. Lisson, Mr. Thacker, and Mr. Donat. Mr. Dennis may also have dated Ms. Lisson and may have information about how Ms. Lisson felt concerning certain events involving Mr. Thacker and Mr. Donat, and of Mr. Thacker's animosity towards Mr. Donat. Mr. Dennis also has knowledge about the circumstances of his departure from GPSI and of his animosity toward Mr. Donat/GPSI.

9. **Lance Holt**
   **c/o Defense counsel**

Mr. Holt is Mr. Thacker's former roommate and coworker at GPSI. He has knowledge of Mr. Thacker's character, including Mr. Thacker's actions taken regarding their joint lease.

10. **Carrie (Sims) Race**
    **c/o Defense Counsel**

Ms. Race is an employee at GPSI. She has knowledge of Mr. Thacker's character and behavior towards GPSI employees while at work, including his abusiveness towards her. ***Ms. Race also has knowledge of issues discussed in her deposition on August 29, 2018.***

**11. Mike MacComiskey**
**c/o Defense Counsel**

Mr. MacComiskey is an employee at GPSI. He has knowledge of an instance in January or February 2017 where Mr. Thacker told him that Mr. Thacker knew he (Mr. Thacker) was going to get fired.

**12. Wayne Holder**
**c/o Defense counsel**

Mr. Holder is the controller at GPSI. He has knowledge of Mr. Thacker's misuse of the company credit card and a conversation between himself and Mr. Mortenson discussing Mr. Thacker's credit card embezzlement.

**13. Phil Eatman**
**c/o Defense counsel**

Mr. Eatman was Mr. Thacker's former manager and has knowledge of Mr. Thacker's personality, job performance issues, and the facts surrounding Mr. Thacker's misuse of the company credit card.

**14. Elizabeth Hajec**
**Address unknown**

Ms. Hajec is Mr. Thacker's ex-girlfriend and will testify at trial regarding the timing and nature of her relationship with Mr. Thacker, to provide impeachment evidence to counter false statements Mr. Thacker made in his deposition.

**15. Danielle Russell**
**Address unknown**

Ms. Russell had a sexual relationship with Mr. Thacker in December 2016 and

8

will testify at trial regarding the timing and nature of that relationship, to provide impeachment evidence to counter false statements Mr. Thacker made in his deposition.

16. **Alissa Hogan**
   **Address unknown**

Ms. Hogan was a GPSI employee who Mr. Thacker inappropriately touched while working at GPSI; she denies ever being touched on the "butt" by Mr. Donat as alleged by Plaintiff. She will testify at trial to provide impeachment evidence to counter false statements Mr. Thacker made in his deposition.

**II. State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.**

Defendants believe that Ms. Lisson and Mr. Thacker both gave written and/or recorded statements in conjunction with their applications for unemployment benefits; *and both have produced various surreptitious recordings made of other GPSI employees.*

**III. List the documents, electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, *expected to be used as Trial Exhibits*, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.**

Defendants possess the following categories of documents believed to be relevant to the claims and defenses:

- Communications stored on GPSI computer systems.

- Documents that reference or are otherwise about Mr. Thacker.

CORE/3505308.0002/142243378.1

1          -       Documents that reference the Amerisure deal.

2          In conjunction with the text messages already produced in this case, Defendants

3   identify the following phone numbers referenced in those texts so that Plaintiff can

4   more readily read those messages:

5          Kristin Lisson: 602-315-3843

6          Robert Donat – 602-677-8000

7          Jeremy Thacker – 480-745-4063 and 469-855-3464

8          Elliot Batcheller – 602-790-7680

9          Jason Walker – 480-236-2434

10         Tyler Mortensen – 480-285-4326

11         Robert Dennis – 480-444-8192

12         ***Defendants are producing documents bearing Bates numbers GPSI_00109633***

13  ***- GPSI_00109673.***

14  **IV.    For each of your claims or defenses, state the facts relevant to it and the**
         **legal theories upon which it is based.**

15

16         **1.      Title VII retaliation claim.**

17         Mr. Thacker's termination was not for a protected reason, *i.e.* it was not because

18  of any reporting of sexual harassment of Ms. Lisson. Mr. Thacker was simply a

19  substandard and disruptive employee, and the witnesses disclosed above will testify to

20  the following facts:

21         Mr. Thacker had previously embezzled money from GPSI through misuse of the

22  corporate credit card. In December 2015, Mr. Walker and Mr. Mortenson wanted to

23  terminate Mr. Thacker because of this fraud but were stopped by Messrs. Batcheller and

24  Donat, who wanted to give Mr. Thacker another chance. However, Mr. Thacker soon

25  blew his second chance.

26         Mr. Thacker had frequent behavioral issues at work, including being caustic and

27  abrasive with employees. He was difficult to deal with and was notorious for leaving a

28

CORE/3505308.0002/142243378.1

"trail of bodies" in his wake. Other coworkers did not like him and he made their jobs harder. Mr. Thacker was also frequently absent while having substandard sales performance. He was caught lying to GPSI about his whereabouts because of the GPS tracker in his car, which showed he was not at work as claimed.

GPSI attempted to help Mr. Thacker be a successful employee by moving him to government sales. In the process of moving Mr. Thacker to that team, GPSI and Mr. Thacker agreed that they would try to reach an agreement on compensation for the Amerisure deal in the future, when it had progressed to a point that it could be evaluated and calculated.

Ultimately, Mr. Thacker was simply too abrasive and disruptive to be kept as an employee, despite having some sales results in 2017. Messrs. Walker and Mortenson reached this conclusion over the course of several meetings with Mr. Thacker in late February and early March 2017. On the basis of his conduct and statements before and during those meetings, Messrs. Walker and Mortenson made the decision to terminate Mr. Thacker. At the time they made that decision, Messrs. Walker and Mortenson had no knowledge that Ms. Lisson had ever been in a relationship with Mr. Donat. *Mr. Walker made the decision to terminate Mr. Thacker after a heated meeting with Mr. Thacker on Thursday March 2, 2017, wherein Mr. Thacker indicated he would no longer be a productive employee (i.e., that he would only give 30% among other issues discussed). This meeting was surreptitiously recorded by Mr. Thacker. That evening and the following morning, on Friday March 3, 2017, Mr. Mortenson spoke with Mr. Walker and he then concurred in Mr. Walker's termination decision. Thereafter, Mr. Donat was asked to determine/approve the amount of severance to be offered to Mr. Thacker and he provided input as to how the termination decision should be communicated to Mr. Thacker.*

*Ms. Lisson made no complaint of sexual harassment until March 13, 2017, after being pushed to do so by an angry Mr. Thacker and their legal counsel.*

11

*Moreover, the complaint lodged only concerned text messages sent to Ms. Lisson after she lied to Mr. Donat about being harmed and/or hacked by Mr. Thacker. She concedes that all other aspects of her relationship with Mr. Donat were consensual and that she was a "willing participant."*

Nor is the fact that Mr. Thacker was dating Ms. Lisson sufficient to state a claim for retaliation under Title VII, which requires that Mr. Thacker prove that his protected conduct was the but-for cause of his termination. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 2525 (2013).

With respect to Mr. Thacker's claimed damages for economic loss on his Title VII and intentional interference with contract claims relating to Amerisure compensation, the Amerisure deal was never intended to be a commissionable program for Mr. Thacker and Defendants never agreed to such. Instead, as was discussed prior to Mr. Thacker's termination, Mr. Thacker was going to receive an earn out paid at either a small percentage of the total sales, or a small per unit spiff of $5-$10 per unit. Even assuming Mr. Thacker was entitled to $10 per unit, the current sales to date for Amerisure have been 1,519 units, or $15,190 in commissions.

Mr. Thacker also failed to mitigate his damages because he unreasonably lost his subsequent job with Fujitsu America because of his own actions.

Mr. Thacker's Title VII claims and any other claim asserting that his termination were "wrongful" are in fact the product of Mr. Thacker's intentional effort to get himself terminated in order to manufacture a claim to bring against GPSI. By December 2016, Mr. Thacker was already unhappy as an employee at GPSI based on his belief that he was not paid appropriately, among other issues. At that time, he was already considering leaving the company. Mr. Thacker eventually decided that, rather than simply leave, he would endeavor to get fired as a way to claim that his termination was "wrongful" and bring a claim through which he hoped to extract money he did not deserve from GPSI. He plotted with Kristin Lisson and Robert Dennis to accomplish

12

this goal, and they helped him both throughout 2017 and in this lawsuit in furtherance of his goal. By the end of February 2017, Mr. Thacker had sought advice from Mr. Kresin concerning a pay dispute. When Mr. Thacker succeeded in getting himself fired over that pay dispute, as he planned to do, Ms. Lisson then revealed to him that she had dated Mr. Donat. Mr. Thacker and his lawyer, David Kresin, encouraged Ms. Lisson to reveal her relationship with Mr. Donat to GPSI management after Mr. Thacker was terminated so that Mr. Thacker could take what would have been a complaint concerning his pay, and turn it into this "retaliation" claim. In sum, this claim is fabricated.

### 2. Intentional interference with contractual relations.

Factually, this claim fails. The premise is that Mr. Donat caused Mr. Thacker's termination. In fact, Messrs. Walker and Mortenson made the decision to terminate Mr. Thacker, based on a series of long-standing issues and meetings with Mr. Thacker in the days leading up to his termination.

This claim also fails as a matter of law, even accepting the faulty factual premise. Intentional interference with contractual relations requires "a contract between the plaintiff and a third party." *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 62, ¶ 54, 985 P.2d 535, 547 (App. 1998). There is no third party identified or alleged to exist in the Complaint. Any actions that Mr. Donat allegedly took to cause Mr. Thacker to be fired from GPSI were necessarily in Mr. Donat's capacity as an owner and manager of GPSI, even if those actions served Mr. Donat's personal interests rather than those of GPSI. When an interfering actor is an agent of the supposed third-party, there is no interference claim even if the actor is acting independently. *See id.* at 63, ¶ 58, 985 P.2d at 548; *see also Payne v. Pennzoil Corp.*, 138 Ariz. 52, 57, 672 P.2d 1322, 1327 (App. 1983) (employees acting for company could not be interfering with contract of the company); *Campbell v. Westdahl*, 148 Ariz. 432, 438, 715 P.2d 288, 294 (App. 1985) (party cannot intentionally interfere with its own contract). The only reason why Mr. Donat could have influenced Mr. Mortensen and Mr. Walker to terminate Mr.

13

Thacker was because Mr. Mortensen and Mr. Walker followed Mr. Donat's instructions as the head of GPSI—not because Mr. Donat was some third party.

### 3. Defamation.

Most of the statements identified in Mr. Thacker's complaint are opinion, not fact, and thus cannot support a defamation claim. Statements of pure opinion are not actionable defamation. *Glaze v. Marcus*, 151 Ariz. 538, 540, 729 P.2d 342, 344 (App. 1986).

*The other alleged statements, such as Mr. Thacker being a felon, having purchased toys illegally with the company credit card, having stolen, having stopped working prior to his termination, being the subject of an ongoing prosecution for felony theft and having STDs, were either never made, taken out of context, or are actually true. For example, Mr. Donat knew at the time of Mr. Thacker's termination that Mr. Thacker had been making fewer calls at work, and that Mr. Thacker had previously been forced to repay GPSI for personal expenses improperly charged to the company credit card.*

Finally, any statements Mr. Donat made to Ms. Lisson were made for her benefit and are thus privileged under Restatement (Second) of Torts § 595. Mr. Thacker will be unable to sustain his burden to overcome this privilege.

### 4. False light invasion of privacy.

Mr. Thacker cannot maintain a claim for false light invasion of privacy because a necessary element is that the statements be public. *Reynolds v. Reynolds*, 231 Ariz. 313, 318, ¶ 13, 294 P.3d 151, 156 (App. 2013). The statements alleged in Mr. Thacker's complaint were never disseminated to the public. Mere "publication" to coworkers, friends, or lovers is not the same as giving publicity for purposes of this tort:

> "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. ***"Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large***, or to so many persons that the matter must be

regarded as substantially certain to become one of public knowledge.

Restatement (Second) of Torts § 652D cmt. a (emphasis added) (cited in Restatement (Second) of Torts § 652E, which is followed in Arizona). False light invasion of privacy is concerned with newspaper articles and other truly public publications, not limited private distribution.

Finally, as above, the representations that Mr. Thacker claims are false are actually true.

### 5. Fair Credit Reporting Act ("FCRA").

Neither Mr. Donat or GPSI ever pulled a "credit report," as that term is meant within the FCRA, on Mr. Thacker.

### 6. Intrusion upon seclusion.

The common-law tort of intrusion upon seclusion is concerned with intrusion into one's private affairs in an improper manner. Restatement (Second) of Torts § 652B (1977). As above, no credit report of Mr. Thacker's was ever obtained. Had it been, however, credit reports do not contain private facts—they are all either public facts or facts obtained from third parties with whom Mr. Thacker voluntarily chose to do business (such as credit card companies). Similarly, the background report at issue here only contained public facts. Mr. Thacker had no expectation of privacy in such facts. *See Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001); *Daniel v. W. Asset Mgmt.*, 14-13573, 2015 WL 2405708, at *3 (E.D. Mich. May 20, 2015).

### 7. Intentional Interference with Prospective Business Relations.

Neither Mr. Donat nor GPSI interfered with any prospective business relation of Mr. Thacker's, so this claim factually fails.

### 8. *After acquired evidence.*

*The "after-acquired-evidence" doctrine permits an employer to avoid some liability by showing that it would have terminated an employee for wrongdoing discovered after a wrongful termination had the employer known of the wrongdoing*

*prior to the wrongful termination. McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 360–62, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); Shnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1412 (9th Cir.1996), cert denied, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); O'Day v. McDonnel Douglas Helicopter Company, 79 F.3d 756, 759 (9th Cir.1996). To establish this defense, GPSI must: (1) present after-acquired evidence of Plaintiff's misconduct; and (2) prove by a preponderance of the evidence that it would have fired Plaintiff for that misconduct. O'Day, 79 F.3d at 759. The employer has the burden of showing that, if it had such evidence, it would have discharged the employee. Id. at 1072 (citing O'Day, 79 F.3d at 758–759) (9th Cir.1995)). If Defendants prevail on the after-acquired—evidence defense, Plaintiff's remedies may be limited. Rivera v. NIBCO, Inc., 364 F.3d 1057, 1070 (9th Cir.2004) (citing McKennon at 879). After acquired evidence includes information and discovery in this case learned by GPSI after Plaintiff's termination that revealed additional wrongdoing, including but not limited to: Plaintiff's continued improper use of the GPSI company credit card to charge personal expenses and mischaracterize of business expense to defraud GPSI and for his personal gain (i.e., Air BnB arrangement with kickback from friend, buying airline tickets for other employee's birthday trip, etc.); his destruction of GPSI property; and Plaintiff's fabrication of his college education on his application and resume submitted to GPSI as part of his hiring. These facts will be established and testified to by the witnesses as detailed above.*

**V. Provide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered.**

*When deemed the successful party, Defendants will seek to recoup their attorney fees and costs expended as to all eligible claims. Defendants are not affirmatively seeking damages.*

CORE/3505308.0002/142243378.1

**VI. Specifically identify and describe any insurance or other agreement under which an insurance business or other person or entity may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse a party for payments made by the party to satisfy the judgment.**

GPSI as well as Mr. Donat may have coverage under a Hartford Commercial General Liability Policy (Primary and Umbrella). The Hartford has indicated it will defend subject to a reservation of rights. Mr. Donat may have insurance coverage under his Allstate Indemnity Company Personal Umbrella Policy, a copy of which is being produced. Allstate has indicated that it will defend subject to a reservation of rights. *Mr. Donat may also have insurance coverage under his Chubb policy. Chubb has indicated that it will participate in the defense subject to a reservation of rights.*

RESPECTFULLY SUBMITTED this 31st day of August, 2018.

**STINSON LEONARD STREET LLP**

By:  */s/ Carrie M. Francis*
Carrie M. Francis
Stefan M. Palys
Michael Vincent
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
*Attorneys for Defendants*

Copy of the foregoing emailed
this 31st day of August, 2018, to:

Kraig J. Marton
Jeffrey A. Silence
Jaburg & Wilk, P.C.
3200 N. Central Avenue, 20th Fl.
Phoenix, AZ 85012
kjm@jaburgwilk.com
jxs@jaburgwilk.com
*Attorneys for Plaintiff*

Timothy B. O'Connor
Schneider & Onofry, PC
365 East Coronado Road
Phoenix, Arizona 85004
toconnor@soarizonalaw.com
*Attorney for Defendant Donat*

*/s/ C. Roundtree*

17