**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Thacker, | No. CV18-0063-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| GPS Insight, LLC; Robert J. Donat, Individually and as Trustee of The Robert Donat Living Trust Dated April 19, 2017, | |
| Defendants. | |

Plaintiff Jeremy Thacker brings this action against Defendants GPS Insight, LLC ("GPSI") and Robert Donat. Plaintiff alleges claims for tortious interference with contract and prospective economic advantage, defamation, invasion of privacy, and violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*., and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"). Doc. 70.

The parties have cross-moved for partial summary judgment. Docs. 112, 113. The motions are fully briefed, and no party requests oral argument. Docs. 119, 123, 129, 133. For the following reasons, the Court will deny Plaintiff's motion, deny summary judgment on the tortious interference with contract claim, and grant summary judgment on the Title VII and FCRA claims and claim for tortious interference with economic advantage.

## I. Background.

Plaintiff held a sales position at GPSI from approximately June 4, 2013 until his termination on March 6, 2017. Since 2006, Donat has been the president, sole director,

and majority shareholder of GPSI's sole member, Sedonatech, Inc. He is also GPSI's founder and CEO. Docs. 70 at 1-2; 105 at 1. Donat had a romantic relationship with a GPSI employee Kristin Lisson, which ended in November 2016. Doc. 105 at 2. Lisson began dating Plaintiff in December 2016. Lisson's supervisors, Tyler Mortensen and Jason Walker, told Plaintiff and Lisson that their relationship did not violate company policy or involve a conflict of interest. *Id.* Plaintiff alleges that Donat began harassing Plaintiff and Lisson about the relationship and terminated Plaintiff for jealous and retaliatory reasons. Docs. 70, 129 at 1-2.

Walker, Plaintiff's direct supervisor, testified that he decided to terminate Plaintiff on the evening of March 2, 2017, in part because of a meeting earlier that day about Plaintiff's compensation in which Plaintiff was insubordinate. Docs. 112 at 3; 129-1 at 105-06. Walker testified that several other performance issues contributed to the decision, including problems with Plaintiff's attendance and attitude, as well as instances of untruthfulness in 2013. Doc. 129-1 at 105-06. Plaintiff was terminated on his next day at the office on March 6, 2017. Doc. 112 at 3.[1]

Defendants move for partial summary judgment on Plaintiff's claims for Title VII violations (Count 1), tortious interference with contract (Count 2), FCRA violations (Count 5), and tortious interference with prospective economic advantage (Count 7). Doc. 112. Plaintiff cross-moves for summary judgment on his FCRA claim. Doc. 113.

## II. Summary Judgment Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] As discussed below, the Court finds a dispute of fact about when Walker decided to terminate Plaintiff.

Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    Count 1: Title VII Violations.

Plaintiff alleges that GPSI discriminated against him because of his romantic relationship with Lisson and retaliated against him because he opposed Donat's sexual harassment of Lisson.  Doc. 70 at 11.[2]

### A.    Sex Discrimination.

#### 1.    Standard.

An employer violates Title VII when it subjects an employee to disparate treatment because of the employee's sex.  42 U.S.C. § 2000e-2(a); *see Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690 (9th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972).  A plaintiff can establish an inference of discrimination "by satisfying the prima facie elements from *McDonnell Douglas*: (1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga*, 847 F.3d at 690-91.

#### 2.    Discussion.

Plaintiff's complaint does not clearly identify the basis for his claim, but he states elsewhere that he was discriminated against because of his association with Lisson as a

---

[2] Plaintiff's complaint collapses his discrimination and retaliation allegations into one count, and neither is clearly pled.  *See* Doc. 70 at 11.  Plaintiff's briefing indicates that he asserts separate discrimination and retaliation claims (*see* Doc. 129 at 6, 11), and Defendants move on both (*see* Doc. 112).

member of a protected class, and that Donat began disparaging Plaintiff once he learned of Plaintiff's relationship with Lisson.  Doc. 129 at 1, 11, 3, 5; *see also* Doc. 112-2 at 9.[3] Plaintiff's own statements repeatedly show that his claim of disparate treatment is based not on the fact that he is a male or that he associated with a female, but on Donat's personal jealousy over Plaintiff's and Lisson's relationship.  GPSI argues that this is not sex discrimination cognizable under Title VII.  Doc. 112 at 6.

Plaintiff relies on a line of cases dealing with associational discrimination based on race or national origin.  *Id.* at 11; Doc. 112-2 at 8-13; *see, e.g.*, *Tovar v. Essentia Health*, 857 F.3d 771, 776 (8th Cir. 2017) (discussing examples).  He acknowledges that those cases involve only relationships between people of different races or national origins, but asserts that "there is nothing in any of [the] decisions that suggests their holdings are so limited."  Docs. 129 at 11; 112-2 at 8-13.  The Ninth Circuit appears to have treated favorably the notion that a plaintiff has a Title VII hostile environment claim when he is discriminated against based on his association with members of a different race.  *See McFinest v. GTE Serv. Corp.*, 360 F.3d 1003, 1118 (9th Cir. 2004).  But Plaintiff cites no Ninth Circuit authority for extending the race-based associational discrimination theory to a case like this, where Plaintiff does not allege that he was mistreated for associating with someone of a different race or national origin.

Some courts have extended associational discrimination to sexual orientation discrimination.  *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 128 (2d Cir. 2018).  But Plaintiff does not argue that he was discriminated against because he had a heterosexual romantic relationship.  He asserts that he was discriminated against because he dated Lisson, who formerly had a relationship with Donat.  Plaintiff states repeatedly that "Donat was motivated by his jealousy and Lisson's rejection of his sexual advances in favor of" Plaintiff.  *See, e.g.*, Doc. 129 at 8.  The alleged basis for the conflict is Donat's alleged

---

[3] Plaintiff also asserts that he was discriminated against because of his complaints to supervisors about Donat's alleged harassment.  Doc. 129 at 11.  This assertion more clearly relates to Plaintiff's retaliation claim.  He develops no theory and cites no authority for viewing this as a basis for non-retaliation Title VII discrimination.

jealousy of Lisson's relationship with Plaintiff, not that Plaintiff was a male dating a female.

"Title VII only prohibit[s] discrimination based on immutable characteristics associated with a worker's sex." *Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1080 (9th Cir. 2004). "[P]ersonal animosity is not the equivalent of sex discrimination," and Plaintiff "cannot turn a personal feud into a sex discrimination case." *Jura v. County of Maui*, No. 11-00338 SOM/RLP, 2012 WL 5187845, at *7 (D. Haw. Oct. 17, 2012) (quoting *Succar v. Dade Cty. Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000)); *see also Onscale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (Title VII is not "a general civility code for the American workplace"); *Northington v. H&M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013) (no protected activity where plaintiff complained about employee's maltreatment based on that employee's personal dispute with plaintiff over a relationship between plaintiff and the employee's ex); *cf. Maner v. Dignity Health*, 350 F. Supp. 3d 899, 904-06 (D. Ariz. 2018) (discussing cases and holding that defendant's favoritism of his romantic partner was non-cognizable under Title VII because it was not based on sex, but a personal relationship).[4]

Plaintiff has failed to establish elements essential to his prima facie case for which he would have the burden at trial, namely that he suffered an adverse employment action on the basis of his sex. *See Celotex*, 477 U.S. at 322. The Court will grant summary judgment to GPSI on Plaintiff's sex discrimination claim.

**B.  Retaliation**

**1.  Standard.**

A retaliation claim must establish that (1) the employee engaged in a protected activity, (2) the employer took an adverse employment action against the employee, and (3) the employer would not have taken the adverse employment action but for a design to retaliate. *Nilsson v. City of Mesa*, 503 F.3d 947, 953-54 (9th Cir. 2007); *see Univ. of Tex.*

---

[4] Plaintiff states briefly that GPSI is liable for creation of a hostile work environment (Doc. 129 at 8), but he fails to develop this argument and his complaint does not assert such a claim (*see* Doc. 70).

*Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (clarifying that employee must show "but for" causation). An employee engages in protected activity when he complains about conduct that he reasonably believes constitutes an unlawful employment practice under Title VII or participates in an EEOC investigation or proceeding. 42 U.S.C. § 2000e-3(a); *see Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). "An employee need not utter magic words to put his employer on notice that he is complaining about unlawful discrimination." *Ekweani v. Ameriprise Fin., Inc.*, No. CV-08-01101-PHX-FJM, 2010 WL 481647, at *6 (D. Ariz. Feb. 8, 2010) (citation omitted). Whether "analyzed as a requirement for protected activity or under the element of causal link, . . . an employer must reasonably be aware that its employee is engaging in protected activity." *Id.* (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982); *see also Quinones v. Potter*, 661 F. Supp. 2d 1105, 1126-27 (D. Ariz. 2009) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291-92 (2d Cir. 1998) for the proposition that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

### 2. No Protected Activity by Plaintiff.

GPSI argues that Plaintiff engaged in no protected activity and was terminated for his conduct, not for retaliatory reasons. Docs. 112 at 3, 6 n.3; 133 at 2, 5. According to Defendants, Plaintiff has misrepresented as protected activity a complaint he made to Mortensen about Donat's harassment of Lisson. Doc. 112 at 6. The alleged complaint was an email Plaintiff sent from his personal email address to Mortensen's personal email address in February 2017. Doc. 112-1 at 232. Plaintiff's message appears to be following up on an earlier conversation with Mortensen ("I told you today because I want you to have a heads up personally"), but indicates that Plaintiff does not wish for Mortensen to share the information, especially with Walker. Plaintiff's statements to that effect include:

> I am ONLY telling you things because first and foremost you're my friend.
> I'm not sure if that is right either though because it's unfair to ask you to not
> say anything when it [a]ffects others professionally and personally.

> Professionally, *I don't think it's worth telling anyone* because I don't think anyone is in a position to do anything about it. . . . If nobody is willing or ready do anything about it, I don't know what good it does for them to know.
>
> [Lisson] doesn't want [Walker] to know because she doesn't trust him to not do anything or to do enough if he did. *I agree with her.*

Doc. 112-1 at 232 (emphasis added). Plaintiff reiterated in a text message that he did not want Mortensen to share the information or take any action. Doc. 112-1 at 201-02, 204.

Defendants argue that this email was not a Title VII complaint. It was a personal communication, not a professional complaint about discrimination. And even if the email was protected activity, Defendants argue, the person who decided to terminate Plaintiff – Walker – was unaware of it before the termination decision. Doc. 112 at 6 n.3.

Plaintiff responds that disputes of fact exist about whether Walker knew of the email, but he cites no evidentiary support. Doc. 129 at 6. He also contends that he complained about unlawful discrimination in January 11 and March 2, 2017 meetings with Walker and Mortensen, but his cited support fails to mention discrimination or complaints of Title VII misconduct. *See* Docs. 129-1 at 112 (Walker's testimony that Plaintiff never told Walker that Donat was harassing Lisson, and only stated that he thought he was unfairly judged by Donat and another employee); 147 (Mortensen's testimony that he did not remember discussing Lisson with Plaintiff on January 11, 2017).

Plaintiff states that he complained of discrimination in oral and written statements to Mortensen. Doc. 129 at 6. But his citations rely again on Plaintiff's incorrect theory of sex discrimination based on his relationship with Lisson, or simply refer to issues regarding his compensation. *See* Docs. 129-3 at 17 (from the February 2017 email, stating that Plaintiff does not think Donat will ever "treat Kristin or [him] fairly after she has crushed [Donat's] ego by choosing [Plaintiff]"); 129-2 at 80 (Plaintiff's text message to Mortensen stating: "If [Donat] is not willing to pay me because of who I'm dating, I shouldn't be the only one willing to say it"); 129-2 at 84 (discussing his compensation in text messages with Mortensen: "I've got an owner breaking laws and every rule of decency in regards to my

- 7 -

personal life. . . . I think I'm better off saying nothing instead of trying to have a fair dialogue.").

Plaintiff also cites a transcript of his March 2 meeting with Walker and Mortensen, in which he stated that he wanted "a nonhostile workplace from the owner." But Plaintiff has corrected the transcript to clarify that he was referring to the Vice President, Elliot Batcheller, not Donat. *See* Doc. 129-1 at 29; *see also* Doc. 112 at 5 n.2. And the cited portion of the conversation does not mention Lisson. In any event, as Defendants note (Docs. 112 at 3; 133 at 3), mere assertions of hostility are insufficient to constitute protected activity without alleging discrimination or harassment based on age, race, sex, or another Title VII protected category. Put another way, complaints about conduct are not protected for purposes of a retaliation claim unless the conduct "fairly falls within the protection of Title VII." *See Maner*, 350 F. Supp. 3d at 907-10 (quoting *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) and collecting cases); *see also Aoyagi v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 3d 1043, 1059-60 (D. Haw. 2015).

Plaintiff has failed to show that he engaged in protected activity or that he had an objectively reasonable belief that GPSI's conduct violated Title VII. *See* 42 U.S.C. § 2000e-3(a); *Trent*, 41 F.3d at 526; *Dorn-Kerri v. Sw. Cancer Care*, 385 F. App'x 643, 644 (9th Cir. 2010) ("Summary judgment was proper on the Title VII retaliation claim regarding alleged unlawful billing practices because Title VII does not cover billing practices."); *Sherrill v. Blank*, No. CV-13-00266-TUC-RCC, 2013 WL 11312398, at *2 (D. Ariz. Nov. 26, 2013) ("Title VII's anti-retaliation provision does not make actionable retaliation against an employee that is not engaged in 'protected activity' within the meaning of Title VII."); *Padilla v. Bechtel Const. Co.*, No. CV 06 286 PHX LOA, 2007 WL 1219737, at *6 (D. Ariz. Apr. 25, 2007) ("[N]o retaliation claim exists under Title VII for an employer's refusal to rehire an employee for reporting safety violations to the EEOC. Elimination of safety violations in employment does not 'fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation.'").

/ / /

### 3.    No Protected Activity by Lisson.

Plaintiff cites the Supreme Court's decision in *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), and seems to assert that Defendants took adverse action against him to retaliate against Lisson because of her complaints and protected activity regarding sex discrimination she experienced. *See* Doc. 129 at 6-7.  In *Thompson*, the Supreme Court held that when an employer terminates an employee to retaliate against the employee's fiancé for the fiancé's protected activity, such misconduct would "dissuade[] a reasonable worker from making or supporting a charge of discrimination" for fear that their fiancé would be fired. 562 U.S. at 174.  The terminated employee is therefore within the "zone of interests" sought to be protected by Title VII and may bring a retaliation action for the termination. *Id.* at 177-78.  The Court declined "to identify a fixed class of relationships for which third-party reprisals [would be] unlawful," noting that firing a close family member would almost always be sufficient, and a milder reprisal against an acquaintance would not. *Id.* at 174-75.

To come within the holding of *Thompson*, Plaintiff must show that Lisson's complaints – for which he claims to have been punished – "fairly fall within the protection of Title VII" and were a but-for cause of his termination. *See Learned*, 860 F.2d at 932.  But Plaintiff's cited evidence fails to show that Lisson complained of conduct that violated Title VII, if at all, until March 9, 2017, three days after Plaintiff was terminated. *See* Docs. 129-4 at 27 (Lisson's text messages to Walker referencing an undescribed email and not mentioning discrimination or misconduct based on her sex); 129-1 at 90-92 (Walker's testimony that at some point after February 2017 Lisson told him that Donat caused her to have a panic attack and told her that her reputation was damaged from dating Plaintiff); 129-1 at 176-80 (Lisson's testimony that she told Walker in February 2017 that Donat sent her a message stating that her professional reputation was at risk).

Lisson testified that she "actually made [her] complaint on March 9," Doc. 129-1 at 177, and that she sent another email to Walker on March 13 – a week after Plaintiff's termination – to "make sure that he knew [her] complaint was sexual harassment, because

[she] did not include that in [her] first complaint," *id.* at 187-88; *see also* Doc. 129-1 at 195-97 (Lisson's declaration not describing any complaints before March 9). Lisson's pre-March 6 statements concern Donat's hostility, personal animosity, or questionable management style, not discrimination against her under Title VII. *See Jespersen*, 392 F.3d at 1080; *Northington*, 712 F.3d at 1065; *Succar*, 229 F.3d at 1345; *Aoyagi*, 140 F. Supp. 3d at 1059-60; *Jura*, 2012 WL 5187845, at *7. Lisson's complaints before Plaintiff was terminated, therefore, do not fairly fall within Title VII's protection and cannot form the basis for Plaintiff's retaliation claim under *Thompson*.

### 4. Retaliation Conclusion.

In sum, Plaintiff has failed to show that he or Lisson engaged in protected activity before his termination. Plaintiff's many arguments about whether Walker knew of Plaintiff or Lisson's complaints, whether Donat influenced or was involved in the termination, and allegations of Donat's derogatory statements about Plaintiff are unavailing because Plaintiff has not presented evidence from which a reasonable jury could find that he or Lisson complained of Title VII violations before he was fired. *See* Doc. 129 at 5-13.[5] Plaintiff has not met his burden to establish a prima facie case of retaliation. *See Nilsson*, 503 F.3d at 953-54; *Celotex*, 477 U.S. at 322. The Court will grant summary judgment on Plaintiff's retaliation claim.

## IV. Count 5: Fair Credit Reporting Act Claim.

Plaintiff alleges that Donat, acting with or on behalf of GPSI, obtained a consumer credit report about Plaintiff, after he was terminated, without a statutorily permissible purpose or under false pretense. Doc. 70 at 15. While Plaintiff's complaint does not specify the source of the report, Defendants seem to understand the claim to refer to a

---

[5] Plaintiff asserts there is "significant circumstantial evidence of retaliation" and fills a page and a half with unexplained case citations and only two citations to the record. *See* Doc. 129 at 12-13. The first record citation refers to the March 2 meeting where Plaintiff complained about compensation and stated he "would like a nonhostile workplace from the owner," but later clarified that he was referring to the Vice President, Elliot Batcheller. Doc. 129-1 at 29. The second citation does not include complaints about Title VII prohibited conduct. *See* Doc. 129-1 at 54. These undeveloped arguments are insufficient.

LexisNexis public records report that Defendants' prior counsel obtained. Doc. 112 at 13-14. The parties cross-move for summary judgment. Docs. 112, 113.[6]

### 1. Plaintiff Lacks Standing.

An individual plaintiff must satisfy three elements to establish Article III standing: (1) an injury-in-fact, (2) causation between the injury and the allegedly wrongful conduct, and (3) that the injury is likely to be redressed by a favorable decision from the Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To satisfy the injury element, a plaintiff's "pleaded injury must be both 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). To be particularized, "the injury must affect the plaintiff in a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). "To be concrete the injury must actually exist – that is, it must be real and not abstract or purely procedural – but it need not be tangible." *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-49 (2016) (internal quotations and citations omitted)).

When a plaintiff seeks damages for violation of a statutory right, such as Plaintiff's FCRA claim, he must "not only plausibly allege the violation but must also plausibly allege a 'concrete' injury causally connected to the violation." *Dutta*, 895 F.3d at 1172 (discussing *Spokeo*, 136 S. Ct. at 1549). The Ninth Circuit has held that the FCRA was "crafted to protect consumers' . . . concrete interest in accurate credit reporting about themselves." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017). To establish an injury, a plaintiff must show that an alleged FCRA violation "actually harm[s]" or "actually create[s] a 'material risk of harm'" to that concrete statutory interest. *Id.* at 1115-16.

Defendants assert that while Plaintiff has alleged a willful violation of the FCRA, he has no evidence that he suffered an actual harm because of the violation. Doc. 112 at 14-15. Plaintiff seems to misunderstand Defendants' standing argument. His response

---

[6] Plaintiff's response to Defendant's summary judgment motion declines to further respond as to his FCRA claim, and directs the Court to Plaintiff's motion and reply. Doc. 129 at 17; *see* Docs. 113, 123.

states that he has alleged damages in his disclosures and directs the Court to his reply brief. Doc. 129 at 17 (citing Exhibit AZ at 56). But the reply does not address standing; it reasserts that Plaintiff has alleged damages and cites his complaint. Doc. 123 at 11. Plaintiff's complaint alleges that Donat obtained the report for an impermissible purpose and used the information to disparage Plaintiff to his former co-workers and others, causing him emotional distress, reputation harm, and lost income and benefits. Doc. 70 at 15. But Plaintiff's citation to Exhibit "AZ 56" includes no evidentiary support for this allegation – it appears to be a one-page chart of text messages to and from Lisson. Doc. 129-4 at 10.

Plaintiff cites no evidence showing that the alleged FCRA violation caused real harm to his interest in accurate credit reporting, and he otherwise fails to address whether he has Article III standing to bring his FCRA claim. *See Robins*, 867 F.3d at 1116 (citing *Spokeo*, 136 S. Ct. at 1550). The Court will not search the record for supporting evidence that Plaintiff declines to identify. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (district courts "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found"); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact"); *see also Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Plaintiff has not shown that he has standing to assert the FCRA claim.

## 2. The FCRA Claim Also Fails on the Merits.

Even if Plaintiff had standing, his claim would fail on the merits. The FCRA was enacted in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007); *see also* 15 U.S.C. § 1681 *et seq*. The Act imposes liability on "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer," or "who obtains a consumer report from a consumer reporting

agency under false pretenses or knowingly without a permissible purpose." § 1681n(a), (b). A consumer report is defined as "any written, oral, or other communication of any information *by a consumer reporting agency* bearing on a consumer's credit worthiness[.]" 15 U.S.C. § 1681a(d)(1) (emphasis added). A consumer reporting agency means:

> any person [or entity] which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers *for the purpose of furnishing consumer reports* to third parties, and which uses any means or facility of interstate commerce *for the purpose of preparing or furnishing consumer reports*.

§§ 1681a(f) (emphasis added), (b).

Defendants argue that Plaintiff cannot show that the relevant LexisNexis entity is a consumer reporting agency under § 1681a(f), or that it expected its public records report to be used for the purposes in § 1681a(d)(1). Doc. 112 at 14. As courts in this district have observed, the definition of a consumer reporting agency breaks down into five elements: (1) the company must be paid for its work or work on a "cooperative nonprofit basis," (2) it must "regularly engage[] in" or be in the business of (3) "assembling or evaluating consumer credit information or other information on consumers," (4) "for the purpose of furnishing consumer reports to third parties," and (5) must use interstate commerce to achieve these aims. *Zabriskie v. Federal Nat. Mortg. Ass'n*, 109 F. Supp. 3d 1178, 1183 (D. Ariz. 2014) (quoting 15 U.S.C. § 1681a(f)); *see also Everts v. PMR Progressive LLC*, No. CV-15-02023-PHX-JJT, 2016 WL 1222821, at *3 (D. Ariz. Mar. 29, 2016). Establishing that an entity is a consumer reporting agency requires a showing of specific intent – a plaintiff must show that the entity "assembles or evaluates [consumer credit information] with the *intent* of providing a consumer report to third parties." *Zabriskie v. Fed. Nat'l Mortg. Assoc.*, 912 F.3d 1192, 1198-99 (9th Cir. 2019) (emphasis added); *see also Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 105-06 (2d Cir. 2019) (citing *Zabriskie* and discussing circuits that "have also concluded that the FCRA includes a specific intent requirement in its definition of a 'consumer reporting agency'").

Plaintiff asserts that LexisNexis is a consumer reporting agency "because it regularly compiles information on consumers for provision of reports to third-parties." Doc. 113 at 7. He refers to a subscription fee and asserts that LexisNexis "expects third parties will access this sensitive consumer information because it requires the user to certify they have a 'permissible purpose' for obtaining the Report," and that LexisNexis "is regularly in the business of collecting data . . . [and] information that is protected under the FRCA." *Id.* at 7-8. Plaintiff cites no evidence in the record supporting these assertions. *See id.* While other portions of Plaintiff's brief include citations to two pages from a LexisNexis webpage and the report that Defendants' counsel obtained (Docs. 113 at 3-4, 113-1 at 21, 64), Plaintiff fails to specifically cite and discuss evidence showing that LexisNexis is a consumer reporting agency under the FCRA, or that LexisNexis had the *purpose* of furnishing *consumer reports* to third parties under the FCRA.[7]

As Defendants note, Plaintiff's own citation to the report at issue in this case seems to weigh against finding such intent, stating:

> In addition to complying with [GLBA and the Driver's Privacy Protection Act ("DPPA")], you should understand that, under the Fair Credit Reporting Act (FCRA) (15 U.S.C. sec 1681), the data provided to you by using the LexisNexis products *may not be used* as a factor in establishing a consumer's eligibility for credit, insurance, employment *or other purposes by that act*.

Doc. 113-1 at 67 (emphasis added). Plaintiff contends that this disclaimer is irrelevant because his claim is not against LexisNexis. Doc. 123 at 3. But for Plaintiff to succeed under the FCRA, he must show that Defendants "obtain[ed] a consumer report from a consumer reporting agency," 15 U.S.C. § 1681n(b), and a consumer reporting agency is an entity that assembles consumer credit information *for the purpose* of reports that are

---

[7] Plaintiff's citation to the LexisNexis page refers only to the Gramm-Leach-Bliley Act ("GLBA"), not the FCRA. Doc. 113-1 at 64.

"expected to be used" in establishing the consumer's eligibility for credit, insurance, employment, or other purposes listed in the statute. 15 U.S.C. §§ 1681a(d)(1), (f).[8]

Plaintiff next cites several cases purportedly showing that courts always assume LexisNexis is a consumer reporting agency. *See* Doc. 123 at 2. But Plaintiff's primarily out-of-circuit citations are unavailing and misleading. *See Brown v. Lowe's Cos.*, 52 F. Supp. 3d 749, 758 (W.D.N.C. 2014) (LexisNexis conceding that the requirements of a different provision, § 1681k, were met); *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 3:11-CV-754, 2014 WL 4403524, at *1 (E.D. Va. Sept. 5, 2014) (introductory summary noting that LexisNexis Risk Data Management Inc. and other defendants challenged whether certain reports were "consumer reports"); *Moore v. Rite Aid Headquarters Corp.*, 33 F. Supp. 3d 569, 573 (E.D. Pa. 2014) (defendant assuming, for purposes of the motion to dismiss, that LexisNexis was a consumer reporting agency); *Bonarrigo v. LexisNexis Risk Sols. FL, Inc.*, No. 1:13-cv-02705, 2014 WL 65290, at *1 (M.D. Pa. Jan. 8, 2014) (recounting in background section the plaintiff's allegation that LexisNexis Risk Solutions Florida, Inc. was a consumer reporting agency); *Boatner v. Choicepoint Workplace Sols., Inc.*, No. CV 09-1502-MO, 2010 WL 1838727, at *1 n.1 (D. Or. May 6, 2010) (discussing parties' arguments regarding a right to indemnification or contribution under the FCRA and simply identifying how LexisNexis is referred to in other case documents); *Greenway v. Info. Dynamics, Ltd.*, 399 F. Supp. 1092, 1095 (D. Ariz. 1974) (restating statutory definition); *Porter v. Talbot Perkins Children's Servs.*, 355 F. Supp. 174, 177 (D.S.N.Y. 1973) (not discussing LexisNexis).

Plaintiff cites a hyperlink and asks the Court to take judicial notice that the Consumer Financial Protection Bureau ("CFPB") has issued a list of companies that are consumer reporting agencies, including LexisNexis Risk Solutions. Doc. 123 at 3 n.2.

---

[8] Defendants also argue that Plaintiff's evidence about LexisNexis is hearsay and inadmissible (Doc. 119 at 2), an argument to which Plaintiff does not meaningfully respond (*see* Docs. 129 at 17, 123 at 3). Plaintiff repeatedly contends that there is no dispute that "one of the LexisNexis entities owned by Reed Elsevier provided a report to Donat containing consumer information for a fee." Doc. 123 at 4. Like nearly all of Plaintiff's assertions, he cites no support in the record.

Plaintiff presents no argument showing that the requirements of Rule 201 are satisfied. *See* Fed. R. Evid. 201; *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). And he cites no part of the record showing that the LexisNexis Risk Solutions listed by the CFPB – among other LexisNexis entities – is the same one that generated the report at issue in this case (the first page of the report states only: "LexisNexis – a division of Reed Elsevier Inc." Doc. 113-1 at 22). Further, Plaintiff cites no evidence or authority showing that the CFPB website refers to LexisNexis as a "consumer reporting agency" within the meaning of the FCRA. *See* Supplementary Reports, LexisNexis Risk Solutions, CFPB (last visited July 1, 2019), https://www.consumerfinance.gov/consumer-tools/credit-reports-and-scores/consumer-reporting-companies/companies-list/lexis-nexis-risk-solutions.[9]

In sum, Plaintiff has cited no evidence showing which LexisNexis entity issued the relevant report, nor evidence showing that the relevant LexisNexis entity acted as a consumer reporting agency under the FCRA. That an entity acts as a consumer reporting agency in one case does not establish that the entity always so acts. Plaintiff must show that whichever LexisNexis entity produced the report assembles or evaluates information with the *intent* of providing a consumer report to third parties. *See Zabriskie*, 912 F.3d at 1198-99; *cf. Zabriskie*, 109 F. Supp. 3d at 1183 n.6 (court noting the limited scope of its holding and noting that it did "not find that Fannie Mae [was] at all times acting as a consumer reporting agency"); *Miller v. Trans Union, LLC*, 644 F. App'x 444, 454 (6th Cir.

---

[9] Defendants cite sources showing that several LexisNexis entities exist, and that some provide consumer reports while others do not. Doc. 119 at 4-5, 8. They state that Plaintiff declined to conduct discovery to determine which LexisNexis entity produced the report here and that he lacks competent evidence on this point. Plaintiff's reply asserts that he requested this information about the report, and that Defendants refused to disclose it. Doc. 123 at 3 n.3. But Plaintiff has the report about himself that Defendants obtained. Doc. 113-1 at 21. And he apparently concedes that he conducted no further discovery on this issue, relying instead on the MIDP's disclosure requirements alone (*see* Doc. 123 at n.3; *see also* Doc. 119 at 5-6), as he has done at other points in this litigation (*see* Docs. 55, 72). Plaintiff had not previously raised this purported discovery dispute as an outstanding issue precluding summary judgment, and he cites no part of the record showing that he requested and was denied this information. Court's Livenote Tr. ("Tr.") at June 20, 2019. Defendants spend some time discrediting Plaintiff's affidavit about LexisNexis on this issue, but Plaintiff does not appear to cite his affidavit in support of his arguments about whether the report was created by a consumer reporting agency.

2016) (citing favorably precedent dismissing FCRA claims for failing to cite evidence that entity met § 1681a(f)'s definition); *Adams v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 08-4708, 2010 WL 1931135, at *9 (D. N.J. May 12, 2010) (plaintiff must establish through discovery that the alleged report qualified as a consumer report under the FCRA). Plaintiff has therefore failed to establish an element of his FCRA claim – that the LexisNexis entity at issue is a consumer reporting agency.

Defendants also argue that the LexisNexis report does not contain the information required in a consumer report from a consumer reporting agency. Doc. 112 at 14; 15 U.S.C. § 1681a(d)(1). Plaintiff notes that the report contains a history of his bankruptcy filings, judgments and liens, employment, criminal offenses, traffic citations, residences, driver's license, home ownership and value, business and personal associations, and education. Doc. 113 at 10-11 (citing Doc. 113-1 at 21). He argues that this information is consistent with the seven categories of information used to determine whether a document is a consumer report in § 1681a(d)(1) – credit worthiness, standing, capacity, character, general reputation, personal characteristics, and mode of living. *Id.* But "[a] report will not be covered by the Act solely because it contains the type of information generally found in consumer reports." *Adams*, 2010 WL 1931135, at *7. That is only part of the statutory definition. Plaintiff must also show that the report was a communication "by a consumer reporting agency . . . which [was] used or expected to be used . . . for the purpose of serving as a factor in establishing the consumer's eligibility" for one of the listed purposes. *See* § 1681a(d)(1). Plaintiff acknowledges that whether the FCRA applies depends in part on "the expected use of the report by the 'consumer reporting agency' that prepares it." Doc. 113 at 10. Yet he cites no evidence on these other elements.[10]

_____

[10] Plaintiff cites § 1681x and states that a consumer reporting agency cannot "evade treatment as a CRA through corporate structuring, [and that a] corporate game of musical chairs to avoid liability is neither relevant nor effective." Doc. 123 at 4. Plaintiff does not develop or meaningfully explain this argument. He also misunderstands the cited provision, which is inapplicable. *See* 15 U.S.C. § 1681x. Plaintiff's reply includes several arguments concerning discovery disputes, attorney-client privilege, Donat's actual and intended uses of the report, and references to Title VII, none of which is relevant. Doc. 123 at 4.

Plaintiff has failed to show that the LexisNexis report is a consumer report produced by a consumer reporting agency, and has therefore failed to make a showing sufficient to establish essential elements of his FCRA claim for which he would have the burden at trial. *Celotex*, 477 U.S. at 322.

### 3. Attorneys' Fees.

If the Court finds that a party's "unsuccessful pleading, motion, or other paper filed in connection with an action under [§ 1681n] was filed in bad faith or for purposes of harassment," the Court "shall award to the prevailing party attorney's fees reasonable in relation to the work expended in response to the pleading, motion, or other paper." 15 U.S.C. § 1681n(c). "The plain language of this section authorizes the recovery of attorneys' fees only when a pleading, motion or other paper is *filed* in bad faith or for the purposes of harassment." *Smith v. HM Wallace, Inc.*, No. 08-22372-CIV-GOL, 2009 WL 3179539, at *2 (S.D. Fla. Oct. 1, 2009) (emphasis added); *see also Rogers v. Johnson-Norman*, 514 F. Supp. 2d 50, 52 (D.D.C. 2007) (§ 1681n(c) requires proof that the filing, not maintenance, of an action was in bad faith or for harassment); *Bagumyan v. Valero Energy Corp.*, No. CV 07-312 ABC, 2007 WL 1500849, *2 (C.D. Cal. Apr. 20, 2007) (same). Several district courts have also held that § 1681n(c) "does not authorize the imposition of attorneys' fees on a party's counsel," but only against the plaintiff himself. *Robinson v. Best Serv. Co., Inc.*, No. 5:16-CV-03346-EJD, 2017 WL 1354766, at *2 (N.D. Cal. Apr. 13, 2017) (citing cases). "Consequently, the scope of the § 1681n(c) inquiry is properly limited to an examination of Plaintiff's conduct, rather than conduct attributed to his counsel." *Id.* (citing cases).

Defendants seek to recoup fees incurred litigating Plaintiff's FCRA claim, arguing that flaws in the claim have been apparent from the beginning of the case. Defendants assert that they informed Plaintiff that there was no qualifying consumer report in this case and that he lacked standing. Doc. 112 at 16. They argue that his subsequent "pursuit" and "maintenance" of this claim entitles them to attorneys' fees. *Id.*; Doc. 133 at 11. But as noted above, the statute applies to the filing of the claim, not its pursuit and maintenance.

Defendants have not shown that the claim was filed in bad faith. Nor have they provided evidence that Thacker himself knew it was filed in bad faith. The Court accordingly will deny Defendants' request for attorneys' fees pursuant to § 1681n(c).

**V.      Count 2: Tortious Interference with Contract.**

Plaintiff alleges that Defendant Donat interfered with Plaintiff's employment contract with GPSI. Defendants seek summary judgment on two grounds: (1) Donat did not participate in the decision to terminate Plaintiff, and (2) Defendants' after-acquired evidence shows that Plaintiff would have been terminated by May 20, 2017 in any event, and any tortious interference damages should terminate on that date. Doc. 112 at 12-13.

**A.      Donat's Involvement in the Termination.**

Plaintiff cites the following evidence to show a genuine issue of material fact on whether Donat participated in his termination. *See* Docs. 129 at 13-14.[11]

Mortensen stated in the March 2 meeting that Donat asked him why Plaintiff was not in the office and what Plaintiff did at his computer because it looked like he was "just logging on to Home Depot and different things all day." Doc. 129-1 at 20.

In March 2017, after Plaintiff's termination, an email exchange between Donat and Plaintiff discussed several contentious issues. Donat wrote that he rarely saw Plaintiff do any work-related activity, and that when Walker and Mortensen investigated Plaintiff's calls they learned that Plaintiff had only "one material phone call" for that week. Docs. 129-2 at 87; 129-3 at 1-2. He also wrote that Walker reported to him that "after digesting [Plaintiff's] attitude from [the March 2] meeting he was *likely* to let [Plaintiff] go." Doc. 129-2 at 87 (emphasis added).

In a March 6, 2017 text to Lisson, Donat wrote that once Walker and Mortensen heard a recorded phone call of Plaintiff (on March 3), they decided "it was the final straw," and Donat agreed. Doc. 129-4 at 23.

---

[11] Plaintiff also cites an out of context conversation about an unclear event between him and a co-worker that does not clearly support his argument. Doc. 129-1 at 12.

In March 8 and 9 texts between Donat and Plaintiff, the two contentiously discussed Lisson and other issues. Doc. 129-4 at 25. Regarding Plaintiff's termination, Donat wrote that "we needed to part ways. [Walker] and [Mortensen] more than me. They agreed before I brought them the recording you [made]." *Id.*

In a March 6 message to Batcheller, Walker stated "[Donat] is on the talk track that he would never had said anything if he knew we were firing [Plaintiff]. I tried to explain that we did not know until Friday morning." Doc. 129-6 at 11.

In a March 7 email to Plaintiff, Lisson reported to him that Mortensen had just come into her office and "openly admitted that they had not made their mind up about how to proceed with [Plaintiff] until Friday." Doc. 129-1 at 240.

This evidence creates a factual issue on whether Walker decided to terminate Plaintiff on the evening of March 2, or whether the decision was made on March 3 after or during a discussion with Donat and Mortensen. *See* Docs. 112 at 3; 129-1 at 105-06, 108-09. As a result, the Court cannot grant summary judgment on the basis that Donat was not involved in Plaintiff's termination.

## B.    After-Acquired Evidence Defense.

### 1.    Motion to Strike.

Rule 12(f) states that the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *see also Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). "The decision to grant or deny a motion to strike is within the Court's discretion." *United States v. Lacey*, No. CR-18-00422-PHX-SPL, 2019 WL 317672, at *1 (D. Ariz. Jan. 24, 2019); *see also Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018). But "motions to strike are a drastic remedy and generally disfavored." *Holyoak v. United States*, No. CV 08-8168-PHX-MHM, 2009 WL 1456742, at *1 (D. Ariz. May 21, 2009).

Defendants raise the defense of after-acquired evidence, contending that GPSI would have terminated Plaintiff in any event based on his alleged misuse of company funds. Doc. 112 at 1-2. Plaintiff has filed a motion to strike the defense, arguing that

Defendants did not disclose it until their amended answer to Plaintiff's first amended complaint on August 31, 2018 – the deadline for completion of fact discovery. Docs. 111 at 1; 105 at 8; 23 at 2.

Defendants argue that Plaintiff's motion to strike is untimely because it was filed on September 28, 2018, more than 21 days after the answer was served on August 31, 2018. Doc. 116 at 3 (citing Rule 12(f)(2)). Plaintiff concedes that his motion is untimely, but asks the Court to exercise its discretion and consider the motion's merits because the defense was not apparent at the beginning of the case and he will be prejudiced. Doc. 120 at 10-11.

Plaintiff's motion was filed a week late, and the Court will therefore deny it as untimely. *See Sauceda v. United States*, No. CV-07-2267-PHX-DGC, 2009 WL 2372188, at *1 (D. Ariz. Aug. 3, 2009); *Lacey*, 2019 WL 317672, at *1. The Court further notes that the after-acquired evidence defense is well-established and commonly argued in wrongful terminations cases, specifically with respect to Title VII claims like those Plaintiff raised. *See, e.g.*, *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070-71 (9th Cir. 2004); *April v. U.S. Airways, Inc.*, No. CV-09-1707-PHX-LOA, 2010 WL 1196015, at *2 (D. Ariz. Mar. 23, 2010) (collecting cases); *see also O'Day v. McDonnell Douglas Helicopter Co.*, 959 P.2d 792, 793, 797 (Ariz. 1998) (holding federal after-acquired evidence defense applies in state law tortious wrongful termination actions); *Olson v. Roosevelt Elementary Sch. Dist.*, No. 1 CA-CV 12-0492, 2013 WL 2296553, at *3 (Ariz. Ct. App. May 23, 2013). Thus, Defendants' after-acquired evidence arguments could not reasonably come as a surprise to Plaintiff or prejudice him, especially given the record discussed below.

## 2. Partial Summary Judgment.

Defendants move for partial summary judgment on their after-acquired evidence defense, seeking to limit Plaintiff's remedies, if any, to the period between his termination on March 6, 2017 and May 20, 2017, because GPSI would have fired him on May 20 when it discovered he had again been misusing company funds. Doc. 112 at 1-2.

1    In 2014, Plaintiff signed a promissory note to GPSI agreeing to pay back $5,741.55

2    for personal expenses he had made on his company credit card. Doc. 112-2 at 17-54. In

3    2015, GPSI found that Plaintiff had again charged $4,726.50 in personal expenses to his

4    company card. Docs. 112-2 at 27-28, 47; 112-3 at 3; 116-1 at 6-24. Plaintiff agreed to add

5    the new charges to his existing note, and, according to Defendants, GPSI warned Plaintiff

6    that he would be terminated if improper charges were made again. Doc. 112-3 at 3. Two

7    months after his termination in March 2017, GPSI learned that Plaintiff had incurred

8    personal charges during 2016-2017 totaling $4,691.84. Doc. 112-3 at 2-3, 7-127. Before

9    Plaintiff initiated this action, GPSI contacted him about some of these new charges and

10   deducted the full amount from his post-termination paycheck. Doc. 112-3 at 2-3.

11   Plaintiff admits to making the personal charges, and did not object to their

12   deduction. Docs. 112-3 at 2-3; 116-2 at 11-21. But he asserts that the charges were

13   authorized, and he disputes that GPSI warned he would be terminated for continued

14   charges. Docs. 120 at 10; 116-3 at 11-25.[12]  He also cites evidence that other GPSI

15   employees used their company cards for personal purchases and were not terminated.

16   Doc. 129 at 15-16 (citing Docs. 129-1 at 137-38, 208).

17   This evidence presents a dispute of fact about whether Plaintiff was told he would

18   be terminated if he made additional personal purchases using his card, and whether

19   Defendants would have actually fired him by May 20, 2017 when they learned of his

---

22   [12] Regardless of whether the charges were authorized, Plaintiff knew of the facts
     constituting Defendants' after-acquired evidence defense before this litigation. He knew
23   about the charges he incurred, and he agreed to repayment and deduction of those expenses.
     He disclosed in this case a police report for theft that Donat filed against him in May 2017
24   for the charges, indicating that Donat considered the personal expenses impermissible. *See*
     Doc. 116-2 at 27-30; *see also* Doc. 120 at 7. On the same day that Defendants amended
25   their answer to include the after-acquired evidence defense, they disclosed the supporting
     factual and legal basis in their twelfth supplemental disclosure. Docs. 116 at 5; 116-2 at
26   42-44; 106. Plaintiff was aware of some of those facts before the disclosure as they related
     to Defendants' defamation defense. Plaintiff's original complaint, filed in January 2018,
27   alleged that Donat had falsely asserted Plaintiff "bought toys illegally with the company
     credit card." Doc. 1-1 at 9. Defendants' original answer denied that those statements were
28   false. Doc. 11 at 5-7. Thus, Plaintiff was well aware before this lawsuit that Defendants
     claimed he had misused company funds, and some of those facts were at issue in this case.

alleged misconduct. *See O'Day*, 959 P.2d at 799. The Court accordingly will deny summary judgment on the after-acquired evidence defense.[13]

**VI.    Count 7: Tortious Interference with Prospective Economic Advantage.**

Defendants argue that Plaintiff lacks evidence to support his tortious interference with economic advantage claim. In response, Plaintiff agrees that this claim should be dismissed. Doc. 129 at 17. The Court accordingly will grant summary judgment on the claim in favor of Defendants.

**IT IS ORDERED**:

1.    Plaintiff's motion to strike (Doc. 111) is **denied**.

2.    Plaintiff's motion for partial summary judgment (Doc. 113) is **denied.**

3.    Defendant's motion for partial summary judgment (Doc. 112) is **granted in part** as set forth above. Judgment is entered in favor of Defendants on Plaintiff's Title VII and FCRA claims, and his tortious interference with prospective economic advantage claim (Counts 1, 5, and 7). Judgment is denied as to Plaintiff's tortious interference with contract claim (Count 2) and Defendants' after-acquired evidence defense.

4.    Within 14 days of this order, the parties shall file a joint memorandum setting forth their positions, in light of these rulings, on any outstanding issues addressed during the conference call on June 20, 2019 (*see* Doc. 147) and on the pending motion for leave to serve a subpoena (Doc. 145).

Dated this 14th day of August, 2019.


*David G. Campbell*
_____
David G. Campbell
Senior United States District Judge

---

[13] Plaintiff also argues that Defendants have failed to plead sufficient facts to satisfy Rule 8's fair notice standard. Doc. 111 at 2. The Court need not address this argument because his motion to strike was untimely.